UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

SLEEPY'S, LLC,

                                  Plaintiff,

                   - against -

SELECT COMFORT WHOLESALE CORPORATION,
SELECT COMFORT RETAIL CORPORATION and
SELECT COMFORT CORPORATION,

                                Defendants.

-------------------------------------------------------------------- x

07 CV 4018 (TCP)(ARL)

**FIRST AMENDED
COMPLAINT**

        Plaintiff, Sleepy's, LLC ("Sleepy's" or "Plaintiff"), by its attorneys, Tannenbaum Helpern

Syracuse & Hirschtritt LLP, for its First Amended Complaint herein, alleges:

### The Parties

        1.      Sleepy's is a Delaware limited liability company with its principal place of business

at 175 Central Avenue South, Bethpage, New York 11714.

        2.      Upon information and belief, defendant Select Comfort Wholesale Corporation

("Select Comfort Wholesale") is a Minnesota Corporation doing business in New York.

        3.      Upon information and belief, defendant Select Comfort Retail Corporation ("Select

Comfort Retail") is a Minnesota Corporation authorized to do business in New York with a

registered agent authorized to accept service of process at 111 Eighth Avenue, New York, New

York.

        4.      Upon information and belief, defendant Select Comfort Corporation ("Select

Comfort Corp.") is a Minnesota Corporation doing business in New York through its subsidiaries,

Select Comfort Wholesale and Select Comfort Retail.

5. Defendants, collectively, engage in the business of manufacturing mattresses, foundations and related bedding products, and marketing those products (a) at wholesale to, *inter alia,* "retail partners" which resell the products to consumers at retail stores they operate, and (b) at retail directly to consumers through company owned Select Comfort retail stores, which sell only Select Comfort products. The Select Comfort retail stores compete directly with Select Comfort's "retail partners" for retail sales of Select Comfort mattresses, foundations and related bedding products.

6. Upon information and belief, Select Comfort Wholesale and Select Comfort Retail are direct or indirect subsidiaries of Select Comfort Corp. Select Comfort Corp., Select Comfort Wholesale and Select Comfort Retail are collectively referred to herein as "Select Comfort" or "Defendants."

7. Upon information and belief, Defendants combined, conspired together and acted in concert, and each acted as the agent of the others, in connection with the wrongful acts alleged herein.

## Jurisdiction

8. Defendants removed this action from the Supreme Court of the State of New York, County of Nassau pursuant to 28 U.S.C. § 1441, by petition for removal filed September 25, 2007.

9. This action arises, *inter alia*, under the Trademark Act of July 5, 1946, as amended, 15 U.S.C. §§ 1051 *et seq.*, known as the Lanham Act.

10. This Court has jurisdiction of this action pursuant to § 39(a) of the Lanham Act, 15 U.S.C. § 1121(a); 28 U.S.C. §§ 1331, 1332(a)(1); 1338(a) and (b), and 1367.

**Nature of the Action**

11.     This is an action to recover the damages Sleepy's suffered as a result of the tortious acts and breaches of contract that Select Comfort committed while Sleepy's was its "Retail Partner." Select Comfort entered into a dealer agreement with Sleepy's and induced Sleepy's to commit valuable resources to promote and popularize Select Comfort's products. As set forth herein, through a concerted pattern of defamation and disparagement of Sleepy's products and Sleepy's, express breaches of the dealer agreement, fraudulent misrepresentations, breach of the implied covenant of good faith and fair dealing contained in the dealer agreement, and unfair competition in violation of federal and New York law, Select Comfort damaged Sleepy's and effectively deprived it of the benefits of the dealer agreement.

**Facts Common to All Causes of Action**

12.     Sleepy's is a multi-generational family owned and operated business specializing in the retail sale of premier quality mattresses, box springs and other bedding accessories primarily in the Northeast United States. For over 50 years, the Sleepy's organization has been synonymous with care, professionalism, and continuously working to provide its customers with the highest quality products, the highest level of service and the best possible prices.

13.     Select Comfort is a manufacturer and marketer of mattresses, box springs and bedding products, specializing in personalized sleep products. Within the past several years, Select Comfort has introduced to the marketplace a new line of adjustable-firmness mattresses known as "Sleep Number Beds," which feature a new air chamber technology, not theretofore widely known to, or accepted by, consumers.

**The Dealer Agreement**

14.     To attempt to popularize its new Sleep Number Beds and gain consumer acceptance for them, Select Comfort sought to market them through established retailers, including Sleepy's, that were already well-known to, and accepted by, consumers, in addition to its own Select Comfort retail stores.  To accomplish this, Select Comfort sought to enter into dealer agreements with such retailers, including Sleepy's, and designate them as Select Comfort's "retail partners."

15.     During the negotiation of a retail partner dealer agreement between Select Comfort and Sleepy's, Select Comfort employees, including Tim Werner, Select Comfort's former Vice President of Sales, and his successor, Bruce Bauman, represented on more than one occasion to Michael Bookbinder, Sleepy's Executive Vice President of Sales, that the Select Comfort products sold at Sleepy's would be of the same high quality as those sold at Select Comfort stores, and specifically that although those sold at Sleepy's would have a wood box foundation, whereas those sold at Select Comfort stores would have a plastic polymer foundation, there would be no material differences in quality between them.  Tim Werner and Bruce Bauman informed Michael Bookbinder that the only reason Select Comfort stores sold mattresses with plastic polymer foundations was because they could be shipped via UPS or (similar delivery service) in a smaller package than wood box foundations, and assured Michael Bookbinder that there was no difference in quality between the wood box foundations Sleepy's would sell and plastic polymer foundations Select Comfort would sell.

16.     On or about June 17, 2005, Sleepy's and Select Comfort, through Select Comfort Wholesale, entered into a "Select Comfort Corporation Dealer Agreement" (the "Dealer Agreement") pursuant to which Select Comfort appointed Sleepy's as its "Retail Partner" to

-4-

"purchase, merchandise, market, advertise, promote and resell" the Sleep Number Beds on Long Island. A copy of the Dealer Agreement is annexed as Exhibit A.

17.      Pursuant to the Dealer Agreement, both Sleepy's and Select Comfort had certain obligations and responsibilities, including, but not limited to, the following:

a.   Section 3(b) of the Dealer Agreement required Sleepy's to "[m]erchandise, market, advertise, promote and sell the Sleep Number Beds, through both general media advertising and point of sale materials . . . ." Pursuant to § 3(c), Sleepy's was also "responsible for all costs and expenses relating to the development, production, placement and use of marketing and advertising materials [for the Sleep Number Beds]."

b.   The Dealer Agreement required Sleepy's to dedicate a significant amount of floor space to the Sleep Number Beds, thereby limiting the amount of floor space available for other products.  Specifically, Sleepy's was required to "[d]isplay in at least 80% of [its] authorized locations, with a minimum retail floor space of 3000 sq. ft., three (3) queen size Select Comfort product sample sets in a manner consistent with the promotion and enhancement of the [Sleep Number Beds'] brand images."

c.   Pursuant to § 4 of the Dealer Agreement, Select Comfort was required to, *inter alia*, provide "first quality merchandise" to Sleepy's and deliver the Sleep Number Beds in a timely manner.

d.   Section 4(c) of the Dealer Agreement expressly forbad Select Comfort from impairing, infringing upon or adversely affecting Sleepy's character, reputation and

good will.

18.     Throughout the course of the parties' business relationship, Sleepy's did all that was required of it under the Dealer Agreement in a competent, professional and conscientious manner. Sleepy's expended significant resources legitimizing the concept and technology of Sleep Number Beds that Select Comfort was trying to advance in the marketplace, and forewent the opportunity to use its valuable retail floor space for other brands.

19.     Despite these efforts, the sales of the Sleep Number Beds at the Sleepy's retail locations on Long Island were far less than had been anticipated.

20.     Although the Agreement provided that the parties' business relationship would continue until September 30, 2006, Select Comfort had the option, at its sole discretion, to renew the agreement thereafter.

21.     Although Select Comfort did not formally elect to renew the Agreement in September of 2006, for months thereafter the parties continued to conduct business as if the Agreement had in fact been renewed.

