

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SLEEPY'S LLC,
                        Plaintiff,                              MEMORANDUM & ORDER
                                                                07-CV-4018 (TCP) (ARL)
        - against -

SELECT COMFORT WHOLESALE
CORPORATION, SELECT COMFORT
RETAIL CORPORATION, and SELECT
COMFORT CORPORATION,

                        Defendants.
--------------------------------------------------------X
```

PLATT, District Judge.

Before the Court are two motions: 1) Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and 2) Defendants' motion to exclude Plaintiff's expert witness ("Daubert Motion"). The Court **DENIES** Defendants' summary judgment motion and **DENIES**, without prejudice to renew, Defendants' Daubert Motion.

## FACTS

Sleepy's ("Plaintiff") is a New York mattress and bedding product retailer with its principal place of business in New York State. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 7. With over 700 stores, Sleepy's serves "a few thousand" customers per day. *Id.* at ¶ 11. Select Comfort ("Defendants") is a bed retailer based in Minnesota. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 1.

In October 2000, Defendants began their Retail Partner Program, through which Defendants sells their products in stores besides their own. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 31. This program, through specialized training and exclusivity arrangements, intended to provide competitive advantages to Defendants and their partners. *Id.* at ¶¶ 32-33.

1

On January 17, 2005, Defendants offered Plaintiff the chance to become a Retail Partner, giving Plaintiff the opportunity to sell Defendants' Sleep Number beds in Plaintiff's stores. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 64. Defendants' Sleep Number bed provides varying degrees of support for its user. *Id.* at ¶¶ 23-25. Instead of box springs, the Sleep Number contains inflatable air chambers that can be adjusted to personal preference. *Id.*

After negotiating throughout the first half of the year, on June 17, 2005, the parties executed the "Select Comfort Corporation Dealer Agreement" ("Dealer Agreement") and became Retail Partners. *See* Pl.'s Compl., Ex. B [hereinafter *Dealer Agreement*]. Assuming no external obstacles existed, both companies agreed that Plaintiff would experience at least a 10% overall increase in sales. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 75. Confident it could successfully retail Defendants' products, Plaintiff wanted a long-term deal, but Defendants hesitated and stated that they preferred a short, experimental relationship due to concerns that Plaintiff would be retailing a product with which it was unfamiliar. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 76. Ultimately, the parties agreed on an initial term of just over one year. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 78. The Dealer Agreement included a mutual non-disparagement provision. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 78. The Dealer Agreement stated that Minnesota law would govern the agreement. *Dealer Agreement* 11(d).

Defendants' Retail Partners sell an exclusive line of beds known as the Personal Preference Collection. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 48. Defendants claim they created the Personal Preference Collection based upon interactions with their initial Retail Partners and the collection is identical to their own line of Sleep Number beds. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 42. Plaintiff, however, contends that Defendants designed the Sleep Number beds to provide Defendants' outlets

with a competitive advantage over Retail Partners. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 43. Plaintiff alleges that Defendants intentionally designed the Personal Preference Collection to provide distinct merchandise to the Retail Partners to avoid competition between Defendants and their partners. *Id.* at ¶ 48. Plaintiff alleges that a chart, provided by Defendants at the outset of the parties' business relationship, illustrated the difference between the models. *Id.* at ¶ 47. Plaintiff claims Defendants' staff used this chart to demonstrate the advantages of Defendants' merchandise. *Id.*

A major difference between the product lines is that Defendants used a plastic polymer foundation as opposed to a wooden foundation used by Retail Partners. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 49. Defendants developed this plastic foundation because Defendants' delivery channels could only transport small boxes that would not fit a typical mattress design. *Id.* at ¶ 53. Defendants disclosed this difference to Plaintiff during negotiations in 2005. *Id.* at ¶ 75. At this time, Defendants informed Plaintiff that the difference would not provide Defendants with a competitive advantage. *Id.* Further, Section 4(a) of the Dealer Agreement stated that Defendants would "[p]rovide first quality merchandise to [Plaintiff]." *Dealer Agreement*. These assurances helped to persuade Plaintiff to sign the Dealer Agreement. *Id.*

Defendants' corporate anti-disparagement policy requires its employees to refrain from speaking negatively about other competitors or Retail Partners. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 62. Plaintiff alleges Defendants have a prevalent policy of training staff to vilify Plaintiff and its products. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 62. Specifically, Plaintiff asserts Defendants trained their staff to communicate false and misleading statements through promotional materials. *Id.* Plaintiff asserts Defendants hosted meetings for staff whose retail stores were in close proximity to Plaintiff's outlets and instructed them that the plastic foundations in Defendants' stores were

3

superior to wood foundations used by Plaintiff. *Id.* Plaintiff believes that by training and encouraging its staff to disparage Plaintiff, Defendants increased acceptance of their brand while simultaneously undermining any benefits Plaintiff hoped to obtain from the Dealer Agreement. *Id.* at ¶ 78.4. Despite their efforts, Plaintiff's sales of Sleep Number beds were less than projected. *Id.* at ¶ 79.2.

