Herbert C. Ross, Jr. (HR 8482)
Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: (212) 451-2300

Andrew S. Hansen (AH 6788)
Heidi A.O. Fisher (HF 6782)
Michelle R. Schjodt (MS 8059)
Oppenheimer Wolff & Donnelly LLP
3300 Plaza VII Building
45 South Seventh Street
Minneapolis, Minnesota 55402
Telephone: (612) 607-7000

*Attorneys for Defendants Select Comfort Wholesale Corporation,
Select Comfort Retail Corporation, and Select Comfort Corporation*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SLEEPY'S, LLC,<br><br>                    Plaintiff,<br><br>          - against -<br><br>SELECT COMFORT WHOLESALE<br>CORPORATION, SELECT COMFORT RETAIL<br>CORPORATION and SELECT COMFORT<br>CORPORATION,<br><br>                    Defendants. | Civil Action No.<br><br>07 CV 4018 (Platt, J.)(Lindsay M.J.) |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS RENEWAL OF
MOTION *IN LIMINE* NO. 1 TO STRIKE AND PRECLUDE EVIDENCE OF
PLAINTIFF'S SECRET SHOPS BASED UPON PLAINTIFF'S
SPOLIATION OF EVIDENCE**

<u>**PRELIMINARY STATEMENT**</u>

Defendant Select Comfort submits this reply and supplement in support of its motion to renew Motion *in Limine* No. 1 and asks the Court to strike all evidence of Plaintiff Sleepy's secret shops on grounds of Plaintiff's spoliation of evidence.[1]  In response to Defendant's previous filings and this Court's statements on the record that it has serious concerns regarding Plaintiff's spoliation of evidence, Plaintiff blithely argues that it essentially had no duty to preserve documents and recordings in anticipation of litigation, ignoring and misrepresenting both the record and the law.

Notwithstanding the seriousness of this issue and the revelations that have come to light at trial, Plaintiff nonetheless in large part rests its argument on briefs, affidavits, and deposition testimony it submitted in response to Defendant's prior motions on this issue, including Defendant's *original* spoliation motion from 2008.[2]  Plaintiff persists in referring to its previous arguments, the prior self-serving affidavit testimony of Plaintiff's executives, and inadmissible documents as the "record."  But not only do the parties and the Court now have the benefit of a more fully developed factual record through additional discovery, but those same executives have now testified at trial—having been subjected to cross-examination and evidentiary rulings

---

[1]  Defendant incorporates its prior trial filings on this issue by reference.  (*See* Defendant's Trial Memorandum Renewing Motion *in Limine* No. 1 to Strike and Preclude Evidence of Plaintiff's Secret Shops Based Upon Plaintiff's Spoliation of Evidence, filed Apr. 10, 2012 (hereinafter "Apr. 10, 2012 Memo.") (Doc. 770); Defendant's Supplemental Trial Memorandum Renewing Motion *in Limine* No. 1 to Strike and Preclude Evidence of Plaintiff's Secret Shops Based Upon Plaintiff's Spoliation of Evidence, filed Apr. 18, 2012 (hereinafter "Apr. 18, 2012 Memo.") (Doc. 771).)

[2]  Accompanying its opposition brief, Plaintiff submits the Affidavit of L. Donald Prutzman which attaches 129 pages of documents that include Plaintiff's prior briefs, supporting affidavits, and deposition testimony of witnesses who have testified at trial.  These documents are not relevant to the current motion to the extent they have been superseded by the factual record developed at trial.  As such, they are not properly before the Court. Defendant requests they be stricken.

by the Court.  Furthermore, Plaintiff's spoliation has been more fully explored at trial through witness testimony and admissible documentary evidence.  Other than the documented (as opposed to fabricated) history of discovery in this case, the Court should ignore and strike Plaintiff's attempts to create a "record" that has not been subject to cross-examination and this Court's evidentiary rulings.

The facts established at trial show that Plaintiff had a clear obligation to preserve evidence as of at least November 6, 2006, and it failed to do so.  This failure resulted in the loss of critical evidence to this litigation, and it was compounded by Plaintiff's dodging repeated requests in discovery for this very same lost evidence, keeping Select Comfort in the dark as to the pervasiveness of Sleepy's spoliation.

In response, Plaintiff argues that its failure to preserve documents were isolated "mistakes" that should be excused.  The record shows otherwise.  Indeed it shows an egregious pattern of spoliation as evidenced by the testimony of at least sixteen witnesses who created e-mails, notes, original reports and recordings that they were **never** asked to retain, were **never** preserved and were **never** produced to Select Comfort.[3]  Plaintiff's behavior is, at the very least, grossly negligent, and there is ample evidence to support a finding of bad faith.  If there were ever a case where severe sanctions were warranted, this is it.

## <u>ADDITIONAL FACTUAL BACKGROUND</u>

## I.    PLAINTIFF'S OBLIGATION TO PRESERVE EVIDENCE WAS CLEAR.

Trial evidence shows that Harry Acker, Sleepy's Chairman and founder, made statements indicating he wanted to bring an "enormous, fabulous lawsuit" against Select Comfort during a

---

[3]    Plaintiff called seventeen "secret shoppers" to testify at trial. One of them, John Giaccobe, testified that he did not create any documents.  All the remaining witnesses testified that they created documents that were destroyed.

meeting on November 6, 2006, and that Michael Bookbinder (a member of Sleepy's executive team who participated in the meeting with Mr. Acker) agreed that Sleepy's was contemplating suing Select Comfort as of that date.  (Michael Bookbinder, Trial Tr. 495:2–5, Mar. 27, 2012; Trial Ex. D-95[4] at p.4.)  Indeed, during that meeting, Mr. Acker instructed his senior executives to get the relevant information to Mr. Blank, Sleepy's General Counsel, and an outside law firm. (D-95 at p. 4.)  Mr. Blank admitted to knowing this shortly after it occurred.  (Adam Blank, Trial Tr. 2948:22–2949:22, May 2, 2012.)  Notwithstanding this knowledge, Mr. Blank testified that he did not institute a written litigation hold at that time.  (Adam Blank, Trial Tr. 2896:24–2897:12; Adam Blank, Trial Tr. 3122:11–3123:17, May 4, 2012.)  Indeed, despite the fact that Mr. Acker expressed his intention to sue Select Comfort, the trial record confirms that Plaintiff failed to issue a litigation hold to the key players involved in this litigation, including Michael Bookbinder, or even verbally inform the seventeen secret shoppers Plaintiff has called as fact witnesses at trial to attempt to prove its claims.

