UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
SLEEPY'S, LLC,                                                  :
                                                               :
                          Plaintiff,                            :
                                                               :   07 CV 4018 (JS)
                     - against -                                :
                                                               :
SELECT COMFORT WHOLESALE CORPORATION,    :
SELECT COMFORT RETAIL CORPORATION and      :
SELECT COMFORT CORPORATION,                        :
                                                               :
                          Defendants.                          :
---------------------------------------------------------------- x


# PLAINTIFF'S [PROPOSED] FINDINGS OF FACT
## AND CONCLUSIONS OF LAW


TANNENBAUM HELPERN
  SYRACUSE & HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10022
(212) 508-6700
  *Attorneys for Plaintiff Sleepy's, LLC*


August 21, 2015

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iv

WITNESSES IN SUPPORT OF PLAINTIFF'S CASE .................................................. vii

FINDINGS OF FACT......................................................................................................... 1

The Parties and their Businesses...................................................................................... 1

The Retail Partner Relationship ....................................................................................... 2

    Select Comfort Designed its Retail Partner Program to Give its Own Retail Stores a
    Competitive Advantage .............................................................................................. 4

    From Select Comfort's Viewpoint, the Retail Partner Program's Purpose was to Gain
    Exposure and Consumer Acceptance of its Airbeds, Dispel their "Gimmicky" Image,
    and "Leverage" the Retail Partners' Distribution Points and Reputation................................. 5

    Select Comfort Considered its Plastic Foundation to be Superior to the Wood Foundation
    Provided to Sleepy's and Intended to Promote it as Such ........................................ 6

Select Comfort's Representations to Sleepy's Concerning the Personal Preference Line ............ 7

Negotiation of the Retail Partner Agreement.................................................................. 10

    Section 4(c) ............................................................................................................... 10

Launch of the Retail Partner Program at Sleepy's......................................................... 11

Launch of Select Comfort's Plan to Denigrate Sleepy's .............................................. 12

Sleepy's Vigorously Promoted the Select Comfort Beds Using Approaches That Select
Comfort Believed To Be Effective ................................................................................ 13

The Parties Continued to Do Business under the Same Terms after
The Nominal Expiration Date of the Retail Partner Agreement..................................... 16

Sleepy's Executive Team Investigates the Cause of the Poor Sales............................. 16

Sleepy's Uncovers the Pattern of Disparagement and Defamation by Select Comfort
that was Causing the Poor Sales of the Select Comfort Products at Sleepy's .............. 19

The Secret Shop Report Evidence Shows that Select Comfort Sales Personnel Systematically
Disparaged Sleepy's and its other Retail Partners to Actual Customers in Accordance
with Several Common Themes, and that this Disparagement was the Result of a
Centrally-Planned Business Strategy .......................................................................... 23

Wood-Related Denigration .................................................................................... 23

Warehouse-Related Denigration ........................................................................... 24

Warranty-Related Denigration .............................................................................. 25

Assertions that Sleepy's Sold Knock-Offs ........................................................... 25

Assertions that Sleepy's Sold Outdated Models ................................................... 26

Assertions that Sleepy's Wired Remote Control was inferior to the Wireless Remote
Control at Select Comfort .................................................................................... 26

Assertions that Sleepy's Models had Inferior Foam, Padding, Ticking, or Fabric ................ 26

Sleepy's Sold Generally Inferior Models ............................................................. 27

Sleepy's Sold Inferior Air Pumps & Refurbished Products ................................. 27

Comments Disparaging Sleepy's Generally .......................................................... 27

Select Comfort's Denigration of Retail Partners and their Products was More Virulent in
Sleepy's Territory than in the Rest of the Country ................................................ 28

Sleepy's Territory ................................................................................................. 29

Areas Adjacent to Sleepy's Territory .................................................................... 40

Outside Sleepy's Territory, any Disparagement by Select Comfort of its Retail Partners
was much Less Virulent than it was within Sleepy's Territory .............................. 42

Select Comfort's Sales Force Made Numerous Disparaging Statements About Sleepy's .......... 43

Sleepy's Decides to Confront Select Comfort ...................................................... 44

Select Comfort's Disparagement and Denigration of the Personal Preference Line in
Sleepy's Territory Caused the Poor Sales of Select Comfort Beds at Sleepy's Stores ............... 48

The Impact on Customers of Select Comfort's Disparagement and Denigration ...................... 50

Scott Cheshul (a Sleepy's senior regional sales manager) ..................................... 50

Tyler Paiva (a Sleepy's District Operations Manager) .......................................... 51

Deborah Zaffron (a former Sleepy's sales person) ............................................... 51

James Constantinides (a Sleepy's Regional Manager) .......................................... 52

Select Comfort Trained its Sales Force to Make Sales to Cross-Shoppers by Exploiting the Differences in the Product Line Carried by Sleepy's ................................................................. 52

Select Comfort's Advertising and Promotional Materials Reinforced the Disparaging Statements Made by Select Comfort's Sales Force ..................................................... 53

The Evidence Refutes Select Comfort's Alternative Causation Theory ................................... 54

Sleepy's Damages .............................................................................................................. 58

    Dr. Benjamin Wilner ....................................................................................................... 59

    Dr. Steven Schwartz ........................................................................................................ 60

CONCLUSIONS OF LAW ................................................................................................... 63

I.      SLEEPY'S HAS PROVED CAUSATION ................................................................... 63

    A.    Circumstantial Evidence is Sufficient to Show Causation and Damages; Direct Evidence is Not Required ......................................................................... 63

    B.    Direct Evidence Shows That Select Comfort's Conduct Affected The Purchasing Decisions of Actual Customers ......................................................... 67

    C.    Consumer Survey Evidence is Not Required ...................................................... 68

II.    SLEEPY'S HAS ESTABLISHED THE ELEMENTS OF EACH OF ITS CLAIMS ...... 69

    A.    Breach of § 4(c) of the Retail Partner Agreement ............................................. 69

    B.    Breach of the Implied Covenant of Good Faith and Fair Dealing ...................... 72

    C.    Unfair Competition ............................................................................................ 75

    D.    Slander *Per Se* ................................................................................................... 79

III.   SLEEPY'S HAS ESTABLISHED DAMAGES ............................................................ 81

SUMMARY ........................................................................................................................ 82

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305 (S.D.N.Y. 2008) .......... 78, 79

*Allan Dampf, P. C. v. Bloom*, 127 A.D.2d 719 (2d Dep't 1987) .................................................. 79

*Am. Electronics, Inc. v. Neptune Meter Co.*, 33 A.D.2d 157 (1st Dep't 1969) ........................... 79

*BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081 (7th Cir. 1994)........................................ 63

*Bolander v. Bolander*, 703 N.W.2d 529 (Minn. Ct. App. 2005) .......................................... 70, 73

*Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406 (2d Cir. 2000) ................................................ 79

*Bunch v. Artec Int'l Corp.*, 559 F. Supp. 961 (S.D.N.Y. 1983)................................................... 76

*Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d. Cir. 1999) ............................................................. 67

*Capitaland Heating & Cooling v. Capital Refrigeration*,
    134 A.D.2d 721, 521 N.Y.S.2d 202 (3d Dep't 1987) ........................................................... 76

*Cherne Contracting Corp. v. Marathon Petroleum Co.*,
    No. 04-4923, 2008 U.S. Dist. LEXIS 10482 (D. Minn. Feb. 11, 2008)............................ 70, 73

*Dynamic Air, Inc. v. Reichold, Inc.*,
    No. 05-CV-0955, 2007 U.S. Dist. LEXIS 57651 (D. Minn. Aug. 7, 2007) ...................... 70, 73

*Efco Corp. v. Symons*, 219 F.3d 734 (8th Cir. 2000)................................................................. 63

*Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556 (1959) .................................................. 76, 79

*Erickson v. Horing*, No. C4-02-138, 2002 WL 31163611 (Min. Ct. App. Oct. 1, 2002)............. 72

*Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 408 F.3d. 460 (8th Cir. 2005) ................ 70, 73

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002).......... 79, 80

*Getty Petroleum Corp. v. Island Transp. Corp.,* 878 F.2d 650 (2d Cir. 1989)........................... 79

*Herman Schwabe, Inc. v. United Show Machinery Corp.*, 297 F.2d 906 (2d Cir. 1962) ............. 67

*Hertz Corp. v. Avis*, 106 A.D.2d 246 (1st Dep't 1985)................................................................ 79

*Ideal Publishing Corp. v. Creative Features, Inc.*, 399 N.Y.S.2d 118 (1st Dep't 1977) ....... 80, 81

*ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 850 N.Y.S.2d 366 (2007) ....................................... 76

*Kivel v. Wealthspring Mortgage Corp.*, 398 F. Supp. 2d 1049 (D. Minn. 2005) ........................ 72

*Liberman v. Gelstein*, 80 N.Y.2d 429 (1992) ...................................................... 79, 80

*McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34 (2d Cir. 1988) ............................ 65

*Metropolitan Opera Assoc. v. Wagner-Nichols Recorder Corp.,*
   199 Misc. 786, 101 N.Y.S.2d 483 (Sup. Ct. N.Y. Co. 1950),
   *aff'd,* 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951) ..................................... 76

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994) ................... 64, 65

*Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951 (D. Minn. 2000) ........................ 69, 72

*Peters v. Mutual Ben. Life Ins. Co.*, 420 N.W.2d 908 (Minn. Ct. App. 1988) ........................... 72

*Playtex Prods. v. Proctor & Gamble Co.*, 126 F. App'x 32 (2d Cir. 2005) .......................... 63, 64

*Porous Media Corp v. Pall Corp.*, 110 F.3d 1329 (8th Cir. 1997)................................................. 63

*Potamkin Cadillac Corp. v. Towne Cadillac Corp.*, 592 F. Supp. 801 (S.D.N.Y. 1984)............. 76

*PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266 (2d Cir. 1987)................. 63, 64, 68

*Roy Export Co. v. Columbia Broadcasting Sys., Inc.*, 503 F. Supp. 1137 (S.D.N.Y. 1980),
   *aff'd,* 672 F.2d 1095 (2d Cir. 1982), *cert. denied*, 459 U.S. 826 (1982) ..................... 76

*Ruder & Finn, Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 422 N.Y.S.2d 518 (1981)............. 79

*S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir. 1987) ......................................................... 82

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995) ...................................... 67

*Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033 (2d Cir. 1992)....................................... 82

*Sprangers v. Interactive Technologies, Inc.,* 394 N.W.2d 498 (Minn. 1986).............................. 72

*Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704 (2d Cir. 1982) .................... 76

*Suburban Graphics Supply Corp. v. Nagle*, 5 A.D.3d 663 (2d Dep't 2004) ............................... 79

*Time Warner, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007)............................................. 69

*TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011)................................................. 66

*Vascular Solutions, Inc. v. Marine Polymer Technologies, Inc.*, 590 F.3d 56 (1st Cir. 2009)..... 67

*Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57 (2d Cir. 1993)...................................................... 79

**<u>Statutes</u>**

Minn. Stat. § 549.09 (2014) ................................................................................. 60, 81

**<u>Other Authorities</u>**

New York Pattern Jury Instructions (West 2010) § 4:1 ........................................ 69, 72

*Sack on Defamation: Libel, Slander, and Related Problems* § 8.2.8
   (4th ed. 2012), Robert D. Sack ........................................................................ 80

## WITNESSES IN SUPPORT OF PLAINTIFF'S CASE

The following witnesses gave testimony in support of Plaintiff's case on the dates indicated.[1]  Their testimony appears at the record pages indicated:

| | | | |
|---|---|---|---|
| **Michael S. Bookbinder** | Sleepy's Former Executive Vice President of Sales and Marketing | March 21, 2012 through March 27, 2012 | Tr. 73:12 - 554:18 |
| **James Constantinides** | Sleepy's Senior Training Manager | March 28, 2012 | Tr. 558:9 - 618:2 |
| **Jesus Arroyo** | District Sales Manager | March 28, 2012; March 29, 2012 | Tr. 618:15 – 666:21 |
| **Deborah Zaffron** | Sleepy's Former District Manager | March 29, 2012; | Tr. 668:8 – 802:5 |
| | | April 3, 2012; | Tr. 1002:21 – 1100:25 |
| | | May 1, 2012 | Tr. 2883:11 – 2890:25 |
| **Gerald Petrillo** | Sleepy's District Operations Manager | March 30, 2012 | Tr. 805:8 – 858:6 |
| **Anthony Colon** | Sleepy's Regional Vice President | March 30, 2012 | Tr. 858:14 – 897:2 |
| **Joseph Seth** | Sleepy's Salesperson | April 2, 2012 | Tr. 901:22 – 935:7 |
| **Anthony Perez** | Sleepy's Regional Manager | April 2, 2012; April 3, 2012 | Tr. 935:16 – 1002:8 |
| **Steve Puran** | Sleepy's District Sales Manager | April 4, 2012 | Tr. 1103:15 – 1151:21 |

---

[1] Plaintiff has offered in evidence designated portions of the depositions of Bill McLaughlin, Sean Swiderski, and Erik Fair as Px 189, Px 190, and Px 191, respectively.  Defendants object to certain designations.  Adjudication of the objections is *sub judice*.

| | | | |
|---|---|---|---|
| **Tyler Paiva** | Sleepy's District Operations and Sales Manager | April 4, 2012 | Tr. 1151:21 – 1230:7 |
| | | April 10, 2012 | Tr. 1428:19 – 1455:21 |
| **Jacqueline Gruman** | Sleepy's Regional Sales Manager | April 10, 2012 | Tr. 1456:22 – 1486:23 |
| **Robert Gorman** | Sleepy's Regional Manager | April 5, 2012 | Tr. 1233:16 – 1290:23 |
| **Michael Grinnan** | Sleepy's Regional Manager | April 9, 2012 | Tr. 1293:20 – 1373:10 |
| **Sarah Mahaffy** | Sleepy's District Manager | April 10, 2012 | Tr. 1376:19 - 1428:15 |
| **Joseph Kilty** | Sleepy's District Sales Manager | April 11, 2012 | Tr. 1494:15 - 1589:25 |
| **John Giacobbe** | Sleepy's Salesperson | April 11, 2012 | Tr. 1590:5 – 1608:22 |
| **David Kapij** | Sleepy's Regional Sales Manager | April 12, 2012 | Tr. 1622:11 – 1694:21 |
| **Dolores Franco** | Select Comfort Vice President of Sales Operations and Training and Senior Director of Stores | April 18, 2012; April 19, 2012 | Tr. 1719:2 – 1892:8 |
| **Paul Mahoney** | Sleepy's District Manager | April 19, 2012 | Tr. 1892:18 – 1951:19 |
| **Bill McLaughlin (deposition)** | Select Comfort President and CEO | April 19, 2012 | Tr. 1953:2 – 1979:14 |
| **Frank Del Vicario** | Sleepy's Sales Professional | April 20, 2012 | Tr. 1989:21 – 2027:2 |
| **Scott Cheshul** | Sleepy's Senior Regional Sales Manager | April 20, 2012 | Tr. 2027:13 – 2067:8 |
| **Bruce Bauman** | Select Comfort Vice President of Retail Partners | April 23, 2012 through April 26, 2012 | Tr. 2074:19 – 2527:19 |

| | | | |
|---|---|---|---|
| **Timothy Werner** | Select Comfort Vice President of Retail Partners | April 26, 2012; April 27, 2012; | Tr. 2529:1 – 2711:7 |
| **Keith Spurgeon** | Select Comfort Vice President of Consumer Channels | April 30, 2012 | Tr. 2715:22 – 2842:6 |
| **Amy Desrosiers** | Sleepy's Sales Professional | May 1, 2012 | Tr. 2846:11 – 2882:9 |
| **Adam Blank** | Sleepy's Chief Operating Officer and General Counsel | May 2, 2012; | Tr. 2896:9 – 2967:21 Tr. 3011:17 – 3042:24 |
| | | May 4, 2012 | Tr. 3094:9 – 3191:25 |
| **Benjamin Wilner** | Expert Witness | July 21, 2015 | Tr. 2:15 – 129:9 |

Plaintiff Sleepy's LLC ("Sleepy's") submits the following proposed Findings of Fact and Conclusions of Law.[2]

## FINDINGS OF FACT

### The Parties and their Businesses

1.      This action concerns the "retail partner" relationship between Sleepy's and Defendants (collectively, "Select Comfort") that existed from June 17, 2005, the date of the Retail Partner Agreement (Px 133), until approximately April 27, 2007 (Px 123; Bookbinder Tr. 306:6-18; Blank Tr. 2961:25-2962:13; Spurgeon Tr. 2773:10-2774:2).

2.      Sleepy's is a retailer of mattresses and bedding products manufactured by others.[3] (Bookbinder Tr. 346:10-347:4; Blank Tr. 2898:1-16; 2906:2-10.)

3.      The company was founded in 1957 (Bookbinder Tr. 327:3-11; Blank Tr. 2898:11-16) and has, over the years, grown to be a chain of over 700 bedding retail stores located throughout the northeastern United States (Bookbinder Tr. 273:1-6; Px 180).

4.      During the time period of the retail partner relationship between Sleepy's and Select Comfort, Sleepy's had about 300-400 stores.  (Bookbinder Tr. 156:8-19.)

5.      Select Comfort is a vertically-integrated manufacturer and retailer of "Sleep Number Beds." (Bauman Tr. 2250:18-2251:5; Spurgeon Tr. 2780:12-22.)

---

[2] Sleepy's originally filed Proposed Findings of Fact and Conclusions of Law in opposition to Defendant's motion for Judgment as a Matter of Law on partial findings pursuant to Fed. R. Civ. P. 52(c) on July 20, 2012 (ECF No. 803).  Sleepy's appealed to the Second Circuit from Judge Platt's September 26, 2012 dismissal of the case pursuant to Fed. R. Civ. P. 52(c).  By Decision and Order dated February 27, 2015 (the "Second Circuit Decision"), the U.S. Court of Appeals for the Second Circuit vacated the dismissal with respect to all but one of Plaintiff's claims and remanded the case.  After two days of testimony from the parties' expert witnesses before Justice Seybert, the bench trial of this case was completed on July 22, 2015.  Judge Seybert directed the parties to file proposed findings of fact and conclusions of law by Friday, August 21, 2015.

[3] In 2009 all of the rights, contracts, and titles belonging to Sleepy's, Inc. were assigned to Sleepy's, LLC.  (Blank Tr. 2962:24-2963:5.)

6.     The Sleep Number beds have an air chamber inside that can be adjusted with a pump to vary the firmness of the bed.  On the queen and king size models, each side can be separately adjusted so that each of two sleepers can have his or her own desired firmness, or "sleep number." (Spurgeon Tr. 2780:25-2782:15.)

7.     The Select Comfort Sleep Number beds are part of a category of bedding called "alternative bedding," which encompasses beds that do not have springs inside.  Instead, they have foam, latex rubber, or air chambers like the Select Comfort beds or combinations of these elements. (Bookbinder Tr. 79:9-19; Blank Tr. 2931:4-11.)

**The Retail Partner Relationship**

8.     Sleepy's and Select Comfort entered into their "retail partner" agreement on June 17, 2005.  (Px 133.)

9.     Under the retail partner agreement Sleepy's sold a line of Select Comfort beds in the Sleepy's stores in certain regions.  (Px 133.)

10.    The territory for the agreement was initially Nassau and Suffolk counties. (Bookbinder Tr. 131:24-132:1; Px 181.)

11.    In late 2005 and early 2006, the territory for the agreement was expanded to encompass New York City, parts of Northern New Jersey, Upstate New York, and certain parts of Connecticut. (Bookbinder Tr. 181:25-182:14; Spurgeon Tr. 2811:13-20; Px 181.)

12.    During the parties' retail partner relationship, Select Comfort, which was both a manufacturer and a retailer, sold Select Comfort beds in its own retail stores, as well as through Sleepy's and retail partners in other areas.  (Bauman Tr. 2251:6-2252:9.)

13.    The Select Comfort stores were located throughout the territory where Sleepy's sold the Select Comfort beds.  Often, the Sleepy's stores and the Select Comfort stores were located in close proximity.  (*See, e.g.*, Arroyo Tr. 627:20-628:12; Colon Tr. 864:25-865:6;

Constantinides Tr. 577:3-17; Giacobbe Tr. 1593:11-1594:11; Gorman Tr. 1239:22-1240:12; 1252:8-1253:5; Paiva Tr. 1158:14-1159:3; Puran Tr. 1108:15-25; Zaffron Tr. 721:25-722:11; 737:13-738:5; 748:25-749:7; 757:2-11.)