**Select Comfort's Scheme**

22.     In recent months, it has become clear to Sleepy's that, in contrast to Sleepy's conscientious performance under the Dealer Agreement, Select Comfort was engaging in a widespread, pattern of breach of the Dealer Agreement, unfair competition, defamation and disparagement, that was part of a plan to induce its "retail partners" to use their prestige with consumers and invest their resources to popularize Sleep Number Beds, while intending to deprive the "retail partners" of the fruits of the Dealer Agreement and garner the benefits of the "retail partners' efforts for its own retail stores.

23.     Sleepy's became aware of Select Comfort's breaches of the Dealer Agreement, its unfair competition, defamation and disparagement through the use of "shopping reports" or "shops" as they are commonly referred to in the industry. Shops are a common tool used in the industry in which a particular retail company uses its own employees, or hires independent professional shopping agencies, to shop at competitor's retail outlets and report their experiences, in order to evaluate that competitor's business practices.

24.     During the course of the parties' business relationship, Sleepy's obtained the results of over 100 "shops" of various Select Comfort retail locations, both inside and outside the territory in which Sleepy's was authorized to sell Select Comfort's products. The overwhelming majority of the "shops" showed that Select Comfort's sales personnel were making false and defamatory statements concerning Sleepy's and certain of Select Comfort's other "Retail Partners" in an effort to induce customers to purchase Sleep Number Beds from Select Comfort rather than its "Retail Partners."

25.     From the detailed shopping reports, Sleepy's learned that during the course of its Retail Partner relationship with Select Comfort, Select Comfort, through its own competing retail stores, engaged in a concerted effort to disparage the Select Comfort products provided to Sleepy's (which, pursuant to the Dealer Agreement, were to be "first quality" merchandise ) and Sleepy's itself.

26.     Specifically, sales personnel at Select Comfort stores regularly represented to customers that (a) the Select Comfort products sold at Sleepy's were inferior to those sold at Select Comfort stores for a variety of reasons, including, but not limited to, the fact that those sold at Sleepy's contained a wood box foundation, which was prone to sagging and warping, as

opposed to the models sold at Select Comfort stores which contained better quality polymer foundations that do not warp or sag, (b) Sleepy's offered inferior sales terms and service, (c) Sleepy's products are likely to be infested with dust mites (which, as Select Comfort knew, customers are prone to confuse with bed bugs), and (d) the Select Comfort brand was being withdrawn from Sleepy's (implying, or in some cases expressly asserting, that Sleepy's would deliver inferior warranty and customer service). These representations were false and misleading.

27.     Among other instances, on January 11, 2007, Jim Constantinides recorded a conversation with Lisa Hegel, a Select Comfort salesperson working out of Select Comfort's Queens Center Mall location, in which Ms. Hegel asserted that a customer should purchase Sleep Number Beds from a Select Comfort store rather than Sleepy's. During that conversation, Ms. Hegel indicated that the base of the mattresses sold at the Select Comfort stores have a solid plastic foundation, while the base of the mattresses sold at Sleepy's have wood foundations and falsely represented that the wood foundations are not as durable and will "warp," "sag" and increase the instances of allergens.

28.     In inducing Sleepy's to enter into the Dealer Agreement, Select Comfort had expressly represented to Sleepy's on a number of occasions that there was no material difference between Sleep Number Beds with plastic foundations and Sleep Number Beds with wood foundations.  Stating that the Select Comfort mattresses sold at Sleepy's and other "Retail Partners" contain foundations that warp and sag is not only an attack on Sleepy's specifically, but an attack on the entire mattress industry in general because wood foundations are the industry norm.

29.     During that same January 11, 2007 "shop" described above, the Select Comfort

-8-

employee not only denigrated the Select Comfort Products that are sold to Sleepy's, but also the other products and brands that Sleepy's carries, stating that the Sleepy's mattresses are stored in a warehouse, and as such could be filled with moisture and infested with allergens.

30.     Numerous other shop reports confirmed Select Comfort's pattern and practice of falsely disparaging Sleepy's and its products.  A small sample of these shopping reports are as follows:

- January 14, 2007 – Yorktown Heights, New York – Sleepy's keeps its product in the warehouse for months which makes it "stale" and "could also be the source of pest infestation." In addition, the Sleep Number Beds sold by Sleepy's are inferior to those sold directly at the Select Comfort retail locations, and are essentially considered Select Comfort "starter" products.

- January 15, 2007 – Poughkeepsie, New York – The polymer box spring used by the Select Comfort retail locations is superior to the wood box spring used by Sleepy's and other Select Comfort "Retail Partners" because wood can attract bugs. In addition, because Sleepy's stores its products in a warehouse, it can deliver Sleep Number Beds immediately and, as a result, the freshness of the foam is questionable.

- November 8, 2006 – New York, New York – Sleepy's sells product that is not what they are touting it to be. For instance, they are selling you one thing but there is a possibility that you are getting a refurb, and they are not telling you about it.

- January 12, 2007 – Manchester, Connecticut – Buying a Select Comfort Product from Sleepy's is like buying a John Deere tractor from Home Depot: the tractor sold by Home Depot is cheaper but is not exactly the same product or the same quality as that which is being sold directly by the John Deere store.

- January 16, 2007 – Langhorne, Pennsylvania – Unlike Sleepy's, Select Comfort safeguards the freshness of the Sleep Number Beds when they are purchased directly from a Select Comfort retail store.

- January 17, 2007 -- The Sleep Number Beds Sleepy's carries have an inferior wood construction.

- January 12, 2007 – West Nyack, New York – The Select Comfort beds that

-9-

Sleepy's carries are outdated and are the equivalent of old models that Select Comfort carried years ago.

31.    As shown by the shopping reports, Select Comfort has been similarly disparaging its "retail partners" in other territories.  During a "shop" conducted on January 16, 2007 at a Select Comfort store in the Providence Mall, in Providence, Rhode Island, the Select Comfort salesperson stated that it was better to purchase Sleep Number Beds directly from the Select Comfort store, as opposed to any one of its authorized retailers, because if service was required, it would be easier to deal directly with the company.  In addition, during that particular "shop," the Select Comfort salesperson indicated that other companies selling Sleep Number Beds did not have as knowledgeable salespeople, and that those other salespeople were not as well trained.

32.    Similarly, during a January 17, 2006 "shop" conducted of a Select Comfort retail location in Modesto, California, Jane Doe Shopper # 129135 indicated to Gayna, the Select Comfort employee, that she had recently shopped at a Sleep Train, which, upon information and belief, is another "Retail Partner" similar to Sleepy's, and was told that their Select Comfort mattresses were less expensive than buying them directly from Select Comfort.  When Jane Doe Shopper # 129135 asked why this was so, the Select Comfort employee stated that "[t]he Sleep Train Select Comfort beds are a lower quality and might be discontinued or refurbished models."

33.    Shopping reports also indicate that Select Comfort has been engaging in the same type of conduct with respect to Jordan's Furniture, which, upon information and belief, is another "Retail Partner" similar to Sleepy's.

34.    On November 19, 2006, Rob Ringler conducted a "shop" of a Select Comfort location in Nashua, New Hampshire during which he explained to the Select Comfort salesperson

-10-

that he was unsure as to whether he should purchase a bed directly from Select Comfort or from Jordan's Furniture. In an attempt to convince Mr. Ringler to buy directly from Select Comfort, the Select Comfort employee stated that Jordan's only uses "cheap" wood bases for their mattresses whereas Select Comfort uses a solid polymer base/frame. The Select Comfort salesperson also stated that Jordan's Furniture only has the lower end Select Comfort bed systems.

**Select Comfort's Termination of the Dealer Agreement**

35.    On January 3, 2007, Sleepy's met with Select Comfort's senior sales executives to discuss, among other things, Select Comfort's disparagement of Sleepy's and the products it sells, as well as the resulting harm that such disparagement was causing.

36.    In that meeting Sleepy's demanded that the disparagement stop immediately.

37.    Approximately one week after that meeting, Select Comfort formally advised Sleepy's by letter dated January 11, 2007, of its intention to discontinue the parties' business relationship because, in the view of Keith Spurgeon, Select Comfort's Senior VP & General Manager Consumer Channels, Select Comfort is "disappointed in [Sleepy's] performance to date" and the relationship with Sleepy's "lacks [the] essential element of success." A copy of Select Comfort's January 11, 2007 termination letter is annexed as Exhibit B.