Following commencement of the partnership in 2005, Defendants learned that Plaintiff's employees were providing negative information about Defendants' products to customers. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 100. Plaintiff immediately acknowledged and addressed each report. *Id.*

Although Plaintiff's sales of Defendants' products were disappointing, Plaintiff aspired to expand the product to its other stores through an expansion of the initial launch. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 106. Defendants doubted any expansion's success, but agreed to it nonetheless. *Id.* at ¶ 109. During the expanded launch, Plaintiff heavily promoted a brand known as Tempur-Pedic, Defendants' primary competitor in the alternative-bedding category. *Id.* at ¶ 111. Plaintiff asserts that it was not contractually obligated to refrain from launching other mattress brands and it simultaneously promoted Defendants' Personal Preference Line. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 111. Plaintiff claims that Defendants did not allow Plaintiff to run promotions or contests advertising the Personal Preference Line and that Plaintiff adopted the "Retail Partner Critical Success Factors," authored by Select Comfort, which were meant to better ensure the sale of the Personal Preference Line. *Id.*

In the spring of 2006, Thomas Weisel Partners ("TWP"), an independent investment group that analyzes publicly traded companies, conducted an analysis of Defendants' Retail Partner

4

Strategy. Defs.' Stmt. Supp. Mot. Summ. J. ¶¶ 112-13. While Defendants claim the analysis was independently conducted, Plaintiff alleges that the report contained hearsay statements and that the investigation was based upon only four in-person store visits. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 113.A. Defendants state that TWP's report contained generally negative observations of Plaintiff's staff, which did not portray Defendants' products in a positive light. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 117. Plaintiff claims, however, that Defendants do not cite any admissible evidence supporting these propositions. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 117. The report, according to Defendants, maintains that Defendants' products have retailed favorably at other Retail Partners locations. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 120.

On August 1, 2006, Defendants requested a meeting with Plaintiff to discuss the parties' business relationship and to evaluate Plaintiff's performance prior to the expiration of the Dealer Agreement. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 136. Both parties dispute which party was responsible for cancelling several planned meetings throughout the fall of 2006. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 144; *see also* Defs. R. 56.1 ¶ 144. Undisputedly, Defendants continued to ship its products to Plaintiff's stores, after September 2006. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 147. Plaintiff alleges the Dealer Agreement continued to remain in effect until 2007. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 147.A. Plaintiff claims Defendants believed that it would be poor business practice to cut off Plaintiff before a meeting was held to discuss the Agreement. *Id.* at ¶ 148.

In the fall of 2006, Plaintiff became concerned based on consumer's comments that Defendants may have been engaging in a widespread pattern of disparaging Plaintiff and its retail products. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 152.I. In an effort to directly verify these comments, Plaintiff decided to investigate by conducting "secret shop" reports, which entails sending

5

out individuals to pose as shoppers in order to obtain reports of firsthand store experience and interactions with staff. *Id.* at ¶¶ 152-155. Plaintiff claims that these secret shops are part of its regular practice and include visits to both Plaintiff own stores and its competitors. *Id.* at ¶ 152.O. Based upon these reports, Plaintiff states that as early as November 2005, Defendants were disparaging Plaintiff and its products and continued to do so throughout their business relationship. *Id.* at ¶ 152.O. Defendants state that the individuals responsible for conducting these secret shops were given instructions to ask staff about the specific differences between the two company's products, although Plaintiff refutes this claim. Defs. Stmt. Supp. Mot. Summ. J. ¶ 156-57; *see also* Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶¶ 156-57. Plaintiff contends that evidence obtained from these reports illustrates that there were higher concentrations of disparagement of Plaintiff's products in regions where the two stores directly competed, indicating that this trend was a result of Defendants' widespread corporate policy of training staff to denigrate Plaintiff. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶¶ 163.D-E. Had it not been for this disparagement, Sleepy's believes it would have attained its original sales objectives. *Id.* at ¶¶ 163.J-M.

On January 3, 2007, the parties finally met to discuss the Agreement. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 164. While Defendants believed the meeting was meant to discuss Plaintiff's underperformance, (*Id.* at ¶ 171), Plaintiff believed the meeting was focused on improving its future performance. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 171. In a letter dated January 11, 2007, Defendants advised Plaintiff that it did not intend to extend the Dealer Agreement. Defs.' Stmt. Supp. Mot. Summ. J. ¶ 174. Plaintiff contends, however, that operations pursuant to the Dealer Agreement continued until April 18, 2007. Pl.'s Am. Stmt. Opp'n Mot. Summ. J. ¶ 174. Plaintiff informed Defendants that if Defendants did not negotiate an extension, Defendants would be subject

to litigation. Defs.' R. 56.1 ¶ 177.