In response, Plaintiff asserts it is a "question of fact as to whether Sleepy's reasonably anticipated litigation" as of November 6, 2006, relegating Harry Acker's statement to one "made in anger."  (Plaintiff's Memorandum of Law in Opposition to Defendants' Renewed Motion *in Limine* for Sanctions ("Plaintiff's Opp'n") (Doc. 772) at p. 2.)  However, there is no trial testimony to support Plaintiff's contention that Mr. Acker's statement was made "in anger" and therefore should not have been taken seriously.  It is undisputed that Mr. Acker made the statements and gave instructions to find an outside law firm.  Mr. Bookbinder, who was a party to the conversation, agreed that Sleepy's was contemplating suing Select Comfort as of November 6, 2006.  Indeed, the evidence at trial confirms that Harry Acker was the "boss" at

---

[4]    All trial exhibits are hereinafter referred to by either the D- or Px- designations used at trial.

Sleepy's, and his instructions were followed.  (Michael Bookbinder, Trial Tr. 87:1–11 (the executive team all reported to Acker); Michael Bookbinder, Trial Tr. 267:17–25 ("when Harry said he wanted something, you had better get it done when he wants it done.  That was understood in the company.").)  As will be discussed, *infra* pp. 11–13, whether or not Mr. Acker decided to immediately commence litigation is of no moment.  That facts clearly show Sleepy's was contemplating litigation.  The standard for triggering a litigant's duty to preserve is when a party *should have known* that evidence *may be relevant* to *future litigation*.  In contrast to Plaintiff's after-the-fact unsupported explanation attempting to downplay Mr. Acker's statements and instructions, Plaintiff tellingly did not call Mr. Acker to testify at trial to refute his own statements.

In any event, Mr. Blank admitted that Sleepy's anticipated bringing litigation against Select Comfort at least by January 3, 2007.  (Adam Blank, Trial Tr. 3123:18–3124:23.)  Yet, Sleepy's still did not issue a written litigation hold to its employees.  Mr. Blank claims that directly after a January 3, 2007 meeting with Select Comfort, when "it looked like it was a chance that [Select Comfort was] not going to comply with [Sleepy's] wishes," he verbally told some people to "hold on to all documents you have that may be relevant to this situation."  (*Id*. at 3123:18–3126:1.)  He thinks those people may have included the executive team, Harry Acker, Ira Fishman, Amy Biel and Dennis Exline, but he is not certain who he told.  (*Id*.)  Mr. Blank did nothing else to ensure documents relevant to Sleepy's secret shops of Select Comfort were preserved.  Neither Mr. Blank, nor anyone else, instructed any of Sleepy's secret shoppers to preserve or retain any documents, even though each of the secret shoppers who have testified at trial were identified as persons with knowledge regarding Plaintiff's claims in Plaintiff's initial

disclosures.  (*Id.* at 3124:9–11; 3126:2–4; Plaintiff's Disclosures Pursuant to Rule 26(a) (Doc. 18).)

Plaintiff's trial counsel claims, relying on its own prior affidavit, that it issued a litigation hold letter to Sleepy's "at or about the time the parties exchanged litigation hold letters," referring to letters exchanged between trial counsel in 2008. (Plaintiff's Opp'n at p. 7.)  And Plaintiff incredibly argues that Select Comfort's assertion that Plaintiff did not issue a litigation hold is "baseless."  (*Id.*)  But there are several problems with this dubious claim.  First, on April 7, 2009 Select Comfort specifically requested in discovery:

> All litigation hold letters or other communications disseminated to Sleepy's personnel that specifically relate to this lawsuit and retaining and collecting evidence related to it, including the date of distribution and the distribution list.

(Affidavit of Heidi A.O. Fisher ("Fisher Aff.") ¶ 13, Ex. J at p. 4 (Request No. 4).)  Plaintiff refused to produce anything in response to this request.  (*Id.*)  That failure indicates that either (1) no such letter was sent to Sleepy's, or that (2) the letter, if sent, was never "disseminated to Sleepy's personnel."   Second, even if Plaintiff's outside counsel did send such a letter to Sleepy's, it was too little too late.  Indeed, this fictitious letter would have been issued over a year after the January 3, 2007 meeting, roughly a year after it was clear that Plaintiff's trial counsel had already been retained in this matter (*see* Trial Ex. D-173),[5] and almost a year after Plaintiff filed its first complaint against Select Comfort.  Moreover, the secret shoppers have testified they were not instructed to retain documents, and the requested documents were not preserved.  (*See* Addendum A.)

---

[5] The admissibility of D-173 is pending and is the subject of Defendant's brief at Doc. No. 776.

## II.   THE MANUFACTURED SECRET SHOP REPORTS ARE NOT BUSINESS RECORDS AND PLAINTIFF CANNOT SIDE-STEP ITS PRESERVATION OBLIGATIONS BY CLAIMING THEY ARE.

Plaintiff attempts to ignore the clear record of its failure to preserve and produce relevant evidence that was requested in discovery by arguing that the secret shops its employees conducted were performed in the ordinary course of business and, therefore, the altered shop reports it has presented at trial are trustworthy.  Not only is Plaintiff's assertion that the shop reports are business records factually inaccurate, but this argument misses the point.  Regardless of the purpose of the secret shops, Plaintiff had a duty to preserve all evidence regarding the secret shops, including e-mails, notes, reports and recordings that the secret shoppers created, as soon as litigation against Select Comfort was anticipated.  (*See infra*, pp. 11–13.)  Plaintiff had a duty to preserve that evidence so it could be located and disclosed to Select Comfort during discovery in response to document requests.  Having been hauled into court and subjected to nearly five years of litigation by Sleepy's, it was Select Comfort's right to receive and review all of the relevant evidence to build its defense—not just that evidence that Sleepy's created to support its own case.