14.     In some instances the Select Comfort retail store and the Sleepy's store selling the Select Comfort beds were located in different parts of the same shopping mall or across the street from one another. (*See, e.g.*, Zaffron Tr. 720:9-722:11; Colon Tr. 863:9-865:6.)

15.     Select Comfort knew that there would be cross-shopping, trained their own sales force to anticipate it, and made efforts to quantify and track cross-shopping. (Franco Tr. 1729:15-1731:5; 1732:11-1733:3; 1734:8-1738:7; 1888:22-1889:12; 1890:24-1891:6; D-293; PX 24; Werner Tr. 2542:14-24; 2543:8-21; 2547:9-22; Bauman Tr. 2110:11-16.)

16.     Select Comfort expressly designed its Retail Partner program to give "Retail Partners" such as Sleepy's a line of Select Comfort beds with somewhat different characteristics from those sold at Select Comfort's own stores. (Spurgeon Tr. 2786:1-9; Bauman Tr. 2108:17-2109:14; Px 10; Px 24.)

17.     The line Sleepy's and other retail partners were given was called the Personal Preference line. (Spurgeon Tr. 2786:1-9; Bauman Tr. 2109:7-14.) Select Comfort called the line it sold in its own stores the Core Line. (Bauman Tr. 2109:7-14.) The most important difference for purposes of this case is that the Personal Preference line sold at Sleepy's was sold with a wooden foundation, which goes underneath the mattress, while the Core Line sold at Select Comfort stores was sold with a plastic polymer foundation. (Blank Tr. 2904:18-22; Bauman Tr. 2111:7-11; Px 24; Px 60.) Other differences include the availability of an unwired remote control at the Select Comfort stores, which was not made available to Sleepy's, and differences

in the ticking and types and thicknesses of foam or padding surrounding the air chamber.  (Blank Tr. 2909:16-2910:4; Bauman Tr. 2272:22-2274:1; Px 24; Px 60.)

18.     Select Comfort had other Retail Partners in other regions of the country.  These included Better Bedding in certain areas of New England, Jordan's in an area centered in Massachusetts, Sleep Train in certain areas of the West, and Mattress Firm in certain areas of the Southwest.  (Bauman Tr. 2094:14-2095:4.)

### Select Comfort Designed its Retail Partner Program to Give its Own Retail Stores a Competitive Advantage

19.     Select Comfort's Retail Partner program existed on a relatively small scale for a year or two, but then Select Comfort decided to expand the Program.  (Bauman Tr. 2287:20-2288:21.)

20.     In mid-2004, Bruce Bauman, whose responsibilities included the Retail Partner Program, Timothy Werner, Vice President of Retail Partners, and Keith Spurgeon, Senior Vice President of Sales, co-authored an internal document, not given to potential retail partners, setting forth the goals, key assumptions, and guiding principles of Select Comfort's Retail Partner Program.  (Px 10; Bauman Tr. 2083:13-2087:9; Werner Tr. 2584:12-2585:14; Px 9; Bauman Tr. 2087:10-2088:25.)  One of the express "Guiding Principles" they established was that "The Retail Partner program will be defined in a way that: --Provides a competitive advantage to Select Comfort retail stores by giving consumers compelling reasons to visit a SC store."  (Px 10; Bauman Tr. 2086:22-2087:9; Px 9; Bauman Tr. 2087:10-2088:25.)

**From Select Comfort's Viewpoint, the Retail Partner Program's Purpose was to Gain Exposure and Consumer Acceptance of its Airbeds, Dispel their "Gimmicky" Image, and "Leverage" the Retail Partners' Distribution Points and Reputation**

21.     One of the "few key reasons" Select Comfort initiated the Retail Partner Program was to increase exposure for its brand by exposing the sleep number bed to a greater number of customers.  (Bauman Tr. 2248:9-13; 2268:7-21.)

22.     Select Comfort recognized that the Retail Partner Program "represent[ed] a business opportunity for Select Comfort to have more points of distribution and leverage the Retail Partners' distribution points and reputation in the market."  (Werner Tr. 2562:20-24; Px 189 (McLaughlin Dep.) at Tr. 170:11-171:20.)

23.     Select Comfort knew that its airbeds had a "gimmicky" image with consumers that greater exposure in Retail Partner stores would help dispel by allowing consumers to experience the product first-hand.  (Px 189 (McLaughlin Dep.) at Tr. 171:3-20; Px 89, p. 4; Paiva Tr. 1200:16-1202:6; 1202:13-22; Constantinides Tr. 600:1-601:10.)

24.     Select Comfort had a strong incentive to structure the Retail Partner Program as it did – to leverage the Retail Partners' stores and reputation to expose the product to consumers, but drive the actual sales to its own stores.  Select Comfort knew that it was far more profitable to sell beds at its own retail stores than through Retail Partners.  In fact, Select Comfort conducted an assessment of the overall retail partner strategy and determined, based on the assumptions they made for their analysis, that it had to sell approximately four beds at a retail partner to equal the incremental profit it would make from one sale in its own store.  (Bauman Tr. 2141:14-2143:15; 2427:24-2428:2; 2428:7-2429:1;  Px 48.)

### Select Comfort Considered its Plastic Foundation to be Superior to the Wood Foundation Provided to Sleepy's and Intended to Promote it as Such

25.     Although Select Comfort told Sleepy's that there was no material difference in quality between the wood foundation provided to Sleepy's and the plastic polymer foundation that Select Comfort reserved for its own stores (*see* ¶ 34, below), Select Comfort in fact considered wood to be an inferior material for the foundation of its Sleep Number beds and intended to communicate that to consumers through its advertising and promotional message that would disparage wood foundation beds.  (Px 14; Px 24; Px 71; Px 83; Px 84; Px 106; Px 108; Px 128; Px 129.)

26.     Select Comfort maintained Brand Standards Manuals for its Core line that were used "to make sure that Select Comfort's marketing materials speak about Select Comfort in a common way" with "consistency in the tone, the feel and the content" across marketing materials.  (Werner Tr. 2567:17-2569:9; Px 84; Px 71; Px 83; Px 14.)  The Brand Standards Manuals were used by the marketing department and outside agencies that wrote advertising and promotional materials and were updated periodically.  (Werner Tr. 2568:13-2569:9; Bauman Tr. 2099:20-2100:10; Px 84; Px 71; Px 83; Px 14.)

27.     Throughout the Sleepy's Retail Partner relationship, Select Comfort's Brand Standards Manuals consistently denigrated wood as a foundation material, stating, for example, with respect to its plastic polymer foundation, that "Unlike wood that can shrink, warp and break down, the foundation of the Sleep Number bed is made of strong, high-density polymer that will provide years of support and service."  (Px 84, p. 33; Px 71, p. 36; Px 83, p. 36; Px 14, p. 36.) The Brand Standards Manual that Select Comfort provided to Sleepy's did not include this information.  (Bookbinder Tr. 130:21-131:13; Px 15.)

**Select Comfort's Representations to Sleepy's Concerning the Personal Preference Line**

28.     Sleepy's first became interested in possibly selling the Select Comfort beds in its stores in early 2005.  (Bookbinder Tr. 91:22-92:7; Blank Tr. 2899:14-2900:14.)

29.     On January 17, 2005, Sleepy's sent an email to Timothy Werner, who was then Vice President of Retail Partners at Select Comfort, expressing that interest.  (D-185; Werner Tr. 2621:6-9.)  There was interest on Select Comfort's part (D-185; Werner Tr. 2633:8-2634:1), but not much progress until mid-March 2005 when Sleepy's sent a letter to Select Comfort's Senior Vice President of Sales, Keith Spurgeon, reasserting its interest and asking to move forward.  (D-102; Bookbinder Tr. 94:9-95:2; Spurgeon Tr. 2800:17-18; 2801:2-12.)  That letter resulted in telephone discussions and meetings in the time frame of March through May 2005 concerning a possible retail partner relationship, including at least one meeting at Sleepy's headquarters, then located in Bethpage.  (Bookbinder Tr. 96:14-24; 116:18-22; Blank Tr. 2899:14-2901:24; Werner Tr. 2592:25-2594:6;  Spurgeon Tr. 2749:22-2751:7,  Bauman Tr. 2089:14-2090:1.)   Michael Bookbinder, Sleepy's Vice President of Sales, Ira Fishman, and Adam Blank, then Sleepy's Executive Vice President and General Counsel, participated on behalf of Sleepy's.  (Bookbinder Tr. 97:6-14; Blank Tr. 2899:14-2901:21; Werner Tr. 2595:19-2595:4; Spurgeon Tr. 2753:1-11; Bauman Tr. 2093:4-14.)  Keith Spurgeon, then Select Comfort's Executive Vice President of Retail Sales, with responsibility for all of Select Comfort's sales channels, including its own stores and the retail partners, Tim Werner, who worked under Mr. Spurgeon as Vice President for Retail Partners, and Bruce Bauman, who initially worked under Mr. Werner as Director of Retail Partners, participated for Select Comfort.[4]  (Bookbinder, Tr. 97:6-14; 98:19-25; Blank Tr.

---

[4] During the parties' relationship, in June 2006, Mr. Werner left Select Comfort for a sabbatical and Mr. Bauman replaced him as Vice President for Retail Partners.  (Werner Tr. 2532:2-24; Bauman Tr. 2077:17-23.)

2900:12-2901:16;  Werner  Tr.  2592:25-2594:6;  Spurgeon  Tr.  2752:3-2753:9;  Bauman  Tr. 2089:14-2090:1.)

30.     In considering the retail partner relationship, when Mr. Bookbinder and Mr. Blank learned that Sleepy's would be selling a different line of Select Comfort beds from that sold in Select Comfort's own stores, both were concerned.   (Bookbinder Tr. 101:8-23; Blank Tr. 2904:6-17.)  The concern was that the Personal Preference line might not be equal in quality, or perceived by consumers to be equal in quality, to the Core line sold at the Select Comfort stores, and that such a difference in quality might put Sleepy's at a competitive disadvantage vis-a-vis the Select Comfort retail stores.  (Blank Tr. 2904:6-2907:2; Bookbinder Tr. 102:12-19; Px 176 at ¶ 5.)  One significant difference of concern was the difference between the plastic and wood foundations.  (Blank Tr. 2906:11-2907:2; Bookbinder Tr. 102:12-19.)

31.     Mr. Blank and Mr. Bookbinder wanted assurances that Sleepy's was not taking on a line that consumers would view as inferior, or that Select Comfort would promote as inferior. (Bookbinder Tr. 102:20-103:18; Blank Tr. 2904:6-17.)  If that were the case, they did not want to become Select Comfort's Retail Partner.  (Blank Tr. 2911:4-10.)  They also wanted to be sure that Select Comfort would not promote the Core line by disparaging Sleepy's or the Select Comfort products it was selling.  (Blank Tr. 2924:1-2925:17.)

32.     Part of the reason for the concern was that the idea of selling a brand of beds effectively in competition with the supplier of the beds, who had their own retail stores, was new to Sleepy's.  (Blank Tr. 2908:10-24.)  Further, the fact that Sleepy's would be selling a separate line of beds from what Select Comfort was selling raised concern over whether it was a second quality line or would be promoted as a second quality line.  (Bookbinder Tr. 101:8-23; Blank Tr. 2911:9-2912:12.)   Although Sleepy's had experience in the bedding industry, it lacked

experience in competing with a vertically integrated manufacturer-retailer such as Select Comfort. (Blank Tr. 2924:1-25.) That is why it asked for, and reasonably relied on, Select Comfort's representations concerning the competing lines of beds. (Blank Tr. 2924:1-25.)

33.    Mr. Blank and Mr. Bookbinder both raised these concerns a number of times with Mr. Spurgeon, Mr. Werner, and/or Mr. Bauman prior to entering into the Retail Partner Agreement. (Bookbinder Tr. 102:20-104:7; 102:12-104:7; 113:3-23; 114:2-16;; Blank Tr. 2909:3-2911:3; 2904:18-2907: Px 176 at ¶ 5.)

34.    The Select Comfort representatives repeatedly represented to Mr. Blank and Mr. Bookbinder, including at the meeting in Bethpage, that selling the Personal Preference line would not place Sleepy's at a competitive disadvantage with respect to the Select Comfort stores. (Bookbinder Tr. 102:12-104:7; 113:3-23; 114:2-16; 121:24-122:23; Bauman Tr. 2093:21-2094:13; Blank Tr. 2909:3-2911:3; Px 24; Px 176 at ¶ 5.)

35.    As noted above (at ¶ 20), at the time Messrs. Bauman, Werner, and Spurgeon made the representations to Sleepy's, they knew the representations were false. They had expressly designed the Retail Partner Program to build in a competitive advantage for Select Comfort's own stores. (Px 10; Bauman Tr. 2083:13-2087:9; Werner Tr. 2584:12-2585:14; Px 9; Bauman Tr. 2087:10-2088:25.) Further, Select Comfort's Brand Standards Manual expressly noted that wood was an inferior material to plastic for the Sleep Number bed foundation. (Px 84, p. 33; Px 71, p. 36; Px 83, p. 36; Px 14, p. 36.)

36.    Select Comfort acknowledged that a primary benefit of the Retail Partner Agreement to a retail partner is the opportunity to realize profits from the sale of Select Comfort beds. (Werner Tr. 2441:18-22.) During the parties' 2005 negotiations, Select Comfort told Mr. Bookbinder that Sleepy's could expect Select Comfort beds to be 10% of Sleepy's sales if

Sleepy's entered into the Retail Partner program with Select Comfort. (Bookbinder Tr. 99:3-100:1; Px 176 at ¶ 4.) Mr. Bookbinder took steps to determine whether that was a reasonable expectation. He contacted a colleague at another Select Comfort retail partner who confirmed that Select Comfort's prediction seemed reasonable. (Bookbinder Tr. 100:2-101:7.) In addition, he performed an analysis of Sleepy's sales that reinforced the reasonableness of Select Comfort's prediction. (Bookbinder Tr.100:16-101:7; Px 176 at ¶ 4.)

**Negotiation of the Retail Partner Agreement**

37.     The parties negotiated the terms of the Retail Partner Agreement (Px 133) between May 24, 2005, when Mr. Bauman provided Select Comfort's initial draft, just before Memorial Day weekend (Bauman Tr. 2301:19-2302:5; D-6), and June 17, 2005, when the agreement was signed (Px 133; Blank Tr. 2917:21-2918:1; Bookbinder Tr. 117:18-118:11).

**Section 4(c)**

38.     Section 4(c) provides in material part:

> **"Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party."** (Px 133 at 3 (emphasis added).)

39.     Mr. Blank asked for such a mutual non-disparagement provision during a conference call with Select Comfort executives on May 31, 2005. (Blank Tr. 2923:14-2924:11.) Mr. Bauman agreed in principle and requested that Mr. Blank provide the language of the provision. (Blank Tr. 2925:4-2925:16.) Mr. Blank did so by email on June 1, 2005. Select Comfort accepted Mr. Blank's language and placed it in the next draft of the agreement in § 4(c) (D-4; Blank Tr. 2926:11-2927:18; Bauman Tr. 2098:10-2099:5.)

40.     Section 4(c) was a generally applicable mutual non-disparagement provision, and was not intended to apply solely in the context of providing warranty service. Although the

provision was placed after a sentence dealing with Select Comfort's obligation to provide warranty service, both parties viewed the provision as a generally applicable non-disparagement provision that forbade the parties from denigrating or disparaging each other or the products they sold.  (Blank Tr. 2927:19-2928:1; Werner Tr. 2604:23-2607:11; Bauman Tr. 2176:15-2178:24; Px 32.)

**Launch of the Retail Partner Program at Sleepy's**

41.     After the Retail Partner Agreement was signed in mid June 2007 (Px 133), the roll-out of the product began.  (Bookbinder Tr. 131:20-23.)   Initially, the territory permitted under the Agreement was Nassau and Suffolk counties.  (Bookbinder Tr. 131:24-132:1; Px 133; Px 181.)

42.     The Select Comfort beds were introduced in Sleepy's stores in August 2005.  (Bookbinder Tr. 131:20-23.)  Sleepy's and Select Comfort held a kick-off meeting on August 7, 2005.  Tim Werner was present, along with Larry Cronkhite, one of Select Comfort's national retail partner trainers.  They met with Sleepy's Regional Vice Presidents, Regional Managers, and District Managers, and also with numerous sales people at meetings in Nassau and Suffolk counties.  (Bookbinder Tr. 133:13-136:17.)

43.     Sleepy's sales force was extensively trained by Select Comfort to show and sell the Select Comfort beds.  Mr. Cronkhite did the initial sales training.  Further training followed throughout the relationship.  Select Comfort assigned Sean Swiderski as a trainer expressly dedicated to Sleepy's.  (Bookbinder Tr. 135:17-19; Bauman Tr. 2540:2-5.)

44.     Sleepy's required its sales people and district managers to undergo intense Select Comfort training.  (Bookbinder Tr. 135:23-136:17.)  Sleepy's wanted that level of training because it wanted the program to be successful.  (Bookbinder Tr. 136:4-17; Px 94.)

**Launch of Select Comfort's Plan to Denigrate Sleepy's**

45.     At the same time Select Comfort was overseeing the launch of the Personal Preference line at Sleepy's, Select Comfort was also meeting with its own regional and store managers to prepare them for the presence of a new retail partner in the market.  (Franco Tr. 1776:24-1778:12;  1788:10-12;  Bauman Tr. 2112:12-2113:2;  Werner Tr. 2535:14-2536:4; 2537:15-21.)

46.     On August 2, 2005, just before the Sleepy's launch, Mr. Spurgeon, Senior Vice President of all retail sales, Mr. Werner, Vice President of retail partners, and Dolores Franco, head of training, held a meeting with the managers of the Select Comfort retail stores in the area where the Sleepy's Retail Partnership was being launched.  (Franco Tr. 1791:12-25; Bauman Tr. 2121:8-2122:5; Werner 2537:22-2539:4.)   One purpose of the meeting included allaying the fears of Select Comfort's own sales force that having to compete against a new Retail Partner would hurt their sales and their earnings.  (Werner Tr. 2547:9-22.)  The store managers were told that the sales force should not worry because, among other things, "Partner stores sell far fewer units than Select Comfort stores" (Px 60), and Select Comfort stores have a number of advantages over retail partners (Px 60; Werner Tr. 2547:9-22).  One of the "advantages" for the Select Comfort stores specifically mentioned was "polymer foundation vs. wood."  (Px 60; Werner Tr. 2547:9-12; 2550:16-23.)

47.     Another purpose of the pre-launch meetings with Select Comfort's own sales managers was to explain, in detail, the differences between the beds Select Comfort stores sold and the beds Sleepy's sold, including the plastic foundation and the wood foundation at Sleepy's. (Franco Tr. 1730:10-15; 1732:11-1733:3; Werner Tr. 2542:14-24.)  This was done so that the sales force at the Select Comfort stores would be able to address questions from cross-shoppers who had looked at the Select Comfort beds at both stores.  (Franco Tr. 1729:15-1731:5; Werner

Tr. 2543:8-21.)  Indeed a comparison chart was distributed and used to highlight the differences between the two lines.  (Px 24; Franco Tr. 1735:4-14; Werner Tr. 2541:4-22; Bauman Tr. 2110:11-16.)

48.    The store managers who attended the pre-launch meetings were supposed to relay the information they had learned to the sales personnel in their respective stores and to train them concerning the differences between the two lines of beds.  (Werner Tr. 2537:2-5.)

**Sleepy's Vigorously Promoted the Select Comfort Beds Using**
**Approaches That Select Comfort Believed To Be Effective**

49.    Sleepy's expended significant resources promoting and legitimizing the concept and technology of Sleep Number Beds, and forewent the opportunity to use its valuable retail floor space, training, and sales force time for other brands.  These resources represent a commercial advantage that belongs to Sleepy's.  (Blank Tr. 2928:2-2930:22.)

50.    In addition to the substantial training provided to Sleepy's sales personnel set forth above (at ¶ 44), Sleepy's took a number of steps to promote the Select Comfort brand and build and maintain excitement about it that Select Comfort later recognized as the type of steps that could substantially enhance sales.[5]

      a.  Sleepy's gave the Personal Preference line great exposure and followed all of Select Comfort's suggestions about how to display the product.  (Bookbinder Tr. 162:7- 163:7.)