38.    However, as is now clear to Sleepy's, any "disappointment" with Sleepy's sales of Sleep Number Beds (a disappointment Sleepy's shared) was not the result of any lack of effort on Sleepy's part, but of Select Comfort's repeated breaches of the Agreement, as set forth at length above, as well as its systematic effort to disparage and denigrate Sleepy's and its products, and undermine Sleepy's ability to sell Sleep Number Beds, so that it could deprive Sleepy's of the benefit of its expenditures and efforts, and garner those benefits for its competing retail stores.

-11-

39.     Even though Sleepy's expressly informed Select Comfort's executives that its employees were disparaging Sleepy's and the products it sells, shopping reports conducted after the parties' January 11, 2007 meeting, some of which are set forth in detail above, indicated that Select Comfort's disparagement of Sleepy's was continuing unabated.

40.     Accordingly, on January 23, 2007, Michael Bookbinder, Sleepy's Executive Vice President wrote to Select Comfort's Chief Executive Officer to request assurances that such disparagement and product denigration would cease.  A copy of this letter is annexed as Exhibit C.

41.     In a letter dated January 23, 2007 from Select Comfort's Chief Executive Officer to Sleepy's Chief Executive, a copy of which is annexed as Exhibit D, Select Comfort stated that it was "disappointed by what we read in the shopping reports" and represented that they "took immediate action to address the reported behavior."

42.     However, numerous shopping reports conducted after Select Comfort's CEO stated that he had taken action to address the problem, indicate that the pattern and practice of disparagement and defamation has nevertheless continued.

43.     For example, on March 8, 2007, Deborah Zaffron, a Sleepy's employee, conducted a "shop" of a Select Comfort retail location in the Smith Haven Mall in Lake Grove, New York.   When Ms. Zaffron asked the Select Comfort employee why a particular Select Comfort mattress was cheaper at Sleepy's, she was assured that Sleepy's did not carry the same models as Select Comfort.

44.     The Select Comfort employee further stated that –

> Sleepy's knows nothing about the [Select Comfort] bed. So if you were ever to have a problem or anything like [that] they, you going

> to Sleepy's they're just going to look at you like call up Select Comfort. So they're not really going to help you in any way, for the little bit of money they may be saving you . . . Another thing is the foundation[.] They don't use our foundation, we never sold them our foundation. What they use is a wooden box underneath; it's prone to warping because of humidity and heat.

45.     The unfair competition and disparagement of Select Comfort's other "Retail Partners" has continued unabated as well.

46.     On March 9, 2007, Sarah Mahaffy conducted a "shop" of a Select Comfort retail location in Farmington, Connecticut. During her visit, she informed Andy Lapenta, the Select Comfort employee, that she had been to Better Bedding, which, upon information and belief, is another Select Comfort "Retail Partner" similar to Sleepy's, and seen a Select Comfort mattress that she was interested in purchasing.

47.     The Select Comfort employee stated that if Ms. Mahaffy purchased the Select Comfort mattress from Better Bedding and was to have any issues with it, she would "have to jump through hoops in order to have someone out to [her] home to take a look at [her] bed, but if [she] was to buy from [Select Comfort] they would immediately come out to [her] home to fix the problem."

48.     The Select Comfort employee also stated that all of the beds Select Comfort sells are "exclusive to them," and that although Better Bedding does sell Select Comfort beds, "it is what Select Comfort sold a few years ago, it is not their new line. Theirs is kind of like imitation."

49.     Select Comfort's failure to take any action concerning the disparagement and defamation, its pervasiveness throughout the course of the relationship, and its use against other "Retail Partners" as well, indicates that the practice was, and is, an intentional policy and tactic

-13-

of Select Comfort.

50.     Select Comfort has induced Sleepy's and other "Retail Partners" to expend significant effort and money on marketing and popularizing Select Comfort's Products, but has attempted to garner the benefits for itself by representing to customers that they will get inferior products and service unless they purchase the Products directly from Select Comfort's retail stores.

51.     The "disappointing" performance of Select Comfort at Sleepy's, as mentioned in the January 11, 2007 termination letter, demonstrates the success of Select Comfort's scheme.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

52.     Plaintiff repeats and realleges paragraphs 1 through 51 above as if fully set forth at length.

53.     Section 4(c) of the Dealer Agreement provides, in pertinent part, that "[e]ach party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party."

54.     Select Comfort breached Section 4(c) of the Dealer Agreement by, among other things, stating to Sleepy's potential customers that (a) the Select Comfort products sold at Sleepy's were inferior to those sold at Select Comfort stores for a variety of reasons, (b) Sleepy's offered inferior sales terms and service, (c) Sleepy's products are likely to be infested with dust mites (which, as Select Comfort knew, customers are prone to confuse with bed bugs), and (d) the Select Comfort brand was being withdrawn from Sleepy's (implying, or expressly asserting, that Sleepy's would deliver inferior warranty and customer service).

55.     By reason of the foregoing, Sleepy's has been damaged in an amount to be proved at

-14-

trial, but not less than $10,000,000.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

56.     Plaintiff repeats and realleges paragraphs 1 through 55 above as if fully set forth at length.

57.     Section 4(a) of the Dealer Agreement provides, in pertinent part, that Select Comfort will "[p]rovide first quality merchandise" to Sleepy's.

58.     Select Comfort breached Section 4(a) of the Dealer Agreement by, among other things, providing Sleepy's with products inferior in quality to what Select Comfort was obligated to provide and/or not equal in quality to the products Select Comfort sold in its own retail stores.

59.     By reason of the foregoing, Sleepy's has been damaged in an amount to be proved at trial, but not less than $10,000,000.

## THIRD CAUSE OF ACTION
### (Fraudulent Inducement)

60.     Plaintiff repeats and realleges paragraphs 1 through 59 above as if fully set forth at length.

61.     During the negotiation of the Dealer Agreement between Select Comfort and Sleepy's, Select Comfort employees, including Tim Werner, Select Comfort's former Vice President of Sales, and his successor, Bruce Bauman, represented on more than one occasion to Michael Bookbinder, Sleepy's Executive Vice President of Sales, that the Select Comfort products sold at Sleepy's would be of the same high quality as those sold at Select Comfort stores, and specifically that although those sold at Sleepy's would have a wood box foundation, whereas those sold at Select Comfort stores would have a plastic polymer foundation, there would be no material

-15-

differences in quality between them.   Tim Werner and Bruce Bauman informed Michael Bookbinder that the only reason Select Comfort stores sold mattresses with plastic polymer foundations was because they could be shipped via UPS or (similar delivery service) in a smaller package than wood box foundations, and assured Michael Bookbinder that there was no difference in quality between the wood box foundations Sleepy's would sell and plastic polymer foundations Select Comfort would sell.

62.   All of the above representations were false when made and Select Comfort knew them to be false. In particular, as the manufacturer of the products, Select Comfort knew that the Select Comfort products sold at Sleepy's were inferior to those sold at Select Comfort stores because those sold at Sleepy's had a wood box foundation, which Select Comfort considered inferior to the plastic polymer foundations sold in Select Comfort stores.  Further, Select Comfort knew or reasonably should have known that there was a significant difference in quality between wood box foundations and plastic polymer foundations, but intentionally omitted to disclose that information, and instead specifically represented to Sleepy's that the two types of frames were of the same high quality in order to induce Sleepy's to become Select Comfort's Retail Partner.

63.   The above misrepresentations and failure to disclose material information to Sleepy's were made by Select Comfort with the intention of inducing Sleepy's to rely thereon in entering into the Dealer Agreement.

64.   Said misrepresentations and failure to disclose induced Sleepy's to enter into the Dealer Agreement, and Sleepy's relied thereon in entering into the Dealer Agreement.

65.   By reason of the foregoing, Sleepy's has been damaged in an amount to be proved at trial, but not less than $10,000,000, and is entitled to recover punitive damages in an amount to be

proved at trial but not less than $20,000,000.

## FOURTH CAUSE OF ACTION
### (Slander Per Se)

66.    Plaintiff repeats and realleges paragraphs 1 through 65 above as if fully set forth at length.

67.    On January 11, 2007, Lisa Hegel, a Select Comfort employee, in the presence of Jim Constantinides and several other persons whose names are unknown, maliciously spoke of and concerning Sleepy's the following false and defamatory words:

- "As far as the actual difference of what you are getting [between a Select Comfort mattress sold directly at Select Comfort and one sold at Sleepy's], the base of our mattress is a solid plastic foundation, so there is no warping or sagging. It cuts down on allergens because there is no wood. The base that they use is made out of wood, so its not quite as durable."