## DISCUSSION

A.   **Standard for Summary Judgment**

A motion for summary judgment may not be granted unless the Court determines that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). "Summary judgment may be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.' " *Williams v. R.H. Donnelly Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). The Court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Castle Rock Entm't, Inc. v. Carol Publ'g Group*, 150 F.3d 132, 137 (2d Cir. 1998).

"A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference may be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). "[T]he judge's function [in reviewing a motion for summary judgment] is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citing *First Nat'l Bank*

7

*of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

The Supreme Court has held that, when opposing parties' versions of events differ substantially, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' " *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## B. Breach of Contract

### a. Standard

As an initial matter as to claims of breach of contract, the Court restates that Minnesota law governs the Dealer Agreement. *See, supra*, 2.

"Where the language used in a contract is plain and unambiguous, there is no opportunity for interpretation or construction." *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 215 N.W.2d 473, 476 (Minn. 1974) (citing 4 Williston on Contracts § 609 (3rd ed.)). " 'The meaning of a contract is to be ascertained from the writing alone, *if possible*, the duty of the court being to declare the meaning of what is written in the instrument, not what was intended to be written.' " *Id.* (citing *Hicks v. Mid-Kansas Oil & Gas Co.*, 76 P.2d 269, 271 (Okla. 1938)) (emphasis added).

However, a fact-finder may find that continued performance after the stated end of an agreement constitutes an extension of the term in a new agreement, at least until the parties stop performance. *See, e.g., Accord Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 408 F.3d 460, 467 (8th Cir. 2005) ("When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old." (citing *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946))); *see also Dynamic Air, Inc. v. Reichold, Inc.*, 05-CV-0955, 2007 WL 2274856, at *7 (D.

Minn. Aug. 7, 2007) ("When a contract governs the duties of the parties for a specified term and it has expired, the parties may thereafter enter into a new contract by conduct . . . or otherwise, and they may adopt the provisions of their former contract or agree to modify them.") (citing *Bolander v. Bolander,* 703 N.W.2d 529, 542 (Minn. Ct. App. 2005))).

As to claims related to Section 4(a), "[s]ummary judgment is inappropriate where terms of a contract are at issue and those terms are ambiguous or uncertain." *Hager's of Cohasset, Inc. v. Nelson,* No. A10-625, 2011 WL 500014, at *2 (Minn. Ct. App. Feb. 15, 2011) (citing *Bank Midwest, Minn., Iowa, N.A. v. Lipetzky,* 674 N.W.2d 176, 179 (Minn. 2004)). " 'A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation.' " *Id.* (citing *Art Goebel, Inc. v. N. Suburban Agencies, Inc.,* 567 N.W.2d 511, 515 (Minn. 1997)). "Whether a contract is ambiguous is a question of law reviewed de novo." *Id.* (citing *Carlson v. Allstate Ins. Co.,* 749 N.W.2d 41, 45 (Minn. 2008)).

### b. Questions of Fact

As the Court noted at oral argument, whether or not Defendants breached the Dealer Agreement is a question of fact. *See* Tr. Oral Arg. 31:13-16. The Court noted that whether the Dealer Agreement was enforceable after the September 30, 2006 termination date—and, thus, whether there could have been breaches of contract—"is a major issue of fact here that I don't get to resolve. If you go to trial, that's for the jury to determine." *Id.* There are genuine issues of fact as to whether a contract was in force at the times of the alleged breaches. There are genuine issues of facts, in addition, as to causation and whether Plaintiff suffered damages.

The Court holds additionally that Section 4(a) is ambiguous and that there are genuine issues of fact as whether Defendants breached it. Questions exist as to what "first quality" meant; Keith

9

Spurgeon, former Vice President at Select Comfort testified that "first quality" is "kind of a generic term," is a "vague" term, "doesn't have a whole lot of meaning," and is a "colloquialism." *See* Prutzmann Aff. Opp'n Supp. Mot. Summ. J., Ex. F, 284:3-24, ECF No. 361. Clearly, there is ambiguity as to this section of the Dealer Agreement and, thus, a fact-finder must make the determination. Plaintiff argues that "the parties' understanding of this term in the Retail Partnership Agreement is a question of fact to be resolved." Pl.'s Mem. Law Opp'n Supp. Mot. Summ. J. 12. The Court agrees and that resolution is for the fact-finder. Defendants' motion is denied, therefore, as to Plaintiff's breach of contract claims.