Moreover, Plaintiff's argument that the shop reports are business records is belied by testimony of many of its witnesses.  Several of Plaintiff's own witnesses testified that the instructions they received to conduct their secret shops of Select Comfort stores were out of the ordinary.  (*See* Jesus Arroyo, Trial Tr. 641:15–642:5, Mar. 29, 2012; Gerald Petrillo, Trial Tr. 815:5–8; 816:10–13; 838:13–16; 848:23–848:6, Mar. 30, 2012; Joseph Seth, Trial Tr. 906:16–21; 929:6–930:20, Apr. 2, 2012.)  Indeed, for some of Sleepy's secret shoppers, this was the first (and only) time they had *ever* conducted a secret shop of a Select Comfort store.  (Joseph Seth, Trial Tr. 934:5–10; Steve Puran, Trial Tr. 1135:20–24, Apr. 4, 2012; Robert Gorman, Trial Tr. 1236:16–21; 1258:20–25, Apr. 5, 2012; John Giacobbe, Trial Tr. 1592:2–6, Apr. 11, 2012.)

Moreover, Plaintiff's witnesses consistently testified that a person named Sam Retenski prepared the altered shop reports Plaintiff produced and relied upon at trial.  (*See, e.g.,* Robert Gorman, Trial Tr. 1282:25–1283:8; Michael Grinnan, Trial Tr. 1330:5–14, Apr. 9, 2012; David Kapij, Trial Tr. 1655:9–1656:1.)  Notably, Plaintiff failed to call Ms. Retenski to testify regarding how the altered shop reports were prepared or that they are even accurate.  Furthermore, the Court correctly refused to admit the altered shop reports as business records when it refused to admit Plaintiff's bulk Exhibit PX-1 into evidence.  (Trial Tr. 252:2–253:12.)

## III.   THE HISTORY OF DISCOVERY IN THIS CASE DEMONSTRATES PLAINTIFF'S ATTEMPTS TO HIDE ITS FAILURE TO PRESERVE DOCUMENTS AND SPOLIATION—FURTHER DEMONSTRATING ITS BAD FAITH.

Finally, Plaintiff makes several false claims in its brief in an attempt to avoid recriminations for its behavior and to place the blame for its own failures on Select Comfort. The most egregious of these is Plaintiff's claim that "[t]he parties agreed that the initial phase of discovery would be limited to a review of the files of six key Sleepy's employees and Sleepy's general files . . . [r]eview of these files yielded a limited number of shop report emails, but no recordings, and Select Comfort did not request a more extensive search."  (Plaintiff's Opp'n at p. 8.)  Plaintiff also incredibly asserts that "Select Comfort never specifically requested the notes and emails and it never raised Sleepy's non-production of this information . . . ." and argues that "Select Comfort is not prejudiced by information it did not specifically request."  (Plaintiff's Opp'n at p. 8.)  These, to put it mildly, are serious misrepresentations to the Court that themselves warrant sanctions. Fed. R. Civ. P. 11(b)(3), (c).  The Fisher Affidavit accompanying this memorandum attaches the relevant document requests, responses, and letters exchanged by the parties' counsel which plainly document the falsity of Plaintiff's reckless assertions and demonstrates Select Comfort's diligence in pursuing the destroyed evidence.

For example,[6] the parties did not agree to a broad limit on the "initial phase of discovery."  Rather, they agreed that Plaintiff could limit its search of files with respect to *one* document request only that was specifically related to communications between the parties to this litigation:   "All documents concerning communications between Sleepy's and Select Comfort."  (Fisher Aff. ¶ 2, Ex. A at 4 (Request No. 2).)  For every other document request propounded, Select Comfort agreed to no such limitation.   That is clear in both Plaintiff's responses to document requests and several subsequent letters exchanged between the parties. (Fisher Aff. ¶¶ 3–8, Exs. B–E.)  For example, on July 22, 2008 Select Comfort wrote to Plaintiff:

> We also understand, as *this limitation was not placed on any other responses*, that *all company records and communications are being searched* for documents in response to the *other thirty-five requests*.

(Fisher Aff. ¶ 4, Ex. C at 2 (July 22, 2008 letter to du Pont).)  The "other thirty-five requests" included, specifically, a request for:

> All documents and recordings concerning Shop Reports of Select Comfort stores including any and all transcripts or other recitation of events described in the Shop Reports.

(Fisher Aff. ¶ 2, Ex. A at 4) (emphasis added).  This request for "all documents and recordings concerning Shop Reports" which included, specifically, all "other recitation[s] of events described in the Shop Reports" obviously encompassed notes and original emailed shop reports prepared by the shoppers.  *See* Local Rule E.D.N.Y. 26.3 (incorporating definition of "document" into all requests for discovery and specifying that "[a] draft or non-identical copy is

---

[6]   Select Comfort urges the Court to review the entire Fisher Affidavit and referenced portions of the attached documents for a more complete picture.  Select Comfort discusses only those portions of the Fisher Affidavit and related documentation in this memorandum as necessary to refute Sleepy's most egregious misrepresentations.

a separate document within the meaning of this term.")[7]   The document request itself belies Plaintiff's curious assertion that Select Comfort did not request this evidence.

Not only did Plaintiff fail to produce requested documents, including emails, but on September 15, 2008 Select Comfort was forced to bring a motion to compel before Magistrate Judge Lindsay to spur Plaintiff's production.  (September 15, 2008 Fisher Letter Motion (Doc. No. 28).)   At that time, Magistrate Lindsay sanctioned Plaintiff for withholding documents. (Oct. 22, 2008 Order, Lindsay J. (Doc. No. 37).)   Further, because Plaintiff's discovery production was so poor and because Plaintiff obstinately claimed that it had already produced the "bulk" of documents in its possession (Fisher Aff. ¶ 9, Ex. F), Select Comfort propounded an interrogatory in an attempt to determine Plaintiff's discovery efforts, requesting that Plaintiff:

> Identify and describe in detail each and every step and/or process that you have taken to locate and produce documents in response to Defendants' First Request for Production of Documents to Plaintiff including, but not limited to, a discussion of databases and files searched, search terms used, methodology of the search, and which specific custodian's files have been searched.

(Fisher Aff. ¶ 10, Ex. G at p. 5 (Interrogatory No. 4).)