---

[5] In a 2007 presentation to Sleepy's, Select Comfort referred to these training, sales and promotional activities as critical success factors, though these factors do not appear to have been previously identified and assembled for any retail partner on any other occasion.  (Px 124, Schwartz Tr. 177:7-10.)  As discussed below, the record is devoid of any analysis – whether by Select Comfort's expert or otherwise – that demonstrates that these so-called success factors bore any relationship to the volume of sales. (*See* below, ¶¶ 141-143.) Nonetheless, as set forth herein, the record reflects that Sleepy's substantially met all of the so-called success factor criteria.

b.  Sleepy's used all the POP – point of purchase materials – that Select Comfort provided, including signage, posters, cardboard cutouts, neon signs, brochures, and other materials.  (Bookbinder Tr. 162:7-163:14.)

c.  Sleepy's supported the Select Comfort line with a substantial advertising program, including single vendor ads, which were highly unusual for Sleepy's. (Bookbinder Tr. 145:24-155:18, 157:11-162:4, 174:8-176:24; Px 148, Px 149; Px 147; Px 150; Px 152; Px 154; Px 93; Px 144;[6] D-17.)  Sleepy's gave the Select Comfort line advertising support comparable to or greater than that given to the Tempur-Pedic line, another brand of alternative bedding Sleepy's sold during the time it was selling Select Comfort.  (Blank Tr. 2931:24-2933:8.)  The Tempur-Pedic line was highly successful at Sleepy's.  (Blank Tr. 3180:25-3181:6; 3181:17-3181:21; Werner Tr. 2682:14-18; 2682:25-2683:7.)  Select Comfort considered a Retail Partner's success with Tempur-Pedic to be a proxy for likely success with Select Comfort.  (Werner Tr. 2622:21-2623:2; 2682:21-2683:7.)

d.  Sleepy's instituted special warehouse procedures that Mr. Bauman recommended and that involved pre-assembling the beds before delivery in a special room. According to Mr. Bauman this would make the product appear more valuable to the consumer.  (Bookbinder Tr. 143:2-20; Bauman Tr. 2558:8-21.)

e.  Sleepy's incentivized its sales force with commissions at the platinum plus level - the highest commission level except for one very high end brand.  In addition, Sleepy's gave the sales force extra commissions – called a SPIFF – of $50 for selling a Select Comfort bed.  (Bookbinder Tr. 165:2-21.)

---

[6] Px 144 was admitted for the limited purpose of showing the type of advertisement Sleepy's ran during the relevant time period.  (Tr. 159:15-19.)

f.   Sleepy's instructed its sales force to show Select Comfort beds to as many customers as possible, including any customer who indicated the beds were in his or her price range.  (Bookbinder Tr. 165:22-166:11; Px 176, ¶ 27.)

g.   Sleepy's introduced an automatic demonstrator, called the "Auto WOW," at Select Comfort's suggestion to lower the amount of sales force time it took to demonstrate the Select Comfort beds.  (Bookbinder Tr. 163:15-165:1.)

h.   Mr. Acker, Sleepy's owner, communicated with the entire sales force on several occasions to stress the importance of selling the Select Comfort products and the opportunity to earn the high commissions that they offered.  (Bookbinder Tr. 145:24-146:16, 183:20-184:12, 177:1-178:15, 178:18-179:14, 179:16-180:16; Px 176, ¶ 21; D-65; D-72.)

i.   Sleepy's ran contests for its sales force in order to promote the Personal Preference line, and on several occasions Sleepy's requested permission to run additional such contests, but Select Comfort would not allow it.  (Bookbinder Tr. 166:15-167:10; Px 176, ¶ 19.)

j.   Sleepy's made the Select Comfort beds available to its sales force for purchase for 10% over what Select Comfort charged Sleepy's (a great price) through the Sleepy's employee purchase program.  (Bookbinder Tr. 167:11-168:4.)

k.   Sleepy's senior management actively monitored Select Comfort sales.  (Px 176, ¶ 22.)

51.   In late 2005 and early 2006, Sleepy's, with Select Comfort's agreement, expanded the areas in which it was offering the Select Comfort beds.  The first expansion included New York City, Northern New Jersey, up the Hudson River, and some parts of Connecticut that were

not already served by a Retail Partner.  (Bookbinder Tr. 180:20-182:14; Bauman Tr. 2113:3-5, 2346:16-20, 2348:22-2349:4; Px 181.)  There was another expansion to a few more stores later in 2006.  (Bookbinder Tr. 182:15-22; Px 181.)

**The Parties Continued to Do Business under the Same Terms after**
**The Nominal Expiration Date of the Retail Partner Agreement**

52.     The Retail Partner Agreement provided that it would nominally expire by its terms on September 30, 2006.  (Px 133.)  After that date, however, Sleepy's and Select Comfort continued to do business on the same terms, including continuing the purchase and sale of Select Comfort beds.    (Bookbinder Tr. 296:20-297:5; Px 171.1-171.49.)    Select Comfort also recognized in January 2007 that the parties were continuing to operate under and observe the terms of the Retail Partner Agreement, in particular the non-disparagement provision of § 4(c). (Bauman Tr. 2178:2-21; 2421:7-2422:11; Px 32.)

**Sleepy's Executive Team Investigates the Cause of the Poor Sales**

53.     Despite Sleepy's efforts, sales of the Sleep Number Beds at the Sleepy's retail locations were disappointing, and remained disappointing throughout the relationship. (Bookbinder Tr. 144:25-145:10; Bauman Tr. 2374:13-15; Blank Tr. 2930:23-2931:3.)  Even after the expansion, the Select Comfort sales at Sleepy's continued to be disappointing, and never grew to the level Select Comfort had predicted or Sleepy's had expected.  (Bookbinder Tr. 183:16-19.)

54.     In 2006, after the expansion failed to improve sales, Sleepy's Executive Team struggled to determine why the Select Comfort product was not succeeding at Sleepy's as expected.  (Bookbinder Tr. 542:17-21; Blank Tr. 2935:8-2936:7.)    Several hypotheses were

suggested and considered.[7]  (Bookbinder Tr. 542:17-21; Tr. 544:16-545:12; Blank Tr. 2935:8-2936:7.)  The effort to find the answer continued all through 2006 until approximately November of 2006.

55.     In late October or early November 2006, Sleepy's senior management decided to investigate the hypothesis that sales were disappointing because the Select Comfort sales force was systematically disparaging Sleepy's and the Select Comfort beds it sold.  (Bookbinder Tr. 213:12-214:2; Blank Tr. 2936:8-23.)  This possible cause was considered because, in hindsight, there had been sporadic reports from consumers of disparagement and several isolated incidents of disparagement over the course of the relationship (Blank Tr. 2936:8-23), including the following:

   a.   In November 2005 there were two incidents – one in Massapequa and one in Rockville Centre, Long Island, in which customers sought to return a Select Comfort bed purchased at Sleepy's because they told Sleepy's they were under the impression – after visiting a Select Comfort showroom and speaking with a Select Comfort sales representative – that the wood foundation sold at Sleepy's was inferior to the plastic foundation available at the Select Comfort store.  (Px 90; Bookbinder Tr. 194:5-195:11; Constantinides Tr. 561:18-562:2; 562:6-563:3; 563:11-20;  564:24-565:9;  566:11-15;  566:23-567:6;  567:8-568:16;  568:20-

---

[7] At the trial Select Comfort cited certain transcribed statements by Mr. Acker as potential causes of poor sales.  At the time, Mr. Acker was semi-retired and living in Florida and was no longer part of the "Executive Team"; the "Executive Team" on the ground in New York had access to contemporaneous information about the company's actual day-to-day operations and its efforts to sell Select Comfort Sleep Number beds in New York, New Jersey and Connecticut.  Mr. Acker did not.  (Blank Tr. 3121:7-21.)  There is no evidence that Mr. Acker's comments were based on any research or analysis of actual store performance, and Sleepy's personnel explained that his comments should be considered as merely Mr. Acker's hypotheses and speculation as to what may have been causing the poor sales.  (*See* Bookbinder Tr. 542:1-21; 544:16-545:12; 545:16-546:1.)

569:17; 569:21-24; 570:9-19; 570:25-571:4; 571:21-572:7.)  One of the customers told a Sleepy's employee that the reason they wanted their money back was because "they were told by a Select Comfort store that their box frame, polymer box, was superior to [Sleepy's] wooden box frame."  (Constantinides Tr. 566:11-15; 572:5-7.)   Sleepy's brought these incidents to Select Comfort's attention shortly after learning of them.  (Px 90; Bookbinder Tr. 194:5-195:11.)

b.   In March 2006 a routine "secret shop" conducted in a Select Comfort store in Stonington, Connecticut showed another incident of disparagement by a Select Comfort salesperson named Kevin.   Mr. Bookbinder alerted Mr. Werner, by email, that the Select Comfort salesperson had said, concerning the foundations, that "the plastic one would hold up better because the wood one would break down after a while and the plastic one's more durable."  (Bookbinder Tr. 204:8-207:11.)  Mr. Werner acknowledged that it should not have happened, apologized to Mr. Bookbinder, and said they would give Kevin further training.  (Bookbinder Tr. 206:12-22.)

c.   In May 2006 there was another incident in which a customer wanted to return Select Comfort merchandise to Sleepy's giving as his reason that he was told at the Select Comfort store that it was inferior to that store's merchandise.  Sleepy's reported to Select Comfort that it had to give a substantial discount to save the sale.  (Bookbinder Tr. 208:3-209:12; Px 53.)

56.   To determine whether or not this hypothesis was correct, in early November 2006, Sleepy's decided to conduct some "secret shops" of the Select Comfort stores in a number of areas.  (Bookbinder Tr. 213:12-214:2; Blank Tr. 2937:14-2938:1.)

**Sleepy's Uncovers the Pattern of Disparagement and Defamation by Select Comfort**
**that was Causing the Poor Sales of the Select Comfort Products at Sleepy's**

57.     Secret shops are a routine procedure in the retail industry.  Stores shop the competition by posing as real customers to gain information about what customers are experiencing at other stores and what their sales forces are telling consumers.  Records about the secret store shops were created and maintained in the regular course of business at Sleepy's Various witnesses testified at trial:

> a.   "Typically, [secret shops are conducted] to get information about a competitor and . . . how they're operating, what they say about products and competitors, we would use our management people for that type of shop."  (Bookbinder Tr. 88:7-10.)
>
> b.   "Generally, a shop is done for the purpose of seeing what your competitors are doing. . . . To look at product; to see if they are breaking price . . .; to see what is going on in the landscape of the competition; to see if there is anybody that we would like to recruit . . .; to see if they are denigrating Sleepy's in any way, their practices.  (Zaffron Tr. 1012:12-22.)
>
> c.   In "a traditional shop . . . we would have [] been looking for . . . how the salesperson interacted with you, specific sales points."  (Seth 906:19-22.)
>
> d.   "It was part of the DNA at Sleepy's, part of the job, to go out and shop the competition on a regular basis."  (Bookbinder Tr. 271:14-16.)

58.     Secret shops are sometimes done by company employees and sometimes by an outside service.  Sleepy's used both in this case.  (Bookbinder Tr. 82:10-84:6; 87:21-89:18; 270:18-271:25.)

59.     In conducting secret shops, secret shoppers seek to replicate the experiences of actual customers.  They do so by posing as real customers:

    a.  Secret shops are "shopping experiences where the person shopping is acting as a customer."  (Bookbinder Tr. 82:23-24.)

    b.  "[W]e were supposed to act like a regular shopper, like we are a regular customer walking into a store to buy."  (Gorman Tr. 1243:13-15.)

    c.  "[W]henever I did a shop I would come in like I was a customer looking for merchandise, and just see what they have to say."  (Zaffron Tr. 696:15-17.)

60.     Indeed, the purpose of secret shops requires that the shoppers appear like normal customers; secret shoppers need to see how salespersons treat actual customers.  (*See* Kilty Tr. 1569:11-13 ("Part of the mission of the shop was to always look for talent so we might have a good hire potentially sometime down the road. That was always the mindset.").)

61.     In order to pose convincingly as real customers, secret shoppers invent storylines simulating what actual customers might say that they conveyed to sales personnel.

    a.  "I have used that [scenario] several times [when conducting secret shops], if I'm looking for a bed. In this case it would be for myself and my significant other . . . ."  (Paiva Tr. 1430:10-23.)

    b.  "[I]t's basically always the same scenario. I'm moving into Rockland County and I'm like the point man of the search party for my family. We are looking for a king-sized bed."  (Arroyo Tr. 632:10-13.)

    c.  "Just like any shop that I do, I walked into the store, played the role of a customer, had a scenario built in my mind. I told the salesperson I was looking for a mattress. You know, my wife was also interested in it and she was not there with

20

me. And I believe I told the salesperson that I was somewhat familiar with the Select Comfort product and I had seen it before." (Kapij Tr. 1632:16-22.)

d.  "I was accompanied by my wife to conduct the shop. And it was a shop whereby we let her know that we needed a queen size mattress, we were in the market, my wife had visited a Sleepy's showroom prior alone and we wanted to go to Select Comfort being that's their exclusive product to compare." (Puran Tr. 1111:20-25.)

e. "Deborah [Zaffron, a Sleepy's District Manager that accompanied me on the secret shop], mentioned [to the salesperson] that we had a deposit on a Select Comfort mattress in a Sleepy's store. And [the sales person] explained the differences to us." (Giacobbe Tr. 1597:21-23.)

f. "I told him my wife and I were shopping for a Select Comfort mattress and that she had seen a model at Sleepy's, and I was curious to know if they carried that particular model." (Colon Tr. 865:20-23.)

62.    Many of the secret shoppers who testified had substantial experience performing shops.

a. There were "hundreds, if not thousands, of shops done individually [during my eleven years at Sleepy's], including what was done with our sales trainees, who were mandated to shop, the management people, who were given assignments as we have been discussing, to shop. I also said it is part of Sleepy's DNA to secret shop, or mystery shop, to stay ahead of the competition to know what was going on. So it is huge numbers." (Bookbinder 282:12-20.)

b.  "[I]t was routine and required that every new sales trainee, as part of their learning process going through the Sleepy's university process . . . go out and shop both a competitor and a Sleepy's store."  (Bookbinder 270:23-271:2.)

c.  "[I] conducted hundreds of shops." (Zaffron Tr. 1015:16-18.)

d.   "[I] conducted shops regularly as part of [my] job at Sleepy's . . . ."  (Arroyo Tr. 640:11-14.)

e.  "[I] conduct[ed] secret shops [] as a district manager . . . all the time."  (Zaffron Tr. 688: 7-9.)

f.  "[C]onducting secret shops [was] a regular activity of Sleepy's [when I was] a district manager."  (Petrillo Tr. 808:18-20.)

g.  "[I] regularly conducted secret shops of competitor's at Sleepy's."  (Colon Tr. 862:19-21.)

h.  "We [] did them on a fairly regular basis. Shopping reports were required as part of our job."  (Kilty Tr. 1519:20-22.)

i.  "[I conducted] secret shops for Sleepy's . . . [p]retty regularly . . . could be on a biweekly, weekly or monthly basis."  (Perez Tr. 936:24-937:4.)

j.   "[My] job as a district manager at Sleepy's involve[d] conducting secret shops of competitors . . . [it] [w]as a regular activity . . . [t]hroughout my career . . . ."  (Mahaffy Tr. 1380:17-22.)

k.  "[T]here were different secret shops that were required several times a year based on product launches or new competition in the market. We also conducted non-required competitive shops on a pretty regular basis at least once or twice a month."  (Grinnan Tr. 1295:24-1296:3.)

l.    "[I] have [] been conducting [secret] shops . . . [f]or my entire employment, about

every month. . . . [for] [s]even years."  (Paiva Tr. 1155:6-11.)

63.    Mr. Bauman testified that Select Comfort similarly shopped its retail partners in

order to "fully understand how the retail partner program was performing" and in order to

"evaluate their effectiveness at selling – representing and selling the Sleep Number bed."

(Bauman Tr. 2434:23-2435:6.)   "Select Comfort [also shopped] their own stores as well on a

regular and ongoing basis to ensure that if there was anything that could be improved upon that

could be identified and dealt with."  (Bauman Tr. 2435:3-6.)

**The Secret Shop Report Evidence Shows that Select Comfort Sales Personnel
Systematically Disparaged Sleepy's and its other Retail Partners to Actual
Customers in Accordance with Several Common Themes, and that this
Disparagement was the Result of a Centrally-Planned Business Strategy**

64.    The testimony of the secret shoppers who testified, the shop reports they prepared

that are in evidence, and the audio recordings of the secret shops that are in evidence show that

throughout the territory in which Sleepy's was selling the Select Comfort beds and in adjacent

areas, Select Comfort's sales force regularly disparaged the Select Comfort merchandise at

Sleepy's (or the local retail partner), and disparaged Sleepy's as a company in accordance with a

group of common themes that recurred again and again in the secret shops.  Although not always

articulated identically, the common pattern clearly emerges.  These common themes that Select

Comfort personnel raised to denigrate Sleepy's included:

Wood-Related Denigration

a.    The wood foundation sold at Sleepy's is inferior to the plastic foundation sold at

the Select Comfort stores. (Px 1.6; Px 1.11; Px 1.21; Px 1.50; Px 1.59; Px 1.64;

Px 1.68; Px 1.80[8]; Px 1.91; Px 1.101; Px 1.102[9]; Px 1.120; Px 1.121; Px 1.128; Px

90; Constantinides Tr. 581:19-25; Arroyo Tr. 635:6-14 (Sleepy's foundation "was

inferior and would cause squeaking and cracking in the future"); Zaffron Tr.

697:11-13; 699:11-13; 702:13-15; 724:14-17; 741:9-13; 750:23-751:16; 758:17-

759:19; 788:14-16; 789:17-19; 790:20-791:2; Petrillo Tr. 820:25-821:22; Perez

Tr. 958:12-959:20; Puran Tr. 1114:10-1115:3; 1116:17-22 ("Select Comfort will

not sell their best product to a partner or competitor . . . that's the reason they

[Sleepy's] don't have the polymer foundation"); Paiva Tr. 1164:2-9; 1186:7-9;

("[T]he polymer foundation. That was a key point she was emphasizing

throughout her presentation"); Gorman Tr. 1249:6-9; 1263:8-24; Grinnan Tr.

1337:10-12; 1344:11-18; Mahaffy Tr. 1388:3-1389:2; 1408:11-15; Kilty Tr.

1510:3-13; 1526:15-1527:21; 1570:25-1571:25; Giacobbe Tr. 1598:2-10; Kapij

Tr. 1634:6-14; 1653:1-1654:8; Mahoney Tr. 1904:18-23; 1915:9-14;  1924:18-

21.)

Warehouse-Related Denigration

b. Sleepy's Select Comfort beds are stored in a warehouse where they will develop

mold, dust mites or allergens, and are not "fresh," whereas the Select Comfort

store's beds are made to order and "fresh."  (Px 1.59; Px 1.102; Px 1.120; Px

1.121; Px 1.128; Constantinides Tr. 581:19-25; Zaffron Tr. 697:14-16; 742:10-11;

751:4-7; Petrillo Tr. 819:23-820:17; 866:3-9; Perez Tr. 958:12-960:13; Paiva Tr.

---

[8] It is clear from the transcript and the foundation laid that the document admitted into evidence
was PX 1.80, not Px 1.81.  (*See* Tr. 919:1-925:24).

[9] It is clear from the transcript and the foundation laid that the document admitted into evidence
was PX 1.102, not Px 1.02.  (*See* Tr. 745:6-16; 1085:23-1093:19).

1163:19-1164:1; 1172:5-9; 1175:22-1176:4; Gorman Tr. 1262:16-24.) This theme of disparagement was particularly damaging because Select Comfort urged Sleepy's to tell customers that its Select Comfort beds were particularly good for people with allergies. (Werner Tr. 2562:25-2564:21; Px 26.)

Warranty-Related Denigration

    c.  Sleepy's offered inferior sales terms and warranty service.[10] (Px 1.6; Px 1.11; Px 1.21; Px 1.38; Px 1.59; Px 1.64; Px 1.80; Px 1.91; Px 1.101; Px 1.102; Px 1.108; Px 1.120; Px 1.121; Px 1.128; Arroyo Tr. 635:19-636:2; Zaffron Tr. 701:10-16 ("Sleepy's won't honor the warranty"); 724:10-12; 725:19-726:2; 759:23-25; Colon Tr. 866:24-867:11; Seth Tr. 915:1-19; Perez Tr. 941:1-5; Puran Tr. 1112:18-1113:14; 1118:21-1119:9; Paiva Tr. 1171:15-18; Gorman Tr. 1262:1-7; Gruman Tr. 1470:16-17 ("Sleepy's does not back up any warranty on their beds").)