- When you buy the mattress directly from Select Comfort, "[y]ou're getting it newer. You don't have to worry that it was . . . you know that there was moisture in it or you know anything like that, allergens as stuff like that, 'cause [Sleepy's] has a warehouse. So if people return a bed and it goes back to the warehouse anything that would come with it would be in the warehouse where there isn't any control or you know . . . ."

68.    By reason of the foregoing false and defamatory words having been spoken of and concerning Sleepy's, Sleepy's business reputation has been damaged in an amount to be proved at trial, but not less than $10,000,000.

## FIFTH CAUSE OF ACTION
### (Slander Per Se)

69.    Plaintiff repeats and realleges paragraphs 1 through 68 above as if fully set forth at length.

70.    On January 12, 2007, Rick Johnson, a Select Comfort employee, in the presence of

-17-

Joseph Kilty and several other persons whose names are unknown, maliciously spoke of and concerning Sleepy's the following false and defamatory words:

- "If you go to a Home depot and look at a John Deere tractor and then go to John Deere and look at the same tractor, what is the difference? The difference is that the tractor sold by Home Depot is cheaper, not the exact same product or quality as the one sold by John Deere itself. This is the same situation we have with these beds."

71.     By reason of the foregoing false and defamatory words having been spoken of and concerning Sleepy's, Sleepy's business reputation has been damaged in an amount to be proved at trial, but not less than $10,000,000.

## SIXTH CAUSE OF ACTION
### (Slander Per Se)

72.     Plaintiff repeats and realleges paragraphs 1 through 71 above as if fully set forth at length.

73.     On January 14, 2007, Judy Travis, a Select Comfort employee, in the presence of Tyler Paiva and several other persons whose names are unknown, maliciously spoke of and concerning Sleepy's the following false and defamatory words:

- "Sleepy's orders a great deal of product to distribute quickly and often times the beds and components are kept in the warehouse for months at a time, which makes the products sold by Sleepy's a stale product. It also could be a source of pest infestation. Whenever a bed is kept in a place like a warehouse for extended periods the product suffers degradation."

74.     By reason of the foregoing false and defamatory words having been spoken of and concerning Sleepy's, Sleepy's business reputation has been damaged in an amount to be proved at trial, but not less than $10,000,000.

-18-

## SEVENTH CAUSE OF ACTION
### (Slander Per Se)

75.     Plaintiff repeats and realleges paragraphs 1 through 74 above as if fully set forth at length.

76.     On January 16, 2007, Faith Snyder, a Select Comfort employee, in the presence of Jerry Petrillo and several other persons whose names are unknown, maliciously spoke of and concerning Sleepy's the following false and defamatory words:

- Each bed sold at a Select Comfort retail location is "made to order – that if it is not accepted by the customer within 30 days of purchase it is sent back to the factory to ensure freshness. Furthermore, unlike Sleepy's Select Comfort safeguards the freshness of their product when it is purchased directly from [a Select Comfort retail store]."

77.     In addition to the foregoing, and in addition to the other allegations of slander per se set forth in the Fourth, Fifth, Sixth and Seventh causes of action, as well as those set forth in the body of this First Amended Complaint, Exhibit E attached hereto sets forth additional false and defamatory statements published by Select Comfort employees of and concerning Sleepy's, all of which are expressly incorporated by reference as if set forth at length.

78.     By reason of the foregoing false and defamatory words having been spoken of and concerning Sleepy's, Sleepy's business reputation has been damaged in an amount to be proved at trial, but not less than $10,000,000.

## EIGHTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

79.     Plaintiff repeats and realleges paragraphs 1 through 78 above as if fully set forth at length.

80.     Pursuant to law, the Dealer Agreement contains an implied covenant that each party

will act in good faith toward the other and deal fairly with the other, and will not act to deprive the other party of the fruits of the contract.

81.    Select Comfort's course of conduct described above constitutes a breach of the implied covenant of good faith and fair dealing.  Specifically, while Sleepy's was using its preeminence in the industry and expending resources to market and advertise Select Comfort's Sleep Number Beds, and while Sleepy's was dedicating valuable floor space to those products at the expense of other brands, Select Comfort was either shipping inferior products to Sleepy's in violation of the Dealer Agreement or misrepresenting to consumers that they were better off buying Sleep Number Beds directly from Select Comfort retail stores because the Sleep Number Beds at Sleepy's, and other "retail partners" were inferior.

82.    Despite the Dealer Agreement's description of Sleepy's and Select Comfort as "retail partners," it is clear from Select Comfort's conduct, as set forth above, that Select Comfort considered Sleepy's to be no different from any other competitor and would stop at nothing to divert customers from Sleepy's.

83.    Select Comfort's actions described at length herein violate the spirit of the Dealer Agreement, which was essentially intended as a "partnership" pursuant to which Sleepy's would provide Select Comfort with access to its extensive marketing and advertising channels and "legitimize" its new Sleep Number Beds to the consuming public, and Select Comfort would provide Sleepy's with a new and different product that was just beginning to gain acceptance in the marketplace.

84.    Select Comfort, however, breached the implied covenant of good faith and fair dealing by garnering the benefits of Sleepy's efforts for itself through the scheme detailed above.

-20-

85.     By reason of the foregoing, Sleepy's has been damaged in an amount to be proved at trial, but not less than $10,000,000.

### NINTH CAUSE OF ACTION
### (Unfair Competition)

86.     Plaintiff repeats and realleges paragraphs 1 through 85 above as if fully set forth at length.

87.     Select Comfort induced Sleepy's to enter into the Agreement and expend significant effort and money on marketing and popularizing Select Comfort's Products based on the understanding that the two would be "Retail Partners."

88.     However, while Sleepy's was complying with all of its obligations under the Agreement and devoting valuable floor space to Sleep Number Beds, Select Comfort was trying to garner all of the benefits for itself by, *inter alia*, directly competing with Sleepy's in a manner not contemplated by the Agreement, including, but not limited to, representing to customers that they will get inferior products and service unless they purchase Sleep Number Beds from Select Comfort's retail stores.

89.     Select Comfort's conduct set forth above constitutes unfair competition.

90.     By reason of the foregoing, Sleepy's has been damaged in an amount to be proved at trial but not less than $10,000,000.

### TENTH CAUSE OF ACTION
### (Violation of the Lanham Act)

91.     Plaintiff repeats and realleges paragraphs 1 through 90 above as if fully set forth at length.

92.     As set forth above, in connection with the retail marketing and promotion of its

Sleep Number Beds, Select Comfort has used in commerce false and misleading descriptions of fact and representations of fact concerning Sleepy's and its products that misrepresent the nature, characteristics and qualities of Sleepy's products and commercial activities.

93.     Sleepy's has been damaged by such false and misleading descriptions and representations in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

94.     By reason of the foregoing Sleepy's has been damaged in an amount to be proved at trial but not less than $10,000,000.

**WHEREFORE,** plaintiff demands judgment:

(a)     On its First Cause of Action in an amount to be proved at trial but not less than $10,000,000;

(b)     On its Second Cause of Action in an amount to be proved at trial but not less than $10,000,000;

(c)     On its Third Cause of Action in an amount to be proved at trial but not less than $10,000,000, and punitive damages in an amount to be proved at trial but not less than $20,000,000.

(d)     On its Fourth through Seventh Causes of Action in an amount to be proved at trial but not less than $10,000,000 in compensatory damages for each such cause of action and each defamatory statement set forth in the body of this First Amended Complaint and in Exhibit E, as well as $20,000,000 in punitive damages for each cause of action and each defamatory statement set forth in the body of this First Amended Complaint and in Exhibit E.

(e)     On its Eighth Cause of Action in an amount to be proved at trial but not less than $10,000,000;

(f)    On its Ninth Cause of Action in an amount to be proved at trial but not less than $10,000,000 in compensatory damages and $20,000,000 in punitive damages;

(g)    On its Tenth Cause of Action in an amount to be proved at trial but not less than $10,000,000 in compensatory damages, trebled in accordance with § 35 of the Lanham Act, 15 U.S.C. § 1117, and for Select Comfort's profits from the violation;

(h)    Such other and further relief as this Court may deem just and proper;

together with the costs and disbursements of this action, including a reasonable attorneys' fee.