### C. Breach of Implied Covenant; Unfair Competition

As with the breach of contract claim, these claims are directly related to whether the Dealer Agreement was in force after September 2006. As noted *supra*, that is a determination for a fact-finder to make. As to these causes-of-action, Defendants' motion, therefore, is denied.

### D. Fraudulent Inducement

#### a. Standard

"A fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, *i.e.*, when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *First Bank of the Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20-21 (N.Y. App. Div. 1999) (citing *Gordon v. Dino De Laurentiis Corp.*, 529 N.Y.S.2d 777, 779 (N.Y. App. Div. 1988)).

> "By contrast, a cause of action for fraud may be maintained where a plaintiff pleads a breach of duty separate from, or in addition to, a breach of the contract. For example, if a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to the plaintiff's breach of contract claim."

10

*Id.* (citing *Non-Linear Trading Co. v. Braddis Assocs., Inc.*, 675 N.Y.S.2d 5, 13 (N.Y. App. Div. 1998); *RKB Enterprises Inc. v. Ernst & Young*, 582 N.Y.S.2d 814, 816-17 (N.Y. App. Div. 1992)).

As to claims related to Section 4(a), "a general merger clause is ineffective . . . to preclude parol evidence that a party was induced to enter a contract by means of fraud." *CooperVision, Inc. v. Intek Integration Techs., Inc.*, 794 N.Y.S.2d 812, 822 (N.Y. Sup. Ct. 2005) (citing *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993). "In order to be considered sufficiently specific to bar a defense of fraudulent inducement . . . a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Id.* (citing *Yanakas*, 7 F.3d at 316). In other words, "[w]here the fraud claim has been dismissed in New York cases, the disclaimer has been sufficiently specific to match the alleged fraud." *Id.* (citing *Yanakas*, 7 F.3d at 316).

    b.    **Questions of Fact**

Clearly, there are questions of fact as to whether Defendants fraudulently induced Plaintiff into the Dealer Agreement. A fact-finder must decide the issues pertaining to this claim, including: 1) was the wood construction inferior to the plastic construction; 2) did Defendants gain a competitive advantage due to the Dealer Agreement; 3) did Defendants make fraudulent claims to induce Plaintiff into the agreements; and, relatedly, 4) did those alleged statements actually induce Plaintiff into the agreement. The Court denies, therefore, Defendants' motion for summary judgment on these causes-of-action.

**E.    Slander Per Se**

    a.    **Standard**

"Under New York law, the essential elements of a claim of slander are an oral defamatory

11

statement of fact regarding the plaintiff which is published to a third party and which causes the plaintiff injury." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, No. 91 Civ. 4544, 1998 WL 259942, at *1 (S.D.N.Y. May 21, 1998) (citing *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993)). "When the defamatory statement is of the type that is classified as slander *per se*, injury is presumed." *Id.* (citing *Weldy*, 985 F.2d at 61; *Liberman v. Gelstein*, 605 N.E.2d 344, 347-48 (N.Y. 1992)).

"Slander of a business is slander *per se* when the integrity or credit of the business is directly attacked." *Id.* (citing *Marlin Fire Arms Co. v. Shields*, 64 N.E. 163, 164-65 (N.Y. 1902); *Ruder & Finn, Inc. v. Seaboard Surety Co.*, 422 N.E.2d 518, 522 (N.Y.1981)).

    b.    **Questions of Fact**

Questions of fact exist as to whether: 1) the Dealer Agreement was in effect at the time of the secret shopper incidences; 2) the secret shoppers "consented" to the defamatory statements; 3) the integrity or credit of the business was directly attacked. The Court denies, therefore, Defendants' motion for summary judgment as to the slander causes-of-action.

F.    **Lanham Act**

    a.    **Standard**

> "Any person who . . . in connection with any goods or services . . . , uses in commerce any . . . false or misleading description of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."

The Lanham Act, 15 U.S.C. § 1125 (2006).

The Court of Appeals for the Second Circuit uses a three-part test to determine whether an alleged statement constitutes "advertising or promotion" as envisioned by the Act. "The statements

must be: 1) commercial speech, 2) for the purposes of influencing customers to buy Defendants' goods or services, and 3) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Boule v. Hutton*, 328 F.3d 84, 90-91 (2d Cir. 2003).

### b. Questions of Fact

Questions of fact exist as to this claim. A fact-finder must decide whether the buying public would conclude, for example, that Defendants alluded to Plaintiff's goods when Defendants' mailers noted the supposed deficiency of wood box springs as opposed to plastic ones.

### G. Daubert Motion

The Court denies this motion without prejudice to renew after this case's next status conference.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **DENIED** and Defendants' Daubert Motion is **DENIED** without prejudice to renew after this case's next status conference.

**SO ORDERED.**

Dated: May 2, 2011
Central Islip, New York

Thomas C. Platt, U.S.D.J.