Plaintiff refused to provide any meaningful response (*id*.), prompting Select Comfort's counsel to conduct a meet-and-confer and write two additional letters to Plaintiff's counsel. (Fisher Aff. ¶¶ 11, 12, Ex. H, I.)   Throughout this process, Select Comfort specifically explained the reason for its diligence:

> Select Comfort propounded this interrogatory to learn Sleepy's efforts to search for and produce documents in response to Select Comfort's requests.  This was prompted by a review of the meager documents that Sleepy's has produced in this litigation and the notable absence of email communications, both between the

---

[7]   In addition, Select Comfort specifically requested "each document and all non-identical copies including copies with marginal notes or deletions, known or available to you, regardless of whether these documents are possessed directly by you or any of your employees, agents, representatives, investigators or by your attorneys or their agents, employees, representatives, or investigators."  (Fisher Aff. Ex. A p. 3.)

parties and internally within Sleepy's, and other documents that circumstances suggest exist but have not been produced.

(Fisher Aff. Ex. I at p. 3.)[8]

Finally, throughout this entire struggle with Plaintiff to obtain documents requested in discovery, Select Comfort was ignorant of one of the most critical pieces of information relevant to the secret shops—the November 6, 2006 meeting in which Sleepy's internally discussed this litigation and deferred meeting with Select Comfort so it could conduct the secret shops. The transcript of this meeting is Trial Ex. D-95. Although the document was covered by pending document requests served on June 12, 2008, Plaintiff failed to produce it. Rather, Plaintiff only produced this document after Select Comfort was forced to move to compel production of documents Plaintiff had improperly withheld as privileged, and Magistrate Judge Lindsay ordered their production. (May 26, 2009 Order, Lindsay Mag. J. (Doc. No. 73).) This document informed Select Comfort for the first time when Plaintiff's obligation to preserve documents was actually triggered, and it revealed Plaintiff's scheme to manufacture secret shop evidence in furtherance of this litigation.

Given Plaintiff's actions throughout discovery, Plaintiff's suggestion that Select Comfort was somehow to blame for not figuring out the depth of Plaintiff's spoliation or that it showed no particular interest in the documents that are the subject of this motion is stunning.

## IV. ADDITIONAL TRIAL TESTIMONY FROM FINAL SHOPPER WITNESS.

Since Defendant's last supplementation of its motion for sanctions filed on April 18, 2012, yet another Sleepy's employee testified about documents he created which were not

---

[8]  In the parties' meet and confer on this issue, Plaintiff stated that it would not respond to this interrogatory because it did not want a "verified" response on the record. (Fisher Aff. ¶ 12, Ex. I at pp. 3–4.) It is now clear that Plaintiff's counsel knew even then that Sleepy's had major spoliation issues and that it was complicit in hiding those issues from Select Comfort.

preserved and were not produced to Select Comfort, despite the fact that Select Comfort specifically requested them in discovery:

- <u>Paul Mahoney</u> – Paul Mahoney testified that he performed three secret shops of Select Comfort stores, pursuant to two sets of instructions he received.  (Paul Mahoney, Trial Tr. 1900:13–1901:5, 1913:3–9; 1914:6–15; 1921:3–22, Apr. 19, 2012.)  Mr. Mahoney testified that he received each set of instructions via e-mail.  (*Id.*)  Mr. Mahoney also testified that after he performed each of three secret shops he conducted on November 8, 2006, January 16, 2007 and January 17, 2007, he prepared an e-mail reporting his findings and sent those e-mails to his boss, Dino Savelli.  (*Id.* at 1905:13–16; 1915:22–1916:1; 1925:3–19; 1929:24–1930:10.)

As with each and every one of Plaintiff's secret shopper witnesses, Mr. Mahoney was never instructed to retain any of the e-mails he sent or received regarding his secret shops of Select Comfort stores and those e-mails no longer exist.  (*See* Apr. 10, 2012 Memo. at pp. 5–8; Apr. 18, 2012 Memo. at pp. 2–4; Paul Mahoney, Trial Tr. 1937:21–1938:1; 1938:22–1939:4; 1940:4–19; 1943:11–23.)

## **ARGUMENT**

## I.   **PLAINTIFF FAILED TO ISSUE A WRITTEN LITIGATION HOLD WHEN LITIGATION WAS REASONABLY ANTICIPATED.**

The record reflects that Plaintiff failed to preserve evidence that it knew would be relevant to future litigation.  "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that evidence may be relevant to future litigation."  *In re Terrorist Bombings of U.S. Embassies in E. Africa v. Odeh*, 552 F.3d 93, 148 (2d Cir. 2008).  "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.'  A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466

(S.D.N.Y. 2010); *Yu Chen v. LW Rest., Inc.*, No. 10 CV 200, 2011 WL 3420433, at *9 (E.D.N.Y. Aug. 3, 2011).

The facts show that Sleepy's founder and Chairman, Harry Acker, discussed initiating litigation against Select Comfort during a November 6, 2006 telephone conference with Michael Bookbinder, and that Mr. Bookbinder agreed that Sleepy's was contemplating suing Select Comfort as of November 6, 2006.  (Michael Bookbinder, Trial Tr. 495:2–5; D-95.)  During that November 6, 2006 call Mr. Acker instructed Mr. Bookbinder to delay a business review meeting between Select Comfort and Sleepy's so Sleepy's could conduct a "blitz" of secret shops on Select Comfort's stores.  (Michael Bookbinder, Trial Tr. 492:8–11; 496:19–4; D-95.)  Harry Acker was the one who ordered the secret shops be conducted. (Michael Bookbinder, Trial Tr. 223:9–13.)  This litigation is the very litigation discussed during that meeting, and the secret shops introduced at trial via testimony and documentary evidence are the fruits of the secret shops conducted as a result of that meeting.  Indeed, all but two of the secret shops introduced into evidence through testimony at trial occurred after November 6, 2006.[9]  Thus, as of November 6, 2006, Plaintiff should have known that evidence created during its "blitz" of secret shops may be relevant to future litigation, and should have issued a written litigation hold instructing its employees to ensure preservation of any documents created during the "blitz."