Assertions that Sleepy's Sold Knock-Offs

    d.  It is better to buy at the stores operated by the manufacturer of the beds – the original – than buying knock-offs from Sleepy's. Sometimes this notion was expressed in metaphors equating buying a Select Comfort bed at Sleepy's with "buying a Cadillac from a Chevy dealer (Mahaffy Tr. 1388:1-2), "like going to a Toyota dealer to get a Mercedez Benz" (Zaffron Tr. 760:9-10), or "it's better to buy a Coach bag from a Coach store" (Zaffron Tr. 698:14-15; Px 1.6; Px 1.11; Px 1.21; Px 1.38; Px 1.128 ("Sleepy's [Select Comfort beds] are not real [Select

---

[10] In fact, the warranty service at each store was identical because Select Comfort was providing the warranty service for both stores. (Px 133, § 4(c); Bauman Tr. 2311:20-25; Werner Tr. 2585:16-2586:8.)

Comfort beds] . . . you won't see Select Comfort on the bed's logo"); Zaffron Tr. 698:13-20; 760:6-15; Perez Tr. 941:1-4; Paiva Tr. 1177:9-25; Gorman Tr. 1243:19-1244:4; Grinnan Tr. 1307:22-24.)

Assertions that Sleepy's Sold Outdated Models

e.   Sleepy's carries older models of Select Comfort beds that are outdated; Select Comfort stores sell the latest models.  (Px 1.6; Px 1.50; Px 1.64; Px 1.68; Px 1.91; Px 1.102; Px 1.120; Arroyo Tr. 633:6-18; Zaffron Tr. 788:22-23; Del Vicario Tr. 2001:16-2002:7 (Select Comfort sales force was trained that they "had the latest models" in contrast with the models sold by retail partners like Sleepy's).)

Assertions that Sleepy's Wired Remote Control was inferior to the Wireless Remote Control at Select Comfort

f.   Sleepy's carries only models of Select Comfort beds that have wired remote controls for the air pumps, as opposed to the superior wireless remote controls in models carried by Select Comfort.  (Px 1.6; Px 1.11; Px 1.21; Px 1.50; Px 1.68; Px 1.101 (Select Comfort "did not give Sleepy's the wireless remote so they could . . . keep the best bed for themselves"); Px 1.121; Colon Tr. 866:10-14; Puran Tr. 1121:18-20; Giacobbe Tr. 1597:23-1598:1; Kapij Tr. 1653:1-3.)

Assertions that Sleepy's Models had Inferior Foam, Padding, Ticking, or Fabric

g.   Sleepy's carries models of Select Comfort that have inferior foam, padding, ticking, or fabric.  (Px 1.50; Px 1.68; Px 1.80; Px 1.101; Px 1.102; Px 1.121; Px 1.128; Zaffron Tr. 701:22-702:7; 724:18-725:2; Seth Tr. 911:20-23.)

65.   Select Comfort's sales force also disparaged Sleepy's and/or the Select Comfort products Sleepy's was selling in ways other than the categories described above, such as:

<u>Sleepy's Sold Generally Inferior Models</u>

    a.  The Select Comfort products sold by Sleepy's were generally inferior (Paiva Tr. 1177:20-24 ("the product sold by Select Comfort was vastly superior . . . [Sleepy's] were starter products"); Gorman Tr. 1264:20-25 ("Sleepy's has a lot of people asking for their money back . . . they walk out of Sleepy's and come to Select Comfort"));

<u>Sleepy's Sold Inferior Air Pumps & Refurbished Products</u>

    b.  Sleepy's sold inferior pumps and may be selling you a refurbished bed but not telling you.  (Px 1.101; Px 1.102; Zaffron Tr. 740:5-7; 742:13); and

<u>Comments Disparaging Sleepy's Generally</u>

    c.  The Select Comfort sales force disparaged Sleepy's generally.  (Gorman Tr. 1265:8-9 ("Sleepy's doesn't have the greatest reputation"); Gruman Tr. 1467:1-2 (Sleepy's "salespeople will lie to you, and they'll tell you anything to make a sale").)

66.    The evidence of disparagement during secret shops justifies an inference that the same types of disparaging statements were made to actual cross-shopping customers.   Direct evidence also supports this conclusion.  One of the secret shoppers witnessed the Select Comfort sales person saying the same disparaging thing said to her to another customer in the store who told the sales person she had seen the Select Comfort beds at a retail partner.  (Mahaffy Tr. 1392:12-1393:25.)

67.    The secret shoppers did not invite or solicit the disparaging comments by Select Comfort's sales force.  Rather, the sales force discussed Select Comfort's retail partners and disparaged Sleepy's even when the secret shoppers had not mentioned Sleepy's.  (Gorman Tr. 1248:8-13 ("I think the main thing I took out of the shop was that in their regular sales pitch . . .

they were specifically, without even being asked, mention[ing] that Sleepy's was no longer going to carry the product and you shouldn't buy it from them.")

68.     Even though Select Comfort's sales personnel often disparaged Sleepy's or other retail partners in response to secret shoppers mentioning them, it is normal for shoppers to cross-shop, and to mention other competitors when shopping.  The evidence shows that cross-shopping comes up normally in conversation.

> a.  "[The salesperson] also mentioned . . . about price. So I explained to him that [] Sleepy's had the lowest price guarantee. And then he said something to the effect that once they hit me with the charges . . . the bed would be much more money for a bed that wasn't an updated bed. The price that he was giving me was all in; it included everything."  (Arroyo Tr. 635:19-636:2.)

> b.  "I mentioned that I had seen something about Select Comfort, Sleepy's. And the salesperson immediately jumped in and said that Sleepy's doesn't sell it any more. . . . He says they weren't a partner, and that they didn't have the same bed. The[ir] [bed] was a wood foundation, not the high density plastic, or whatever they used." (Grinnan Tr. 1337:5-12.)

> c.  "Like I said, I explained to [the salesperson] that I was moving in, I was looking for a king-sized bed. And he proceeded to show me . . . the Select Comfort beds. I made a statement to the effect that Sleepy's also had those beds. And he proceeded to let me know how the models that we carried at Sleepy's . . . were older models." (Arroyo Tr. 633:3-14.)

**Select Comfort's Denigration of Retail Partners and their Products was More Virulent in Sleepy's Territory than in the Rest of the Country**

69.     The secret shops also showed that there was a higher concentration of more pointed, virulent negativity from Select Comfort salespeople within the area in which Sleepy's competed directly with Select Comfort than in other parts of the country.  The secret shops in the areas adjacent to the areas in which Sleepy's competed directly with Select Comfort showed that while there was some virulent negativity from Select Comfort salespeople, there were far more

instances of no denigration at all.  (Px 176, ¶ 15[11]; Blank Tr. 3138:1-3138:13; 3138:23-3139:17; 3140:2-3140:21;   3144:14-23;   3145:4-12;   3146:13-16;   3146:24-3147:17;   3147:21-3148:3; 3185:21-3186:12; 3186:21-3187:23; 3188:7-3190:6.)  The secret shops in the rest of the country, far from the areas in which Sleepy's competed directly with Select Comfort, showed that while there was some negativity from Select Comfort salespeople, it was relatively minor and mild, or non-existent.  In fact, secret shops performed outside Sleepy's territory sometimes showed no disparagement at all. (Px 176, ¶ 15; Px 188.)[12]

### Sleepy's Territory

70.   Queens Center Mall, Queens, NY (Sticker #1[13])

    a.   Secret shop conducted by James Constantinides on January 12, 2007.

        i.   Corresponding Shop Report PX 1.59

            1.   "The polymer box unlike wood is more durable and long lasting will not warp or sag, promote dust mites and is better if you have allergies."

            2.   "The Sleepy's mattresses are stored in a warehouse where other returned mattresses go . . . and they could have moisture in them or allergens or things like that."

            3.   "[T]he base of our mattress is a solid plastic foundation, so there is no warping or sagging. It cuts down on allergens because there is no wood. The base that they use is made out of wood, so it's not quite as durable."

---

[11] Select Comfort offered "***the entire [Px] 176***" in evidence without reservation or restriction, and the Court received it. (Tr. 366:7-12) (emphasis supplied).

[12] Sleepy's offered Px 188 into evidence (Tr. 3073:9-3074:15), and submitted a memorandum of law concerning the admission of this exhibit.  The decision on admission remains *sub judice* (Docket #789).  Px 188 contains secret shop reports of Select Comfort conducted outside of Sleepy's territory, and these shop reports show little or no disparagement of Select Comfort's local Retail Partner.

[13]   Sticker numbers refer to stickers placed by secret shopper witnesses on one of Sleepy's trial demonstrative maps of Sleepy's territory (Px 180 and Px 181), in approximately the location of the Select Comfort store where they conducted their secret shops.

4. "[Sleepy's] return policy . . . is a 14-day exchange policy and we give you a 30-night in home trial and it you don't like it you can actually return it for a full refund."

5. "You're getting it newer [from Select Comfort]. You don't have to worry that it was . . . you know that there was moisture in it or you know anything like that, allergens and stuff like that, 'cause they have a warehouse. So if people return a bed and it goes back to the warehouse anything that would come with it would be in the warehouse where there isn't any control or you know . . . ."

6. "Basically dust mites, any types of mites and bugs and stuff like that are more attracted to wood and natural fibers than they are to anything else. Also the way the wood bases and box springs are is they're not always solid, they're just kind of fabric, so they kind of get their way in there and get trapped in there. . . . [A]s far as this compared with a spring mattress there really isn't any comparison compared you can even open it up and vacuum out the inside."

    ii.  <u>Corresponding Audio Recording Px 3.11[14]</u>

71.    Palisades Mall, West Nyack, NY (Sticker #2)

    a.  Secret shop conducted by Jesus Arroyo on January 12, 2005.

      i.  <u>Trial Testimony</u>

1. "[H]e proceeded to . . . show me that the material that they use in their box spring is a polymer material, and told me that the one that Sleepy's used was made out of wood, which was inferior and would cause squeaking and cracking in the future." (635:6-11.)

2. "[O]nce [Sleepy's] hit me with charges . . . the bed would be much more money for a bed that wasn't an updated bed. The price that he was giving me was all in; it included everything." (635:23-636:2.)

    ii.  <u>Corresponding Shop Report PX 1.64</u>

1. "[Sleepy's] are old models that they have sitting in one of the[ir] many warehouses."

---

[14] The Court took Px 3.11 into evidence on March 28, 2012.  (594:4-6.)

        2. "Select Comfort stores gets the better beds, Sleepy's carries old model beds . . . ."

  b. Secret shop conducted by Anthony Perez on November 8, 2006.

    i. <u>Trial Testimony</u>

        1. "She basically started talking about that ours is a strip-down version of theirs, comparing the comfort or the return policy versus Sleepy's, the price difference and the materials. She was basically saying everything we carried in our stories [sic] was a watered-down version." (941:1-4.)

72.   Bay Shore Mall, Bay Shore, NY (Stickers #3, 5)

  a. Secret shop conducted by Deborah Zaffron on November 5, 2006.

    i. <u>Trial Testimony</u>

        1. "He stated that our box springs were given to Sleepy's for free. That Select Comfort would never honor the warranty of the merchandise. He was very negative about Sleepy's." (696:22-25.)

        2. "He said that Sleepy's [Select Comfort products] . . . were kept in a warehouse. He said that theirs were better than Sleepy's." (697:14-17.)

        3. "[T]he box springs that Sleepy's sold were warped and would break." (699:11-13.)

        4. "He talked about the foam being different in the bed." (701:22.)

        5. "They said that wood was not good. It wasn't as good as theirs. And the polypropylene foundation would last a lifetime." (702:13-15.)

    ii. <u>Corresponding Shop Report Px 1.21</u>

        1. "Our prices were not like Sleepy's who gives 50% off then adds $300."

        2. Sleepy's wood foundations are "the worst thing that you can use it's like putting your mattress on the floor."

      3. "Sleepy's does not honor warrant[ie]s! If you buy from Select Comfort you will always have the 'real' company behind you. . . . Sleepy's plays games . . . [the salespeople] were pounding on that fact."

      4. "Buying from Select Comfort is buying from the original and that it would be like buying a Coach bag from Coach or buying from someone else that would be a 'copy'. . . . [Y]ou should not buy the 'copy' at Sleepy's . . . ."

      5. "Wireless remotes are better – you cannot get them at Sleepy's."

   iii. <u>Corresponding Audio Recording Px 3.17[15]</u>

b. <u>Secret shop conducted by Deborah Zaffron on January 26, 2007.</u>

   i. <u>Trial Testimony</u>

      1. "Sleepy's uses refurbished pumps in the pump that fills the bed up with air." (740:5-7.)

      2. "Sleepy's is a prefab design, and it's not made to order. . . . Select Comfort, they make the bed for you. And that it has been sitting around in plastic and it will smell like the warehouse." (742:7-11.)

   ii. <u>Corresponding Shop Report Px 1.102</u>

      1. "Sleepy's has last year's model . . . ."

      2. "'The construction is generally different. It's a thin wood and warps. It happens from having pressure on it, due to it being so cold in the winter and warm in the summer; when there is hot air it's the pressure that makes it warp! That why [Select Comfort] use[s] a polymer, so it doesn't warp."

      3. Select Comfort "has a 30 day trial period they will give you your money back. At Sleepy's 'you have to pay full price . . . .'"

      4. "The cheapness of Sleepy's is the wood foundation and less substance on the pillow top."

---

[15] The Second Circuit found that statements on this recording by the Select Comfort salespersons "would be understood as communicating a fact known by the speaker to be true" and remanded for reconsideration. Second Circuit Decision at 20-21.

       iii.  <u>Corresponding Audio Recording Px 3.5</u>

  c.  Secret shop conducted by Robert Gorman on January 10, 2007.

     i.  <u>Trial Testimony</u>

        1.  The "salesperson said . . . buying from Sleepy's is like buying a knockoff of a Coach bag." (1243:18-21.)

        2.  "They said that Sleepy's employees had very little knowledge, and that if you ever had a problem, that they wouldn't take care of it as well as they would at Select Comfort." (1244:12-15.)

  d.  Secret shop conducted by Robert Gorman on January 20, 2007.

     i.  <u>Trial Testimony</u>

        1.  "I think the main thing that I took out of the shop was that in their regular sales pitch . . . they were specifically, without even being asked, mentioned that Sleepy's was no longer going to carry the product and you shouldn't but it from them." (1248:8-13.)

        2.  The salesperson discussed "the box springs warping because they are made out of wood rather than theirs is made out of polymer . . . that was said every time I shopped." (1249:7-10.)

  e.  Secret shop conducted by Robert Gorman on April 11, 2007.

     i.  <u>Corresponding Shop Report Px 1.125</u>

        1.  "Sleepy's will only offer you an exchange of another mattress plus fees while [Select Comfort] will give you your money back minus a small shipping charge."

73.    Roosevelt Field Mall, Garden City, NY (Sticker #4)

  a.  Secret shop conducted by Deborah Zaffron on January 13, 2007.

     i.  <u>Trial Testimony</u>

        1.  "[E]very time I would go into a Select Comfort store, [they] would . . . say that their box springs were plastic. . . . [T]hat the box springs that Sleepy's used would warp, break, crack. They wouldn't last." (790:20 - 791:2.)

33

      ii.   Corresponding Shop Reports Px 1.50

          1.   "[Sleepy's] models are older."

b.  Secret shop conducted by Deborah Zaffron on January 26, 2007.

      i.   Trial Testimony

          1.  "[T]he mattress [] that Sleepy's sold were not the same mattresses or quality type that you would get from Select Comfort directly. They also talked about the plastic molded boxes that the mattresses went on. And stated that Sleepy's had a thin wooden box that would squeak and not last." (724:10-17.)

          2.  "Whenever you went into a store . . . they would talk about the foams that would be between the air chambers and the covering of the mattress were different thicknesses. . . . That their's was an inch thicker." (724:18-725:2.)

          3.  "That if we bought from Sleepy's instead of Select Comfort that we would not . . . be able to get the bed serviced if there was something wrong with it. . . .  Any Select Comfort you would buy from Sleepy's, that you would have a hard time getting the bed serviced from Select Comfort." (725:19-726:2.)

      ii.  Corresponding Shop Report PX 1.101

          1.  Select Comfort "did not give Sleepy's the wireless remote so they could keep i[t] for themselves and keep the best bed for themselves."

          2.  Select Comfort "cancelled the retail partnership with Sleepy's because Sleepy's did not perform the way the expected . . . ."

          3.  "We told the salesperson that we saw the 'same bed' at Sleepy's and he laughed hard and said 'no you didn't'. . . . [Select Comfort] sell[s] a 'different line,' and [has] the 'main' Sleep number beds."

          4.  "I'm not going to trash, but we as the manufacture[r] kept the top of the line."

          5.  "Select Comfort had a double faster pump and that the design of the Select Comfort was more advantageous."

6. "[Select Comfort] had a great return policy, it didn't cost anything, and you get your money back. You do not have to purchase another mattress like you have to at Sleepy's."

7. "If you buy from Sleepy's it would be $500 less, but it's not the same bed."

   iii. <u>Corresponding Audio Recording Px 3.6</u>

c. Secret shop conducted by John Giacobbe on August 26, 2007.

   i. <u>Trial Testimony</u>

1. "[H]e explained the differences to us. I remember a few things. One was a remote control. The ones at Sleepy's had wires on them and he can offer us one that didn't have a wire. . . . he mentioned the box springs, that the Sleepy's box springs were made of wood, and he said that they deteriorated and squeaked . . .and that his were made of plastic and that the plastic was better. . . . he explained that it didn't rot and their plastic box springs will last forever. . . . also that Sleepy's wasn't carrying Select Comfort any longer and that there was a limited amount of supply and that we would be better off, you know, purchasing it in a Select Comfort store." (1597:23 - 1598:15.)

d. Secret shop conducted by Deborah Zaffron.

   i. <u>Corresponding Audio Recording Px 3.18</u>

74. Walt Whitman Mall, Huntington, NY (Stickers #6, 12)

a. Secret shop conducted by Robert Gorman on November 8, 2006.

   i. <u>Trial Testimony</u>

1. "[T]hey started telling me everything that was wrong with Sleepy's; from the salespeople, from the inferior product, from the problems with the company to the pricing, many, many – a litany of things why you shouldn't buy from them." (1262:3-7.)

2. "They said that Sleepy's stores their mattresses in this big warehouse whe[re] they can sit for a while, and the Select Comfort is made and shipped while it's still fresh right after it's manufactured." (1262:21-24.)

35

3. "Sleepy's box springs or foundations are made out of the wood and wood can warp. . . . [T]heir product, because it's made out of plastic or polymer can't warp, so it's a superior product." (1263:8-17.)

4. "Sleepy's has a lot of people asking for their money back. . . . That's why they come to her store, they walk out of Sleepy's and come to Select Comfort." (1264:20-25.) [10]

5. "Sleepy's doesn't have the greatest reputation. . . . [T]heir reputation in dealing with customers is not the greatest." (1265:8-17.)

b. Secret shop conducted by Deborah Zaffron on March 8, 2007.

i. Trial Testimony

6. "[T]he Sleepy's box springs are wooden, and the Select Comfort's are a modular polymer, and it is not going to warp. And it also came in pieces, so it would be easier for replacement of parts, and more durable. (751:14-17.)

ii. Corresponding Shop Report Px 1.121

7. "[Sleepy's has] an exchange policy once you buy a bed from there you can exchange it, but you can only go up in model, you can't ever go down and you can't ever get your money back. Select Comfort doesn't work that way, once you order your bed from us, if you are not happy with it you can return it for a full refund less the shipping costs. Everything is refunded to you. . . . [I]f you are not happy you can get your money back, you can't do that with Sleepy's."

iii. Corresponding Audio Recording Px 3.16

75. Smith Haven Mall, Lake Grove, NY (Sticker #7)

a. Secret shop conducted by Deborah Zaffron on March 8, 2007

i. Trial Testimony

1. "This salesman also talked about how Sleepy's was no longer selling Select Comfort beds. . . . And that [] if I bought a Select Comfort bed from Sleepy's that Sleepy's knew nothing about the bed. (758:5-9.)