Dated: New York, New York
       January 6, 2010

TANNENBAUM HELPERN SYRACUSE
& HIRSCHTRITT LLP

By: _____
       Andrew W. Singer
       L. Donald Prutzman
       George F. du Pont
900 Third Avenue
New York, New York 10022
(212) 508-6700
*Attorneys for Plaintiff*

**EXHIBIT A**

# SELECT COMFORT CORPORATION
# DEALER AGREEMENT

## *SLEEPY'S, INC.*

THIS DEALER AGREEMENT ("Agreement") is made and effective as of June 17, 2005 (the "Effective Date") by and between Select Comfort Wholesale Corporation, a Minnesota corporation ("Select Comfort"), and Sleepy's, Inc, a New York corporation ("Retail Partner").

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, Select Comfort and Retail Partner agree as follows:

1.     **Appointment.** Select Comfort hereby appoints Retail Partner, as an authorized dealer of Select Comfort's line of Sleep Number® beds in the Personal Preference™ collection as further defined in Exhibit A (the "Products") subject to the terms and conditions set forth herein. Retail Partner accepts its appointment as a dealer of the Products and commits to purchase, merchandise, market, advertise, promote and resell the Products and to otherwise perform the obligations of Retail Partner under and in accordance with the terms and conditions of this Agreement. Retail Partner acknowledges that, subject to the provisions of paragraph (f) of section 4, nothing in this Agreement precludes Select Comfort from entering into dealer agreements with other retail partners.

2.     **Independent Contractor.** Retail Partner is a corporate entity that operates a business independent from that of Select Comfort and is in all respects and for all purposes an independent contractor to Select Comfort. Subject to the obligations of the parties under this Agreement, each of the parties hereto will at all times maintain sole operational control and responsibility in the conduct of such party's business. The parties acknowledge and agree that no employment, partnership, joint venture or fiduciary relationship exists or arises from this Agreement. Retail Partner acknowledges and agrees that Retail Partner is not authorized to enter into any contractual commitments on behalf of Select Comfort or to otherwise bind Select Comfort in any way.

3.     **Retail Partner Obligations.** Retail Partner will:

(a)     Purchase the Products for resale to end customers only in a normal household quantity in Retail Partner's retail locations in metropolitan markets as identified in Exhibit B, which may be amended from time to time; Retail Partner will not transship, divert, consign, sell or otherwise dispose of the Products to any person, location or business for the purpose or with knowledge of resale or further distribution; Retail Partner will not sell the Products at locations in any other metropolitan markets, without the prior written consent of Select Comfort; Retail Partner will not sell Products through any electronic communications medium operated by itself or a third party, including but not limited to the Internet; Retail Partner is permitted to accept and fulfill end customer orders obtained through their telemarketing business, without limitation to the location of the end customer. However, Select Comfort reserves the right in its sole discretion to unilaterally prohibit Retail Partner from accepting sales through their telemarketing business

outside of approved markets, as defined in Exhibit B.  Select Comfort will ship or deliver only to Retail Partner's distribution centers serving retail locations in the authorized metropolitan markets;

(b)      Merchandise, market, advertise, promote and sell the Products, through both general media advertising and point of sale materials, in each case consistent with (i) the promotion and enhancement of the Select Comfort® and Sleep Number® and Personal Preference™ brand images and (ii) Select Comfort's Retail Partner Policy and Procedures Manual ("Retail Partner Manual"), as the same may be amended or supplemented from time to time by Select Comfort ;

(c)      Be responsible for all costs and expenses relating to the development, production, placement and use of marketing and advertising materials, except to the extent that Select Comfort agrees to provide marketing or advertising materials to Retail Partner;

(d)      Offer warranty coverage for the Products only to the extent approved and provided by Select Comfort and assist Select Comfort in fulfilling its warranty obligations, by providing Select Comfort end customer data, on a daily basis, in one of the approved electronic formats as outlined in Exhibit C;

(e)      Comply in all respects with all applicable laws, rules, regulations and determinations of all governmental agencies, not engage in any misleading advertising or misleading written or oral statements concerning the Products or other Select Comfort dealers, and not engage in any activities that could constitute deceptive advertising or trade practices or otherwise violate any truth-in-advertising laws;

(f)      Display in at least 80% of Retail Partner's authorized locations, with a minimum usable retail floor space of 3000 sq. ft., three (3) queen size Select Comfort product sample sets in a manner consistent with the promotion and enhancement of the Select Comfort and Sleep Number® and Personal Preference™ brand images and agree Select Comfort will be its exclusive supplier of air beds;

(h)      Fulfill all requirements of this Retail Partner Agreement, and comply with Select Comfort Corporation's procedures, which may be issued by Select Comfort Corporation from time to time, including but not limited to the Retail Partner Manual;

(i)      Deliver, assemble and service the Product for the end consumer in a timely manner;

(j)      Not disparage Select Comfort or any products distributed through Select Comfort's retail stores or any of Select Comfort's other retail partners and not interfere with any of Select Comfort retail store's relationships with customers or potential customers;

(k)      Include Select Comfort brand image in Retail Partner advertising, where appropriate, to increase consumer awareness regarding the availability of Products in Retail Partner stores.


4.      **Select Comfort Obligations:**  Select Comfort will:

2

(a)     Provide first quality merchandise to Retail Partner meeting all mutually agreed upon specifications;

(b)     Deliver product in a timely manner;

(c)     Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to Retail Partner by Select Comfort; Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party;

(d)     Provide consistent and quality marketing and advertising through both general media advertising and point of sale materials, in each case consistent with the promotion and enhancement of the Select Comfort® and Sleep Number® brand images; and

(e)     Provide Retail Partner a website, http://personalsleep.com, which will contain Product content to assist Retail Partner with providing consumers information via the Internet.  This website can be linked to or referenced by the Retail Partner website.

(f)     Select Comfort will not sell Products to any other Specialty Bedding Retailer for subsequent sale/distribution in the authorized markets as defined in Exhibit B.  Specialty Bedding Retailer is defined as a retailer for whom at least 65% of total revenue is the result of the sale of mattress, box springs, frames and related items to the end consumer.  This does not include Select Comfort or The Healthy Back Store, LLC (our existing Specialty Back Store Retail Partner).

5.     <u>Select Comfort Retail Partner Manual and Quality Review Practices.</u>

(a)     <u>Compliance with Retail Partner Manual.</u> Retail Partner acknowledges that Retail Partner has received and reviewed Select Comfort's Retail Partner Manual and other Select Comfort manuals discussed in the Retail Partner Manual including but not limited to  Retail Partner Standards Manual and Product Manual.  Retail Partner acknowledges that Select Comfort may amend or supplement the Retail Partner Manual, Product Manual and the Retail Partner Standards Manual from time to time in its sole discretion.

**Failure of Retail Partner to comply with the Select Comfort Retail Partner Manual and policies may result in immediate termination of this Agreement in Select Comfort's sole discretion.  Select Comfort may also elect to exercise any other remedy available to it under this Agreement or at law or in equity for any such failure.  Notwithstanding any other provision of this Agreement, Retail Partner remains free to sell the Products at any price it chooses, consistent with Retail Partner's obligation to promote and enhance the Select Comfort® and Sleep Number® and Personal Preference ™ brand images.**

<u>Quality Review Practices.</u>  Retail Partner acknowledges that, consistent with the terms of this Agreement, Select Comfort may discontinue selling the Products to Retail Partner in Select Comfort's sole discretion, with or without cause, for any reason or no reason at all, subject to not less than thirty (30) days' prior written notice to Retail Partner; Select Comfort agrees to fulfill

Retail Partner's orders as needed to fulfill customer orders taken by Retail Partner up to the effective date of termination. Retail Partner also acknowledges that Select Comfort has informed Retail Partner that Select Comfort will conduct periodic reviews of Retail Partner's marketing, merchandising, advertising, promotion and sale of the Products to ensure Retail Partner adequately promotes and enhances the Select Comfort® and Sleep Number® and Personal Preference ™ brand images.