Even ignoring that evidence, it is beyond dispute that Plaintiff had an obligation to preserve documents by January 3, 2007.  Plaintiff's General Counsel, Adam Blank, admits that by January 3, 2007, Sleepy's anticipated suing Select Comfort.  (Adam Blank, Trial Tr. 3123:18–3124:23.)  But even then, neither Mr. Blank, nor anyone else, issued a written litigation

---

[9]    The two other shops occurred two days (November 4, 2006) and one day (November 5, 2006) before the meeting.  Accordingly, documents related to those shops would still have been in existence at that time, and a prompt litigation hold would have preserved the relevant evidence.

hold informing all key players, including Sleepy's secret shoppers, to preserve all documents which may be relevant to the litigation Sleepy's intended to bring against Select Comfort. Indeed, the majority of the secret shops testified about during trial (24 out of 34) occurred after January 3, 2007.  (*See* Addendum A.)  As a result of Plaintiff's failure to do anything to preserve the original reports, e-mails, notes and recordings created by its secret shoppers, they were evidently destroyed.

Notwithstanding its obligation, Plaintiff incredibly argues that it did not have an obligation to preserve ***all*** of the secret shop evidence.  (Pl.'s Opp'n at 11) (arguing no obligation to preserve "every dictation recording, handwritten or typewritten draft, shorthand book, marked up revision, sticky note, related marginalia, or other precursor").  But when an obligation to preserve evidence attaches and a litigant is barred from destroying "unique evidence," that is exactly what it means.  *See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (finding duty to preserve notes of interviews and notes relied on to draft summary of hiring process); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 212 F.R.D. 178, 222, 231 (S.D.N.Y. 2003) (ordering sanction in the form of "judgment as to liability against defendants" and making clear that "document" includes a "*draft* or *other nonidentical copy*") (emphasis added).  Moreover, because the so-called "shop reports" were created specifically in anticipation of this litigation, Plaintiff's position is even more dubious. Sleepy's is apparently advocating a rule that would allow a plaintiff to plan for litigation and manufacture evidence in support of its case but refuse to provide the drafts, notes, and facts underlying that proffered evidence in discovery by claiming there was no obligation to preserve that evidence.

13

## II.   SLEEPY'S CONDUCT WAS AT A MINIMUM GROSSLY NEGLIGENT.

### A.   The Court Need Not Find Plaintiff Intentionally Destroyed Documents To Issue Sanctions.

Plaintiff argues that it did not act with the requisite "culpable state of mind," claiming that the Court must find that it had "intentionally" destroyed the original recordings and other multitude of secret shop evidence for sanctions to be warranted.  But "a finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator."  *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) *cert. denied*, 528 U.S. 1119 (2000).

Plaintiff argues that ordinary negligence does not rise to the level of a "culpable state of mind" by relying on selected criminal cases in which the court required intentional conduct by the government for sanctions.  However, those isolated cases did not change the settled law of the Second Circuit.  Over a decade ago, the Second Circuit discussed the relevant legal standard at length and instructed that "a culpable state of mind" sufficient for sanctions includes a *continuum* of conduct from negligence to intentionality, instructing courts to make a case-by-case determination as to the level of culpability and severity of sanction.  *See Reilly*, 181 F.3d at 267–68; *Byrnie*, 243 F.3d at 108.  That position was reiterated in *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002).  And just recently, on January 19, 2012, the Second Circuit confirmed that this remains the law of the circuit, citing *Residential Funding* and explaining that sanctions for spoliation of evidence "*may be appropriate in some cases involving the negligent destruction of evidence.*"  *Twitty v. Salius*, 455 Fed. Appx. 97, 2012 WL 147913, at *2 (2d Cir. Jan. 19, 2012)[10] (finding no abuse of discretion in denying sanctions where original video tape was erased through negligent improper use of copying equipment

---

[10]   Accordingly, Plaintiff is further incorrect when it claims that "under the Second Circuit's most recent authority, sanctionable spoliation requires that a party *intended* to destroy evidence."  (Plaintiff's Opp'n (Doc. 772) at p. 12.)

when opposing counsel had already viewed original tape before it was destroyed, and where there was an undisputed duplicate copy for use at trial).[11]  Plaintiff willfully ignores this case law in its continued attempt to evade ramifications for its egregious conduct.

**B.     Plaintiff's Conduct Was At Least Grossly Negligent.**

Here, Defendant has offered overwhelming evidence that Plaintiff's behavior was well beyond negligent—it was at least grossly negligent if not bad faith.  Plaintiff acted in at least a grossly negligent manner by failing to issue a written litigation hold and failing to notify all key players to ensure that both their electronic and paper records were preserved as soon as litigation was contemplated.  "Possibly after October, 2003, when *Zubulake IV* was issued, and definitely after July 2004, when the final relevant *Zubulake* opinion was issued, the failure to issue a *written* litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information."  *Pension Committee*, 685 F. Supp. 2d at 467 (emphasis in original); *see also Williams v. New York City Transit Auth.*, No. 10 cv 0882, 2011 WL 5024280, at *4, *6–*7 (E.D.N.Y Oct. 19, 2011) ("[T]he failure to issue a *written* litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information.") (citation omitted); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221

---

[11]  Even before the Second Circuit issued its opinion in *Twitty*, a cursory search of district court cases in the Second Circuit—and specifically in the Eastern District of New York—over the past year easily demonstrates that the standard remains unchanged and "[o]rdinary negligence is sufficient for a finding of a culpable state of mind."  *Siani v. State Univ. of N.Y. at Farmingdale*, No. 09-CV-407, 2011 WL 2580361, at *3 (E.D.N.Y. June 28, 2011) (Bianco, J.); *see also Williams*, 2011 WL 5024280, at *3, *8 (Pollack, Mag. J.); *Pirrello v. Gateway Marina*, No CV 2008-1798, 2011 WL 4592689, at *4 (E.D.N.Y Sept. 30, 2011) (Go, Mag. J.); *Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, No 10-cv-2618, 2011 WL 3471508, at *18 (E.D.N.Y Aug. 5, 2011) (Mann, Mag. J.); *Green v. Netsmart Techs., Inc.*, No. CV 08-4971, 2011 WL 2225004, at *7–*8 (E.D.N.Y. Feb. 28, 2011), *report and recommendation adopted by* 2011 WL 2193399 (E.D.N.Y. June 2, 2011) (Platt, J.); *Liberman v. FedEx Ground Package Sys., Inc.*, No. 09-cv-2423, 2011 WL 145474, at *4 (E.D.N.Y. Jan. 18, 2011).