2. "[T]his person also talked about the foundation. That Sleepy's did not use a foundation. That Select Comfort never sold Sleepy's foundation. . . . [He said] [w]hat these beds want is a sol[i]d flat face, like a platform bed or like our foundation. . . . Over time wood does warp. It's just natural for it – humidity, wood warps.  (758:17-759:9)

3. "[H]e talked about Sleepy's not honoring warranties or warrant[y]ing their merchandise, whether it be Select Comfort or anybody else. He also stated that Sleepy's should not even be selling Select Comfort beds."  (759:23-760:1.)

4. "[I]t's like going to a Toyota to get a Mercedes Benz instead of going to Mercedes Benz to for a Mercedes Benz. It's just like even if you're saving $500 up the road, just go to Benz because they know."  (760:9-12.)

5. "The Sleepy's box spring is wood and it warps."  (760:23.)

6. "[I]f Sleepy's sells . . . a sleep number bed, [] Select Comfort . . . might not warranty it. And what are you going to do after that? . . . Sleepy's does not return money. That is one thing they don't do . . . . "  (761:25-762:5.)

ii.   Corresponding Shop Report Px 1.128

1.    "[Sleepy's] [m]erc[andise] is not fresh."

2.   "[Sleepy's] merch[andise] is much lesser of a product."

3.   "You will sweat from [Sleepy's] ticking."

4.   "[Sleepy's] plays games."

5.   "[Y]ou wont see Select Comfort on the beds logo [at Sleepy's].

iii.   Corresponding Audio Recording Px 3.4

76.   New York, NY (Broadway and 72nd Street) (Sticker #9)

a.   Secret shop conducted by Anthony Colon on September or November 4, 2006.

i.   Trial Testimony

37

1.  "[T]he Select Comfort mattresses that were sold at Sleepy's were basically sitting on a shelf in a warehouse for months, and I would have no idea as to how long it was sitting there. And buying the mattress from them, I would get a freshly made product. . . ." (866:4-9.)

2.  "[T]he salespeople at Sleepy's, they float from store to store. So if I had a problem with the particular bed that I had purchased from them, it would be virtually impossible for me to get it taken care of . . . . He also said that in the event I would be unhappy with the mattress, that they would offer me an exchange or a refund, where Sleepy's wouldn't do that." (866:24-867:11.)

3.  "Where [Select Comfort's] models have a working foundation, this would prolong the comfort level of the mattress; their foundation as opposed to the block of wood that Sleepy's mattress had." (868:1-4.)

   b.  Secret shop conducted by Steve Puran on January 26, 2007.

      i.  <u>Trial Testimony</u>

1.  "Select Comfort will not sell their best product to a partner or competitor, that [] was part of the reason that Sleepy's had the lower model or lower price quality product, and also that's the reason they don't have the polymer foundation that would go with the Select Comfort product." (1116:17-22.)

2.  "Sleepy's would charge 299 to do an equal or greater exchange . . . Select Comfort['s] fee would be $99." (1118:23-1119:3.)

3.  "Sleepy's didn't abide by the rules so they [Select Comfort] were pulling the partnership because of that." (1121:11-13.)

      ii.  <u>Corresponding Audio Recording Px 3.12 (<i>not in evidence</i>)</u>[16]

77.  Galleria Mall, Poughkeepsie, NY (Sticker #11)

---

[16] The Second Circuit remanded to this Court the question of the admissibility of shop recordings Px 3.1, Px 3.2, Px 3.7, Px 3.8, Px 3.9, and Px 3.12, and held that to the extent the District Court excluded any of the recordings on the grounds that Sleepy's had not established chain of custody, that was error.  Second Circuit Decision at 26-27.

a. Secret shop conducted by Anthony Perez on January 15, 2007.

    i. <u>Trial Testimony</u>

        1. The salesperson compared "Select Comfort, which is a polymer, [] to [Sleepy's] foundation box, which is made out of wood. And the wood would attract bugs." (958:22-24.)

        2. "[T]he Select Comfort person was pointing out the . . . [Sleepy's] foundation of box springs, comparing it to Select Comfort . . . a lesser quality of material being used, and again, just talking about the []return policy, Select Comfort versus Sleepy's." (959:17-22.)

        3. "[Sleepy's] delivering the product fast could bring into question the freshness of the product, meaning it could sit in a warehouse for an indefinite period of time, where Select Comfort['s] product would be fresher upon delivery." (960:8-11.)

78. Jefferson Valley Mall, Yorktown Heights, NY (Sticker #14)

    a. Secret shop conducted by Tyler Paiva on January 14, 2007.

        i. <u>Trial Testimony</u>

            1. "[S]he started to talk to me about how Sleepy's doesn't sell a fresh product . . . . [W]hen the mattresses get to the warehouse, they are there for several months." (1163:19-25.)

            2. "[S]he started to talk about the foundations that we use in comparison to the polymer used in her showroom. . . . [S]he said oh, yes, it's very important you have the correct foundation. Otherwise, the bed will collapse. It's not made to not be on that polymer foundation, and Sleepy's does not sell it, so their product is basically inferior." (1164:2-9.)

            3. "[W]e did talk about the warranty aspect of the bed, if there was something not quite to our liking. She said Sleepy's only gives 21 days but Select Comfort gives 30 days. (1171:15-18.)

            4. 1164:9 [1, 2]"So she asked the question would you rather deal with someone who can give you the bed direct or someone who is a middleman who allows the beds to sit in

the warehouse for any length of time, making them stale in effect." (1172:5-9.)

5. Sleepy's "keep[s] . . . the Select Comfort mattress in the warehouse for extended periods where they can become stale and have pest infestation. . . . [I]f a bed sits too long in a warehouse it can become degraded . . . she really basically was saying were keeping old mattresses . . . full of bugs and degraded." (1175:15-1176:4.)

6. "[T]he product sold by Select Comfort was vastly superior, she used that expression. . . . [Sleepy's] were starter products." (1177:20-24.)

7. "Ms. Travis told me she felt the product we had was inferior for several reasons. The other reason was because we don't have the polymer foundation. That was a key point she was emphasizing throughout her presentation." (1186:5-9.)

**Areas Adjacent to Sleepy's Territory**

79.   Oxford Valley Mall, Langhorne, PA (Sticker #8)

  a.  Secret shop conducted by Gerald Petrillo on January 16, 2007.

    i.  Trial Testimony

      1.   "[T]he box that Sleepy's carried . . . wasn't as good as it was that I would be getting if I got it from them [Select Comfort] directly; that there was a different type; that ours was a wood box and theirs, basically, was a plastic box. . . . [Sleepy's was] not offering one as strong as Select Comfort had  . . . ." (821:1-22.)

      2.  "[T]heir product was fresher than what I would receive if I bought it from Sleepy's. . . . [I]f I bought it from . . . Sleepy's, that there was no way to control how long the product had been warehoused." (820:1-11.)

80.   Deptford Mall, Deptford Township, NJ (Sticker #13)

  a.  Secret shop conducted by Michael Grinnan on November 8, 2006.

    i.  Trial Testimony

      1.   "[T]hey're not the same. They don't have the same materials as the ones Sleepy's has. This is better. The ones

in Sleepy's are similar to things they put in other retail partners, like QVC, that are essentially knockoffs . . . ." (1307:19-24.)

    ii. Corresponding Shop Report Px 1.38

    iii. Corresponding Audio Recording Px 3.15

81. Morristown Mall, Morristown, NJ (Sticker #15)

    a. Secret shop conducted by Michael Grinnan on January 17, 2007.

       i. Trial Testimony

          1. "The beds that Sleepy's carried had an inferior wood foundation." (1337:25-1338:1.)

    b. Secret shop conducted by Michael Grinnan on January 18, 2007.

       i. Trial Testimony

          1. "[T]he Sleepy's bed had a wood foundation. The Select Comfort bed did not. The Select Comfort beds had just recently been upgraded so they were newer models. And that Select Comfort offered a 30 day trial period, which Sleepy's did not." (1344:17-21.)

       ii. Corresponding Shop Report Px 1.91

82. Coventry Mall, Pottstown, Pa (Sticker #18)

    a. Secret shop conducted by Jacqueline Gruman on February 9, 2007.

       i. Trial Testimony

          1. "[T]he salespeople at Sleepy's will tell you anything . . . they think will make you buy a mattress." (1466:16-18.)

          2. "[W]e're taking the contract away because Sleepy's has screwed us . . . the salespeople will lie to you, and they'll tell you anything to make a sale." (1466:25-1467:2.)

          3. "He said, Sleepy's does not back up any warranty on their beds. And that is a quote. . . . And, those people at Sleepy's will tell you anything to make you buy even though it's a lie. That's his quote. That's what he said. . . . He said that Sleepy's find's every loophole. He told me that, the

salespeople at Sleepy's will lie to you about almost everything." (1470:16 - 1471:2.)

4. "Sleepy's does not back up any warranty on their beds." (1470:16-17.)

5. "Sleepy's finds every loophole. . . . Sleepy's will lie to you about almost everything." (1470:25-1471:2.)

83.     Providence Mall, Providence, RI (Sticker #19)

    a.   Secret shop conducted by Joseph Kilty on January 25, 2007.

        i.   <u>Trial Testimony</u>

            1.   "[O]ne of the largest differences between the Select Comfort beds and the beds that were offered by the retail partners, again, was the foundation. . . . [T]he foundations were plastic, a polymer material. (1526:15-20.)

        ii.   <u>Corresponding Audio Recording Px 3.8 (*not in evidence*)</u>

84.     Enfield Square Mall, Enfield, CT (Sticker #22)

    a.   Secret shop conducted by David Kapij on November 8, 2006.

        i.   <u>Trial Testimony</u>

            1.   "Select Comfort's boxes or foundations were polymer, and that Sleepy's were wood. . . . [T]he wood would come apart, and I believe eventually fail or fail sooner than the polymer." (1634:6-13.)

        ii.   <u>Corresponding Audio Recording Px 3.2 (*not in evidence*)</u>

**<u>Outside Sleepy's Territory, any Disparagement by Select Comfort of its Retail Partners was much Less Virulent than it was within Sleepy's Territory</u>**

85.     The secret shops also showed that there was a higher concentration of more pointed, virulent negativity from Select Comfort salespeople within the area in which Sleepy's competed directly with Select Comfort than in other parts of the country.  The secret shops in the areas adjacent to the areas in which Sleepy's competed directly with Select Comfort showed that while there was some virulent negativity from Select Comfort salespeople, there were far more

instances of no denigration at all.  (Px 176, ¶ 15; Blank Tr. 3138:1-3138:13; 3138:23-3139:17; 3140:2-3140:21;   3144:14-23;   3145:4-12;   3146:13-16;   3146:24-3147:17;   3147:21-3148:3; 3185:21-3186:12; 3186:21-3187:23; 3188:7-3190:6.)

86.    And in fact, secret shops performed outside Sleepy's territory sometimes showed no disparagement at all.  (Px 176, ¶ 15; Px 188[17].)

**Select Comfort's Sales Force Made Numerous Disparaging Statements About Sleepy's**

87.    The evidence introduced at trial showed that Select Comfort made the following disparaging statements about Sleepy's:

  a.  "[T]he sales associate told me that . . . Sleepy's carried a wood box spring that could warp and also hold allergens and that their polymer box was better. Also, that the Select Comfort mattresses were made to order and that Sleepy's would hold the product in the warehouse for a long period of time. . . . [S]he said that the wood box spring from Sleepy's could definitely, you know, hold allergens and her polymer box would not." (Lisa Hegel to Jim Constantinides, 1/12/07, Queens Center Mall, Elmhurst, Queens (Sticker #1), Constantinides Tr. 581:19-582:11.)

  b.  "If you go to Home Depot and look at a John Deere tractor and then go to John Deere and look at the same tractor, what is the difference? The difference is the tractor sold by Home Depot is cheaper, not exactly the same product or quality as the one sold by John Deere itself. This is the same situation we have with these beds."  (Rick Johnson to Joseph Kilty, 1/12/07, Buckland Hills Mall, Manchester, CT (Sticker # 17), Kilty Tr. 1509:8-19.)

  c.  "She was talking about how we keep our Select Comfort beds in the warehouse, and her main focus was to help me understand that Select Comfort makes the bed specifically fresh for us as needed, or as we keep our – the Select mattress in the warehouse for extended periods where they can become stale and have pest infestation. . . . Well, basically she is saying bugs can get inside the plastic sealed containers, and I didn't realize that, I pretended like that's news to me, and she talked about if a bed sits too long in a warehouse it can become degraded . . . we were keeping old mattresses . . . and that the mattresses were full of bus and degraded."  (Judy Travis to Tyler Paiva, 1/14/07, Jefferson Valley Mall, Yorktown Heights, NY (Sticker #14), Paiva Tr. 1175:12-1176:4.)

---

[17]  *See* footnote 14, above.

d.  "She made mention that if I buy from [Select Comfort], that the product is made to order, so it's being made specifically for me. Therein, it would take some time for me to receive it; I wouldn't get it right away. But if I bought it from somebody else, like Sleepy's, that there was no way to control how long the product had been warehoused, basically sitting on the shelf.  So that's where the whole freshness aspect came up. She indicated her products are carefully controlled and monitored in that respect, and it wouldn't be wise to get one that had been sitting in an unknown warehouse situation for any length of time."  (Faith Snyder to Gerald Petrillo, 1/16/07, Oxford Valley Mall, Langhorne, PA (Sticker #8), Petrillo Tr. 820:6-17.)

e.  "He also said that in the event I would be unhappy with the mattress, that they would offer me an exchange or a refund, where Sleepy's wouldn't do that."  (Don Ehrman to Anthony Colon, 9 or 11/4/06, New York, NY (Broadway and 72nd Street) (Sticker #9), Colon Tr. 867:9-11.)

f.  "Sleepy's won't honor the warranty. . . . [but] Select Comfort had a 20 year warranty."  (Bill O'Grady to Deborah Zaffron, 11/5/06, Bay Shore, NY (Sticker #3), Zaffron Tr. 701:10-12.)

g.  "[T]hey're not the same. They don't have the same materials as the ones Sleepy's has. This is better. The ones in Sleepy's are similar to things they put in other retail partners, like QVC, that are essentially knockoffs of the bed I was laying on  [in the Select Comfort store]."  (Bruce to Michael Grinnan, 11/8/06, Deptford Mall, Deptford, NJ (Sticker #13), Grinnan Tr. 1307:19-24.)

h.  The "salesperson said . . . buying from Sleepy's is like buying a knockoff of a Coach bag." (1/10/07 (Select Comfort salesperson to Robert Gorman, 1/10/07, Bay Shore Mall, Bay Shore, NY (Robert Gorman on April 11, 2007), Gorman Tr. 1243:18-21.)

i.  "He said, Sleepy's does not back up any warranty on their beds. And that is a quote. . . . And, those people at Sleepy's will tell you anything to make you buy even though it's a lie. . . Sleepy's find's every loophole. . . . [T]he salespeople at Sleepy's will lie to you about almost everything." (2/9/07 Ray Roberts to Jacqueline Gruman, 2/9/07, Pottstown, Pa (Sticker #18), Gruman Tr. 1470:16 - 1471:2.)

**Sleepy's Decides to Confront Select Comfort**

88.  Once Sleepy's believed that it had identified the reason for the poor sales of the

Select Comfort beds, Sleepy's senior management wanted to get the problem corrected so that

sales would improve, and wanted to move forward with Select Comfort.  (Bookbinder Tr. 215:3-7; 240:4-13; Blank Tr. 2951:22-2952:2.)

89.    The parties had been planning to hold a business review meeting originally scheduled for September 7, 2006, in order to improve the parties' relationship going forward. (Bookbinder Tr. 239:23-240:18; Bauman Tr. 2222:16-21; Px 28; Px 37.)   The meeting was rescheduled several times.  (Px 35; Px 36; Px 37; Px 40; D-176.)

90.    However, the meeting was finally scheduled to occur on January 3, 2007 at Sleepy's offices in Bethpage.  (Bookbinder Tr. 244:13-20; Bauman Tr. 2149:9-12.)   At that meeting Sleepy's planned to confront Select Comfort executives with some of the shop reports. Sleepy's expected that seeing the actual reports would convince Select Comfort that the pattern of disparagement was the reason for the poor sales and get them to address and fix the problem. (Bookbinder Tr. 215:3-7; 240:4-13; 549:6-16; Blank Tr. 2944:17-2945:3; 2951:22-2952:2.)

91.    The January 3 meeting occurred as scheduled.  (Bookbinder Tr. 244:13-20; Bauman Tr. 2149:9-12; Blank Tr. 2952:15-17; Spurgeon Tr. 2759:2-4.)  Mr. Spurgeon and Mr. Bauman and two other Select Comfort representatives came to Bethpage and met with Mr. Bookbinder and Mr. Blank, among others.  Harry Acker participated by telephone from Florida. Mr. Acker told Mr. Spurgeon and Mr. Bauman what the shop reports showed, asked that the disparagement be stopped and asked for a letter from Bill McLaughlin, Select Comfort's CEO, giving assurance that the practice of denigration and disparagement would stop.  (Bookbinder Tr. 244:23-245:10;  246:23-247:11;  Blank  Tr.  2955:14-2956:13;  Bauman  Tr.  2175:22-2176:1; Spurgeon  Tr.  2774:12-2775:11.)   Mr.  Spurgeon  became  visibly  upset  and  red-faced  and exchanged some heated words with Mr. Acker.  (Bookbinder Tr. 245:19-246:6; 284:18-22.)   It is disputed whether Mr. Acker asked for the letter within 72 hours or Mr. Spurgeon said he

would respond to the request within that time frame, but it is undisputed that such a request was made.  (Bookbinder Tr. 246:2-6; Blank Tr. 2959:21-24; Bauman Tr. 2423:5-17.)

92.    Mr. Bauman and Mr. Spurgeon also told Mr. Blank at the meeting that the requested letter was not necessary because the Retail Partner Agreement already forbade the disparagement in issue.  (Blank Tr. 2957:16-25; Bauman Tr. 2421:7-22; 2423:10-13; Px 32; Px 157.)  Mr. Blank agreed, but he indicated that Mr. Acker wanted the letter nevertheless.  (Blank Tr. 2957:16-2958:7.)

93.    This exchange makes clear that Bauman and Spurgeon (1) considered the anti-disparagement clause in § 4(c) to forbid the disparagement, and (2) considered the terms of the Retail Partner Agreement to be in effect and to govern the parties' relationship at that time, which was after the nominal expiration date in the Agreement.

94.    Mr. Acker did not threaten Select Comfort with litigation at the meeting; rather, he said that litigation was the last thing Sleepy's wanted.  (Blank Tr. 2958:8-14.)

95.    After Mr. Acker's remarks, the Select Comfort team was given a sampling of the shop reports from Sleepy's secret shoppers – approximately ten – and was left alone to review them for a period of time.  (Bookbinder Tr. 246:23-247:11; Blank Tr. 2954:10-19; 2958:20-2959:4; Bauman Tr. 2422:25-2423:4; Spurgeon Tr. 2770:13-22.)

96.    When the meeting reconvened, some effort was made to conduct the business review that was contemplated using a set of printed power point slides prepared by Select Comfort.  (Px 124; Bookbinder Tr. 247:21-248:9; Spurgeon Tr. 2770:23-2771:12; 2838:5-19; 2841:2-2842:2; Bauman Tr. 2154:3-6; 2414:20-25; 2418:15-2419:4.)   In those power point slides, Select Comfort reiterated the amount of sales it originally predicted would be achieved by

Sleepy's – a 15-20% sales share with at least a 70% incremental sales rate.  (Bauman Tr. 2417:10-18; Px 124.)

97.   Sleepy's executives left the meeting with the understanding that they would receive the requested letter from Mr. McLaughlin within 72 hours.  On January 8, not having heard anything, Mr. Bookbinder tried to contact Mr. Spurgeon and Mr. Bauman, and when unsuccessful, sent an email to Mr. McLaughlin concerning the requested letter.  (Bookbinder Tr. 285:2-287:14; Px 82.)  Mr. McLaughlin did not respond, but Mr. Bauman responded to Mr. Bookbinder, stating that there would be no letter because the parties' agreement already forbade disparagement, the same reasoning he and Mr. Spurgeon had articulated at the January 3 meeting.  (Bookbinder Tr. 287:19-293:2; Px 32; Px 157.)