In connection with its Retail Partner quality reviews, and in unilaterally deciding whether or not to continue its relationship with Retail Partner, Select Comfort may consider, among other things, the following factors:

(i)   Retail Partner's compliance with this Agreement, Select Comfort Retail Partner Manual and Retail Partner Standards Manual;

(ii)  The quality and reach of Retail Partner's general media marketing and advertising of the Products;

(iii) The quality and breadth of Retail Partner's point of sale advertising, display and promotion of the Products;

(iv)  The quality and extent of Retail Partner's initial and continuing sales associate training with respect to the Products;

(v)   The quality and extent of Retail Partner's customer service and selling practices; and

(vi)  The volume of Retail Partner's sales of the Products.

(c)   <u>Unilateral Nature of Policies</u>. The Select Comfort Retail Partner Manual and Select Comfort's Retail Partner quality review practices and Select Comfort Retail Price Policy are unilateral policies and practices of Select Comfort. Notwithstanding any other terms and conditions in this Agreement, Select Comfort has and retains the unilateral rights as set forth in its announced Retail Price Policy to refuse to deal with the Retail Partner and to terminate the Retail Partner and to modify the Retail Price Policy. Retail Partner acknowledges that there is no agreement, express or implied, involving Select Comfort, Retail Partner or any other person respecting the price at which Retail Partner resells the Products. Retail Partner acknowledges that officers, employees, representatives, or other agents of Select Comfort have no authority (1) to enter into any agreement or understanding with respect to the price at which Retail Partner resells the Products, (2) to coerce or otherwise force Retail Partner to price the Products at any level other than the price unilaterally determined by the Retail Partner, or (3) to discuss with Retail Partner the pricing or advertising practices of any other Select Comfort retail partner. If any officer, employee, representative, or other agent of Select Comfort tries to coerce or reach an agreement with Retail Partner concerning the price at which Retail Partner resells the Products, Retail Partner will promptly inform the Select Comfort General Counsel in Minneapolis, Minnesota in writing of that event. Retail Partner also acknowledges that the Select Comfort Retail Partner Manual and Select Comfort's Retail Partner quality review practices create no right, title or interest in or for the benefit of Retail Partner, do not form the basis of any bargain by the Retail Partner, and may be changed at any time by Select Comfort in its sole discretion.

4

6.     **Terms and Conditions of Sale.** All sales by Select Comfort to Retail Partner will be subject to Select Comfort's Standard Terms and Conditions of Sale as communicated from time to time by Select Comfort to Retail Partner. Retail Partner acknowledges and agrees that Select Comfort may change its Standard Terms and Conditions of Sale at any time in its sole discretion effective upon not less than thirty (30) days prior written notice to Retail Partner. Any additional or contradictory terms in any purchase order or other communication from Retail Partner will have no effect. Select Comfort may refuse shipment if Retail Partner's account is not current. All orders are subject to acceptance by Select Comfort, which acceptance may be given or withheld by Select Comfort in its sole discretion. Notwithstanding the foregoing, the agreed upon payment terms for wholesale sales of mattresses and foundations shall be a net thirty five (35) days from the date Select Comfort ships the Products from its facility to Retail Partner and shall not be subject to reduction.

7.     **Trademarks.** Select Comfort hereby grants to Retail Partner a non-exclusive, royalty-free license to use Select Comfort's trademarks, trade names, service marks and logos (the "Select Comfort Marks") solely for purposes of performing Retail Partner's obligations and exercising Retail Partner's rights under this Agreement. The license granted hereby will terminate upon the termination of this Agreement for any reason. Retail Partner agrees to comply in all respects with the Select Comfort Retail Partner Manual and the Standards Manual regarding usage of the Select Comfort Marks, both of which Select Comfort may amend or supplement from time to time in its sole discretion. Retail Partner further agrees (a) not to remove or alter any Select Comfort Mark; (b) not to use any other marks or other material which might lead to confusion or uncertainty with any Select Comfort Mark; (c) not to use any Select Comfort Mark except in the merchandising, marketing, advertising, promotion or sale of the Products; (d) to discontinue any usage of any Select Comfort Mark upon request thereof by Select Comfort; and (e) not to use any Select Comfort Mark in any manner or in any advertisement that does not comply with the Select Comfort Retail Partner Manual or Retail Partner Standards Manual. Retail Partner acknowledges and agrees that it has not acquired any right, title or interest in or to any Select Comfort Mark, or any copyright, patent, registration, goodwill or other intellectual or proprietary property right of Select Comfort except as expressly granted by this Agreement. Retail Partner further agrees that, except in connection with the merchandising, marketing, advertising, promotion and sale of the Products consistent with the terms of this Agreement, Retail Partner will not use any of the Select Comfort Marks (or any variation thereof) without Select Comfort's prior written consent. The parties agree that damages at law may not be sufficient to remedy a breach of this Section 7. Therefore, equitable or legal remedies, including without limitation injunctive relief and/or specific performance, will be available for the breach of any of the provisions of this Section 7.

8.     **Confidential Information.** "Confidential Information" means all technical and business knowledge, know-how, inventions, formulae, improvements, developments, customer lists, marketing and sales information, and all other confidential, non-public, proprietary information and data developed or held by the party, including that which relates to the use, composition, properties, methods of manufacture, or sale or marketing of the Products; provided however, "Confidential Information" does not include information or data which: (a) is known to a party prior to receipt thereof from the other as evidenced by records; (b) is disclosed in good faith by a third party who is in lawful possession thereof and has the right to make such disclosure; or (c) is or shall have become part of the public domain by publication or otherwise, through no fault of

the other party. Each of the parties will retain in strict confidence all Confidential Information of the other and, further, will disclose such information only to such of its own personnel or agents that have a need to know such information for purposes of performing duties in furtherance of the business relationship contemplated by this Agreement. Each party will require its personnel and agents to keep such information in strict confidence. Other than for the purpose of performing under this Agreement, neither party will use or disclose the Confidential Information of the other for any purpose. The restrictions and obligations of this Section 8 will survive the expiration or termination of this Agreement for a period of three (3) years. The parties agree that damages at law may not be sufficient to remedy a breach of this Section 8. Therefore, equitable or legal remedies, including without limitation injunctive relief and/or specific performance, will be available for the breach of any of the provisions of this Section 8.

## 9.    Termination

(a)    Initial Term.   Subject to earlier termination in accordance with any provision of this Agreement, the term of this Agreement shall commence as of the Effective Date and will expire September 30, 2006 (the "Initial Term").

(b)    Renewal Periods.   At least sixty (60) days prior to the expiration of the Initial Term, Select Comfort will, at its sole discretion, provide Retail Partner our proposed Retail Partner Agreement.

(c)    Termination for Cause.   Upon a material breach of this Agreement that has not been cured to the reasonable satisfaction of the non-breaching party within ten (10) days after notice of such breach, this Agreement may be terminated by the non-breaching party effective immediately upon written notice of termination or effective upon such later date as may be specified in the notice of termination from the non-breaching party.

(d)    Termination upon Certain Events.   In the event that a receiver is appointed to or applied for by a party for all or a material portion of the business or assets of such party, a bankruptcy or insolvency petition is filed by or against a party, an assignment is made for the benefit of creditors of a party, or a party shall become insolvent or unable to meet its obligations in the ordinary course of business, this Agreement may be terminated by the other party effective immediately upon written notice of termination or effective upon such later date as may be specified in the notice of termination from the terminating party.

(e)    Waiver of Termination.   The conduct by either of the parties after termination of this Agreement, including without limitation any sale of the Products, will not be construed as a waiver of the termination of this Agreement or as an extension or continuation of the term of this Agreement beyond the period specified in the notice of termination; any such termination of this Agreement may only be waived by an express written waiver of termination signed by the terminating party.

(f)    Effect of Termination.   Upon termination of this Agreement: (i) all payment obligations of either party to the other party will be due and payable under the same terms and conditions as before, except where termination was for cause in which case all payment obligations of either party to the other party will be accelerated and become immediately due and payable in full; (ii)

6

once all existing stock and floor models have been sold or taken back by Select Comfort, Retail Partner will discontinue the merchandising, marketing, advertising, promotion and sale of the Products; (iii) Select Comfort may elect to purchase any or all inventory of the Products in the possession of Retail Partner and Retail Partner agrees to sell such inventory to Select Comfort at the original cost; (iv) Retail Partner may sell inventory, that Select Comfort does not elect to purchase from Retail Partner, to end consumers (v) Retail Partner will immediately make available for pickup by Select Comfort all catalogs, brochures and other marketing or promotional materials furnished to Retail Partner by Select Comfort that remain in the possession of Retail Partner; if said material is not picked up within thirty (30) days of termination, all rights and claims to said material shall terminate and Retail Partner shall dispose of said material in a lawful manner; (vi) once all existing stock and floor models have been sold or taken back by Select Comfort, Retail Partner will immediately discontinue use of any of the Select Comfort Marks; (vii) each party will return to the other party all documents constituting Confidential Information of the other party; and (viii) the provisions of all of Section 7, paragraphs (a), (b) and (c) of Section 10, and all of Section 11 of this Agreement will survive the termination of this Agreement indefinitely.