(S.D.N.Y. 2003) (finding a party is grossly negligent if its fails to preserve evidence after it is on notice of its duty to preserve the evidence); *Toussie v. Cnty. of Suffolk,* No. 01-6716, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007) (failure to issue a litigation hold at the outset of litigation constitutes gross negligence); *Chan v. Triple 8 Palace, Inc.,* No. 03-CV-6048, 2005 WL 1925579, at *7 (S.D.N.Y.2005) (same); *Star Direct Telecom, Inc. v. Global Crossing Bandwith, Inc.*, 05-CV-6734T, 2012 WL 1067664, at *4 (W.D.N.Y. Mar. 22, 2012) (same); *Yu Chen*, 2011 WL 3420433 at *12 (same).

Additionally, the failure to collect documents (either paper or electronic) from "key players" like Mr. Bookbinder and the secret shoppers constitutes gross negligence or willfulness.[12] *Pension Committee*, 685 F. Supp. 2d at 465; *Williams*, 2011 WL 5024280, at *4, *7 ("[F]ailure to collect and preserve records from key players 'constitutes gross negligence.'") (citation omitted).   Plaintiff did not issue a written litigation hold, did not inform its employees of their duty to preserve documents, and did nothing to preserve the e-mails, notes, original reports and recordings the secret shoppers created.   As a result, evidence regarding Plaintiff's secret shops that goes to the heart of each of Plaintiff's claims was, in fact, destroyed.

Even if Mr. Blank gave his so-called verbal instructions to "hold on to" documents to a handful of Sleepy's executives on January 3, 2007, Plaintiff did not instruct its other employees, including the secret shoppers, to retain documents relating to the primary evidence Plaintiff relies

---

[12]  "'Key players' have been defined as 'the people identified in a party's initial disclosures and any subsequent supplement thereto.   Because these 'key players' are '[those] likely to have relevant information,' it is particularly important that the preservation duty be communicated clearly to them.'"   *Yu Chen*, 2011 WL 3420433 at *9 (quoting *Zubulake v. USB Warburg L.L.C.*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)).   On April 10, 2008, Plaintiff filed its Initial Disclosures, identifying each of the secret shoppers who have testified at trial as individuals "likely to have discoverable information concerning the claims raised by Plaintiff."   Plaintiff also identified "documents concerning shop reports" as among those documents in its possession, custody and control.   (Plaintiff's Initial Disclosures Pursuant to Rule 26(a) (Doc. 18).)

upon to support is claims—its secret shops.  Plaintiff's failure to do so and the resultant destruction of evidence is inexcusable.  In fact, the record indicates that Sleepy's destroyed documents available from at least two sources.  As Plaintiff's counsel concedes, the e-mails and audio recordings of Plaintiff's secret shops were sent to Mr. Bookbinder. (Plaintiff's Opp'n at p. 4.)  Thus, even assuming, *arguendo*, that Plaintiff had no duty to ask its secret shoppers to preserve documents and recordings, Mr. Bookbinder was so informed and Plaintiff still did not preserve evidence such as e-mails that Mr. Bookbinder sent to or received from the secret shoppers, recordings that Mr. Bookbinder received from the secret shoppers, or original reports Mr. Bookbinder received from those secret shoppers.  Furthermore, Plaintiff has never explained why the e-mails its employees sent and received were not preserved and retrieved from Sleepy's e-mail servers.  In fact, Plaintiff has never produced any explanation as to why the evidence was destroyed.

Select Comfort's requests for production were clear.  And Select Comfort's continued diligence in attempting to obtain discovery from Plaintiff when suspected critical evidence not forthcoming is detailed in the Fisher Affidavit and its attached documents.  It was not Select Comfort's duty to assume that Sleepy's had failed to satisfy its discovery obligations and produce evidence in its possession, which only Sleepy's—and not Select Comfort—knew existed.  And Plaintiff even fabricates an "agreement" between the parties in an attempt to excuse itself for its failure to search for documents, but in its haste to manufacture an explanation, it has forgotten that such an agreement wouldn't absolve Plaintiff of its obligation to preserve such documents in the first place—which it clearly did not do.

The clear pattern of spoliation and attempted cover-ups belies Plaintiff's argument that its conduct was merely negligent or that it should not be sanctioned.  Indeed, Plaintiff's actions here

are similar to those found to constitute bad faith in *Metro. Opera*, 212 F.R.D. at 221–24 (bad faith found when party exhibits an "aggressively willful" pattern, which included "belittling" opposing counsel's requests for documents and consistently changing stories to fit the new facts or avoid recriminations). Here, Plaintiff failed to issue a written litigation hold when litigation was reasonably anticipated, failed to inform any secret shoppers of their duty to preserve documents, blamed Defendant for its lack of "interest" in the documents, lied to the Court, and has consistently altered its story. This demonstrates intentional, bad faith conduct.

## III.   PLAINTIFF'S CONDUCT SUPPORTS AN INFERENCE THAT THE EVIDENCE WOULD HAVE BEEN FAVORABLE TO SELECT COMFORT.

Because Plaintiff acted in a grossly negligent or intentional manner, that fact alone is sufficient to support an inference that the missing notes, e-mails, reports and recordings are relevant, and that Select Comfort has been prejudiced. "[W]hen evidence is destroyed in bad faith *or with gross negligence*, that alone has been found to be sufficient to support an inference that the missing evidence would have been favorable to the prejudiced party, and thus relevant." *Artista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 141 (S.D.N.Y. 2009) (emphasis added). "Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a *grossly negligent* manner." *Pension Committee*, 685 F. Supp. 2d at 467 (emphasis added). "Severe sanctions for discovery violations, including dismissal, may be imposed for intentional conduct, such as bad faith or *gross negligence.*" *Great N. Ins. Co. v. Power Cooling, Inc.*, No. 06-CV-874, 2007 WL 2687666, at *9 (E.D.N.Y. Sept. 10, 2007) (emphasis added); *see also Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1064 (2d Cir. 1979) (plaintiff's grossly negligent failure to produce documents constituted "fault" warranting sanction of preclusion of evidence even where preclusion was tantamount to dismissal of case).