98.   Shortly thereafter, on January 11, 2007, Mr. Spurgeon sent a letter to Mr. Acker advising that Select Comfort wanted to end the Retail Partnership and wind up the relationship and proposing that Sleepy's continue to sell the Select Comfort beds through the end of February.  (Bookbinder Tr. 296:9-19; Spurgeon Tr. 2771:19-2771:24; Px 31.)

99.   Sleepy's still wanted something done about the disparagement.  On January 23, Mr. Bookbinder sent a letter on behalf of Mr. Acker to Mr. McLaughlin again asking for a letter giving assurance that the disparagement would stop.  (Bookbinder Tr. 299:4-300:6; Px 81.)  This time Mr. McLaughlin did respond – the same day.  (Bookbinder Tr. 299:4-300:6; Px 145.)  In a January 23, 2007 letter (Px 145) he told Mr. Acker that:

> All of us at Select Comfort were disappointed by what we read in the shopping reports that you provided to us.  We took immediate action to address the reported behavior, putting our teams on notice that this would not be tolerated and reassuring them that you were working with your teams to be equally respectful.

100.   However, the disparagement did not abate.  Sleepy's performed some further secret shops to determine if there was any change.  (Bookbinder Tr. 304:4-18; D-34.)  These

shops showed that the same types of disparagement continued.  (*See, e.g.*, Arroyo Tr. 635:6-11; Petrillo Tr. 820:25-821:22; Seth Tr. 911:20-7; Perez Tr. 958:12-16; Paiva Tr. 1163:24-1164:9; Gorman Tr. 1243:18-21; Mahoney Tr. 1915:8-17; Bookbinder Tr. 304:19-305:2.)

101.    Although Mr. Bauman and Mr. Spurgeon claimed that Select Comfort "took immediate action to address" the disparagement as Mr. McLaughlin's letter asserted, neither could remember what was done, who was contacted, or whether anything was issued in writing. Nor did they know whether any Select Comfort sales personnel were fired or disciplined in any way, or whether any of the sales personnel identified in shop reports they reviewed were even contacted.  (Bauman Tr. 2184:1-2185:18;  Spurgeon Tr. 2776:8-2778:2.)  Even though Mr. Bauman was the senior officer in charge of the Retail Partner program, he testified that taking action with respect to the disparagement was not his direct concern.  (Bauman Tr. 2184:1-9.)

102.    The Retail Partner relationship continued until early May 2007 when the last beds and materials were removed from Sleepy's stores.  (Bookbinder Tr. 305:9-306:1; Px 123.) Sleepy's last purchase of beds from Select Comfort was pursuant to an invoice dated March 17, 2007.  (Px 171.49.)

103.    On April 18, 2007 the parties entered into a Wind-Up Agreement providing for the orderly wind up of the Retail Partner relationship.  (Bookbinder Tr. 306:2-18; Blank Tr. 2961:11-2962:7; Px 123.)

**Select Comfort's Disparagement and Denigration of the Personal Preference Line in**
**Sleepy's Territory Caused the Poor Sales of Select Comfort Beds at Sleepy's Stores**

104.    Select Comfort's disparagement of the Select Comfort beds at Sleepy's and disparagement of Sleepy's itself, combined with advertising and promotional materials that told consumers that the wood foundation at Sleepy's was inferior to the plastic polymer foundation at the Select Comfort stores, caused Sleepy's to lose sales of Select Comfort beds that it would

have made but for the disparagement, if it had been competing on a level playing field with the Select Comfort stores.

105.    Select Comfort representatives repeatedly told Sleepy's that there was no material difference in quality between the plastic and wood foundations and that selling the Personal Preference line would not place Sleepy's at a competitive disadvantage.  (*See* ¶ 34, above.)

106.    Select Comfort's sales force worked on commission, had sales goals they were required to meet, and earned additional commission from sales exceeding their sales goals. (Werner Tr. 2564:22-2565:18.)   Thus, Select Comfort incentivized them to make all sales possible in the Select Comfort stores.

107.    The secret shopper evidence shows that the Select Comfort sales personnel in and near Sleepy's Retail Partner territory regularly used the same themes in their sales pitches to denigrate the Select Comfort beds at Sleepy's and Sleepy's as a business.  (*See* ¶¶ 64-66, above.) The frequent occurrence of these common themes, coupled with the fact that Select Comfort specifically trained such sales personnel about how to address the competition posed by nearby Sleepy's stores, makes clear that the disparagement is not the work of a few rogue sales persons, but rather was the encouraged, or at least tolerated, policy of Select Comfort at the management level.

108.    It is reasonable and logical to infer that the same derogatory sales pitch themes the Select Comfort sales force used with secret shoppers posing as actual consumers were used with actual consumers who cross-shopped at the Select Comfort stores.  In fact, one secret shopper heard a Select Comfort sales person make the same types of derogatory statements to an actual shopper who was in the store at the same time.  (Mahaffy Tr. 1392:12-1394:11.)

109.    It is also reasonable and logical to infer, from the results of the secret shops coupled with the sporadic reported instances of disparagement in 2005 and 2006 (*see* ¶ 55, above) that the pattern of denigration existed before the period of the secret shops and had been occurring throughout the Retail Partner relationship.

110.    Notably, Select Comfort's Senior Vice President of Retail Partners admitted at the trial that telling a consumer that the wood foundation would warp or sag would make that product less desirable to the consumer.  (Werner Tr. 2684:11-2685:12.)

**The Impact on Customers of Select Comfort's Disparagement and Denigration**

111.    The conclusion is also obvious and inescapable that the types of derogatory statements the Select Comfort sales force regularly used would affect consumer purchasing decisions.  Indeed direct evidence shows that this is so.  In several instances, customers told Sleepy's personnel that the reason they did not want to purchase from Sleepy's was that they understood that the Select Comfort beds available at Sleepy's were inferior to those offered at the Select Comfort store.  This led to actual cancelled sales, returns, and/or lost sales.  Sleepy's offered this testimony as evidence of the customers' states of mind:

**Scott Cheshul (a Sleepy's senior regional sales manager)**

112.    Mr. Cheshul testified in making an offer of proof that he personally met with a Sleepy's customer who wanted to cancel his purchase of a Select Comfort bed from Sleepy's, giving as his reason that, while speaking to Select Comfort sales persons, he was told that the Select Comfort beds sold at Sleepy's were inferior to the models sold at Select Comfort stores,

and that Sleepy's had been overcharged for it.  Mr. Cheshul testified that he gave the customer a $500 discount.  (Tr. 2027:10-2057:2.)[18]

### Tyler Paiva (a Sleepy's District Operations Manager)

113.    Mr. Paiva testified that on at least two different occasions he personally met with Sleepy's customers who canceled their purchase of Select Comfort beds from Sleepy's, giving as their reasons that, while speaking to Select Comfort sales persons, they were told that the foundations sold at Sleepy's were inferior to the foundations sold at Select Comfort stores. (Tr. 1205:5-1213:23.)[19]

### Deborah Zaffron (a former Sleepy's sales person)

114.    Ms. Zaffron testified that a Sleepy's customer purchased a Select Comfort bed at Sleepy's, but later returned and canceled the sale, giving as his reason that, while speaking to a Select Comfort salesperson at a store located in the same shopping mall, he was told that the merchandise was inferior.[20]    (678:13-683:16.) Ms. Zaffron then called the Select Comfort representative and put him on a speaker phone with the customer present.  (Tr. 682:19-683:5.) During that conversation, the Select Comfort employee repeated the derogatory statements, and told Ms. Zaffron and the customer "many negative things about the Select Comfort [bed] that

---

[18] The Second Circuit ruled that this evidence is admissible to show the customer believed that the Select Comfort merchandise sold by Sleepy's was inferior, and that Sleepy's was harmed by Select Comfort's conduct.   Second Circuit Decision at 22-23.

[19] The Second Circuit ruled that Sleepy's inability to identify the customers whose states of mind were at issue does not render the evidence hearsay.  Second Circuit Decision at 23.

[20] The Second Circuit ruled that Ms. Zaffron's testimony as to what the customer said about his reasons for wanting to cancel his purchase was competent, nonhearsay evidence of the customer's state of mind, i.e., his beliefs about the merchandise and Sleepy's.  Second Circuit Decision at 24-25.

Sleepy's sells," including that the Select Comfort beds at Sleepy's were inferior to the beds at the Select Comfort store.[21]  (Tr. 683:6-16.)

### James Constantinides (a Sleepy's Regional Manager)

115.    Mr. Constantinides testified that on at least two different occasions he spoke on the telephone with Sleepy's customers who canceled their purchase of Select Comfort beds from Sleepy's, giving as their reasons that Select Comfort sales persons told them that the Select Comfort beds sold at Sleepy's were inferior to the models sold at Select Comfort stores.[22]  (Px 90; Tr. 563:14-564:6; 564:23-566:21); (Tr.566:23-572:7).

### Select Comfort Trained its Sales Force to Make Sales to Cross-Shoppers by Exploiting the Differences in the Product Line Carried by Sleepy's

116.    Select Comfort's senior management trained its store managers that Select Comfort stores had competitive advantages over Sleepy's, including the plastic polymer foundations, which Select Comfort considered superior to the wood foundations at Sleepy's, which would warp and crack according to Select Comfort.  (*See* ¶ 27, above.)  The store managers were then entrusted with conveying this training to the rank-and-file sales personnel.  (*See* ¶¶ 45-47, above.)   The store managers trained the sales personnel in Retail Partner territories "that our retail partners sold an inferior product to what we sold and we were welcome

---

[21] The Second Circuit ruled that Ms. Zaffron's testimony as to what the Select Comfort employee said on the telephone while the customer was present was admissible "at least to show disparagement in breach of contract, and perhaps for other purposes as well."    Second Circuit Decision at 25. One of those other purposes was to show that statements by Select Comfort employees that customers said created their states of mind that the Select Comfort beds sold at Sleepy's were inferior to those sold at Select Comfort were, in fact, made to customers by Select Comfort salespersons.

[22] The Second Circuit ruled that this evidence is admissible to show the customer's state of mind. Second Circuit Decision at 25-26.

to explain that to our customers." (Desrosiers Tr. 2869:22-2870:12.; *see also* Del Vicario Tr. 1998:11-1999:15, 2001:11-2002:17; 2015:22-2017:5; 2017:13-15, 2017:25-2018:19; 2019:7-11.)

## Select Comfort's Advertising and Promotional Materials Reinforced the Disparaging Statements Made by Select Comfort's Sales Force

117.    In addition to the Select Comfort personnel's sales pitches, Select Comfort's advertising and promotional materials reflected the advertising message of the Brand Standards Manuals – that wood is an inferior material for the Select Comfort foundation (*see* ¶¶ 26-27, above) – and communicated to consumers that the wood foundation at Sleepy's was inferior to the plastic foundation at Select Comfort.  (Px 129, Franco Tr. 1828:12-1829:25; Werner Tr. 2565:19-2566:14; Px 108, Franco Tr. 1830:7-1832:17; Werner Tr. 2566:15-2567:10; Px 106, Franco Tr. 1832:23-1836:1; Px 128, Bauman Tr. 2135:19-2141:7; Franco Tr. 1798:11-1803:21.)

118.    A Select Comfort promotional brochure (Px 129) states, for example:

> **Great sleep starts with a Sleep Number® Foundation**
>
> Precision engineered and constructed of high-density polymer, our foundations provide solid and uniform support for your mattress and won't warp, twist or break down like old fashioned wood box springs.  They're simple to assemble and move, fit with standard bed furniture and frames, and are covered in a matching coverlet.

119.    Consumers regularly refer to the structure beneath the mattress as a "box spring" whether or not it has springs (Constantinides Tr. 602:12-14; 602:23-603:8; 603:25-604:6; 604:17-20; Arroyo Tr. 656:7-11; 657:5-12; Seth 927:4-7; 927:10-25; 928:16-20; Perez Tr. 980:12-21; 981:7-12; 981:20-23; Petrillo Tr. 833:17-834:9; Colon Tr. 880:20-881:5; 881:14-20; Gorman Tr. 1266:23-1267:18; 1267:21-1268:4; Paiva Tr. 1203:3-25; Grinnan Tr. 1350:24-1351:9), and so would understand the advertisement above to convey the message that the wood foundations at Sleepy's are inferior to the plastic foundations at the Select Comfort stores.

120.    In addition, (a) Select Comfort sales personnel refer to the structure beneath the Select Comfort mattress as the "box spring" (Px 3.6 at 11:26, 13:59, 14:45; Giacobbe Tr. 1591:25-1598:17; Zaffron Tr. 721:9-14; 723:15-21; 724:14-17; 734:18-737:7; Px 1.101) and (b) Select Comfort senior executives use the term "box spring" to refer to that structure (Werner Tr. 2609:12-2611:20; Px 189 (McLaughlin Dep.) at Tr. 62:9-20).    Other Select Comfort advertisements convey a similar message.  (Px 106 at 11; Px 108 at 6; Px 128 at 15; Px 129 at SP00102.)

**The Evidence Refutes Select Comfort's Alternative Causation Theory**

121.    The sheer volume of evidence of disparagement, the nature of the disparagement, and the logical and demonstrated impact on customers readily leads to the conclusion that Select Comfort's disparagement caused Sleepy's to lose substantial sales of Select Comfort Sleep Number beds.  The evidence demonstrated that Select Comfort management trained its sales personnel to denigrate Sleepy's and that, following the training, the Select Comfort sales personnel employed the same consistent themes from store to store across a broad sampling of stores across a widespread geographic region – that Sleepy's engaged in deceptive sales practices, that the wood foundation of the Select Comfort beds Sleepy's sold posed significant pest and quality concerns, and that the Sleepy's Sleep Number beds were inferior.  (Sleepy's FOF ¶¶ 70-84.)  There is no evidence to suggest that this disparagement did not begin immediately with the Select Comfort training of its sales personnel that anticipated the 2005 launch of Sleepy's participation in the Select Comfort Retail Partner program, nor is there any evidence to suggest that the disparagement abated before the program ended in April 2007.  To the contrary, evidence from throughout the two-year relationship reflects such disparagement. (*Id*. ¶¶ 55-66.)

122.    Similarly, Sleepy's has presented credible evidence that the nature of the disparagement would and did cause customers to cancel orders of Sleepy's products – demonstrating that the disparagement directly and repeatedly caused Sleepy's to lose sales of Sleep Number beds that it otherwise reasonably could have been anticipated to make.  (*Id.* ¶¶ 53.)  There is no evidence to indicate that any of these lost sales were caused by any factor other than Select Comfort's disparagement.

123.    Despite this substantial evidence, Select Comfort contends that the poor sales of Select Comfort beds at Sleepy's was caused by (a) Sleepy's supposed undertrained and undermanned staff and (b) its supposed failure to implement what Select Comfort terms "Critical Success Factors".   Neither argument is persuasive or supported by the evidentiary record adduced at trial.

124.    First, there is no evidence that the tape recorded musings of Mr. Acker about what potential problems may have caused low sales was anything more than speculation.  Mr. Acker was semi-retired and living in Florida at the time.  There is no evidence that he was provided with or reviewed any data about what actually was driving low sales at the time he made these statements, nor that he had spoken to the Executive Team before he made them to confirm their accuracy.  Indeed, the record is clear that after the results of further investigation and analysis were provided to Mr. Acker, such as the secret shops, Mr. Acker stated unequivocally to Select Comfort that he had concluded that Select Comfort's disparagement had caused the lost sales. (*See* above, ¶¶ 89-91.)

125.    As for the so-called "Critical Success Factors", the record is devoid of evidence that these factors were either "critical" or caused or even were correlated with "success."  For example, there is no evidence that these factors were compiled for any other purpose than for a

single meeting with Sleepy's in January 2007.  There is no evidence that the same or similar list was provided to any other retail partner, and Select Comfort's expert witness Dr. Steven Schwartz could not dispute that a separate Select Comfort document noted only "two critical elements for long-term success: a commitment by Retail Partner Senior management to ensure program success and the delivery of consistent, high quality marketing support."  (Schwartz Tr. at 178:5-24.)  Select Comfort did not present and its expert Dr. Schwartz was not aware of any quantitative analysis or specific examples of how any of the so-called "Critical Success Factors" correlated or caused sales or how their absence would affect sales.  (Tr. 187:24-188:3.)

126.    The so-called "Critical Success Factors" – such as "Build and maintain excitement" and "Actively support Sleep Number brand" – were not specifically and consistently defined by Select Comfort (either for Sleepy's or any other Retail Partner) in any way that could be measured, and there were not analyses done to see how or whether any of the Retail Partners met these criteria (other than, perhaps, subjective opinion) – or how the level of any other Retail Partner's support for the factor compared to Sleepy's or any other Retail Partner.  Simply put, the so-called "Critical Success Factors" appear to be little more than unfounded opinions that were assembled for use in a single meeting with Sleepy's.

127.    Furthermore, the record contains substantial evidence that Sleepy's devoted substantial resources to the subjective criteria that Select Comfort now posits as critical. Sleepy's management demonstrated substantial support and commitment to the program.  When the program was launched, Mr. Acker exhorted the sales staff to promote the product.  He noted that Sleepy's was giving the sales staff a good commission on the Sleep Number beds, would be spending a lot of money to advertise the product, urges the sales staff to show Select Comfort what Sleepy's could do and concluded by saying "I don't want you to let me down.  I'm

depending on you." (Dx 65.) He repeated this message with the entire sales force on many other occasions to stress the importance of selling the Select Comfort products and the opportunity to earn the high commissions that they offered. (Bookbinder Tr. 145:24-146:16, 183:20-184:12, 177:1-178:15, 178:18-179:14, 179:16-180:16; Px 176, ¶ 21; D-72.) There are numerous other examples of management support including meetings with Sleepy's Regional Vice Presidents, Regional Managers, and District Managers, in connection with the project launch (Bookbinder Tr. 133:13-136-17) and active management review of Select Comfort sales (Px 176, ¶ 22).

128. As for marketing support, there is similarly substantial evidence to demonstrate Sleepy's active and consistent promotion of the Select Comfort bed sales. Sleepy's followed all of Select Comfort's suggestions about how to display the product. (Bookbinder Tr. 162:7-163:7.) Sleepy's used all the POP – point of purchase materials – that Select Comfort provided, including signage, posters, cardboard cutouts, neon signs, brochures, and other materials. (Bookbinder Tr. 162:7-163:14.) Sleepy's supported the Select Comfort line with a substantial advertising program, including single vendor ads, which were highly unusual for Sleepy's. (Bookbinder Tr. 145:24-155:18, 157:11-162:4, 174:8-176:24; Px 148, Px 149; Px 147; Px 150; Px 152; Px 154; Px 93; Px 144; D-17.)

129. As for training, Select Comfort's own January 2007 business review reflects the number of training programs Sleepy's ran – at launch, in 2005 and 2006 (Px 124 at 4). Sleepy's sponsored contests (*see* above at ¶ 50(i)), offered an employee purchase program (above at ¶ 50(j)), and engaged in post-launch conference calls (above at ¶ 50(h)). Sleepy's upper management actively monitored and supported sales activities (Bookbinder Tr. 504:23-25), and Sleepy's established sales of the Sleep Number bed as a key performance indicator. (Bookbinder Tr. 504:19-21.) In short, though there is no evidence that the so-called "Critical Success

Factors" affected sales, there can be no question that Sleepy's provided the support the factors sought.

130.  Sleepy's success with the Tempur-Pedic brand further refutes Select Comfort's theory that any failure to meet the reasonably anticipated sales was caused by Sleepy's own failures.  Select Comfort recognized that retail partners who were successful with Tempur-Pedic, another brand of alternative bedding, were likely to be successful with Select Comfort and made that one of its selection criteria for new retail partners.  Select Comfort considered success with Tempur-Pedic to be a "surrogate" for success with the Select Comfort brand.  (Werner Tr. 2622:21-2623:2;  2682:21-2683:7.)   Although Sleepy's did not sell Tempur-Pedic at the beginning of the Select Comfort relationship, it began to do so shortly thereafter.  (Bookbinder Tr. 381:2-3; Blank Tr. 2931:12-23; 3180:25-3181:6; 3181:17-21; Werner Tr. 2682:14-16.)  The Select Comfort brand received advertising support from Sleepy's equal to the support Sleepy's provided Tempur-Pedic (Blank Tr. 2931:24-2933:8), and the Select Comfort brand received other support from Sleepy's equal to, *if not more favorable* than, the support Sleepy's provided Tempur-Pedic.  (Bookbinder Tr. 157:11-162:4; Blank Tr. 2931:24-2933:8.)  Tempur-Pedic was a rousing success at Sleepy's and outsold Select Comfort by a wide margin.  (Blank Tr. 3180:25-3181:6; 3181:17-3181:21;  Werner  Tr.  2682:14-18;  2682:25-2683:7.)    That  Tempur-Pedic succeeded but Select Comfort failed, with equivalent marketing and advertising support, shows that the level of support Select Comfort received from Sleepy's was not the reason for the failure.