**10.    Indemnification and Insurance.**

(a)    Indemnification Obligations of Select Comfort.  Select Comfort will indemnify Retail Partner against and hold Retail Partner harmless from any costs, damages, expenses or liabilities, including reasonable attorneys' fees and court costs, for any personal or advertising injury to, or damage to personal property of, any person to the extent caused by: (i) the Products as sold by Select Comfort to Retail Partner; (ii) the negligent, reckless, intentional or willful acts or omissions of Select Comfort, its agents, employees, subcontractors or invitees; (iii) the breach of any express or implied warranty of Select Comfort; (iv) the use of Select Comfort's advertising materials related to the Products; or (v) any breach by Select Comfort of the terms of this Agreement.

(b)    Indemnification Obligations of Retail Partner.  Retail Partner will indemnify Select Comfort against and hold Select Comfort harmless from any costs, damages, expenses or liabilities, including reasonable attorneys' fees and court costs, for any personal or advertising injury to, or damage to the personal property of, any person to the extent caused by: (i) any alteration or modification by Retail Partner of the Products as sold by Select Comfort to Retail Partner; (ii) the negligent, reckless, intentional or willful acts or omissions of Retail Partner, its agents, employees, subcontractors or invitees; (iii) the breach of any express or implied warranty of Retail Partner; (iv) the use of Retail Partner's advertising materials related to the Products (to the extent that they deviate from the guidelines or advertising materials provided by Select Comfort); or (v) the breach by Retail Partner of the terms of this Agreement.

(c)    Prompt Notice of Claims.  Each party will provide prompt written notice to the other of any claim, action or proceeding that may be the subject of a claim for indemnification under the provisions of this Section 10. The failure of a party to give prompt notice of any claim, action or proceeding will not diminish the indemnifying party's obligation of indemnification hereunder, except to the extent that such failure materially and adversely prejudices the indemnifying party's defense of the claim, action or proceeding.

(d)    Maintenance of Insurance.  Retail Partner and Select Comfort will each procure and maintain, at their respective expense, for the term of this Agreement and any renewal thereafter,

Commercial General Liability Insurance including Advertising, Product and Contractual Liability coverage (covering this Agreement) with coverage in minimum amounts equivalent to Two Million Dollars ($2,000,000) per occurrence for bodily injury and property damage.

(e)     Certificates of Insurance.  Upon request, the parties will provide to each other certificates evidencing that the insurance coverage required by this Agreement is in full force and effect and will not be canceled or materially altered without thirty (30) days' prior written notice.  Such insurance will be obtained from companies reasonably satisfactory to the respective parties.  Respecting the indemnification obligations of this Agreement, Retail Partner will be named as an additional insured under Select Comfort's General Commercial Liability Insurance policy, and Select Comfort will be named as an additional insured under Retail Partner's General Commercial Liability Insurance policy.

(f)     Survival of Provisions.  The provisions of paragraphs (a), (b) and (c) of this Section 10 will survive indefinitely the expiration or termination of this Agreement.

**11.    Miscellaneous.**

(a)     Assignment.  Retail Partner may not assign this Agreement or any interest therein and, further, may not delegate any of its duties under this Agreement to any person or entity, without the prior written consent of Select Comfort.  Select Comfort may not assign this Agreement or any interest therein nor delegate any of its duties under this Agreement, without prior written consent of Retail Partner, except that Select Comfort will be free to assign this Agreement or delegate any of its duties hereunder to any affiliated entity or any successor to all or substantially all of the business or assets of Select Comfort without the consent of Retail Partner.

(b)     Entire Agreement.  This document, in conjunction with the Retail Partner Manual and Retail Partner Standards Manual, constitute the entire agreement made between the parties with respect to the subject matter hereof.  This Agreement supersedes all previous agreements, both written and oral, of any nature between the parties with respect to the subject matter hereof.

(c)     Amendment.  This Agreement may not be amended, modified or changed, except pursuant to a written instrument signed by the authorized representatives of each of the parties.

(d)     Governing Law.  This Agreement will be governed and construed in accordance with the laws of the State of Minnesota without application of its conflict of law principles.

(e)     Waiver.  Any waiver of any provision of this Agreement must be in a written instrument signed by the waiving party to be enforceable.  Any one-time waiver of any term of this Agreement or failure to strictly enforce the terms of this Agreement will not preclude a party from asserting a subsequent or continuing breach or from otherwise requiring strict conformance with the terms of this Agreement.

(f)     Severability.  If for any reason any provision of this Agreement, including without limitation, any provision relating to the termination of this Agreement, shall be deemed, by a court of competent jurisdiction, to be legally invalid or unenforceable in any jurisdiction to which it applies, the validity of the remainder of this Agreement will not be affected thereby, and the invalid or unenforceable provision will be deemed modified to the minimum extent necessary to make that provision consistent with applicable law, and in its modified form, that provision

will then be enforceable.

(g)     Notice. Any notice or other communication required or that may be given pursuant to this Agreement shall be in writing and shall be delivered personally, faxed or sent by certified, registered, or via an overnight express, nation-wide delivery service, postage or delivery charge pre-paid, to the President or Chief Executive Officer of the respective party and Adam Blank, Executive Vice President & General Counsel at the relevant address as set forth below.  Any such notice or communication will be deemed given when so delivered personally, faxed or if mailed or if delivered via a nation-wide delivery service, on the earlier of the date of receipt or ten (10) days after the date of such mailing or two (2) days after delivery to such nation-wide delivery service.

Select Comfort Corporation                  Sleepy's, Inc
6105 Trenton Lane North                      175 Central Avenue South
Minneapolis, MN  55442                       Bethpage, NY  11714


IN WITNESS WHEREOF, the parties have executed this Agreement by and through their authorized representatives as of the date written in the Preamble of this Agreement.


SELECT COMFORT WHOLESALE CORPORATION          Partner name

By: _____                 By: _____

Print Name: Tim Werner                        Print Name: Michael S. Bookbinder

Title: VP, Retail Partners                    Title: Executive Vice President

9

## EXHIBIT A

Personal Preference[TM] II
Personal Preference[TM] III
Personal Preference[TM] V

## EXHIBIT B

Long Island, NY

11

## EXHIBIT C

Required Data

        Retail Partner ID
        Order ID
        Date of Customer Purchase
        Customer Name
        Customer Address
        Select Comfort Product Number
        Product Quantity
        Product Purchase Price
        Retail Partner Store Number/Name

Electronic Formats

        XML
        Text File

12

**EXHIBIT B**



**CREATOR OF THE SLEEP NUMBER BED**

January 11, 2007

Dear Harry,

Thank you very much for meeting with us last week. We always appreciate the opportunity to discuss our business relationship with you and your senior management team.

The purpose of requesting this meeting since September 2006 was to review the performance of the Select Comfort/Sleepy's relationship and to agree on appropriate next steps for both parties. To this end, we prepared an agenda and presentation that summarized the history and challenges of the program, reviewed critical success factors and historic sales results, and outlined our expectations regarding future performance, should we elect to extend our relationship. While the meeting proceeded in many other directions, we distributed copies to your team and had the opportunity to briefly reference several issues with them before our departure.

Clearly, both parties are disappointed in the performance to date and each has opinions as to the reasons behind the results. I will not summarize each party's list of possible contributing factors. However, I will restate a point that we made at our first meeting and have continued to share with you through last week; Select Comfort believes the _most_ important factor in a relationship is the commitment of the dealer's senior management to the success of the program. Our experience is clear and consistent on this point and we work hard to earn and reward this support.