Plaintiff's assertion that the evidence it destroyed could not be relevant or adverse to Sleepy's case is incorrect.  For example, Plaintiff brings claims for slander.  Thus, what was actually said during the secret shops is acutely important.  Therefore, Select Comfort does take issue with the fact that all Plaintiff has produced are altered shop reports, created by its executives who knew that Plaintiff was contemplating bringing litigation against Select Comfort. Plaintiff claims that the altered shop reports are "substantially the same" as the missing evidence. (Plaintiff's Opp'n at p. 20.)  But—particularly because of Plaintiff's spoliation—we have only Plaintiff's self-serving testimony as proof.  And when words matter, "substantially the same" is simply not sufficient.  Altered shop reports created by or at the direction of Michael Bookbinder, who knew that the founder and Chairman of Sleepy's wanted to bring litigation against Select Comfort, are no substitute for the destroyed tape recordings, which would actually evidence the words that were used during the secret shops, or the original e-mails, reports, or notes that the secret shoppers themselves created over five years ago.

Moreover, under cross examination, several of Plaintiff's witnesses grudgingly admitted that the altered shop reports did not, as a matter of fact, accurately reflect everything that occurred during the secret shops themselves.  (*See, e.g.,* Tyler Paiva, Trial Tr. 1445:4–1446:14, Apr. 10, 2012; Jacqueline Gruman, Trial Tr. 1476:9–1477:1, Apr. 10, 2012; Paul Mahoney, Trial Tr. 1930:11–1932:2; 1935:10–1936:3; 1944:3–1946:4; Sarah Mahaffy, Trial Tr. 1417:20–1418:8; 1419:7–11, Apr. 10, 2012.)  When recordings were available, they didn't always match the contents of the altered shops reports.  (*See* David Kapij, Trial Tr. 1686:2–1687:8, Apr. 12, 2012 (discussing discrepancies between Px 1.18 and Px 4.9).)  Moreover, the testifying shoppers all admitted that they had never seen the altered shop reports until either just before trial or at the time their depositions were taken, years after the secrets shops occurred and their original reports

or notes were created, and they never compared their original reports or notes to the altered

documents offered at trial.  Therefore, it is not credible to believe their testimony that the altered

shop reports offered at trial were "substantially the same" as the original destroyed documents.

Finally, Select Comfort demonstrated at trial that several shop reports not introduced by

Plaintiff showed the shoppers candidly admitted to shamelessly baiting Select Comfort

employees in an attempt to lure them into saying something negative about Sleepy's.  (Adam

Blank, Trial Tr. 3139:20–3140:14 (Px 1.36); 3141:14–3142:20 (Px 1.44); 3145:4–3145:21 (Px

1.106); 3146:13–3147:19 (Px 1.109).)  That indicates that the absent notes, recordings, and

original shop reports would likely show more of the same, undercutting Plaintiff's entire case.

## IV.     THE COURT SHOULD STRIKE PLAINTIFF'S SECRET SHOPPER EVIDENCE AS A SANCTION FOR ITS SPOLIATION OF EVIDENCE.

It is within the Court's discretion to determine what sanctions are most appropriate under

these circumstances.  *Reilly*, 181 F.3d 253 at 267.  What is clear is that some sanction is

warranted given Plaintiff's utter disregard of the discovery rules for which Plaintiff has provided

no credible explanation.  Preclusion sanctions, or at a minimum adverse inference sanctions, are

warranted here.

The cases Plaintiff cites to argue that no sanction should be imposed are factually distinct

from the present circumstances.  In *Abramowitz v. Inta-Boro Acres Inc.*, the evidence at issue

was erased pursuant to the defendant's standard document retention policies before the defendant

was on notice of the evidence's potential relevance to the litigation.  No. 98-cv-4139, 1999 WL

1288942, at *5 (E.D.N.Y. Nov. 16, 1999).  Here, Plaintiff's General Counsel testified that

Plaintiff had no document retention policy in place at the time.  (Adam Blank, Trial Tr. 3174:11–

3174:16.)  Indeed, Select Comfort requested a copy of any such policy in discovery and received

none.  (Fisher Aff. Ex. K at p. 5 (Interrogatory No. 5).)  And Plaintiff cannot seriously contend

that it did not recognize the relevance of the secret shop evidence to its planned litigation. Similarly, in *Klezmer v. Buynak*, the court determined that an adverse inference instruction was not warranted against defendant because the plaintiff could have obtained evidence of whether the machine at issue was defective by inspecting the machine itself, rather than relying on maintenance logs that were destroyed.   227 F.R.D. 43, 51–52 (2005).   Sanctions were not imposed because the plaintiff too was at fault.   *Id*. at 52.   Here, as discussed earlier, Plaintiff alone was in possession of the critical shop evidence.   Plaintiff knew it was contemplating litigation against Select Comfort, but it did nothing to preserve records it knew would form the basis of its claims.   Select Comfort had no method beyond the one it exercised (pursuing the documents and evidence in discovery) to obtain the information Plaintiff destroyed.

Select Comfort requests that the Court exercise its power, and sanction Plaintiff for its inexcusable conduct.

Date:  May 29, 2012                    **OPPENHEIMER WOLFF & DONNELLY LLP**


By: s/ Heidi A.O. Fisher_____
    Heidi A.O. Fisher (HF6782)

Andrew S. Hansen  (AH 6788)
Heidi A.O. Fisher (HF 6782)
Michelle R. Schjodt (MS 8059)
3300 Plaza VII Building
45 South Seventh Street
Minneapolis, Minnesota  55402
Telephone:   (612) 607-7000
Facsimile:    (612) 607-7100
E-Mail:  *ahansen@oppenheimer.com*
       *hfisher@oppeneheimer.com*
       *mschjodt@oppenheimer.com*

**OLSHAN GRUNDMAN FROME ROSENZWEIG &
WOLOSKY LLP**
Herbert C. Ross, Jr. (HR 8482)
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone: (212) 451-2300

*Attorneys for Defendants Defendant Wholesale
Corporation, Defendant Retail Corporation, and
Defendant Corporation*