**Sleepy's Damages**

131.  Having demonstrated that Select Comfort's disparagement caused Sleepy's to lose sales, Sleepy's presented persuasive evidence that the compensatory damages that it suffered, including prejudgment interest, was in the amount of $30 million.

**Dr. Benjamin Wilner**

132.    Sleepy's damages expert, Dr. Benjamin Wilner, is currently the national practice leader of the mathematical economics and statistical analysis practice for the accounting firm of Grant Thornton (Tr. 3:10-12).  Dr. Wilner's experience and credentials are notable.  He has a Ph. D. in managerial economics and decision science from the Kellogg Graduate School of Management at Northwestern University.  (Tr. 3:20-23.)  Dr. Wilner has been a professor of economics, finance and statistics at the University of Michigan, the University of Iowa, Northwestern University, and the Helsinki School of Economics in Finland.  (Tr. 4:5-8.)

133.    Dr. Wilner arrived at his damages calculation by building an economic model (Tr. 9:7-8) and calculating the difference between the profits Sleepy's reasonably expected to make during the period it sold the Select Comfort line of beds, and the profits Sleepy's actually made during that time period.  (Tr. 8:9-14.)  Though he used the term "reasonably expected" in his model, he also referred to his analysis as a "but for" analysis.  (Tr. 38:14-23.)

134.    To populate his model with reliable data, Dr. Wilner (1) researched the mattress industry, (2) reviewed documents produced in this litigation by both Select Comfort and Sleepy's, (3) talked to Sleepy's employees, (4) talked to the International Sleep Products Association (a trade association of mattress manufacturers), (Tr. 13:7-18), and incorporated Sleepy's actual sales data.  (Tr. 30:24-31:8.)

135.    Among the documents he considered were documents that demonstrated that Select Comfort's Retail Partner program had operated for many years prior to introducing Sleepy's (Tr. 22:1-19; 23:5-24), and had more than 900 participating stores.  The Select Comfort data that he reviewed also showed substantial consistency in sales performance across Retail Partners.  Dr. Wilner also discussed Px 124, which was prepared by Select Comfort during the parties' relationship. (Tr. 28:4-9.)  Px 124 indicated Sleepy's incremental revenue opportunity;

"based on Select Comfort's history at multiple partner launches at approximately the same time," Sleepy's could have expected Select Comfort beds in Sleepy's stores to have a 15-20% sales share number with a 70 percent incremental rate. (Tr. 29:9-25.)   Dr. Wilner further determined that when he applied Select Comfort's figures found in Px 124 to his damages analysis, Sleepy's should have reasonably expected an 11.7% to 16.3% growth in mattress set sales due to the presence of Select Comfort beds. (Tr. 30:1-18.)

136.    Based on this expected sales growth, and taking into account corresponding incremental costs, Dr. Wilner calculated, and offered his expert opinion, that Sleepy's was damaged in the amount of $11.1 to $16 million without including prejudgment interest. (Tr. 7:19-22.)

137.    Dr. Wilner then testified that he used an interest rate of 10 percent per year, in accordance with Minn. Stat. § 549.09 (2014).  (Tr. 46:1-3.)[23]

138.    Using this interest rate, Dr. Wilner calculated Sleepy's damages, with interest, to be $20.8 to $30.01 million including interest through July 1, 2015 (Tr. 7:22-8:2).

**Dr. Steven Schwartz**

139.    Select Comfort's expert, Dr. Steven Schwartz, did not criticize the calculations that Dr. Wilner performed; he conceded that Dr. Wilner's arithmetic was "basically correct" (Tr. 160:14-17).  Indeed, he admitted that the analysis that Dr. Schwartz had previously performed – relying on Dr. Wilner's methodology but using a lower (10%-15%) sales share and lower (65%) incremental rate, yielded damages that ranged from $4.2 million (through January 11, 2007) (Tr. 167:18-19) to $7.1 million (Tr. 168: 2-5).  Dr. Schwartz submitted these figures in Exhibit 3 to his expert report (Tr. 167:11-19; Px 194).  Moreover, Dr. Schwartz conceded that Sleepy's

---

[23] The Retail Partner Agreement expressly provides for Minnesota law as the agreement's governing law.  (Px. 133 at 11(d).)

continued to sell Select Comfort beds past the date of January 11, 2007 in his report, which would have increased any applicable damages  (Tr. 167:3-6), and conceded that the $4.2 million to $7.1 million range he had previously calculated did not include prejudgment interest (Tr. 168:7-11).

140.    Nonetheless, Dr. Schwartz, who was proffered only as a damages expert and not as a causation expert (Tr. 137:21-138:4), contended that there is "no evidence of any causal link" between the evidence in the case and Sleepy's damages (Tr. 163:9-10), and thus opined that damages should not be awarded.

141.    The record adduced at trial, however, offers ample evidence that Select Comfort's disparagement caused damage, and Dr. Schwartz's reliance upon purported variance with the so-called "Critical Success Factors"  is unpersuasive to contradict a finding of causation.

142.    Dr. Schwartz failed to take into account vital testimony that goes to the heart of the causation question.  For example, Dr. Schwartz conceded that he did not consider any of the secret shop evidence as evidence of the impact of disparagement.  (Tr. 173:17-21.)

143.    Dr. Schwartz's testimony about whether Sleepy's had complied with the so-called "Critical Success Factors"  found in Px 124, p. 4 (Tr. 174:4-14) only underscored the unreliability of those factors and his limited knowledge as to whether Sleepy's had met those factors:

       a.   Dr. Schwartz conceded that he was not aware of any standardized list of the so-called critical success factors prepared in connection with the Retail Partner Program.  (Tr. 177:7-10);

b.  To that end, Dr. Schwartz conceded that he had no recollection of "post-launch conference calls" being identified as a critical success factor in materials distributed to any other retail partner.  (Tr. 178:1-3);

c.  Dr. Schwartz conceded that he did not do any independent investigation of what Sleepy's upper management's involvement with the launch was.  (Tr. 184:20-23.);

d.  Dr. Schwartz conceded that he was not aware of any specific data of other retail partners that reflect how any particular one of the so-called critical success factors, or their absence, had a numerical correlation to the sales share or incremental rates.  (Tr. 187:2-10.);

e.  Dr. Schwartz conceded that he had not investigated specifically the quantitative impact of performance of any of the critical success factors on sales share.  (Tr. 187:24-188:3.);

f.  Dr. Schwartz conceded that he did not recall that Bookbinder's affidavit testimony (Px 176) stated that, but for Select Comfort's disparagement, Sleepy's would have achieved at least the sales that others retail partners did.  (Tr. 195:14-21.)

144.   Accordingly, Dr. Schwartz's assertion that causation evidence is lacking is nothing more than his own lay (non-expert) testimony and is belied by the evidence in the record.  As shown in the following section, contrary to Dr. Schwartz' contention, Sleepy's did prove causation.

## CONCLUSIONS OF LAW

### I.   SLEEPY'S HAS PROVED CAUSATION

1.      Sleepy's is entitled to prove its case through direct or circumstantial evidence. The evidence shows that Select Comfort's actions in systematically allowing its sales force to disparage Sleepy's and the Select Comfort products it sold caused Sleepy's damage.

### A.   Circumstantial Evidence is Sufficient to Show Causation and Damages; Direct Evidence is Not Required

2.      Although there is direct evidence supporting Sleepy's case (Sleepy's FOF at ¶¶ 66), causation of commercial damage from denigrating and false statements disseminated in the marketplace, like other propositions, can be proven by circumstantial evidence.  *E.g.*, *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 272 (2d Cir. 1987) (direct evidence not required to prove causation in false advertising case); *Playtex Prods. v. Proctor & Gamble Co.*, 126 F. App'x 32, 25 (2d Cir. 2005) (summary order) (affirming denial of motion for judgment as a matter of law and holding that "circumstantial evidence is of no less value than direct evidence and it can be sufficient to prove causation just as it can be to prove other propositions"); *Efco Corp. v. Symons*, 219 F.3d 734, 740 (8th Cir. 2000) (there is no support for contention that plaintiff was required to prove causation with direct rather than circumstantial evidence); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1093 & n.11 (7th Cir. 1994) (circumstantial evidence can be sufficient to prove causation); *Porous Media Corp v. Pall Corp.*, 110 F.3d 1329 (8th Cir. 1997) (circumstantial evidence sufficient to prove causation in false advertising and product denigration case).

3.      In *PPX Enters.* the plaintiff sued a competitor for marketing albums that stated on the packaging that the musical performances they contained were by Jimi Hendrix when in fact they contained no Hendrix performances or only performances in which he was an unidentified

background player.  The lower court granted judgment for defendant on the ground that plaintiff offered no customer evidence or customer surveys showing that customers actually believed that the defendant's albums contained Hendrix's performances.   The Second Circuit reversed, holding that customer evidence was not necessary because the packaging spoke for itself – customers would believe what they were told about the product and actual customers or customer surveys were not required.  *PPX Enters.* applies here.  Similarly, here the record establishes that Select Comfort sales personnel routinely told customers that the Select Comfort beds sold at Sleepy's were inferior to those sold at the Select Comfort retail stores, and that such information, which was indisputably material to a consumer's purchasing decision, was the type of information upon which customers would act to buy Sleep Number beds from Select Comfort rather than Sleepy's.  No customer evidence or survey is necessary.  *See also Playtex Prods.*, 126 F. App'x at 35.

      4.     Here, an inference of harm from the pattern of disparaging statements about the competing product at Sleepy's is appropriate and consumer testimony is not necessary for the obvious proposition that the disparagement would cause a consumer to buy at Select Comfort rather than Sleepy's.  *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994), demonstrates this.  *Ortho* involved statements made by a non-competitor concerning the anti-aging effects of the non-competitor's own product without making any comparison to Ortho's product.  The Court explains that the Second Circuit "has adopted a flexible approach" toward the requirements for showing causation and injury:

> The type and quantity of proof required to show injury and causation has varied from one case to another depending on the particular circumstances.  On the whole, we have tended to require a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products, or the

> defendant's advertisements do not draw direct comparisons between the two.

*Id.* at 694.

5.     Under that rule, a less substantial showing of causation and damage applies in this case because the two lines of beds are obviously in direct competition and the statements draw direct comparisons between the Select Comfort beds and the Sleepy's beds.  To illustrate the rule, the *Ortho* court used as an example of the less substantial showing *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34 (2d Cir. 1988), which held that the district court did not err by presuming harm after finding that an ad for an over-the-counter pain reliever made a misleading comparison to a specific competing product.  The same analysis should apply here.

6.     Testimony from numerous secret shoppers provides circumstantial evidence of the extent of the pattern of denigration.  Secret shoppers have testified to "secret shops" during which Select Comfort sales personnel, believing they were dealing with actual customers (Sleepy's FOF at ¶¶ 60-62), denigrated the Select Comfort beds that Sleepy's or other retail partners were selling and/or Sleepy's itself.  (*Id.* at ¶¶ 64-65.)  The denigration concentrates on a handful of consistent themes that are too similar to possibly be the random actions of rogue sales persons.

7.     This evidence circumstantially supports two logical and compelling inferences.  First, it is reasonable and logical to infer that the same denigrating statements the Select Comfort sales force made to secret shoppers posing as actual consumers were made to numerous *actual customers* who "cross-shopped" at both the Select Comfort stores and Sleepy's.[24]  The evidence

---

[24] The close proximity of Select Comfort retail stores to Sleepy's stores made it very easy for customers to "cross-shop," *i.e.,* shop for the Select Comfort beds in both Sleepy's and the Select Comfort store.  In fact, Select Comfort knew that there would be cross-shopping, trained their own sales force to anticipate it, and made efforts to quantify and track cross-shopping.  (Sleepy's FOF ¶ 15.)

shows that the experience of secret shoppers is convincing circumstantial evidence of, and a compelling proxy or surrogate for, the experience of actual customers, and therefore supports an inference that Select Comfort made the same types of statements to actual customers.  (Mahaffy Tr. 1392:12-1394:11; Sleepy's FOF at ¶ 60-66.)  The evidence establishes that a primary purpose of secret shops is to learn what competitors are saying to customers.  To achieve this purpose, Sleepy's well-experienced secret shoppers took pains to make sure they would be perceived as actual customers.  (Sleepy's FOF ¶¶ 57-63.)  Accordingly, it is logical to infer that statements made to secret shoppers are also being made to actual customers.

8.      Second, the secret shopper evidence, coupled with the evidence of earlier, seemingly isolated, instances of denigration during 2005 and early 2006, also supports the inference that the pattern of denigration was not limited in time to the period during which the secret shops occurred, but rather had been occurring throughout the parties' business relationship beginning in August 2005.  (*Id*. at ¶ 55.)

9.      Furthermore, there is no requirement that actual customers testify.   Some evidence of actual lost sales (*id.* ¶ 53) supports an inference that numerous other sales were lost, although Sleepy's does not know about them.  It would be virtually impossible for Sleepy's— indeed for *any* retailer—to obtain evidence of, and prove, all lost sales.  In most instances customers who bought from Select Comfort instead of Sleepy's because of the denigration would not have let Sleepy's know and Sleepy's would have no way of knowing about them.  *E.g.*, *TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 825, 831 (9th Cir. 2011) ("proving a counterfactual is never easy, and is especially difficult when the injury consists of lost sales that are predicated on the independent decisions of third parties; *i.e.,* customers . . . [a] plaintiff who can't produce lost sales data may therefore establish an injury by creating a chain of inferences

66

showing how defendant's false advertising could harm plaintiff's business") (citations omitted); *Vascular Solutions, Inc. v. Marine Polymer Technologies, Inc.*, 590 F.3d 56, 62 (1st Cir. 2009) (noting that where there is widespread product denigration, "generalized evidence of lost profits is 'probably enough' to prove special damages, particularly where it is impractical to establish specific lost sales"); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (allowing projected damages based on evidence of lost sales).

10.     The secret shopper evidence shows that the Select Comfort sales personnel in and near Sleepy's Retail Partner territory regularly used the same themes in their sales pitches to denigrate the Select Comfort beds at Sleepy's and Sleepy's as a business.  (Sleepy's FOF ¶¶ 57-66.)  The frequent occurrence of these common themes makes clear that the disparagement is not the work of a few rogue sales persons, but rather was the encouraged, or at least tolerated, policy of Select Comfort at the management level.

**B.     Direct Evidence Shows That Select Comfort's Conduct Affected The Purchasing Decisions of Actual Customers**

11.     Select Comfort's assertion that there is no direct evidence of disparaging comments to actual customers is factually wrong.  The record contains direct evidence supporting the obvious and inescapable conclusion that the types of derogatory statements the Select Comfort sales force regularly used would affect consumer purchasing decisions.  In several instances, customers told Sleepy's personnel that the reason they did not want to purchase from Sleepy's was that they understood that the Select Comfort beds available at Sleepy's were inferior to those offered at the Select Comfort store.  (*Id*. at ¶ 55.)  This is customer state-of-mind evidence, properly offered to show that the type of denigration at issue in this case affects customer purchasing decisions.  *See Herman Schwabe, Inc. v. United Show Machinery Corp.*, 297 F.2d 906, 914 (2d Cir. 1962).  As the Second Circuit noted in this case

Sleepy's inability to identify the customers whose states of mind were at issue did not render the evidence hearsay.  2d Cir Decision at 23; *Callahan v. A.E.V., Inc.*, 182 F.3d 237, n.11 (3d. Cir. 1999).  Further, Select Comfort's own Senior Vice President for Retail Partners agreed that telling a consumer that the wood foundation would warp or sag would make that product less desirable.  (Werner Tr. 2684:11-2685:12.)

12.     Additionally, there is direct evidence that real customers heard Select Comfort employees make disparaging or slanderous statements.  Sarah Mahaffey testified that she heard a Select Comfort sales person make derogatory statements to an actual customer who was in the store at the same time Ms. Mahaffey was conducting her secret shop.  (Mahaffy Tr. 1392:12-1394:11.)  Deborah. Zaffron testified that after a Sleepy's customer canceled the sale of a Select Comfort Bed, giving as his reason that, while speaking to a Select Comfort salesperson at a store located in the same shopping mall, he was told that the merchandise was inferior, Ms. Zaffron called the Select Comfort representative and put him on a speaker phone with the customer present.  During that conversation, the Select Comfort employee made derogatory statements about the Select Comfort beds at Sleepys and told Ms. Zaffron and the customer "many negative things about the Select Comfort [bed] that Sleepy's sells," including that the Select Comfort beds at Sleepy's were inferior to the beds at the Select Comfort store.  (678:13-683:16.)

C.     **Consumer Survey Evidence is Not Required**

13.     Consumer survey evidence is not required to prove causation here.  In *PPX Enters.,* 818 F.2d at 272, the Second Circuit reversed the district court for requiring consumer survey evidence, where it was clear from defendant's statements concerning the product alone that consumers would be influenced and misled.  In that case, "[t]he jury's conclusion that consumers actually were deceived by Audiofidelity's misrepresentations is supported by the false advertising contained on the record albums and the fact that Audiofidelity successfully sold

the albums on the market." 818 F.2d at 272. The Second Circuit has also held that when an advertisement, "considered in context[,] necessarily impl[ies] a false message . . . no extrinsic evidence of consumer confusion is required." *Time Warner, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Here, there can be no question that consumer behavior would be affected, for example, by Select Comfort statements that the Select Comfort beds sold by Sleepy's had inferior, squeaking and cracking wood foundations, were filled with mites and would not be subject to adequate warranties. There is no requirement for consumer surveys in this type of case to demonstrate the obvious.

## II.   SLEEPY'S HAS ESTABLISHED THE ELEMENTS OF EACH OF ITS CLAIMS.

### A.   Breach of § 4(c) of the Retail Partner Agreement

14.   The elements of a claim for breach of contract are: (1) formation of a contract between the parties; (2) performance by the plaintiff of any conditions precedent; (3) defendant's failure to perform; and (4) damages. New York Pattern Jury Instructions (West 2010) ("PJI") § 4:1; *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000).[25]

15.   The parties entered into a written Dealer Agreement dated as of June 17, 2005 (the "Retail Partner Agreement") (Px 133) pursuant to which Sleepy's would purchase beds from Select Comfort and resell them in certain of its bedding retail stores as an authorized "Retail Partner" of Select Comfort.

16.   During the parties' business relationship Select Comfort also sold its beds through its own retail stores located in Sleepy's territory in competition with Sleepy's.

---

[25]   The contract in issue provides that it is to be governed by Minnesota law.

17.     Section 4(c) of the Retail Partner Agreement provided that "Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the 'Brand Image') of the other party."

18.     Section 4(c) was a mutual general anti-disparagement provision that forbade the parties from denigrating or disparaging each other or the products they sold.  It was not limited to the context of the provision of warranty service.

19.     The Retail Partner Agreement contained no conditions precedent to Select Comfort's obligations under § 4(c).  Sleepy's did not materially breach the Retail Partner Agreement or act in a way that would have excused Select Comfort's failure to abide by § 4(c).

20.     The parties' business relationship pursuant to the terms of the Retail Partner Agreement continued through approximately April 2007.  Although the Retail Partner Agreement had a nominal expiration date of September 30, 2006, the parties continued to do business thereafter on the same terms, or under a new contract containing the same terms arising from their conduct. *See* 2d Cir. Decision at 11; *see also Dynamic Air, Inc. v. Reichold, Inc*., No. 05-CV-0955, 2007 U.S. Dist. LEXIS 57651, at *21-22 (D. Minn. Aug. 7, 2007) (quoting *Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005)); *Cherne Contracting Corp. v. Marathon Petroleum Co.*, No. 04-4923, 2008 U.S. Dist. LEXIS 10482, at *9 (D. Minn. Feb. 11, 2008) (citations omitted); *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc*., 408 F.3d. 460, 467-68 (8th Cir. 2005) (discussing New York law).