In our meeting last week, it was clear that our relationship with Sleepy's lacks this essential element of success. Therefore, we believe there is no reason to extend the term of our Agreement. We have continued to supply product past the expiration date of the Agreement so that we could discuss expectations and explore whether we should offer an extension of the Agreement. Based on the meeting and performance to date, extending the Agreement does not appear to be appropriate. We regret this outcome for a relationship that began with our most positive expectations.

We are prepared to immediately begin to work with your team on an orderly wind-up of the dealer relationship. We propose Sleepy's continue to sell its remaining inventory of Select Comfort product through the end of February, following which we will arrange for the timely retrieval of our merchandising materials and fixtures. We are open to any suggestions you and your team may have to help us both achieve an orderly wind-up of the relationship.

Very truly yours,

Keith Spurgeon
Senior VP & General Manager
Consumer Channels

6105 Trenton Lane North • Minneapolis, Minnesota 55442 • (p) 763.551.7000 (f) 763.551.7826 • www.selectcomfort.com

**EXHIBIT C**

From:   Bookbinder, Mike
Sent:   Tuesday, January 23, 2007 12:15 PM
To:     'bill.mclaughlin@selectcomfort.com'
Cc:     Blank, Adam; Acker, David
Subject:   Sleepy's

January 23, 2007

Mr. William McLaughlin
Chief Executive Officer
Select Comfort
6105 Trenton Lane N
Minneapolis, MN 55442

Dear Mr. McLaughlin:

I am sending this letter on behalf of Harry Acker.

We are in receipt of Bruce Bauman's email regarding the wind up of the business relationship between Sleepy's and Select Comfort. We have no intention of addressing this email until you address the issue of defamation and resulting damage to our Company and the products which we, as your retail partner, have purchased from you. On January 3, 2007, we presented your team of four executives ten (10) shopping reports conducted both in, and outside of, our trading area with confirmed instances of disparagement engaged in by your salespeople/agents. The ten reports represent only a fraction of the total number of shops that have been conducted. These shopping reports showed, among other things, the denigration of Sleepy's and the Select Comfort products sold by Sleepy's and other Select Comfort "partners" in other parts of the country and confirm that Select Comfort has not complied with the Agreement between us nor with its common law obligations and duties. All that we asked was to receive a letter from you, as Chief Executive Officer of Select Comfort, assuring Sleepy's that this conduct and behavior would cease. In light of the ongoing and serious nature of Select Comfort's misconduct, we asked that you respond within 72 hours.

It has now been several weeks, and by this point we fully expected that you would have responded, advising us that such behavior is not endorsed, nor tolerated by Select Comfort, that all necessary steps were being taken to immediately end the disparagement and ensuring us that in the future this would not occur again. We are extremely upset that the only response that we have received was from your subordinates, who stated that there will be no response. Not only is your failure to respond a shock to us, but as we speak, our shoppers confirm that your agents continue to denigrate not only Sleepy's and the products that we have purchased from YOU, but your other retail partners as well. We have no idea

3/14/2007

how much volume this has cost Sleepy's in the past, nor how much it is costing Sleepy's in lost sales EVERY DAY that passes since you were apprised of these serious problems. We have averaged .15 beds sold per store per week while operating as your retail partner. Perhaps the number of beds should have been ten (10) times that number or more had your agents not denigrated the products that we purchased from you and sold in our stores as your "partner." We placed an order for additional merchandise, knowing that we, as the most successful mattress company in America, would see our sales of Select Comfort products dramatically increase once the denigration and defamation ceased.

We ask again that you provide us with the letter that Harry Acker requested at our meeting of January 3, 2007, and that you release the order that has been placed, and all future orders that will be placed.

Yours truly,


Michael S. Bookbinder
Executive Vice President
Sleepy's, Inc.


Cc: David Acker
    Adam Blank

3/14/2007

**EXHIBIT D**

January 23, 2007

Dear Mr. Acker:

Thank you for your letter of January 23, 2007.

I can assure you that any disparagement or denigration of any partner, supplier, competitor, or their products, services or reputation is neither endorsed nor tolerated at Select Comfort. To the contrary, we specifically train our Select Force to deal respectfully and positively with these parties and with customers who may inquire about them, and we expect our partners to do the same..

All of us at Select Comfort were disappointed by what we read in the shopping reports that you provided to us.  We took immediate action to address the reported behavior, putting our teams on notice that this would not be tolerated and reassuring them that you were working with your teams to be equally respectful. I understood that you'd been informed of this action, and apologize if there was mis-communication.

We are all disappointed that our partnership did not meet the growth potential that we've experienced in other markets.  We are committed to conclude our relationship in a positive manner, knowing that as leaders in our industries we are likely to have other opportunities in the future.

Sleep well,

Bill McLaughlin

**EXHIBIT E**

**EXHIBIT E**

**ADDITIONAL DEFAMATORY STATEMENTS**

| Date | Location of Select Comfort Retail Store that was Shopped | Name of Select Comfort Employee making the Defamatory Statement | Name of Person to whom Defamatory Statement was Published | Statement |
|---|---|---|---|---|
| 9/4/06 | New York, NY | Dom Ehrman | Anthony Colon | Sleepy's will not take their bed should you be unhappy with your purchase, where [Select Comfort] would offer me an exchange or a refund. |
| 11/5/06 | Bay Shore, New York | Bill O'Grady | Deborah Zaffron | Sleepy's does not honor warranties. If you buy from Select Comfort you will always have the real company behind you. |
| 11/7/06 | Smith Haven Mall, Lake Grove, NY | Sean Barret | Anthony Bender | Sleepy's ticking are all rayon and poly vs. the Select Comfort's jersey knit and the Sleepy's boxes are inferior wood vs. the Select Comfort foundations which are a high grade plastic that are built to last/can sustain up to 1,000 lbs. of weight on each side vs. Sleepy's which can only hold up to 500 lbs. |
| 11/7/06 | Garden State Plaza, Paramus, NJ | Addul Manczram | Scott Cheshul | Select Comfort sells the original Sleep Number Bed, Sleepy's has a knock-off. Sleepy's only has bits and pieces of the ingredients used in the original Sleep Number bed. |

| Date | Location of the Select Comfort Retail Store that was Shopped | Name of Select Comfort Employee making the Defamatory Statement | Name of Person to whom Defamatory Statement was Published | Statement |
|------|------|------|------|------|
| 11/8/06 | New York, NY | Raymond Rodriguez | Lou Dallojacono | With a company like Sleepy's or Rockaway Bedding, if you want to return something, they are going to do their damnedest to keep you from returning that bed. They are going to tell you *"oh no, its yours. You already slept on it, we can't do anything about it."* In our case, we'll take the bed back. |
| 11/8/06 | New York, NY | Raymond Rodriguez | Lou Dallojacono | It's against the law to sell a refurb bed. Believe me when I tell you they do things like that. They will take and refurbish the bed and sell it in clearance. |
| 11/8/06 | Deptford Mall, NJ | Bruce | Michael Grinnan | The beds at Sleepy's are knock-offs of our products. |
| 1/10/07 | Bay Shore, New York | | Bob Gorman | Buying from Sleepy's is like buying a knock-off of a Coach bag. |
| 1/15/2007 | Staten Island Mall, Staten Island, NY | May Elshazly | Joseph Seth | The main difference between the Select Comfort Mattresses sold at Sleepy's and sold at Select Comfort was the boxspring. Select Comfort's is made of resin (stronger than the wood box Sleepy's uses). |
| 1/16/07 | Freehold Raceway Mall Freehold, NJ | Roger Wolford | Paul Mahoney | Sleepy's uses a particle board base while [Select Comfort] uses a polymer base. |

[8014871-1]

2

DJK
March 20, 2007

| Date | Location of Select Comfort Retail Store that was shopped | Name of Select Comfort Employee making the Defamatory Statement | Name of Person to whom Defamatory Statement was Published | Statement |
|---|---|---|---|---|
| | | | | Theirs is better, sturdier and more durable. |
| 1/17/07 | Deptford Mall, NJ | Bruce | Mike Grinnan | Their beds were a hybrid between the 4000 and 5000 [models] with an inferior wood foundation |
| 2/6/07 | Coventry mall Pottstown, PA | Ray Roberts | Jacqueline Gruman | Sleepy's does not back up any warranty on their beds; they find every loophole. The salesperson at Sleepy's will lie to you about almost everything. Those people at Sleepy's will tell you anything to make you buy even though it's a lie. |

DJK
March 20, 2007

3

[80/487-1]