**Second Supplemental Addendum A**

**Testimony and Exhibits to be Stricken from the Record**

| Witness | Date of Testimony | Secret Shop | Trial Transcript Pages to be Stricken | Exhibits to be Stricken |
|---|---|---|---|---|
| James Constantinides | Mar. 28, 2012 | Jan. 12, 2007<br><br>Queens Center Mall | 574:8–598:18 | Px 3.11 |
| Jesus Arroyo | Mar. 28, 2012<br><br>Mar. 29, 2012 | Jan. 12, 2007<br><br>Palisades Mall | 621:21–623:18<br><br>626:13–655:14 | Px 1.64 |
| Deborah Zaffron | Mar. 29, 2012 | Nov. 5, 2006<br><br>Westfield Bayshore Mall | 691:25–719:16<br><br>783:18–784:16 | Px 1.11<br><br>Px 1.21<br><br>Px 3.17 |
| Deborah Zaffron | Mar. 29, 2012 | Jan. 26, 2007<br><br>Roosevelt Field Mall | 720:9–736:22<br><br>784:17–785:13 | Px 1.101<br><br>Px 3.6 |
| Deborah Zaffron | Mar. 29, 2012 | Jan. 26, 2007<br><br>Westfield Bayshore Mall | 736:23–747:9 | Px 1.102<br><br>Px 3.5 |
| Deborah Zaffron | Mar. 29, 2012 | Mar. 8, 2007<br><br>Walt Whitman Mall | 747:10–755:22 | Px 1.121<br><br>Px 3.16 |
| Deborah Zaffron | Mar. 29, 2012 | Mar. 8, 2007<br><br>Smith Haven Mall | 755:24–772:15 | Px 1.120<br><br>Px 3.4 |
| Deborah Zaffron | Mar. 29, 2012 | Roosevelt Field Mall | 772:17–783:3 | Px 3.18 |

| Witness | Date of Testimony | Secret Shop | Trial Transcript Pages to be Stricken | Exhibits to be Stricken |
|---|---|---|---|---|
| Gerald Petrillo | Mar. 30, 2012 | Jan. 16, 2007<br><br>Oxford Valley Mall | 810:10–832:19 | |
| Anthony Colon | Mar. 30, 2012 | Nov. 4, 2006<br><br>Broadway & 72nd | 863:7–880:16 | |
| Joseph Seth | Apr. 2, 2012 | Jan. 15, 2007<br><br>Staten Island Mall | 904:16–926:23 | Px 1.80 |
| Anthony Perez | Apr. 2, 2012 | Nov. 8, 2006<br><br>Palisades Mall | 938:2–954:15 | |
| Anthony Perez | Apr. 2, 2012 | Jan. 15, 2007<br><br>Poughkeepsie Galleria | 954:18–980:21 | |
| Steve Puran | Apr. 4, 2012 | Jan. 26, 2007<br><br>Broadway & 72nd | 1106:25–1129:24<br><br>1136:16–1143:15 | |
| Tyler Paiva | Apr. 4, 2012 | Jan. 14, 2007<br><br>Jefferson Valley Mall | 1156:19–1197:18<br><br>1444:15–1454:1 | Px 1.73 |
| Robert Gorman | Apr. 5, 2012 | Nov.8, 2006<br><br>Walt Whitman Mall | 1258:5–1266:19 | |

| Witness | Date of Testimony | Secret Shop | Trial Transcript Pages to be Stricken | Exhibits to be Stricken |
|---------|-------------------|-------------|---------------------------------------|-------------------------|
| Robert Gorman | Apr. 5, 2012 | Jan. 10, 2007 Bay Shore Mall Jan. 20, 2007 Bay Shore Mall | 1236:22–1250:14 | |
| Michael Grinnan | Apr. 9, 2012 | Nov. 8, 2006 Deptford Mall | 1298:1–1332:5 | Px 1.38 Px 3.15 |
| Michael Grinnan | Apr. 9, 2012 | Jan. 17, 2007 Morristown Mall | 1332:6–1341:15 | |
| Michael Grinnan | Apr. 9, 2012 | Jan. 18, 2007 Morristown Mall | 1341:16–1349:15 | Px 1.91 |
| Sarah Mahaffy | Apr. 10, 2012 | Mar. 9, 2007 Westfarms Mall, CT | 1383:15–1405:12; 1415:17–1426:6 | Px 1.6 Px 1.4 |
| Sarah Mahaffy | Apr. 10, 2012 | Mar. 9, 2007 Meridien, CT | 1405:13–1409:22; 1426:7–1428:10 | Px 1.1 |
| Jacqueline Gruman | Apr. 10, 2012 | Feb. 6, 2007 Pottstown, PA | 1460:6–1472:25 1482:8–1486:20 | Px. 1.108 |
| Joseph Kilty | Apr. 11, 2012 | Jan. 12, 2007 Buckland Hills Mall | 1498:3–1515:17 | Px 1.61 |
| Joseph Kilty | Apr. 11, 2012 | Jan. 25, 2007 Providence Place Mall | 1515:18–1543:22 | Px 3.8 |

| Witness | Date of Testimony | Secret Shop | Trial Transcript Pages to be Stricken | Exhibits to be Stricken |
|---|---|---|---|---|
| Joseph Kilty | Apr. 11, 2012 | Jan. 25, 2007 Emerald Square Mall | 1543:23–1562:11 | Px 3.7 |
| Joseph Kilty | Apr. 11, 2012 | Jan. 30, 2007 Crystal Mall | 1562:12–1576:14 | Px 3.9 |
| David Kapij | Apr. 12, 2012 | Nov. 8, 2006 Enfield, CT | 1625:20–1647:25 | Px 3.2 |
| David Kapij | Apr. 12, 2012 | Nov. 2006 Manchester, CT | 1648:1–1659:14 | Px 3.1 |
| David Kapij | Apr. 12, 2012 | Nov. 30, 2006 Holyoke Mall | 1659:15–1678:21 | Px 1.113 Px 3.3 |
| Paul Mahoney | Apr. 19, 2012 | Nov. 8, 2006 Raceway Mall | 1897:18–1911:13 | |
| Paul Mahoney | Apr. 19, 2012 | Jan. 16, 2007 Raceway Mall | 1911:14–1920:18 | |
| Paul Mahoney | Apr. 19, 2012 | Jan. 18, 2007 East Brunswick Mall | 1920:19–1928:13 | |

Addendum A - iv