21.     Throughout the parties' business relationship Select Comfort engaged in a pervasive and persistent pattern and practice, through its retail store sales force and its advertising, of denigrating and disparaging the line of Select Comfort beds Sleepy's sold and

Sleepy's, itself.  The evidence shows that the denigrating and disparaging comments by Select Comfort's sales force were made to actual customers.

22.    In addition, Select Comfort's advertising and brochures indicated to consumers that the Select Comfort beds sold at the Select Comfort retail stores (with plastic polymer foundations) were superior in quality to those sold at Sleepy's (with wood foundations) because their plastic polymer foundations would not warp, crack, or sag like, and would last longer than, old fashioned wood box springs.

23.    Select Comfort's senior management was fully aware of the foregoing pattern and practice of disparagement and denigration and trained, or at least tacitly encouraged, its sales force to exploit the differences between the lines of beds, in particular the plastic polymer foundation sold at Select Comfort retail stores versus the wood foundation sold at Sleepy's, as a sales tool to encourage the purchase of Select Comfort beds at Select Comfort stores rather than at Sleepy's stores.

24.    When Sleepy's expressly advised Select Comfort of the denigration and disparagement, Select Comfort took only minimal steps to curtail or control it, which they knew or should have known were plainly inadequate.

25.    The foregoing pattern and practice of disparagement damaged Sleepy's by influencing customers to decline to purchase Select Comfort beds from Sleepy's and instead purchase them from the Select Comfort retail stores.  As a result, Sleepy's sold far fewer Select Comfort beds than it would have absent said pattern and practice.  In some cases, customers who had ordered Select Comfort beds from Sleepy's cancelled or returned the beds after visiting a Select Comfort retail store and hearing the disparagement of Sleepy's and its beds.

26.     Under Minnesota law, which governs the Retail Partner Agreement, "the appropriate measure of damages for breach of contract is that amount which will place the plaintiff in the same situation as if the contract had been performed." *Peters v. Mutual Ben. Life Ins. Co.*, 420 N.W.2d 908, 915 (Minn. Ct. App. 1988).  Also, "[t]he long-established measure of damages for breach of contract in Minnesota is: So far as money can do it, to be placed in the same situation, with respect to damages, as if the contract had been performed." *Sprangers v. Interactive Technologies, Inc.,* 394 N.W.2d 498, 503-04 (Minn. 1986).   Dr. Wilner's computation of the profits Sleepy's would have made had Select Comfort not breached the contract thus represents Sleepy's damages for breach of contract.

### B.     Breach of the Implied Covenant of Good Faith and Fair Dealing

27.     The elements of a claim for breach of the implied covenant of good faith and fair dealing are: (1) formation of a contract between the parties; (2) defendant's failure to perform under the contract's implied covenant of good faith and fair dealing by engaging in conduct that had the effect of preventing the plaintiff from receiving the fruits of the contract, by evading the spirit of the bargain, and/or by refusing to fulfill some duty or contractual obligation based on an ulterior motive; and (3) damages.   PJI § 4:1; *Parkhill*, 174 F. Supp. 2d at 961; *Kivel v. Wealthspring Mortgage Corp.*, 398 F. Supp. 2d 1049, 1057 (D. Minn. 2005); *Erickson v. Horing*, No. C4-02-138, 2002 WL 31163611, at *13 (Min. Ct. App. Oct. 1, 2002).

28.     The parties entered into the Retail Partner Agreement, pursuant to which Sleepy's would purchase beds from Select Comfort and resell them in certain of its bedding retail stores as an authorized "Retail Partner" of Select Comfort.

29.     During the parties' business relationship Select Comfort also sold its beds through its own retail stores located in Sleepy's territory in competition with Sleepy's.

30.     Select Comfort acknowledges that the primary benefit of the Retail Partner Agreement to a retail partner is the opportunity to realize profits from the sale of Select Comfort beds.  Such profits were the fruits of the contract Sleepy's expected to realize and were an essential part of the spirit of the bargain.

31.     The parties' business relationship pursuant to the terms of the Retail Partner Agreement continued through approximately April 2007.  Although the Retail Partner Agreement had a nominal expiration date of September 30, 2006, the parties continued to do business thereafter on the same terms, or under a new contract containing the same terms arising from their conduct.  *Dynamic Air*, 2007 U.S. Dist. LEXIS 57651, at *21-22 (D. Minn. Aug. 7, 2007) (quoting *Bolander*, 703 N.W.2d at 542); *Cherne*, 2008 U.S. Dist. LEXIS 10482, at *9 (D. Minn. Feb. 11, 2008) (citations omitted); *see also Fairbrook*, 408 F.3d. at 467-68 (8th Cir. 2005) (discussing New York law).

32.     In April 2007, the parties entered into an agreement concerning the wind-up of their business relationship (the "Wind-Up Agreement" (Px 123)) which provided that Sleepy's, and impliedly Select Comfort, would comply with the terms of the Retail Partner Agreement in connection with the wind up of the relationship.

33.     By operation of law, the Retail Partner Agreement, any new contract containing the terms thereof arising from the parties' conduct, and the Wind-Up Agreement each contained an implied covenant of good faith and fair dealing providing that neither party would engage in conduct that would have the effect of preventing the other from receiving the fruits of the contract or that would evade the spirit of the bargain, or would refuse to fulfill some duty or contractual obligation based on an ulterior motive.

34.     Throughout the parties' business relationship Select Comfort engaged in a pervasive and persistent pattern and practice, through its retail store sales force and its advertising, of denigrating and disparaging the line of Select Comfort beds Sleepy's sold and Sleepy's, itself, as set forth above.

35.     Select Comfort's senior management was fully aware of the foregoing pattern and practice of disparagement and denigration and trained, or at least tacitly encouraged, its sales force to exploit the differences between the lines of beds, in particular the plastic polymer foundation sold at Select Comfort retail stores versus the wood foundation sold at Sleepy's, as a sales tool to encourage purchase of Select Comfort beds at Select Comfort stores rather than at Sleepy's.

36.     In fact, Select Comfort had designed its retail partner program to build in a competitive advantage for itself, which it exploited through the disparagement campaign.

37.     When Sleepy's expressly advised Select Comfort of the denigration and disparagement, Select Comfort took only minimal steps to curtail or control it, which they knew or should have known were plainly inadequate.

38.     As a result of the above pattern and practice of disparagement and denigration, and Select Comfort's conduct enabling and implementing it, Sleepy's sold far fewer Select Comfort beds than it would have absent such pattern and practice.

39.     Select Comfort's use of said pattern and practice to drive sales of Select Comfort beds to Select Comfort retail stores rather than Sleepy's prevented Sleepy's from realizing the fruits of the contract by depriving it of the profits on sales it expected to realize from the Retail Partner Agreement, and evaded the spirit of the bargain.

40.     As set forth above, Select Comfort had a motive to use exposure of its products at Sleepy's to dispel their "gimmicky" image with consumers, but drive the sales of the product away from Sleepy's and to its own retail stores.   In furtherance of this ulterior motive, Select Comfort acted to gain the advantages it sought for itself but drive sales away from Sleepy's, thus depriving Sleepy's of the benefits of the Retail Partner Agreement.

41.     Select Comfort's breaches of the implied covenant of good faith and fair dealing damaged Sleepy's by depriving it of the profits it would have otherwise realized from the sale of Select Comfort beds, and had the parties' business relationship continued for the period it would have continued but for Select Comfort's breach of the covenant of good faith and fair dealing.

42.     Because breach of the implied covenant of good faith and fair dealing constitutes a breach of contract, the contract measure of damages under Minnesota law noted in Paragraph 26 above applies.   Accordingly, Dr. Wilner's computation of Sleepy's lost profits constitutes Sleepy's damages for breach of the implied covenant.

**C.     Unfair Competition**

43.     The elements of a claim for unfair competition are: (1) that the parties competed with each other in the sale of a product or service; (2) that the defendant misappropriated a commercial advantage belonging to the plaintiff and used that advantage to compete against the

plaintiff or engaged in some form of commercial immorality;[26] and (3) that the plaintiff was damaged. *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478, 850 N.Y.S.2d 366 (2007); *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556 (1959).

44.     During the parties' business relationship described above Select Comfort not only supplied beds to Sleepy's but also sold its beds through its own retail stores located in Sleepy's sales territory in competition with Sleepy's.

45.     As set forth above, prior to entering into the business relationship Select Comfort expressly represented to Sleepy's that there was no material difference between the line of beds sold at Select Comfort's own stores and the line of beds sold at Sleepy's.

46.     Sleepy's expended significant resources, time, and effort in selling and promoting the Select Comfort beds.  Among other things:

> a.   Sleepy's position in the marketplace as a well-known retailer of bedding products lent credibility to, and helped popularize, Select Comfort's beds when they were displayed in Sleepy's stores;

---

[26] Unfair competition is a broad and flexible doctrine that will be applied to redress "any form of commercial immorality." *Roy Export Co. v. Columbia Broadcasting Sys., Inc.*, 503 F. Supp. 1137, 1151-52 (S.D.N.Y. 1980), *aff'd*, 672 F.2d 1095 (2d Cir. 1982), *cert. denied*, 459 U.S. 826 (1982) (*quoting Metropolitan Opera Assoc. v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 492 (Sup. Ct. N.Y. Co. 1950), *aff'd*, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951)).  It is an "amorphous" cause of action, encompassing any form of commercial immorality involving the taking of the skill, expenditures and labors of a competitor.  *See Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 710 (2d Cir. 1982); *Roy Export Co.*, 672 F.2d at 1105; *Potamkin Cadillac Corp. v. Towne Cadillac Corp.*, 592 F. Supp. 801, 802 (S.D.N.Y. 1984); *Bunch v. Artec Int'l Corp.*, 559 F. Supp. 961, 971-972 (S.D.N.Y. 1983).  The basic issue in a cause of action for unfair competition is simple—was the conduct complained of fair or unfair?  *See Capitaland Heating & Cooling v. Capital Refrigeration*, 134 A.D.2d 721, 521 N.Y.S.2d 202 (3d Dep't 1987).

b. Sleepy's use of its stores to display Select Comfort's beds gave greater exposure to Select Comfort's products than available through Select Comfort's retail stores alone;

c. Floor space in Sleepy's showrooms is a scarce commodity and there is an opportunity cost to devoting significant floor space to a particular brand. Sleepy's devoted significant floor space to Select Comfort's products. As a result, said floor space was not available for other products from which Sleepy's could have earned profits (Sleepy's FOF ¶ 49);

d. Sleepy's devoted the time and effort of its sales force and management to promote and sell Select Comfort beds. In particular, Sleepy's sales force devoted time and effort to demonstrating the Select Comfort beds for customers and allowing them to experience these products first hand. As set forth above, Select Comfort was aware that experiencing the product first hand tended to dispel the "gimmicky" image that Select Comfort beds had with consumers;

e. Sleepy's spent resources in advertising the availability of Select Comfort beds at its stores.

47. The foregoing measures gave Sleepy's a commercial advantage with respect to the sale of Select Comfort beds from which Sleepy's expected to profit in an environment in which there was fair competition between itself and the Select Comfort retail stores.

48. Select Comfort misappropriated Sleepy's commercial advantage through the following scheme:

    a.  designing its retail partner program to give its own stores a competitive advantage over Sleepy's by, among other things, keeping the plastic polymer foundations exclusively for its own stores and giving the wood foundations to Sleepy's, and keeping the wireless remotes exclusively for its own stores and giving hardwired remotes to Sleepy's; and

    b.  Exploiting its built in, but undisclosed, competitive advantage by (1) training, or at least tacitly encouraging, its sales force to exploit its competitive advantage by representing to consumers, through the campaign of disparagement and denigration described above, that the beds available at the Select Comfort stores were superior in quality to the Select Comfort beds available at Sleepy's, and (2) advertising to consumers that the beds at its stores with plastic polymer foundations would perform better than "old fashioned wood box springs."

49.    The effect of the above scheme was to use Sleepy's commercial advantage to popularize and legitimize Select Comfort's beds (including dispelling their "gimmicky" image), but drive sales of Select Comfort beds to Select Comfort's own stores and away from Sleepy's, thereby misappropriating the benefits of Sleepy's efforts.

50.    Sleepy's was damaged by the foregoing scheme because, as a result of Select Comfort's exploitation of its built in competitive advantage, Sleepy's earned far fewer profits from the sale of Select Comfort beds than it would have earned if the competition between Select Comfort stores and Sleepy's had been fair and on a level playing field.

51.    The measure of damages for unfair competition is the loss of profits sustained by reason of the unfair conduct. *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305,

320 (S.D.N.Y. 2008); *Suburban Graphics Supply Corp. v. Nagle*, 5 A.D.3d 663, 666 (2d Dep't 2004); *Allan Dampf, P. C. v. Bloom*, 127 A.D.2d 719, 720 (2d Dep't 1987); *Hertz Corp. v. Avis*, 106 A.D.2d 246, 251 (1st Dep't 1985); *Am. Electronics, Inc. v. Neptune Meter Co.*, 33 A.D.2d 157 (1st Dep't 1969); *Electrolux*, 6 N.Y.2d at 571-572.  Here, that is the amount calculated by Dr. Wilner, which represents Sleepy's loss of profits by reason of Select Comfort's unfair competition.

52.     In addition, punitive damages may be awarded for unfair competition.  *Getty Petroleum Corp. v. Island Transp. Corp.,* 878 F.2d 650, 657 (2d Cir. 1989).  Punitive damages are appropriate here in light of Select Comfort's deliberate, deceptive scheme to use Sleepy's resources to popularize its beds and counteract their "gimmicky" image, but drive sales of the Select Comfort beds to its own stores where it knew that sales were four times more profitable to it than sales made at Sleepy's.  Accordingly punitive damages in the amount of $20 million should be awarded.

### D.     Slander *Per Se*

53.     The elements of a claim of slander *per se* are (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to someone other than the plaintiff.  *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 409 (2d Cir. 2000) (quoting *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993)); *Ruder & Finn, Inc. v. Seaboard Surety Co*., 52 N.Y.2d 663, 670, 422 N.Y.S.2d 518 (1981).  In the context of slander *per se*, damages therefrom are presumed and specific itemization of damages is not required, as long as general damages are proven.  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).  Here, because the evidence shows a pervasive pattern and practice of disparagement and defamation going well beyond the specific

defamatory statements proven, damages are not limited to the damage to Sleepy's reputation solely in the eyes of those to whom specific defamatory statements were made.

54.     Select Comfort made the defamatory statements described above (Sleepy's FOF ¶¶ 111-115), on the dates and at the places described therein.

55.     The statements, on their face, are unqualified statements of fact, rather than statements of opinion or puffery that would not be capable of defamatory meaning.   Select Comfort employees repeatedly attacked Sleepy's integrity, good will, and creditworthiness.

56.     Sleepy's did not solicit or consent to the defamatory statements.[27]   It is a basic premise that "honest inquiry or investigation by a person who has been defamed about the existence, source, or nature of the defamation is not the equivalent to consent to its repetition." Second Circuit Decision at 14; *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 8.2.8 (4th ed. 2012).   Sleepy's was making such an honest inquiry, motivated by a good faith attempt to learn whether the Select Comfort sales force was carrying on a consistent pattern of slander.   Furthermore, Sleepy's had reason *not* to anticipate defamatory responses in each case because Select Comfort had agreed not to disparage it in the Retail Partner Agreement, Bauman and Spurgeon told Sleepy's at the January 3, 2007 meeting that the Retail Partner Agreement forbade disparagement, (Sleepy's FOF ¶ 92, above), Bauman reaffirmed that in an email on January 8 (*id.* ¶ 97), and Select Comfort's President  expressly represented in a January 23, 2007 letter to Sleepy's that disparagement would not be tolerated and steps had been taken to insure that further disparagement would not occur. (*Id.* ¶ 99.)

57.     The Court may award general damages for slander *per se.  Fashion Boutique of Short Hills,* 314 F.3d at 59 (citing *Liberman,* 80 N.Y.2d at 435); *see also Ideal Publishing Corp.*

_____

[27] The Second Circuit remanded this question for reconsideration.   Second Circuit Decision at 18.

*v. Creative Features, Inc.*, 399 N.Y.S.2d 118, 119 (1st Dep't 1977). The lost profits calculated by Dr. Wilner is a reasonable measure of the damages Sleepy's suffered as a result of Select Comfort's slander, and the pattern and practice of slander the evidence demonstrates.

### III.   SLEEPY'S HAS ESTABLISHED DAMAGES

58.   The Retail Partner program had been operating for three years by the time that Sleepy's became a retail partner, had grown to 900 stores and data reflected consistent sales growth among the other Retail Partners throughout the United States.  (Wilner Tr. 22:1-19, 23:15-24:25.)  Whether viewed through the rubric of Select Comfort's breaches of contract, covenant of good faith or fair dealing, unfair competition or slander per se, but for Select Comfort's disparaging conduct, Sleepy's should have achieved the 15%-20% sales share and 70% incremental rate that Select Comfort reported that its multiple other retail partners had achieved.  (Px. 124 at 8.)  Select Comfort's damages expert Dr. Schwartz contends that the damages should somehow be discounted or disregarded because certain of the claims that Sleepy's asserted – such as the failure to provide first quality merchandise – have been dismissed.  The Court disagrees.  The issue that caused damage was not the actual difference in the quality of the respective beds sold by Select Comfort or Sleepy's, but by Select Comfort's pervasive campaign to convince customers that the Sleepy's Sleep Number bed was inferior and that Sleepy's itself was not trustworthy.  That harm – an element of each of the claims that Sleepy's has proved – properly results in the same damages for all – the difference between Sleepy's reasonably expected (but for) profits from selling the Sleep Number bed compared to its actual profits – plus the Minnesota statutory pre-judgment interest that applies.  (Minn. Stat. § 549.09 (2014).)

59.   Lost profits need not be proven to an absolute certainty.  The plaintiff need only present evidence that provides the finder of fact with a reasonable basis upon which to calculate

the amount of damages. Plaintiff need not prove the amount of loss with mathematical precision. Plaintiff need only provide the Court with a sound basis for approximating lost profits with reasonable certainty. Lost profits, though typically difficult to prove with exactitude, may be recovered to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty. *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992); *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir. 1987). Dr. Wilner's computation of lost profits more than amply satisfies that standard.

**Summary**

In summary:

    a. Select Comfort breached § 4(c) of the Retail Partner Agreement by allowing its sales force to engage in disparaging conduct in violation of the anti-disparagement provision.

    b. Select Comfort breached the implied covenant of good faith and fair dealing in the Retail Partner Agreement by acting in a way that deprived Sleepy's of the benefits it expected to realize from the Agreement – the profits from the sales of Select Comfort beds. Select Comfort was never a true retail partner. It only "leveraged" Sleepy's time, showroom floor space, effort, and reputation to popularize its beds and expose them to a wider segment of the pubic, while depriving Sleepy's of its expected profits by driving the sales to its own stores through the built-in competitive advantage, the inferiority of the wood foundation that it recognized, and the pattern of disparagement of the beds it gave Sleepy's to sell.

    c. Select Comfort engaged in unfair competition by misappropriating for itself the commercial advantage Sleepy's invested in and developed by devoting floor space and employee time for training and sales, and putting its reputation behind the Select Comfort beds. Select Comfort induced Sleepy's to create that commercial advantage by telling Sleepy's that there was no material difference in quality between the Core line and the Personal Preference line and that Sleepy's would not be at a competitive disadvantage (when, in fact, Select Comfort believed there was a difference in quality and had designed the two lines to give itself a competitive advantage). Select Comfort then garnered the benefit of that commercial advantage by systematically allowing its sales force to denigrate the Personal Preference line and Sleepy's and sending consumers the advertising message that the wood foundation was inferior to the plastic foundation. The result was to drive the sales of the Select Comfort beds away from Sleepy's and to the Select Comfort stores.

d.  Select Comfort's sales personnel slandered Sleepy's by making the defamatory statements alleged in the Amended Complaint and proved at trial.

e.  By reason of the foregoing, Sleepy's has been damaged in an amount that was reasonably calculated to $30 million including interest through July 1, 2015.

f.  Judgment should enter in favor of Sleepy's on liability and awarding compensatory damages plus pre-judgment interest in the amount of $30 million and punitive damages on Sleepy's claim for unfair competition in the amount of $20 million, totaling $50 million dollars.

Dated: _____

_____
Hon. Joanna Seybert
United States District Judge