Andrew S. Hansen (AH 6788)
Heidi A.O. Fisher (HF 6782)
Oppenheimer Wolff & Donnelly LLP
Campbell Mithun Tower - Suite 2000
222 South Ninth Street
Minneapolis, Minnesota  55402
Telephone:     (612) 607-7000

*Attorneys for Defendants Select Comfort Wholesale Corporation,*
*Select Comfort Retail Corporation, and Select Comfort Corporation*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SLEEPY'S, LLC,<br><br>                    Plaintiff,<br><br>      - against -<br><br>SELECT COMFORT WHOLESALE<br>CORPORATION, SELECT COMFORT RETAIL<br>CORPORATION and SELECT COMFORT<br>CORPORATION,<br><br>                 Defendants. | Civil Action No.<br><br>07 CV 4018 (Seybert, J.) |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ......................................................................... vi

**FINDINGS OF FACT**..................................................................................1

I.     THE PARTIES.......................................................................................1

     A.     Sleepy's...................................................................................1

     B.     Select Comfort. ......................................................................2

II.     THE RETAIL PARTNER PROGRAM.................................................4

     A.     The Personal Preference™ Collection.....................................6

     B.     Select Comfort's Anti-Disparagement Policy. ........................8

III.     THE RETAIL PARTNER RELATIONSHIP BETWEEN THE PARTIES.......................9

     A.     Sleepy's Approaches Select Comfort. .....................................9

     B.     Negotiation Of The Dealer Agreement....................................12

          1.     Section 4(c)....................................................................13

          2.     The Personal Preference™ Information. ......................15

     C.     Termination Of The Dealer Agreement. ...................................17

IV.     THE FINAL DEALER AGREEMENT...................................................17

     A.     Section 3(j)..............................................................................18

     B.     Section 4(c)..............................................................................19

     C.     Section 9..................................................................................19

     D.     Section 11................................................................................20

V.     SLEEPY'S CONDUCT DURING THE RETAIL PARTNERSHIP..............................20

     A.     Training...................................................................................21

     B.     Advertising..............................................................................22

C.      Employee Purchase Program. ..........................................................25

D.      Sleepy's Failure To Display The Personal Preference™ Line. ...........26

E.      Sleepy's Failure To Show The Personal Preference™ Product. ..........27

F.      Sleepy's Sales Force Itself Disparaged The Personal Preference™ Beds, Resulting In Lower Sales. ................................................................28

G.      Sleepy's Internal Analysis. ...............................................................30

H.      Thomas Weisel Partners Reported Similar Behavior. ..........................32

I.      Select Comfort Sought A Business Review Meeting With Sleepy's. .................33

VI.     SLEEPY'S SECRET SHOPS. ........................................................................35

A.      Sleepy's Directed Its Employees To Solicit Statements About Sleepy's. ............35

B.      Sleepy's Destroyed The Original Shop Report Evidence. ....................38

VII.    THE JANUARY 3, 2006 BUSINESS REVIEW MEETING. ..........................39

VIII.   THE WIND-UP AGREEMENT. ...................................................................44

BACKGROUND .............................................................................................47

I.      PROCEDURAL POSTURE. .........................................................................47

II.     THE SECOND CIRCUIT'S APPELLATE DECISION. ..................................47

III.    OUTSTANDING ISSUES. ............................................................................49

A.      Spoliation. .......................................................................................49

B.      The Admissibility Of The Thomas Weisel Report. ............................50

C.      The Reliability Of Sleepy's Expert's Opinion. ...................................51

PROPOSED CONCLUSIONS OF LAW .........................................................52

I.      SLEEPY'S HAS SUBMITTED NO EVIDENCE OF INJURY OR CAUSATION.........52

A.      Legal Standard. ................................................................................52

B.      There Is No Direct Evidence Of Causation Or Damages In The Record. .............53

ii

C.      Sleepy's Cannot Prove Its Case Through Circumstantial Evidence. ..................... 55

      1.      Sleepy's Failed To Introduce Consumer Evidence. ................................... 56

      2.      The Evidence Shows That The Extraordinary Inferences Requested By Plaintiff Are Not Justified. ................................................... 57

D.      Sleepy's Failed To Sell Sleep Number® Beds Because Of Its Own Actions. ................................................................................. 58

      1.      Sleepy's Failed To Adequately Advertise The Personal Preference™ Line. ...................................................... 58

      2.      Sleepy's Salespeople's Behavior Undercut Sleepy's Sales Of The Personal Preference™ Line. ...................................... 60

            a.      Sleepy's Salespeople Did Not Show The Product. ........................ 60

            b.      Sleepy's Salespeople Were Disparaging The Personal Preference™ Beds. ................................................... 61

      3.      Sleepy's Acknowledged And Identified The Causes Of Its Poor Sales Of Personal Preference™ Products. .................................... 62

      4.      An Independent Analysis Confirmed Sleepy's Internal Comments. .......... 63

E.      The Damages Experts. ......................................................... 64

II.      SLEEPY'S HAS FAILED TO PROVE ITS CLAIM FOR SLANDER *PER SE*. ............. 69

A.      Legal Standard. ................................................................. 69

B.      Sleepy's Claims Fail Because The Alleged Statements Do Not Constitute Slander Per Se—Rather, They Are Unpled Product Disparagement. .................... 70

      1.      The Alleged Statements Do Not Attack Sleepy's Integrity Or Credit. ................................................................... 70

      2.      Sleepy's Failed To Establish Falsity. ........................................ 72

C.      Sleepy's Schemed To "Decoy" Select Comfort Into A Lawsuit, And Therefore Consented To All Allegedly Slanderous Statements. .......................... 74

      1.      Legal Standard. ............................................................. 74

2.      Sleepy's Internal Recording Shows That The Secret Shops Were Conducted To Trap Select Comfort Into A Choice Between Being Sued And Extending The Dealer Agreement.............................76

3.      Mr. Colon's "Shop" Cannot Support A Claim For Slander *Per Se*. ..........78

D.      The Evidence Cannot Be Admitted To Show A "Pattern And Practice." .............78

1.      Pattern And Practice Evidence Is Not Probative Of A Slander *Per Se* Claim. ...................................................................................79

2.      Sleepy's Introduced Insufficient Evidence To Show A Pattern And Practice........................................................................................80

III.    SELECT COMFORT DID NOT BREACH SECTION 4(C) OF THE DEALER AGREEMENT..................................................................................................83

A.      The Dealer Agreement Terminated On September 30, 2006 And Was Not Extended By Conduct Of The Parties. ...................................................84

B.      Select Comfort's Actions Were Not Consistent With An Intent To Waive Termination...................................................................................85

1.      Sleepy's Orchestrated A Delay To The End Of The Relationship. ...........86

2.      Select Comfort Did Not Intend To Waive Expiration Of The Dealer Agreement. ...................................................................87

C.      Select Comfort's Actions Were Not Consistent With An Intent To Create An Implied-In-Fact Contract...................................................................89

D.      Section 4(c) Applies To Select Comfort's Provision Of Warranty Service. .........91

E.      The Drafting History Supports Select Comfort's Interpretation Of Section 4(c). ...................................................................................................93

F.      Sleepy's Has Shown No Loss Of Brand Image. ...........................................94

G.      Sleepy's Prior Breach Excused Select Comfort's Performance. .........................96

H.      The Parties' Course Of Performance Established That Negative Salesperson Statements Did Not Constitute A Material Breach..........................97

IV.     SLEEPY'S HAS NOT ESTABLISHED A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.................................................98

iv

A.      Minnesota Does Not Recognize A Separate Cause Of Action. ............................98

B.      The Claim Also Fails Under Common Law. .........................................................99

    1.      This Claim Fails If The Dealer Agreement Expired On September 30, 2006...................................................................................................100

    2.      Sleepy's Has Presented No Evidence Of A Breach.................................100

    3.      Sleepy's Secret Shop Evidence Does Not Support This Claim...............101

V.      SLEEPY'S HAS NOT PROVEN ITS CLAIM OF UNFAIR COMPETITION. ...........102

A.      Legal Standard. ...................................................................................................102

B.      Sleepy's Claim Fails Because Sleepy's Has Failed To Prove Malice And Special Damages...................................................................................................103

C.      There Is No Evidence Of A Property Right Belonging Exclusively To Sleepy's...................................................................................................................104

D.      There Is No Evidence That Defendant Misappropriated Sleepy's Labors, Skill, Expenditures, Or Good Will.......................................................................104

E.      Sleepy's Has Offered No Evidence Of Bad Faith. .............................................105

VI.     SLEEPY'S IS NOT ENTITLED TO PREJUDGMENT INTEREST ON ANY POTENTIAL AWARD OF DAMAGES.......................................................................105

**CONCLUSION** ....................................................................................................................106

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Abe's Rooms, Inc. v. Space Hunters, Inc.*,
  833 N.Y.S.2d 138 (N.Y. App. Div. 2007) ...................................................................102, 105

*AgInformationData, LLC v. Integrated Solutions Group., Inc.*,
  No. 11-3673, 2014 WL 4348209 (D. Minn. Sept. 8, 2014).................................................97

*Ammirato v. Duraclean International, Inc.*,
  No. CV 07-5204, 2011 WL 2730918 (E.D.N.Y. July 13, 2011) ...........................................53

*Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Engineering Sales, Inc.*,
  436 N.W.2d 121 (Minn. Ct. App. 1989).................................................................................93

*Argus Inc. v. Eastman Kodak Co.*,
  801 F.2d 38 (2d Cir. 1986)...................................................................................58, 62, 63

*Ashland Management Inc. v. Janien*,
  624 N.E.2d 1007 (N.Y. 1993)...............................................................................................52

*Bari v. Control Data Corp.*,
  439 N.W.2d 44 (Minn. Ct. App. 1989).................................................................................93

*Bolander v. Bolander*,
  703 N.W.2d 529 (Minn. Ct. App. 2005).........................................................................86, 89

*Bonebrake v. Cox*,
  499 F.2d 951 (8th Cir. 1974)................................................................................................98

*Cambridge Associates v. Inland Vale Farm Co.*,
  497 N.Y.S.2d 751 (N.Y. App. Div. 1986) ...........................................................................71

*Cherogsky v. Crosstown Bell, Inc.*,
  463 N.W.2d 522 (Minn. 1990).............................................................................................92

*Chum Ltd. v. Lisowski*,
  198 F. Supp. 2d 530 (S.D.N.Y. 2002)..................................................................................53

*Cox v. Mortgage Electronic Registration Systems, Inc.*,
  685 F.3d 663 (8th Cir. 2012) .............................................................................................101

*Design Strategies, Inc. v. Davis*,
  384 F. Supp. 2d 649 (S.D.N.Y. 2005)...........................................................................53, 102

*Distronics Corp. v. Roberts-Hamilton Co.*,
575 F. Supp. 275 (D. Minn. 1983) ......................................................................96

*Dykes v. Sukup Manufacturing Co.*,
781 N.W.2d 578 (Minn. 2010)..............................................................................93

*Dynamic Air Inc. v. Reichhold, Inc.*,
No. 05-cv-0955, 2007 U.S. Dist. LEXIS 57651 (D. Minn. Aug. 7, 2007) .......86, 88

*Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*,
825 N.W.2d 695 (Minn. 2013)..............................................................................92

*Evans v. Waldo*,
No. 04-CV-566, 2006 WL 2689819 (E.D.N.Y. Sept. 18, 2006) ............................79

*Farmers Insurance Exchange v. West*,
No. 11-2297, 2013 WL 1687704 (D. Minn. Apr. 18, 2013)...................................97

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
75 F. Supp. 2d 235 (S.D.N.Y. 1999)................................................................55, 56

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
942 F. Supp. 209 (S.D.N.Y. 1996) .......................................................................83

*Fashion Boutique of Short Hills v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002) .......................................................................... passim

*Fashion Boutique of Short Hills v. Fendi USA, Inc.*,
No. 91 Civ. 4544, 1998 WL 259942 (S.D.N.Y. May 21, 1998) ...............54, 69, 74

*Fingerlakes Aquaculture, LLC v. Progras Welding Supply, Inc.*,
825 N.Y.S.2d 559 (N.Y. App. Div. 2006) .............................................................52

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)...................................................................................53

*G.M. Brod & Co. v. U.S. Home Corp.*,
759 F.2d 1526 (11th Cir. 1985) ......................................................................80, 82

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*,
277 F. Supp. 2d 269 (S.D.N.Y. 2003)..................................................................103

*Halla Nursery, Inc. v. City of Chanhassen*,
781 N.W.2d 880 (Minn. 2010)..............................................................................93

*Healy v. Carlson Travel Network Associates*,
227 F. Supp. 2d 1080 (D. Minn. 2002)........................................................ passim

*Hiriam Hicks, Inc. v. Synagro WWT, LLC*,
   867 F. Supp. 2d 676 (E.D. Pa. 2012) ..................................................94

*Home Insurance Co. v. National Union Fire Insurance of Pittsburgh*,
   658 N.W.2d 522 (Minn. 2003)............................................................96

*Investors Syndicate v. Baskerville Brothers Holding Co.*,
   274 N.W. 627 (Minn. 1937)................................................................98

*ITC Ltd. v. Punchgini, Inc.*,
   518 F.3d 159 (2d Cir. 2008)................................................................56

*J.J. Brooksbank Co. v. Budget Rent-A-Car Corp.*,
   337 N.W.2d 372 (Minn. 1983)............................................................98

*Jay N Jen, Inc. v. Polge Seafood Distributing, Inc.*,
   894 N.Y.S.2d 296 (N.Y. App. Div. 2010) ...........................................95

*Kenford Co. v. Erie Cty.*,
   493 N.E.2d 234 (N.Y. 1986)..........................................52, 53, 65, 69

*Kivel v. Wealthspring Mortgage Corp.*,
   398 F. Supp. 2d 1049 (D. Minn. 2005)......................................99, 100

*Kladek, Inc. v. American Bank of St. Paul*,
   A09–948, 2010 WL 935378 (Minn. Ct. App. Mar. 16, 2010)..............91

*LaSociete Generale Immobiliere v. Minneapolis Community Development Agency*,
   44 F.3d 629 (8th Cir. 1994) ..............................................................101

*Leoni v. Bemis Co.*,
   255 N.W.2d 824 (Minn. 1977)............................................................53

*Leslie v. Minneapolis Teachers Retirement Fund Association*,
   16 N.W.2d 313 (Minn. 1944)..............................................................97

*LoPresti v. Massachusetts Mutual Life Insurance Co.*,
   820 N.Y.S.2d 275 (N.Y. App. Div. 2006) ..................................102, 104

*Loussier v. Universal Music Group, Inc.*,
   No. 02-2247, 2005 WL 5644420 (S.D.N.Y. Aug. 30, 2005)..........80, 81

*Machleder v. Diaz*,
   801 F.2d 46 (2d Cir. 1986)..................................................................53

*MapInfo Corp. v. Spatial Re-Engineering Consultants*,
   No. 02-CV-1008, 2006 WL 2811816 (N.D.N.Y. Sept. 28, 2006)....53, 94

viii

*Metro Office Parks Co. v. Control Data Corp.*,
205 N.W.2d 121 (Minn. 1973)..................................................................................91

*Minevitch v. Puleo*,
193 N.Y.S.2d 833 (N.Y. App. Div. 1959) ...........................................................102

*Minneapolis Public Housing Authority v. Lor*,
591 N.W.2d 700 (Minn. 1999)..................................................................................91

*Minnwest Bank Central v. Flagship Props. LLC*,
689 N.W.2d 295 (Minn. Ct. App. 2004) ..............................................................99

*MTS Co. v. Taiga Corp.*,
365 N.W.2d 321 (Minn. Ct. App. 1985)..............................................................96

*Old Country Toyota Corp. v. Toyota Motor Distributors, Inc.*,
966 F. Supp. 167 (E.D.N.Y. 1997) ........................................................................98

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*,
32 F.3d 690 (2d Cir. 1994)..........................................................................52, 56

*Park v. Lewis*,
528 N.Y.S.2d 250 (N.Y. App. Div. 1988) ...........................................................74

*Pliam v. Cendant Mortgage Corp.*,
513 Fed. App'x 634 (8th Cir. 2013) ...................................................................100

*Potter v. Hartzell Propeller, Inc.*,
189 N.W.2d 499 (Minn. 1971) ...........................................................................106

*Prozeralik v. Capital Cities Communications, Inc.*,
626 N.E.2d 34 (N.Y. 1993)..................................................................................72

*Romper Room Inc. v. Winmark Corp.*,
60 F. Supp. 3d 993, at Part II.B. (E.D. Wis. 2014) .................................................95

*Ruder & Finn Inc. v. Seaboard Surety Co.*,
52 N.Y.2d 663 (1981) ......................................................................................70, 71

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000)..........................................................................52, 55

*Sierra Petroleum Co. v. Beaudry Oil & Service, Inc.*,
No. 08-6466, 2011 WL 2036974 (D. Minn. May 24, 2011)..................................97

*Simplex, Inc. v. Diversified Energy Systems, Inc.*,
847 F.2d 1290 (7th Cir. 1988) ...........................................................................82

ix

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
    779 F.3d 191 (2d Cir. 2015)............................................................... passim

*Snyder v. Sony Music Entertainment, Inc.*,
    684 N.Y.S.2d 235 (N.Y. App. Div. 1999) ...............................................69

*Solas v. Jones*,
    No. 04 Civ. 2980, 2005 WL 525444 (S.D.N.Y. March 7, 2005).....................77

*Sports & Travel Marketing, Inc. v. Chicago Cutlery Co.*,
    811 F. Supp. 1372 (D. Minn. 1993)..............................................99, 101

*Sterling Capital Advisors, Inc. v. Herzog*,
    575 N.W.2d 121 (Minn. Ct. App. 1998).............................................100

*The Grandoe Corp. v. Gander Mountain Co.*,
    No. 11-cv-0947, 2012 WL 3430735 (D. Minn. Aug. 14, 2012)......................99

*Toltec Fabrics, Inc. v. August Inc.*,
    29 F.3d 778 (2d Cir. 1994)...........................................................94

*Tractebel Energy Marketing, Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007)...........................................................99

*U.S. Football League v. National Football League*,
    842 F.2d 1335 (2d Cir. 1988).....................................................80, 81

*U.S. v. Ben Zvi*,
    242 F.3d 89 (2d Cir. 2001).......................................................47, 48

*U.S. v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006)..........................................................80

*United States v. Bryce*,
    287 F.3d 249 (2d Cir. 2002)..........................................................47

*United States v. Stanley*,
    54 F.3d 103 (2d Cir.1995)...........................................................48

*Valspar Refinish, Inc. v. Gaylord's Inc.*,
    764 N.W.2d 359 (Minn. 2009).....................................................86, 89

*Viking Supply v. National Cart Co.*,
    310 F.3d 1092 (8th Cir. 2002) .......................................................84

*Webb Candy, Inc. v. Walmart Stores, Inc.*,
    No. 09-cv-2056, 2010 WL 2301461 (D. Minn. June 7, 2010) ............86, 88, 89, 90

*Weight Watchers of Quebec Ltd. v. Weight Watchers International, Inc.,*
    523 F. Supp. 774 (E.D.N.Y. 1981) ................................................................53

*Wells v. Belstrat Hotel Corp.,*
    208 N.Y.S. 625 (N.Y. App. Div. 1925) ....................................................74, 78

*Zubulake v. UBS Warburg LLC,*
    382 F. Supp. 2d 536 (S.D.N.Y. 2005) .......................................................80, 81

**STATUTES**

C.P.L.R. 3016 (McKinney 2015) ....................................................................79

Minnesota Statutes Section 336.1-304 .............................................................99

**OTHER AUTHORITIES**

Federal Rule of Evidence 406 ..........................................................................81

Restatement (Second) of Torts § 577 cmt. .......................................................75

William Lloyd Prosser, et al., *Prosser & Keeton on Torts*, § 114 at 823 (5th ed. 1984) ..............75

Defendants Select Comfort Wholesale Corporation, Select Comfort Retail Corporation, and Select Comfort Corporation (collectively "Select Comfort" or "Defendant") submit the following (Proposed) Findings of Fact and Conclusions of Law and asks the Court to enter judgment in Defendant's favor:

## FINDINGS OF FACT

I.   **THE PARTIES.**

   A.   **Sleepy's.**

   1.   Sleepy's is a New York company with headquarters in New York. (Michael Bookbinder, Trial Tr. 78:16–24.)

   2.   Sleepy's owns a chain of retail stores that sell mattresses and bedding products. (Michael Bookbinder, Trial Tr. 74:19–22, 79:3–8.)

   3.   During the 2005 to 2007 time period, Sleepy's had between 300 and 400 stores located in New York, New Jersey, Maryland, Washington D.C., Northern Virginia, Rhode Island, Massachusetts, Connecticut, Vermont, Eastern Pennsylvania and New Hampshire. (Michael Bookbinder, Trial Tr. 74:23–77:1.)

   4.   Sleepy's has over fifty years of experience in the retail bedding business. (Michael Bookbinder, Trial Tr. 78:25–79:2, 80:24–81:2.)

   5.   Harry Acker is Sleepy's founder, owner, and CEO and is the top executive and decision-maker at Sleepy's. (Michael Bookbinder, Trial Tr. 87:4–6, 385:15–22; Adam Blank, Trial Tr. 3121:24–3122:2.)

   6.   During the 2005 to 2007 time period, Michael Bookbinder was Sleepy's Executive Vice President of Sales. (Michael Bookbinder, Trial Tr. 74:13–18.)

   7.   Michael Bookbinder has forty years of experience in the bedding industry. (Michael Bookbinder, Trial Tr. 417:2–6.)

1

8.    As Sleepy's Executive Vice President of Sales, Michael Bookbinder was responsible for overseeing Sleepy's sales force and district managers.  Mr. Bookbinder also oversaw Sleepy's marketing and advertising department.  (Michael Bookbinder, Trial Tr. 77:18–78:14.)

9.    During the 2005 to 2007 time period, Ira Fishman was Sleepy's Vice President of Merchandising.  Mr. Fishman was responsible for working with vendors to put together product lineups.  Mr. Fishman reported directly to Mr. Bookbinder.  (Michael Bookbinder, Trial Tr. 92:14–20.)

10.    During the 2005 to 2007 time period, Adam Blank was Sleepy's Executive Vice President and General Counsel.  (Adam Blank, Trial Tr. 2896:24–2897:10.)

11.    Harry Acker, Michael Bookbinder, Adam Blank, and David Acker were part of Sleepy's "executive team" which was responsible for "running the company."   (Michael Bookbinder, Trial Tr. 87:1–14.)

12.    The executive team reported to Harry Acker.  (Adam Blank, Trial Tr. 3121:24–3122:2.)  Harry Acker was the CEO and ultimate decision-maker.  (Michel Bookbinder, Trial Tr. 385:15–22.)

13.    Sleepy's business model is to carry all the major mattress brands, allowing Sleepy's to advertise that they "have them all."   (Michael Bookbinder, Trial Tr. 381:4–25; Michael Bookbinder, Trial Tr. 174:8–175:20; D-17; Px 152.)

**B.    Select Comfort.**

14.    Select Comfort is the manufacturer and seller of the Sleep Number® bed.  (Keith Spurgeon, Trial Tr. 2780:10–24.)

15.    Instead of using springs like a traditional mattress, the Sleep Number® bed contains inflatable air chambers that can be adjusted by a remote control to provide firmer or

softer support for the user.  (Michael Bookbinder, Trial Tr. 92:25–93:15; Keith Spurgeon, Trial Tr. 2780:25–2782:15; D-184 at SLCO0008722.)

16.     Depending on the Sleep Number® bed model, the air chambers are topped with various layers of foam and other padding similar to traditional mattresses.  (D-184 at SLCO0008725–SLCO0008726.)

17.     The Sleep Number® mattress rests on a foundation which is a flat, stable and solid surface that provides the proper base for the air-chamber technology to inflate against. (Dolores Franco, Trial Tr. 1846:11–12; Tim Werner, Trial Tr. 2626:10–2627:5; D-184 at SLCO0008731.)

18.     The Sleep Number® bed does not use a traditional "box spring" because such a product does not provide the optimum level of support to achieve the benefits of the air-chamber technology.  (Tim Werner, Trial Tr. 2649:1–10; Dolores Franco, Trial Tr. 1806:10–1807:2; D-184 at SLCO0008731.)

19.     During the period of the parties' relationship, Select Comfort was a successful mattress retailer and was ranked the No. 1 mattress retailer by sales volume in the country for several consecutive years by the trade journal, Furniture Today.  (Bruce Bauman, Trial Tr. 2254:17–2255:6, 2259:2–2260:19; D-262.)

20.     Select Comfort has a multi-channel sales and distribution strategy.  Select Comfort sells the Sleep Number® bed through its own retail stores, direct phone and internet sales, the shopping network QVC, and sales to the hospitality industry.  (Bruce Bauman, Trial Tr. 2251:7–2252:9.)

## II.     THE RETAIL PARTNER PROGRAM.

21.     In 2000, Select Comfort began selling its beds through Retail Partners.  (Tim Werner, Trial Tr. 2616:9–13; Bruce Bauman, Trial Tr. 2267:24–2268:1; D-178.)

22.     Select Comfort's Retail Partners were local mattress retailers in various parts of the country that sold a variety of brands of mattresses to customers in their stores.  (Tim Werner, Trial Tr. 2614:6–2620:17.)

23.     Keith Spurgeon was Select Comfort's Senior Vice President of sales during the 2005 to 2007 time period and was responsible for the oversight and management of the Retail Partner program.  (Tim Werner, Trial Tr. 2534:22–25, 2539:12–17.)

24.     Tim Werner was the Vice President of Retail Partners for Select Comfort from 2002 to June 2006.  Mr. Werner oversaw all aspects of the Retail Partner program, including Retail Partner selection, management, strategy, operations and training.  (Tim Werner, Trial Tr. 2532:2–10; 2613:16–2614:2.)

25.     Bruce Bauman served as Select Comfort's Senior Director of Retail Partners from 2004 to June 2006 and became the Vice President of Retail Partners for Select Comfort in June 2006.  (Bruce Bauman, Trial Tr. 2076:23–2077:6; Tim Werner, Trial Tr. 2535:1–5.)

26.     Select Comfort initiated the Retail Partner program to reach more consumers, increase revenue and profitability for the company, and sell more Sleep Number® beds.  (Bruce Bauman, Trial Tr. 2268:7–23; Keith Spurgeon, Trial Tr. 2784:15–25.)

27.     The Retail Partner program was designed to provide benefits for Retail Partners as well as for Select Comfort.  (Bruce Bauman, Trial Tr. 2268:24–2269:1; Keith Spurgeon, Trial Tr. 2785:4–25.)

28.     The Retail Partner program was designed to provide incremental sales and profitability to Retail Partners, meaning additional sales that the Retail Partner would not have

4

otherwise made. (Bruce Bauman, Trial Tr. 2431:10–2432:6; Keith Spurgeon, Trial Tr. 2785:17–25; Px 10 at 6.)

29. Retail Partners that were part of Select Comfort's Retail Partner program had access to a product consumers were interested in, could draw consumers into their stores by advertising the availability of the Sleep Number® bed, and, like Sleepy's, could advertise that they were a "one–stop shop," having traditional inner spring mattresses, foam–based mattresses, and air–based products. (Bruce Bauman, Trial Tr. 2269:2–2271:8.) That allowed them to draw customers into their stores and keep them there without the need to shop around, thus increasing the probability of a sale.

30. Select Comfort used four key criteria to determine who would be a successful Retail Partner: (1) Select Comfort looked for retailers that were dominant in terms of share of sales in their market; (2) Select Comfort wanted retailers that were heavy advertisers and had a significant share of voice in the market; (3) Select Comfort wanted retailers that would be a good brand fit for Select Comfort, where both parties could enhance the other's brand; and (4) Select Comfort wanted to make sure that future partners had demonstrated success in selling alternative bedding products. (Tim Werner, Trial Tr. 2621:18–2623:2.)

31. Select Comfort's first Retail Partners were Goods in Illinois, Gabberts in Minneapolis and Benchmark Furniture in Kansas City. (Tim Werner, Trial Tr. 2616:13–21; D-178.)

32. In 2002, Sleep Train and Sleep America were added as Retail Partners. (Tim Werner, Trial Tr. 2616:22–2617:13; D-178.)

33. Sleep Train and Sleep America were dominant retailers and advertisers in California and Arizona respectively. (Tim Werner, Trial Tr. 2617:15–2618:8.)

34.     Over the next several years, Select Comfort added Retail Partners in the Southeast, in Connecticut, Washington, D.C., Hawaii and Alaska.  (Tim Werner, Trial Tr. 2618:9–2619:22; D-178.)

### A.     The Personal Preference™ Collection.

35.     Select Comfort's Retail Partners marketed and sold an exclusive line of Select Comfort products, known as the Personal Preference™ collection, that was different from beds sold at Select Comfort's retail stores.  (Bruce Bauman, Trial Tr. 2272:7–20; Tim Werner, Trial Tr. 2551:17–2552:2, 2552:8–2553:3, 2624:9–16; Keith Spurgeon, Trial Tr. 2786:1–12., D-184 at 3.1.)

36.     Select Comfort referred to the line of beds it sold at Select Comfort's own retail stores as the Core line.  (Michael Bookbinder, Trial Tr. 107:8–16; D-19.)

37.     The technology and basic components of the Personal Preference™ beds are identical to the Core line of Sleep Number® beds.  (Bruce Bauman, Trial Tr. 2272:22–2273:8.)

38.     The Personal Preference™ line was intentionally designed to offer "in between" models that slotted between the Core models offered by Select Comfort.  (Michael Bookbinder, Trial Tr. 105:8–17, 106:6–11; D-19; D-31.)

39.     For example, the Personal Preference™ collection was comprised of three models that fit between the 3000 and 4000, the 4000 and 5000, and the 7000 and 9000 Core models. (Michael Bookbinder, Trial Tr. 107:8–108:2; D-19; D-31.)

40.     Like the Core line of products, the Personal Preference™ collection had several different models with different types and thicknesses of foam surrounding the air chambers. (Bruce Bauman, Trial Tr. 2272:22–2273:16; D-19.)

41.     A chart that was provided to Sleepy's at the onset of the parties' relationship illustrated how the models of the two lines dovetailed and included the product specifications for

6

each model.  (Michael Bookbinder, Trial Tr. 104:20, 105:5–108:2; D-19; D-31; Bruce Bauman, Trial Tr. 2323:18–2324:1.)

42.     The foundation sold with the Personal Preference™ line was made of wood, whereas the foundation sold with the Core line of Select Comfort beds was a polymer plastic foundation.  (Bruce Bauman, Trial Tr. 2273:17–22; Keith Spurgeon, Trial Tr. 2786:22–2788:5.)

43.     The difference in foundations was a result of logistical considerations raised by the Retail Partners.   (Bruce Bauman, Trial Tr. 2274:13–2275:13; Keith Spurgeon, Trial Tr. 2788:6–2789:15.)

44.     Select Comfort's original sales channel (telemarketing) and all of its current direct sales channels deliver products to customers through United Parcel Service ("UPS"), and UPS will not ship a product the size of a bed foundation.  (Bruce Bauman, Trial Tr. 2276:7–18; Tim Werner, Trial Tr. 2625:4–16.)

45.     Due to this logistical hurdle, Select Comfort designed a polymer foundation which could be disassembled into separate pieces of sufficiently small size to fit into multiple boxes that could be shipped through UPS, which could be easily reconstructed by the consumer, and which was strong enough to withstand certain weight limits when used as a mattress foundation.  (Bruce Bauman, Trial Tr. 2275:14–2276:18; Tim Werner, Trial Tr. 2625:4–16.)

46.     At the beginning of the Retail Partner program, Select Comfort's first Retail Partners received and sold the polymer foundation.  (Bruce Bauman, Trial Tr. 2274:23–25; Tim Werner, Trial Tr. 2683:12–18.)

47.     Select Comfort's early Retail Partners, including Gabberts, Benchmark Furniture, Sleep Train, and Sleep America, informed Select Comfort that they did not want to carry and sell the polymer foundation because multiple boxes were difficult for them to inventory and they did

7

not want to have to assemble the foundation.  (Bruce Bauman, Trial Tr. 2275:1–13, 2276:19–2277:20; Tim Werner, Trial Tr. 2624:23–2625:3, 2625:16–2626:24.)

48.     Therefore, those early Retail Partners requested that Select Comfort provide a one-piece foundation to be used with the Personal Preference™ mattresses that came in one box.  (Bruce Bauman, Trial Tr. 2275:1–13; Tim Werner, Trial Tr. 2625:25–2626:3.)

49.     To meet this request, Select Comfort designed a wood foundation which would provide the same solid, level support that the polymer foundation provided.  (Bruce Bauman, Trial Tr. 2277:21–2278:10; Tim Werner, Trial Tr. 2625:25–2627:8.)

50.     There was no material difference between the two foundations in terms of quality or how they performed with the Sleep Number® mattress.  (Bruce Bauman, Trial Tr. 2273:17–24, 2277:21–2278:10; Tim Werner, Trial Tr. 2626:4–2627:8; Keith Spurgeon, Trial Tr. 2790:1–3.)

51.     Both the polymer and wood foundations were covered by Select Comfort under the exact same 20–year limited warranty.  (Bruce Bauman, Trial Tr. 2281:4–11; Tim Werner, Trial Tr. 2585:16–22.)  Select Comfort provided and serviced the warranty—it was not handled by the Retail Partners themselves.  (Bruce Bauman, Trial Tr. 2311:9–2312:5.)

**B.     Select Comfort's Anti-Disparagement Policy.**

52.     It was Select Comfort's corporate policy and training to avoid disparaging or speaking negatively about any competitor or Retail Partner at any time—including Sleepy's.  (Dolores Franco, Trial Tr. 1861:13–1865:10; Tim Werner, Trial Tr. 2651:10–2654:4.)  This was confirmed by former Select Comfort employees who worked for Sleepy's at the time of their testimony.  (Amy Desrosiers, Trial Tr. 2847:5–8, 2864:15–22; Frank Del Vicario, Trial Tr. 1990:20–21, 2024:5–2025:22.)

III.     **THE RETAIL PARTNER RELATIONSHIP BETWEEN THE PARTIES.**

     A.     **Sleepy's Approaches Select Comfort.**

53.     In the last quarter of 2004, Sleepy's became interested in carrying Select Comfort beds.  (Michael Bookbinder, Trial Tr. 90:24–91:9.)

54.     Sleepy's CEO, Harry Acker, made a decision to pursue a relationship with Select Comfort.  (Michael Bookbinder, Trial Tr. 92:21–24; 319:20–320:24.)

55.     At the time, Sleepy's did not have any other mattresses in the air bed category, nor did it have any successful prior experience selling this type of product.   (Michael Bookbinder, Trial Tr. 388:5–16.)

56.     On January 17, 2005, Sleepy's approached Select Comfort about becoming one of Select Comfort's Retail Partners.   (Michael Bookbinder, Trial Tr. 91:11–92:12; Tim Werner, Trial Tr. 2589:1–3, 2620:23–2621:9; Keith Spurgeon, Trial Tr. 2794:11–2795:10; D-185.)

57.     At the time, Select Comfort did not have any Retail Partners in the New York area.  (Bruce Bauman, Trial Tr. 2287:3–10, 2287:20–2289:4, 2289:12–2290:4; D-182 at 3.)

58.     Select Comfort was considering several different retailers to become its exclusive Retail Partner in the New York area.   (Bruce Bauman, Trial Tr. 2287:20–2289:4, 2289:12–2290:4; D-182 at 3.)

59.     Select Comfort was not considering Sleepy's as a prospective Retail Partner because Sleepy's did not meet Select Comfort's selection criteria.   (Bruce Bauman, Trial Tr. 2287:20–2291:6, 2292:4–2293:15; Tim Werner, Trial Tr. 2621:10–2623:24; Keith Spurgeon, Trial Tr. 2795:25–2797:7; D-182 at 4, 5.)

60.     Select Comfort had researched Sleepy's and was concerned about the ethics of Sleepy's business operation.   (Bruce Bauman, Trial Tr. 2293:16–25; Tim Werner, Trial Tr. 2623:6–20; Keith Spurgeon, Trial Tr. 2796:18–2797:7.)

61.     Through its research, Select Comfort learned that Sleepy's customers had filed a series of complaints with the Better Business Bureau and that it had been reported that Sleepy's had represented false information to customers about Select Comfort.  (Bruce Bauman, Trial Tr. 2294:1–2298:24; D-164.)

62.     In 2004, the New Jersey Attorney General filed suit against Sleepy's for violations of the State's Consumer Fraud Act alleging the company, among other things, sold defective or damaged products to consumers, failed to deliver merchandise as promised, and misled consumers regarding the companies' exchange policy and their right to receive refunds.  (Adam Blank, Trial Tr. 3033:20–22, 3038:2–3039:14; D-247.)

63.     Sleepy's resolved the lawsuit with the New Jersey Attorney General through a monetary settlement.  (Adam Blank, Trial Tr. 3102:4–15; D-147.)

64.     During the 2005 to 2007 time period there were also articles in the press regarding an investigation of Sleepy's alleged violations of New York City's consumer protection law, including charges of deception for failing to adequately disclose terms of Sleepy's exchange policy, failing to honor warranties and selling used mattresses, which Sleepy's customers would have seen.  (Adam Blank, Trial Tr. 3013:17–3015:10, 3020:15–21, 3022:8–20, 3023:18–3024:6, D-259; D-263.)

65.     Sleepy's aggressively pursued a relationship with Select Comfort.  (Michael Bookbinder, Trial Tr. 94:9–95:2; Keith Spurgeon, Trial Tr. 2802:3–5; D-102.)

66.     In a letter dated March 23, 2005, Sleepy's continued to pursue a relationship with Select Comfort, claiming that because of Sleepy's size, it was in the best position to advertise and promote Select Comfort's products in the New York area.  (Michael Bookbinder, Trial Tr. 94:9–95:2; D-102.)  In that letter, Mr. Acker also stated that Sleepy's had visited with another

airbed manufacturer, Beautyrest, suggesting that Sleepy's would pursue a relationship with Select Comfort's competitor if Select Comfort did not agree to partner with Sleepy's.  (Michael Bookbinder, Trial Tr. 320:8–322:4; Tim Werner, Trial Tr. 2636:2–2638:1; Keith Spurgeon, Trial Tr. 2801:13–2802:2; D-102.)

67.     Mr. Acker also represented that Sleepy's would advertise Select Comfort's product, stating that Sleepy's would "gallerize [Select Comfort's] product, prominently displayed with all the POP material that you have available so we can properly display your product" and that "Sleepy's has the financial wherewithal to publicize and promote Select Comfort unlike anybody in the Northeast."  (Michael Bookbinder, Trial Tr. 323:8–20; Tim Werner, Trial Tr. 2638:4–23; D-102.)

68.     Despite Select Comfort's reservations, Select Comfort decided to discuss a Retail Partnership with Sleepy's primarily because of Mr. Acker's representations about Sleepy's commitment to advertising, representing and selling the Sleep Number® bed.  (Bruce Bauman, Trial Tr. 2298:25–2299:19; Tim Werner, Trial Tr. 2633:10–2634:1; Keith Spurgeon, Trial Tr. 2798:12–2800:16.)

69.     Mr. Acker represented to Select Comfort that Sleepy's would make a significant investment in advertising the Sleep Number® bed, would display all three Personal Preference™ beds on Sleepy's showroom floors, and would provide commitment from Sleepy's senior management to ensure that Sleepy's sales staff would become proficient in selling the Sleep Number® bed.  (Bruce Bauman, Trial Tr. 2299:4–2300:18; Tim Werner, Trial Tr. 2633:10–2634:1.)

70.     Sleepy's enticed Select Comfort to enter a business relationship by promising to conduct significant advertising.  (Tim Werner, Trial Tr. 2589:1–3; 2620:23–2621:9, 2632:18–

11

2634:24, 2636:2–11, 2638:4–2640:15; Keith Spurgeon, Trial Tr. 2794:11–2795:10, 2797:14–2800:16, 2802:10–2803:2; Bruce Bauman, Trial Tr. 2299:20–2300:2; D-102.)

71.    In the first quarter of 2005, Select Comfort employees Keith Spurgeon and Tim Werner met with Sleepy's to discuss Sleepy's interest in becoming a Retail Partner of Select Comfort.  (Michael Bookbinder, Trial Tr. 93:16–94:8.)

72.    Sleepy's understood that successful sales were dependent upon Sleepy's taking the appropriate steps to advertise and sell the bed.  (Michael Bookbinder, Trial Tr. 329:22–330:13.)

73.    To assess the Retail Partner program, Mr. Bookbinder merely called a person who he knew from the mattress business, Len Gaby.  Mr. Gaby worked for Sleep America and had a Retail Partner agreement with Select Comfort.  (Michael Bookbinder, Trial Tr. 100:2–15.)

74.    Mr. Bookbinder asked Mr. Gaby "if he was satisfied or not with the results" and Mr. Gaby told Mr. Bookbinder "he was satisfied with the results."  (Michael Bookbinder, Trial Tr. 100:2–15; Michael Bookbinder, Trial Tr. 325:15–21.)

75.    Mr. Bookbinder did not inquire about Sleep America's level of sales with Select Comfort or Sleep America's sales practices to determine whether Sleepy's was similar or would be able to undertake similar sales practices to accomplish similar sales results.  (Michael Bookbinder, Trial Tr. 325:22–326:13.)

**B.    Negotiation Of The Dealer Agreement.**

76.    During the spring of 2005, the parties negotiated a contract entitled "Select Comfort Corporation Dealer Agreement" (the "Dealer Agreement").  (Px 133.)

77.    Sleepy's was represented by its General Counsel, Adam Blank, during negotiations of the Dealer Agreement.  (Adam Blank, Trial Tr. 3103:23–3104:7.)

12

78.     On May 24, 2005, Select Comfort provided Sleepy's with its template Dealer Agreement, which is the standard agreement Select Comfort gave to all its Retail Partners. (Bruce Bauman, Trial Tr. 2301:12–2302:5.)

79.     On May 25, 2005, Sleepy's General Counsel, Adam Blank, sent Select Comfort an email and marked-up copy of the Dealer Agreement with Sleepy's comments and revisions. (Michael Bookbinder, Trial Tr. 333:13–334:12, 336:3–337:17; D-10.)

### 1.     Section 4(c).

80.     Under Section 4(c) of the Dealer Agreement, Select Comfort agreed to handle warranty claims for Sleepy's customers that purchased a Select Comfort bed from Sleepy's. (Michael Bookbinder, Trial Tr. 336:20–337:9; Tim Werner, Trial Tr. 2585:16–2586:2.)

81.     Section 4(c) of the underlined standard Dealer Agreement stated that Select Comfort will:

Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to retail partner by Select Comfort.

(Michael Bookbinder, Trial Tr. 335:5–20; D-9; Bruce Bauman, Trial Tr. 2310:22–2311:19.)

82.     Select Comfort's standard agreement included this provision because Select Comfort handled warranty service for all Select Comfort beds, including those sold by Retail Partners, and it was committed to providing a very high level of service to customers who bought its products.  (Bruce Bauman, Trial Tr. 2311:9–2312:5.)

83.     Sleepy's was concerned that when Select Comfort handled warranty claims for Sleep Number® beds purchased at Sleepy's, Select Comfort might not provide good service to Sleepy's customers which might reflect poorly on Sleepy's.  (Michael Bookbinder, Trial Tr. 337:10–17; Bruce Bauman, Trial Tr. 2315:7–2315:21; Tim Werner, Trial Tr. 2602:23–2604:1.)

84.     Therefore, Sleepy's sent Select Comfort a redlined version of the template Dealer Agreement with the following comment inserted within Section 4(c):

13

> Does this representation mean that Select Comfort will be handling all warranty claims directly with the customer?  If so, can Sleepy's get a representation regarding Select Comfort's best efforts to service Sleepy's customers insofar as nothing is more important to Sleepy's than its reputation.

(Michael Bookbinder, Trial Tr. 336:7–337:23; Bruce Bauman, Trial Tr. 2312:11–2313:12, 2314:4–2315:6; D-10.)

85.     On June 1, 2005, Sleepy's General Counsel, Adam Blank drafted and provided Select Comfort with proposed contractual language regarding Sleepy's concern about warranty service, which stated:

> Each party represents that it shall not impair, infringe upon or adversely effect the character, reputation and good will (collectively, the "Brand Image") of the other party.

(Bruce Bauman, Trial Tr. 2315:22–2316:15; D-4.)

86.     Select Comfort accepted Sleepy's proposed language and on June 8, 2005, Mr. Bauman sent Mr. Bookbinder and Mr. Blank a revised contract.  (Michael Bookbinder, Trial Tr. 337:25–338:14; Bruce Bauman, Trial Tr. 2316:21–2318:14; D-9.)

87.     The language Mr. Blank proposed was added to Section 4(c) in the same location where Mr. Blank had inserted his comment regarding Sleepy's concern about how Select Comfort would handle warranty claims made by Sleepy's customers.  (Michael Bookbinder, Trial Tr. 338:15–339:13; Bruce Bauman, Trial Tr. 2316:21–2318:14; D-9; Px 133 § 4(c).)  The entire new provision, with the inclusion of Sleepy's language, therefore read:

> Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to Retail Partner by Select Comfort;  Each party represents that is shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party.

14

88.     Mr. Blank reviewed and approved the placement of Sleepy's proposed contractual language before the Dealer Agreement was signed.  (Adam Blank, Trial Tr. 3109:19–24, 3111:1–5.)

89.     Section 3(j) of the Standard Retail Partner Agreement—not at issue in this lawsuit—contained a unilateral non-disparagement provision which stated that Sleepy's will:

> (j) Not disparage Select Comfort or any products distributed through Select Comfort's retail stores or any of Select Comfort's other Retail Partners and not interfere with any of Select Comfort retail store's relationships with customers or potential customers.

(Michael Bookbinder, Trial Tr. 339:18–340:13; Px 133.)

90.     Sleepy's did not ask for any additions or changes to Section 3(j) of the Standard Retail Partner Agreement.  (Bruce Bauman, Trial Tr. 2312:6–10.)  Sleepy's did not ask Select Comfort to make Section 3(j) a mutual non–disparagement provision.  (Michael Bookbinder, Trial Tr. 340:14–16; Bruce Bauman, Trial Tr. 2321:13–2322:3; Adam Blank, Trial Tr. 3105:13–3106:19.)

### 2.      The Personal Preference™ Information.

91.     In April or May 2005, Select Comfort also provided Sleepy's with a Retail Partner Guide and Personal Preference™ Product Manual, which discussed the product specifications, features and benefits of the Personal Preference™ line of beds that Retail Partners carried, including the components that made up the mattresses and foundations of the Personal Preference™ lineup.  (Michael Bookbinder, Trial Tr. 111:25–112:25; 129:17–130:6; Bruce Bauman, Trial Tr. 2325:10–2327:8; D-184; Px 13.)

92.     Before Sleepy's entered into a Retail Partnership with Select Comfort, the parties discussed the differences between the Personal Preference™ line foundation and the Core line

15

foundation.  (Michael Bookbinder, Trial Tr. at 101:23–102:6; Bruce Bauman, Trial Tr. 2334:2–14.)

93.     Sleepy's understood that the Personal Preference™ line Select Comfort's Retail Partners carried came with a wood foundation.  (Michael Bookbinder, Trial Tr. at 101:24–102:6; Bruce Bauman, Trial Tr. 2334:2–14.)

94.     Select Comfort also gave Sleepy's a sample of the Personal Preference™ bed so that Sleepy's could evaluate and test it.  (Michael Bookbinder, Trial Tr. 326:14–327:2; Bruce Bauman, Trial Tr. 2324:2–2325:1.)

95.     Sleepy's did not undertake any studies or tests to compare the Core line and Personal Preference™ line.  (Adam Blank, Trial Tr. 3119:5–18.)

96.     Sleepy's knew it was getting a different version of the Sleep Number® bed than Select Comfort sold in its own retail stores.  (Michael Bookbinder, Trial Tr. 326:14–327:2; Adam Blank, Trial Tr. 3118:11–14.)

97.     Before Sleepy's entered into a Retail Partnership with Select Comfort, Sleepy's questioned why there were differences in the products including the wireless remote and foundation.  (Michael Bookbinder, Trial Tr. 101:11–23.)

98.     Select Comfort informed Sleepy's that the beds in the Personal Preference™ line were different but that all Select Comfort beds were made with the same quality material and that the Personal Preference™ line was equivalent from a quality and performance standpoint. (Michael Bookbinder, Trial Tr. 102:3–6, 102:23–103:18, 344:2–344:16; Bruce Bauman, Trial Tr. 2336:1–8; Tim Werner, Trial Tr. 2626:4–2627:8; Keith Spurgeon, Trial Tr. 2789:16–2790:8.)

99.     Keith Spurgeon, Tim Werner and Bruce Bauman never told Sleepy's that Select Comfort would not retain any "competitive advantages" over Sleepy's.  (Bruce Bauman, Trial

Tr. 2334:19–2335:4; Tim Werner, Trial Tr. 2643:24–2644:11; Keith Spurgeon, Trial Tr. 2806:9–2807:6.)

100.    Both parties had relative "competitive advantages" over one another, dependent upon the customer's point of view.  (Tim Werner, Trial Tr. 2556:17–25, 2559:14–18; Tim Werner, Trial Tr. 2644:8–2645:4, 2671:14–2674:1.)

101.    Before they entered into the Retail Partner Agreement, Sleepy's knew that the plastic polymer foundation was not part of the Retail Partnership program.  (Michael Bookbinder, Trial Tr. 347:9–14.)

102.    Sleepy's understood that the reason Select Comfort used a polymer foundation in its retail stores was because Select Comfort's orders were shipped via UPS or Federal Express, and they were made to fit into boxes that could be shipped to consumers.  (Michael Bookbinder, Trial Tr. 102:7–11, 104:8–19, 111:5–14.)

### C.    Termination Of The Dealer Agreement.

103.    Due to the uncertain nature of the business prospects and its uneasiness with Sleepy's in general, Select Comfort proposed a six-month expiration for the Dealer Agreement, but Sleepy's wanted a longer initial term.  (Bruce Bauman, Trial Tr. 2327:9–2330:23; D-165.)

104.    Both parties considered the Retail Partnership between Select Comfort and Sleepy's a "test."  (Bruce Bauman, Trial Tr. 2329:8–2330:25; D-165 at 6; D-69 at 1.)

105.    The parties finally agreed to an initial term of just over a year, to expire by its terms on September 30, 2006.  (Bruce Bauman, Trial Tr. 2329:24–2331:3; D-165.)

## IV.    THE FINAL DEALER AGREEMENT.

106.    Select Comfort and Sleepy's entered into the Dealer Agreement on June 17, 2005. (Px 133.)

107.    Section 1 of the Dealer Agreement made Sleepy's a Retail Partner and an "authorized dealer of Select Comfort's line of Sleep Number® beds in the Personal Preference™ collection as further defined in Exhibit A (the "Products") subject to the terms and conditions set forth herein." (Px 133.)

108.    Sleepy's understood that it would be carrying the Personal Preference™ line of Select Comfort beds.  (Michael Bookbinder, Trial Tr. 367:20–22.)

109.    Sleepy's understood that all of Select Comfort's other Retail Partners also carried and sold the Personal Preference™ line of Select Comfort beds.  (Michael Bookbinder, Trial Tr. 367:23–368:5.)

110.    Exhibit A of the Dealer Agreement authorized Sleepy's to sell three models of the Personal Preference Collection: Personal Preference II, Personal Preference III, and Personal Preference IV.  (Px 133.)

111.    In Section 5(a) of the Dealer Agreement, Sleepy's acknowledged that it received and reviewed "Select Comfort's Retail Partner Manual and other Select Comfort manuals discussed in the Retail Partner Manual including but not limited to Retail Partner Standards Manual and Product Manual," and these documents were expressly incorporated by reference in § 11(b).  (Px 133 at § 5(a).)

112.    All of Select Comfort's Retail Partners received the exact same merchandise—the Personal Preference™ line of Sleep Number® beds.  (Bruce Bauman, Trial Tr. 2323:12–17; Tim Werner, Trial Tr. 2630:22–24.)

**A.    Section 3(j).**

113.    Section 3(j) of the Dealer Agreement remained unchanged from the Standard Dealer Agreement and placed a unilateral non-disparagement obligation on Sleepy's that provided that Sleepy's will:

18

(j) Not disparage Select Comfort or any products distributed through Select Comfort's retail stores or any of Select Comfort's other Retail Partners and not interfere with any of Select Comfort retail store's relationships with customers or potential customers;

(Px 133 at § 3(j).)  There is no corresponding contractual provision relating to Select Comfort's obligations to Sleepy's in relation to disparagement of Sleepy's or the products sold.

**B.    Section 4(c).**

114.    Section 4(c) of the Dealer Agreement relating to warranty service stated that Select Comfort will:

Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to Retail Partner by Select Comfort;  Each party represents that is shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party.

(Px 133 at § 4(c).)

115.    Sleepy's never complained about how Select Comfort provided warranty service to Sleepy's customers.  (Bruce Bauman, Trial Tr. 2321:9–12.)  Sleepy's did not present any evidence at trial that Select Comfort failed to provide warranty service or, during the course of providing warranty service, did anything to "impair, infringe upon or adversely affect" Sleepy's "reputation and goodwill."

**C.    Section 9.**

116.    Section 9 of the Dealer Agreement, entitled "Termination", contained the following relevant provisions:

(a) Initial Term.  Subject to earlier termination in accordance with any provision of this Agreement, the term of this Agreement shall commence as of the Effective Date and will expire September 30, 2006 (the "Initial Term").

(e) Waiver of Termination.  The conduct by either of the parties after termination of this Agreement, including without limitation any sale of the Products, will not be construed as a waiver of termination of this Agreement or as an extension or continuation of the term of this Agreement beyond the period specified in the

notice of termination; any such termination of this Agreement may only be waived by an express written waiver of termination signed by the terminating party.

(Px 133 at § 9.)

**D.      Section 11.**

117.    Section 11 of the Dealer Agreement contained the following relevant provisions:

(b) <u>Entire Agreement</u>.  This document, in conjunction with the Retail Partner Manual and the Retail Partner Standards manual, constitute the entire agreement made between the parties with respect to the subject matter hereof.  This Agreement supersedes all previous agreements, both written and oral, of any nature between the parties with respect to the subject matter hereof.

(d) <u>Governing Law</u>.  This Agreement will be governed and construed in accordance with the laws of the State of Minnesota without application of its conflict of law principles.

(e) <u>Waiver</u>.  Any waiver of any provision of this Agreement must be in a written instrument signed by the waiving party to be enforceable.  Any one-time waiver of any term of this Agreement or failure to strictly enforce the terms of this Agreement will not preclude a party from asserting a subsequent or continuing breach or from otherwise requiring strict conformance with the terms of this Agreement.

(Px 133 at § 11.)

**V.      SLEEPY'S CONDUCT DURING THE RETAIL PARTNERSHIP.**

118.    After the Dealer Agreement was executed, Select Comfort beds were placed in Sleepy's stores in August 2005.  (Michael Bookbinder, Trial Tr. 131:20–23.)

119.    Sleepy's sales territory, pursuant to the Dealer Agreement, was limited to Nassau and Suffolk Counties in Long Island.  (Michael Bookbinder, Trial Tr. 131:24–132:1.)

120.    This was the first time Sleepy's attempted to sell a product at only a subset of its stores.  (Michael Bookbinder, Trial Tr. 388:17–389:19.)

A.    **Training.**

121.    On August 8, 2005, a product rollout meeting was held in Sleepy's Hicksville showroom. (Michael Bookbinder, Trial Tr. 133:13–134:12.)

122.    At the August 8, 2005 meeting, Select Comfort instructed Sleepy's on how to sell the Personal Preference™ line of beds, and discussed the benefits and features of the Personal Preference™ line of Select Comfort beds. (Michael Bookbinder, Trial Tr. 134:23–135:3.)

123.    Unlike other Retail Partners, Sleepy's gave Select Comfort limited access to Sleepy's employees for the initial training. (Bruce Bauman, Trial Tr. 2337:8–2338:13; Tim Werner, Trial Tr. 2669:12–2670:9.)

124.    Select Comfort typically held 4 to 8 hours of initial training with other Retail Partners, but Sleepy's greatly restricted access to its salesforce and only allowed approximately 1 to 1-1/2 hours for training with Sleepy's employees. (Bruce Bauman, Trial Tr. 2337:8–2338:13; Tim Werner, Trial Tr. 2669:12–2670:9.)

125.    Sleepy's limitation of Select Comfort's access to Sleepy's employees compromised Select Comfort's ability to win over Sleepy's salespersons and hindered their ability to effectively learn how to sell the Personal Preference™ product from the outset. (Bruce Bauman, Trial Tr. 2337:8–2338:13.)

126.    Select Comfort provided Sleepy's district managers and employees with additional training so that Sleepy's employees would have the tools to be proficient in selling the Personal Preference™ line of Select Comfort beds. (Michael Bookbinder, Trial Tr. 135:4–22.)

127.    In an attempt to further assist Sleepy's, Select Comfort transferred one of its most successful store managers, Sean Swiderski, to be a Retail Partner trainer for Sleepy's. (Michael Bookbinder, Trial Tr. 135:12–22, 137:6–14; Tim Werner, Trial Tr. 2678:2–21.)

21

128.    Select Comfort also assigned two additional trainers to assist Sleepy's salespersons.  (Tim Werner, Trial Tr. 2699:22–6.)

129.    Sleepy's presented no evidence that it attempted to train its salespeople to sell Select Comfort beds outside of Select Comfort's own attempts to do so.

**B.    Advertising.**

130.    Advertising is critical for successful sales of Select Comfort products.  (Tim Werner, Trial Tr. 2634:10–24.)

131.    Sleepy's well-understood this and used its promise of substantial advertising to entice Select Comfort into the business relationship.  (Michael Bookbinder, Trial Tr. 323:8–20; Tim Werner, Trial Tr. 2638:4–23; D-102.)

132.    Select Comfort spends nearly $100 million per year on advertising, and its other Retail Partners did significantly more advertising than Sleepy's.  (Tim Werner, Trial Tr. 2634:21–2636:1, 2641:8–2642:4; Keith Spurgeon, Trial Tr. 2810:3–11.)

133.    Select Comfort supported the launch of the Select Comfort products in Sleepy's stores by spending $35,000 in advertising from August 22, 2005 to October 16, 2005 in the Long Island market to drive customers to Sleepy's stores to purchase Sleep Number® beds.  (Michael Bookbinder, Trial Tr. 374:16–20; D-204.)

134.    Sleepy's did not advertise the Personal Preference™ collection as it had promised.  (Tim Werner, Trial Tr. 2640:16–2641:14; Bruce Bauman, Trial Tr. 2338:20–2340:13; Keith Spurgeon, Trial Tr. 2808:25–2810:2.)

135.    On or about January 18, 2006, Harry Acker asked Sleepy's advertising team to put together a monthly folder with all Select Comfort advertisements that Sleepy's ran, which included the date the advertisements were run, the size of the advertisements and the dollars

spent on advertising for Select Comfort each month. (Michael Bookbinder, Trial Tr. 384:11–386:21; D-42.)

136. At trial, however, Sleepy's only introduced nine newspaper and radio advertisements Michael Bookbinder believes Sleepy's ran featuring the Personal Preference™ collection. (Michael Bookbinder, Trial Tr. 147:7–23, 150:15–151:10, 151:18–152:16, 152:18–153:7, 153:10–155:2, 159:20–161:13, 161:16–162:5, 174:8–19; Px 148; Px 149; Px 147; Px 150; Px 151; Px 152; Px 154; Px 93; D-17.)

137. Sleepy's did not introduce into evidence any affidavits from any media outlets verifying that it ran advertisements regarding Select Comfort. In fact, Sleepy's claimed to have destroyed the affidavits, which was not disclosed in discovery. The destruction included destruction of affidavits received after litigation was first contemplated and even after it was commenced. (Michael Bookbinder, Trial Tr. 383:3–384:10; Adam Blank, Trial Tr. 2966:15–25.)

138. After the launch of the Personal Preference™ line of beds in Sleepy's stores, sales were disappointing. Sleepy's was averaging one sale every two weeks on Long Island. (Michael Bookbinder, Trial Tr. 144:25–145:10; Keith Spurgeon, Trial Tr. 2808:14–24.)

139. In the fourth quarter of 2005, Sleepy's requested Select Comfort expand the territory in which Sleepy's was allowed to exclusively sell Select Comfort products. (Michael Bookbinder, Trial Tr. 180:20–181:3; Keith Spurgeon, Trial Tr. 2811:13–20.)

140. After convincing Select Comfort to enter into the contract by promising substantial advertising, Sleepy's told Select Comfort it was not advertising as promised because it would be inefficient to do so because Sleepy's territory was limited to Long Island. (Tim Werner, Trial Tr. 2674:2–2676:3; Bruce Bauman, Trial Tr. 2346:16–2347:8; Keith Spurgeon, Trial Tr. 2812:4–2813:20.)

141.     Sleepy's promised that if Select Comfort agreed to expand the number of Sleepy's stores that carried the Personal Preference™ line, it would substantially increase advertising activity for the product to drive sales.  (Michael Bookbinder, Trial Tr. 476:5–21; D-3.)

142.     Although Select Comfort was hesitant to expand the territory, in exchange for another promise from Sleepy's to increase advertising, including radio and television advertising, Select Comfort agreed to expand Sleepy's territory.  (Tim Werner, Trial Tr. 2674:2–2676:3; Bruce Bauman, Trial Tr. 2339:15–23; 2346:16–2348:8; Michael Bookbinder, Trial Tr. 181:25–182:14, 476:12–21.)

143.     Harry Acker admitted that Sleepy's agreed to increase its advertising of the Personal Preference™ line in an internal recording:

> I thought that if we got New York we would be able to talk our salespeople into selling it.  I guess I talked you into New York and I did promise you that we would promote the product and go crazy.

(Michael Bookbinder, Trial Tr. 482:13–16; D-69.)

144.     After the first phase of the expansion, Sleepy's sales of the Sleep Number® beds still did not improve.  (Michael Bookbinder, Trial Tr. 183:16–19.)

145.     Sleepy's failed to run the promised advertising.  (Tim Werner, Trial Tr. 2676:24–2677:12; Bruce Bauman, Trial Tr. 2345:5–12, 2348:4–11; Keith Spurgeon, Trial Tr. 2814:24–25.)  While Sleepy's did some limited print advertising, it did not perform any electronic advertising for the Sleep Number® bed as Harry Acker promised.  (Bruce Bauman, Trial Tr. 2339:15–2340:13.)

146.     Sleepy's admitted that it promised, and failed to deliver on, substantial additional advertising to support the expansion of the Select Comfort product to additional markets.  (D-3 at 1; D-95 at 4.)

24

147.     Sleepy's lack of advertising was discussed by the parties on several occasions. (Bruce Bauman, Trial Tr. 2340:14–19, 2343:23–2344:13.)

148.     When asked about the lack of advertising, Michael Bookbinder acknowledged the failure to advertise in writing, stating:

> The major problem that we have with Harry's discussion with you about advertising in New York is really going to sound odd, but we believe it is true. We have created what Harry calls a "monster" at Sleepy's.  There are so many customers coming into our stores, our sales people do not, and so far, will not, take the time that is required to present and sell the Personal Preference collection of beds.  Don't get the wrong impression; it is not ONLY your product they don't have time to spend cultivating the customer; it is other high end product as well. So, Harry ask [sic], what good will it do to spend MORE money (we certainly have NOT ceased, or cut back on print advertising) on TV when we can't handle the customers now?  Good question, right?

(Michael Bookbinder, Trial Tr. 478:4–478:15; Bruce Bauman, Trial Tr. 2342:3–2343:20; D-3 at 1; Px 37 at 1.)

149.     Sleepy's also acknowledged in internal recordings that it was not doing the advertising it promised, noting that Select Comfort "WILL ALMOST [sic] REQUIRE US TO DO MORE ADVERTISING AS WE PROMISED."  (D-95 at SP009056.)

150.     In another internal recording, Harry Acker admitted: "I CAN TELL YOU RIGHT NOW THAT WE WILL NOT PROMOTE THE PRODUCT ON TV OR RADIO . . . ."  (D-69 at SP008875.)

## C.     Employee Purchase Program.

151.     In Select Comfort's experience with its own salespeople and other Retail Partners, owning a Sleep Number® bed helps win the sales employees' hearts and minds and makes it easier for salespeople to sell the Sleep Number® bed.  (Bruce Bauman, Trial Tr. 2350:11–13.)

152.     Select Comfort asked Sleepy's to allow its salespersons to participate in Select Comfort's employee purchase program, whereby Sleepy's salespeople could buy a Personal

Preference™ bed from Select Comfort directly for below cost. However, unlike Select Comfort's other Retail Partners, Sleepy's would not allow it. (Michael Bookbinder, Trial Tr. 168:6–17, 168:20–170:15, 171:9–173:15; Bruce Bauman, Trial Tr. 2242:2–10; D-180.)

153. Sleepy's instead only allowed its sales force to participate in Sleepy's own employee purchase program. That program, however, did not provide the level of discount the Select Comfort program did and did not incentivize Sleepy's salespeople to purchase Select Comfort beds over other brands. (Michael Bookbinder, Trial Tr. 167:11–170:5.)

**D.  Sleepy's Failure To Display The Personal Preference™ Line.**

154. Select Comfort explained to Sleepy's that the sales program for the Personal Preference™ line was premised upon a three-bed setup and that it was necessary to have three beds on Sleepy's showroom floors because a salesperson could sell off one bed to another as part of its customer-facing sales strategy. (Michael Bookbinder, Trial Tr. 342:7–16; Bruce Bauman, Trial Tr. 2302:23–2304:11.)

155. Sleepy's changed Section 3(f) of the Dealer Agreement to reflect that Sleepy's would display three beds in 80% of its stores instead of each of its stores. (Michael Bookbinder, Trial Tr. 342:4–6.)

156. Under Section 3(f) of the Retail Partner Agreement, Sleepy's was required to:

(f) Display in at least 80 percent of retail partners authorized locations with a minimum usable retail store space of 3,000 square feet, three queen size Select Comfort product sample sets in a manner consistent with the promotion and enhancement of the Select Comfort and Sleep Number and Personal Preference brand image, and agree Select Comfort will be its exclusive supplier of airbeds.

(Michael Bookbinder, Trial Tr. 341:13–24; Px 133.)

157. Sleepy's displayed fewer than three beds at several of its stores, and the number of beds where it displayed less than three beds increased over time. (Bruce Bauman, Trial Tr. 2304:18–2305:8, 2379:13–2380:3; D-166.)

158.    In January 2006, Select Comfort informed Sleepy's that it was uncomfortable with the number of stores in the expansion area where Sleepy's was displaying only two beds, rather than the three Personal Preference™ beds.  (Michael Bookbinder, Trial Tr. 390:16–391:17; D-191.)

159.    Virtually every other Retail Partner displayed three beds in all of its stores. (Bruce Bauman, Trial Tr. 2304:18–2305:8.)

**E.    Sleepy's Failure To Show The Personal Preference™ Product.**

160.    Sleepy's failure to sell the Personal Preference™ product is attributable to its own actions:

- Sleepy's salespeople were "afraid" to sell Select Comfort's products.  (Michael Bookbinder, Trial Tr. 426:4–428:3; D-72 at 1.)

- Sleepy's sales force had not taken to the Personal Preference™ product.  (Michael Bookbinder, Trial Tr. 483:10–13; D-69 at 2.)

- Sleepy's did not have enough salespeople to cover all of the customers that were coming into its stores.  (Michael Bookbinder, Trial Tr. 482:12–483:9; D-69 at 1.)

- Sleepy's salespeople were not showing the Select Comfort products.  (Michael Bookbinder, Trial Tr. 453:12–455:7, 483:10–24; D-67; D-69 at 2.)

161.    Sleepy's salespeople did not take the time necessary to sell the Personal Preference™ beds.  (Michael Bookbinder, Trial Tr. 481:19–482:11; D-3; D-69 at 1.)

162.    Sleepy's admitted to Select Comfort that its salespeople were not showing the Personal Preference™ line of beds:

> There are so many customers coming to our stores, our sales people do not, and so far will not, take the time that is required to present and sell the Personal Preference collection of beds.

(Michael Bookbinder, Trial Tr. 478:4–478:15, 185:6–19, 186:21–25; D-3.)

163.   Sleepy's conducted 100–200 secret shops of its own stores each month to determine whether Sleepy's employees were performing up to Sleepy's expectations.  (Michael Bookbinder, Trial Tr. 88:11–22, 271:5–10.)

164.   Through those secret shops Sleepy's admitted that it had an understanding of what was going on at its stores.  (Michael Bookbinder, Trial Tr. 421:19–422:1.)  Sleepy's specifically looked at whether its salespeople were showing products.  (Adam Blank, Trial Tr. 3173:2–20.)  Because of these secret shops, Sleepy's knew exactly what was going on at its stores and determined that its salespeople were not showing the products.

**F.     Sleepy's Sales Force Itself Disparaged The Personal Preference™ Beds, Resulting In Lower Sales.**

165.   In August or September 2005, Tim Werner raised some complaints to Michael Bookbinder regarding allegations that Sleepy's employees were stating untruthful or disparaging things about Select Comfort or the Personal Preference™ line of beds, including:

- That the stores carry the same products and Sleepy's sell them for less than the Select Comfort malls stores do;

- Select Comfort products have a "mold issue";

- Select Comfort stores are no longer open;

- Select Comfort is not doing well, and that is why Sleepy's is carrying the products;

- Sleepy's carries the latest versions of the Sleep Number beds, and Select Comfort carries outdated models.

(Michael Bookbinder, Trial Tr. 411:13–415:11, 416:3–20; D-209.)

166.   Mr. Bookbinder responded to the complaints by instructing his regional managers to look into the complaints and by informing Sleepy's employees that they were not to disparage a competitor.  (Michael Bookbinder, Trial Tr. 416:16–20; D-209.)

28

167.    Mr. Bookbinder felt this was an appropriate way to handle the issues Mr. Werner had raised.  (Michael Bookbinder, Trial Tr. 416:21–417:1.)  Sleepy's did not introduce evidence that any disciplinary action was taken as a result of these statements.

168.    Sleepy's internal documents also discuss how its salespeople were "knocking," "denigrating" and "disparaging" Select Comfort and the Personal Preference™ line.  (Michael Bookbinder, Trial Tr. 429:1–434:23, 505:20–506:12; D-116; D-117; D-209.)

169.    On April 7, 2006, Mr. Bookbinder sent an email, voicemail, or both to Sleepy's entire Nassau County and Suffolk County sales force, informing them that "shoppers did not have a positive experience with Sleepy's.  Not one sales person introduced the shopper to the Sleep Number bed.  According to the shopper, the sales people were more interested in selling inner springs or Temper-Pedic," and "[t]he shoppers found that Sleepy's sales people were pushing for great deals, trying to get a deposit instead of selling the value of the merchandise and the value of the product and that they were extremely aggressive.  In a few instances the sales person was negative about the Sleep Number brand, [and] tried to steer the shoppers toward other products."  (Michael Bookbinder, Trial Tr. 429:1–435:17; D-116.)

170.    Sleepy's executives acknowledge that in a sales industry, like the bedding industry, salespeople sometimes say things they should not.  (Michael Bookbinder, Trial Tr. 417:7–10.)

171.    When this does occur, Sleepy's believes the appropriate way to deal with the instances is by talking to the employees who made the inappropriate statements.  (Michael Bookbinder, Trial Tr. 416:24–417:15.)

172.    To the extent similar issues were raised by Sleepy's relating to allegations directed toward Select Comfort's sales employees, Select Comfort responded in the same way. (Tim Werner, Trial Tr. 2652:9–2656:21; Bruce Bauman, Trial Tr. 2354:20–2357:15.)

173.    Sleepy's and Select Comfort had established an understood course of performance when these situations arose on either side.  (Tim Werner, Trial Tr. 2652:9–2656:21; Bruce Bauman, Trial Tr. 2354:20–2357:15; Keith Spurgeon, Trial Tr. 2778:14–19.)

### G.    Sleepy's Internal Analysis.

174.    On September 8, 2006—as the one year term of the dealer Agreement was drawing to a close—Harry Acker directed Michael Bookbinder to send a questionnaire to Sleepy's sales force requesting feedback on the Select Comfort product including, among other things, whether the Select Comfort products were an asset and whether they should be replaced with another product in order to "figure out what Sleepy's should do in relationship to this merchandise."  (Michael Bookbinder, Trial Tr. 455:9–458:5, 459:15–460:14; D-32; D-26.)

175.    Mr. Bookbinder sent that survey to Sleepy's sales force and Sleepy's received over 140 answers to the survey. (Michael Bookbinder, Trial Tr. 458:7–13; D-26.)

176.    Some of Sleepy's salespeople admitted, among other things, to "selling off of" the Select Comfort bed, "steering customers away" from it, and telling customers that it is an "overpriced air mattress."  (D-26 at SP002029, SP002032, SP002059, SP002070.)  There is no evidence that Sleepy's disciplined or dissuaded these employees from continuing such practices.

177.    In an October 3, 2006 transcript, Harry Acker stated that Sleepy's had "carefully investigated" the reasons why Sleepy's was failing to sell the Personal Preference™ line of beds and that the reasons included management's refusal to support the Retail Partner relationship:

> We have investigated carefully and have spoken to a lot of our salespeople and we are willing to share with you a lot of feedback from them.

30

***

Our sales people feel like you are an adversary, not a partner, and personally we agree with them.  We don't think they have been trained to sell the product properly.  A lot of our sales people feel that the Select Comfort product is inferior to other merchandise that we carry….

(Michael Bookbinder, Trial Tr. 484:9–487:17; D-123.)

178.    The results of Sleepy's investigation did not include any attribution of Sleepy's poor sales to Select Comfort sales personnel allegedly making disparaging statements about Sleepy's or the Personal Preference™ line of products Sleepy's carried.  (Michael Bookbinder, Trial Tr. 480:1–481:17, 484:9–488:5; D-3; D-123.)

179.    Later, on January 4, 2007 (after planning to bring this lawsuit), Harry Acker sent an e-mail to Sleepy's entire sales force specifically inquiring as to whether Select Comfort salespeople were saying negative things about Sleepy's and instructing his sales force, "to send an e-mail to Mike Bookbinder if they have had contact with consumers who have said that the Select Comfort store salespeople have been saying negative things about Sleepy's or about the products that we carry from Select Comfort."  (Michael Bookbinder, Trial Tr. 498:25–501:6, D-36.)  Sleepy's received no responses, clearly indicating that Sleepy's sales force heard no such comments from customers.  In fact, Sleepy's internal documents fail to show a single instance where a salesperson complained of comments made by Select Comfort salespeople.  (*Id*.)

180.    During the term of the Dealer Agreement, Sleepy's never told Select Comfort that Sleepy's believed that it had lost sales due to statements made by Select Comfort's sales force.  (Michael Bookbinder, Trial Tr. 480:19–481:12; D-3.)

31

## H.     Thomas Weisel Partners Reported Similar Behavior.[1]

181.    In the spring of 2006, an independent investment group called Thomas Weisel Partners LLC ("TWP") conducted an analysis of Select Comfort's Retail Partner program which resulted in consistent findings.  TWP was not hired by Select Comfort nor is it affiliated with Select Comfort.   TWP visited 7 of Select Comfort's 11 Retail Partners, including Plaintiff. TWP's report of its research ("Weisel Report") was a clear indictment of Plaintiff's culture and efforts to sell the Sleep Number bed.  The report noted that "with the exception of Sleepy's, we generally had positive experiences" and included a subheading stating "Extremely negative experience at Sleepy's."  TWP also provided several factual observations of Plaintiff:

- "consistently unimpressed with the customer care, product knowledge and overall store environment;"

- "the store personnel were extremely aggressive;"

- "[i]n a few instances, the sales person was negative about the Sleep Number brand and tried to steer us toward other products;"

- "salespersons had a 'car salesmen-like' mentality;"

- "salesmen created an uncomfortable environment;"

- "Aside from Sleepy's, we believe that all other retail partners accurately portrayed [Select Comfort] in their stores."

TWP ranked the Retail Partners in several categories such as store environment, knowledge of Select Comfort product, honesty, not pushing promotions, and product offering.  TWP noted that Plaintiff "was consistently at the bottom of the rankings" and received a 2 out of 5 for "honesty while all other Retail Partners scored a 4 or 4.5."  TWP also noted that "in most circumstances,

---

[1]     During trial, Defendant attempted to introduce Defendant's Exhibit D-22, drawing objections from Plaintiff.  The admissibility of this document is an open issue.  See discussion on p. 50, *infra*.

the customer does not walk away with a poor image of Select Comfort (or any other brand) but a poor image of Sleepy's in general."  (D-22.)

182.    Tim Werner from Select Comfort gave Michael Bookbinder a copy of the Weisel Report.  (Trial Tr. 438:9–11.)  Mr. Bookbinder described the Weisel Report as a report prepared by a research company that had performed secret shops of some of Select Comfort's Retail Partners to evaluate Select Comfort's retail partner program.  (*Id*. at 430:3–13; 437:7–11.)

183.    In response to his receipt of the Weisel Report, on April 7, 2006, Mr. Bookbinder sent an email, voicemail, or both to Plaintiff's entire Nassau and Suffolk sales force discussing the report's contents.  (*Id*. at 429:1–430:1; 430:14–16; D-116.)  Mr. Bookbinder believed the statements in the Weisel Report were true.  (Michael Bookbinder, Trial Tr. 431:16–432:4, 6–11; 432:22–433:9.)

**I.    Select Comfort Sought A Business Review Meeting With Sleepy's.**

184.    On August 1, 2006, over a month before the Dealer Agreement expired, Select Comfort requested and pursued a business review meeting with Sleepy's to discuss the business relationship.  (Bruce Bauman, Trial Tr. 2375:4–6; Michael Bookbinder, Trial Tr. 239:23–240:13, 474:24–475:24; D-3; Px 28.)

185.    Select Comfort's reason for requesting the meeting two months prior to the expiration of the Dealer Agreement was to review Sleepy's performance to date, discuss Sleepy's lack of advertising, and determine whether Sleepy's was willing to make certain adjustments and adhere to the critical success factors that Select Comfort determined were necessary for success of the business relationship should Select Comfort elect to continue it. (Bruce Bauman, Trial Tr. 2399:25–2400:24; D-177 at 9.)

186.    Select Comfort specifically advised Sleepy's that the meeting was about Sleepy's poor performance and was "much more than a general business update meeting."   (D-3 at SP000070; D-177 at SLCO0006828.)

187.    The meeting was scheduled for September 7, 2006.  (Michael Bookbinder, Trial Tr. 240:14–21; Bruce Bauman, Trial Tr. 2394:9–2395:7; Px 28; D-177.)

188.    The Dealer Agreement terminated on September 30, 2006.  (Michael Bookbinder, Trial Tr. 189:3–7; Px 133 § 9(a).)

189.    Select Comfort prepared a draft PowerPoint presentation for the scheduled September 7, 2006 meeting which identified that the Dealer Agreement terminated on September 30, 2006 and contained no discussion of extending the term or waiving that expiration.  (Bruce Bauman, Trial Tr. 2377:2–17, 2380:16–2381:4; D-166.)

190.    Sleepy's was aware that the Dealer Agreement was terminating and that Select Comfort was considering whether or not to continue the business relationship.  (D-69 at 3, 4.)

191.    Sleepy's cancelled the September 7, 2006 meeting, and throughout the fall and winter of 2006, scheduled, cancelled and rescheduled the meeting multiple times.  (Michael Bookbinder, Trial Tr. 239:23–241:4, 244:13–20, 477:3–24; Bruce Bauman, Trial Tr. 2394:9–2395:7, 2407:14–25; Px 28; D-177; D-3; D-193.)

192.    Sleepy's internal documents confirm that it intentionally delayed the business review meeting past the end of the term of the Dealer Agreement so that it could perform secret shops of Select Comfort's stores and attempt to leverage a continued business relationship or bring a lawsuit.  (Michael Bookbinder, Trial Tr. 244:9–20; Michael Bookbinder, Trial Tr. 491:20–492:17; D-95 at SP009056, SP009059.)

34

193.    On November 6, 2006, Mr. Bookbinder participated in a telephone conference with Harry Acker, Plaintiff's CEO.  (Michael Bookbinder, Trial Tr. 488:12–489:11; D-95.)

194.    During that telephone conference, Mr. Bookbinder, Mr. Acker and Mr. Fishman reviewed the results of a secret shop of a Select Comfort store conducted by Anthony Colon.  (D-95.)

195.    During this telephone conference, Mr. Acker stated:

This may be an enormous fabulous lawsuit for Sleepy's to collect damages…

This may be very good because if we start getting involved in a lawsuit especially in a class action and it gets publicity it will not be good for them.  This cannot help them at all in the industry, it won't mean a thing to the consumer, but it will for people who want to do business with them.

Get all of this information to Adam [Blank] and another law firm, one that specializes in this.

(Michael Bookbinder, Trial Tr. 493:23–495:9, D-95.)

196.    During this telephone conference, Mr. Acker instructed his employees to once more delay the business review meeting, which had been rescheduled to take place on November 9, 2006, to give Sleepy's time to conduct a "blitz" of secret shops of Select Comfort stores, stating "I would like to see if we could drag this out because I need more time."  (Michael Bookbinder, Trial Tr. 244:13–20, 492:8–11, 496:19–497:14; D-95 at SP009059.)

## VI.    SLEEPY'S SECRET SHOPS.

### A.    Sleepy's Directed Its Employees To Solicit Statements About Sleepy's.

197.    On November 6, 2006 or November 7, 2006, after his telephone conference with Harry Acker, Michael Bookbinder sent an e-mail to Sleepy's Regional Vice Presidents, Regional Managers and Area Managers to conduct the "blitz" of secret shops in each Sleepy's market area where Select Comfort had stores.  (Michael Bookbinder, Trial Tr. 244:6–12, 520:23–523:13, 530:20–531:21, 531:21–532:10; D-295.)

35

198.    It appears that the instructions for these initial secret shops were that:

- "EACH RM [REGIONAL MANAGER] OR AM [AREA MANAGER] NEEDS TO DO A SHOP; HARRY IS ASKING FOR THIS."

- "WE WANT TO KNOW SPECIFICALLY WHAT SELECT COMFORT SAYS ABOUT SLEEPY'S."

- "WHAT ARE THE DIFFERENCES IN THEIR BEDS AND OUR BEDS?"

- "DO THEY SAY THAT THEIR BEDS ARE BETTER THAN OURS?"

- "DO THEY DENIGRATE SLEEPY'S OR THE PRODUCTS WE SELL?"

- "YOU NEED TO HAVE THIS DONE WEDNESDAY; SORRY ABOUT THAT."

- "THE SHOP NEEDS TO BE ON TAPE."

- "THERE NEEDS TO BE A BULLET POINT SYNPOSIS SENT TO MY ATTENTION."

(Michael Bookbinder, Trial Tr. 523:15–525:9; D-295; *see also* Anthony Perez, Trial Tr. 939:12–940:8, 982:12–16; Robert Gorman, Trial Tr. 1268:25–1269:17; Michael Grinnan, Trial Tr. 1302:13–1303:22; Paul Mahoney, Trial Tr. 1900:13–21.)

199.    The original e-mail instructions were destroyed by Sleepy's even though the e-mail was clearly sent after Sleepy's began contemplating litigation against Select Comfort. Sleepy's has never provided the date the e-mail instructions were destroyed.   (Michael Bookbinder, Trial Tr. 493:23–495:9, 530:20–531:21, 531:21–532:10; *see also* Anthony Perez, Trial Tr. 985:4–17; Michael Grinnan, Trial Tr. 1302:17–1303:1; Paul Mahoney, Trial Tr. 1900:13–1901:5.)

200.    Michael Bookbinder wanted the shop reports by November 8, 2006.  (Michael Bookbinder, Trial Tr. 244:6–12.)

201.    During the secret shops, Sleepy's employees posed as customers and visited Select Comfort stores in order to solicit statements from Select Comfort employees commenting on Sleepy's.  (Michael Bookbinder, Trial Tr. 535:9–12.)

36

202.    These secret shops were performed by employees of Sleepy's at the request of

Sleepy's.  (Anthony Perez, Trial Tr. 938:20–22, 955:3–7; Robert Gorman, Trial Tr. 1260:19–20;

Michael Grinnan, Trial Tr. 1299:15–24; David Kapij, Trial Tr. 1626:13–22, 1649:7–11, 1661:2–

4, 1683:14–19; Paul Mahoney, Trial Tr. 1899:24–1900:4.)

203.    In order to get the Select Comfort salespeople to make statements about Sleepy's

to use in this lawsuit:

- Sleepy's secret shoppers were the individuals who first mentioned Sleepy's.  (*See* James Constantinides, Trial Tr. 610:17–23; Gerald Petrillo, Trial Tr. 844:4–10; Joseph Seth, Trial Tr. 931:14–17; Michael Grinnan, Trial Tr. 1364:10–21, 1370:12–1371:22.)

- Sleepy's employees invited Select Comfort employees to comment on Sleepy's by asking about the differences between Sleepy's and Select Comfort. (*See* Anthony Colon, Trial Tr. 865:14–866:2; Steve Puran, Trial Tr. 1145:18–22; Robert Gorman, Trial Tr. 1261:22–1262:10; Michael Grinnan, Trial Tr. 1370:12–1371:22; Sarah Mahaffy, Trial Tr. 1427:16–1428:7; John Giacobbe, Trial Tr. 1597:18–1598:10; Paul Mahoney, Trial Tr. 1904:1–1905:12.)

- In some instances, the Sleepy's employees intentionally directed the topic of conversation back to Sleepy's when the salesperson avoided talking about Sleepy's. (*See* Gerald Petrillo, Trial Tr. 844:4–10; Joseph Seth, Trial Tr. 910:15–911:10; Michael Grinnan, Trial Tr. 1359:17–1363:16.)

204.    Additional Sleepy's employees were provided instructions for more secret shops

of Select Comfort stores.  The instructions stated that they "must mention that [they] have

shopped at a Sleepy's store" and "would like to know what the differences are between the beds

sold at the Select Comfort store and those sold at Sleepy's."  (D-34 at 2; *see also* Jesus Arroyo,

Trial Tr. 629:13–16, 658:3–659:18; Gerald Petrillo, Trial Tr. 814:15–815:4, 839:2–21; Joseph

Seth, Trial Tr. 929:6–930:11, 955:10–16; Robert Gorman, Trial Tr. 1240:19–25; Tyler Paiva,

Trial Tr. 1430:1–8; Paul Mahoney, Trial Tr. 1913:3–1914:18, 1938:2–8.)

205.    They were instructed that this was the "information we need."  (D-34 at 2.)

## B.   Sleepy's Destroyed The Original Shop Report Evidence.

206.   Sleepy's secret shoppers all claim to have created written reports of their secret shops which were sent by e-mail to Sleepy's management, or audio recordings that were delivered to either Michael Bookbinder or Sam Retenski (Mr. Bookbinder's assistant).  (Michael Bookbinder, Trial Tr. 527:7–18; James Constantinides, Trial Tr. 584:2–12; Jesus Arroyo, Trial Tr. 637:4–7; Deborah Zaffron, Trial Tr. 703:10–21, 728:18–24, 716:17–718:9, 742:18–743:14, 744:6–7, 751:20–752:4, 764:3–5; Gerald Petrillo, Trial Tr. 823:24–824:2; Anthony Colon, Trial Tr. 868:11–19, 888:25–889:4;   Joseph Seth, Trial Tr. 915:20–916:5, 919:23–920:2; Anthony Perez, Trial Tr. 941:16–23, 954:6–11; Steve Puran, Trial Tr. 122:25–1123:12; Tyler Paiva, Trial Tr. 1154:18–24, 1166:21–1167:12, 1174:15–1175:5, 1192:15–22; Robert Gorman, Trial Tr. 1241:2–1242:5, 1261:2–3, 1265:24–1266:13; Michael Grinnan, Trial Tr. 1308:24–1309:21, 1338:13–1339:1, 1344:22–1345:5, 1316:18–1317:1; Jacqueline Gruman, Trial Tr. 1460:4–5, 1467:9–18, 1471:20–22, 1473:10–16; Joseph Kilty, Trial Tr. 1505:23–1506:11, 1513:10–21, 1522:1–1523:11, 1554:6–16, 1572:22–1574:24; David Kapij, Trial Tr. 1635:22–1636:10, 1671:22–1672:3, 1685:11–23, 1639:7–10, 1655:6–8, 1658:12–1659:2, 1677:2–24; Paul Mahoney, Trial Tr. 1905:13–16, 1915:22–1916:1, 1925:3–19, 1929:24–1930:10.)

207.   All of these reports and emails were destroyed by Sleepy's; in fact, notwithstanding that litigation was not only contemplated, but planned, at the time the secret shops were taking place, neither Mr. Bookbinder nor the secret shoppers retained their original notes, shop reports, e-mails or recordings of the secret shops.  (Michael Bookbinder, Trial Tr. 536:2–9;  Anthony Colon, Trial Tr. 890:12–891:7; Joseph Seth, Trial Tr. 922:24–25; 932:3–8; Anthony Perez, Trial Tr. 947:17–948:10, 951:13–17; Steve Puran, Trial Tr. 1135:15–19; Tyler Paiva, Trial Tr. 1224:18–1225:23; Robert Gorman, Trial Tr. 1270:8–13; Michael Grinnan, Trial Tr. 1316:24–1317:1; Sarah Mahaffy, Trial Tr. 1413:13–1414:25; Jacqueline Gruman, Trial Tr.

1479:20–1480:21; David Kapij, Trial Tr. 1693:19–1694:2; Paul Mahoney, Trial Tr. 1937:21–1938:1, 1938:22–1939:4, 1940:4–19, 1943:11–23.)

208.    None of the secret shoppers were ever asked for their notes or reports or instructed to preserve such documents.  This is true even after Sleepy's commenced litigation against Select Comfort and after Select Comfort brought a motion for spoliation sanctions.  (*Id*.)

209.    Several of the tapes were recorded over or lost—and then some were found after Select Comfort brought a motion for spoliation.  (Michael Bookbinder, Trial Tr. 536:10–537:21.)

210.    Sleepy's presented testimony about thirty-four secret shops.  However, Sleepy's claimed to have conducted over a hundred secret shops of Select Comfort stores.  (Adam Blank, Trial Tr. 3136:13–21.)

211.    Sleepy's did not identify or present evidence about any actual customer who heard any disparaging statements about Sleepy's made by a Select Comfort employee.

## VII.    THE JANUARY 3, 2006 BUSINESS REVIEW MEETING.

212.    On January 3, 2007, the business review meeting originally sought by Select Comfort on August 1, 2006 finally took place at Sleepy's headquarters to Bethpage, New York.  (Michael Bookbinder, Trial Tr. 244:19–20, 246:11–13.)

213.    At the meeting, before any business discussions could take place, Sleepy's presented Select Comfort with ten secret shop reports, prepared by Sleepy's, of some of the secret shops it had been conducting.  (Michael Bookbinder, Trial Tr. 247:1–11.)

214.    Sleepy's did not identify where those secret shops occurred, who was shopped, or what was said during the secret shops.

215.    Harry Acker threatened that Sleepy's would bring litigation against Select Comfort.  (Bruce Bauman, Trial Tr. 2423:21–23; Keith Spurgeon, Trial Tr. 2827:20–2828:8.)

39

216.    For the January 3, 2007 meeting, Select Comfort had revised the Power Point presentation it created for the originally-scheduled September 7, 2006 meeting, entitled "Sleepy's Business Review," and provided a copy to Sleepy's.  (Bruce Bauman, Trial Tr. 2414:20–2417:1; Px 33; Px 124.)

217.    The document contains a list of "Retail Partner Program Critical Success Factors" including, but not limited to "employee purchase program (help win hearts & minds)," "Establish S/N bed sales as a key performance indicator, set sales performance expectations," and "actively advertise Sleep Number brand, advertise breadth of selection including Sleep Number bed."  (Bruce Bauman, Trial Tr. 2417:2–9; Px 124 at 4.)

218.    The document provided a range of "typical sales results when this level of support is provided" which was contingent upon a Retail Partner satisfying each of the critical success factors.  (Bruce Bauman, Trial Tr. 2417:10–2418:13; Px 124 at 4.)

219.    The Sleepy's Business Review also reiterated that the Dealer Agreement had already expired on September 30, 2006.  (Bruce Bauman, Trial Tr. 2420:9–16; Px 124 at 10.)

220.    On January 3, 2007, the same day as the meeting, Mr. Acker sent an e-mail to Sleepy's entire sales force instructing them not to speak negatively about or denigrate any competitor or any competitor's products.  (Michael Bookbinder, Trial Tr. 498:7–499:14; D-36.)

221.    Sleepy's admitted that it sent this e-mail to its sales force because Sleepy's anticipated that Select Comfort would do its own secret shops of Sleepy's and find that Sleepy's salespersons were denigrating Select Comfort's products.  (Michael Bookbinder, Trial Tr. 499:19–500:16.)

222.    On January 9, 2007, Mr. Bookbinder requested additional secret shops of Select Comfort retail stores.  (Michael Bookbinder, Trial Tr. 300:13–20.)

223.    Mr. Bookbinder sent an e-mail to Sleepy's regional vice presidents stating that he wanted "to make sure that [Sleepy's] cover[ed] every Select Comfort showroom in our trading area, that we want a capable management person to conduct a shop of every Select Comfort store in the area where Sleepy's was doing business."  (Michael Bookbinder, Trial Tr. 300:20–301:7; D-34.)

224.    Mr. Bookbinder included instructions with this e-mail for what Sleepy's wanted its secret shoppers to find out during their shops.  Specifically, Sleepy's presented several topics for its salespeople to inquire about, including:

- if Select Comfort claimed that their products and services were better than their Retail Partners;

- if the Select Comfort people gave any reasons why not to buy from the Retail Partner;

- if anything was specifically said about the freshness of the products; meaning were the products in Sleepy's warehouses less fresh because they were warehoused versus the products sold by Select Comfort;

- if there was any denigration about any of Select Comfort's Retail Partners in Sleepy's trading area;

- what the sales people at Select Comfort said about why there were differences between the Personal Preference retail program and Select Comfort's Core program; and

- if the salesperson said there was any benefit for the consumer buying from a mall store rather than from a Retail Partner.

(Michael Bookbinder, Trial Tr. 302:2–303:14; D-34 at 2.)  This accounts for the so-called "similarities" or "patterns" in reported responses by Sleepy's secret shoppers.

225.    If Sleepy's wasn't a Retail Partner of Select Comfort's in the area where the secret shop was performed, Sleepy's wanted to know what Select Comfort salespeople said about its other Retail Partners, Jordan's Furniture and Better Bedding, as well.  (Michael Bookbinder, Trial Tr. 302:2–303:14; D-34.)

226.    On January 11, 2007, Select Comfort sent Sleepy's a letter stating that it did not intend to extend the term of the Dealer Agreement and specifically reiterated that the Dealer Agreement had terminated on September 30, 2006.  (Michael Bookbinder, Trial Tr. 296:9–17; Keith Spurgeon, Trial Tr. 2771:19–25; Px 31.)

227.    Mr. Spurgeon proposed that Sleepy's continue selling off its inventory through the end of February 2007 while the parties wound up the relationship.  (Michael Bookbinder, Trial Tr. 296:20–24.)

228.    As provided in Section 9(e) of the Dealer Agreement, the termination date of the agreement—September 30, 2006—could only be waived expressly, in writing, by Select Comfort.  (Px 133 at § 9(e).)

229.    Select Comfort never provided an express written waiver of the termination of the Dealer Agreement.  (Keith Spurgeon, Trial Tr. 2826:12–25; Bruce Bauman, Trial Tr. 2332:20–2333:10; Bruce Bauman, Trial Tr. 2413:9–2414:6.)

230.    Select Comfort never waived, or intended to waive, the September 30, 2006 termination of the Dealer Agreement.  (Bruce Bauman, Trial Tr. 2413:20–2414:6.)

231.    Select Comfort continued to provide product to Sleepy's after September 30, 2006, in reliance on the plain language of Section 9(e) of the Dealer Agreement, which provided that "[t]he conduct by either of the parties after termination of this Agreement, including without limitation any sale of the Products, will not be construed as a waiver of termination of this Agreement or as an extension or continuation of the term of this Agreement."  (Bruce Bauman, Trial Tr. 2333:11–15; Bruce Bauman, Trial Tr. 2412:22–2413:19; Keith Spurgeon, Trial Tr. 2826:3–25; Michael Bookbinder, Trial Tr. 189:8–191:11; Px 133 at § 9(e).)

232.    On January 23, 2007, Sleepy's advised Select Comfort that it refused to discuss the wind-up of the relationship and demanded that Select Comfort release a pending order for merchandise to it "and all future orders" that it placed.  (Michael Bookbinder, Trial Tr. 297:12–299:2; Px 81.)

233.    On January 23, 2007, Mr. McLaughlin sent Mr. Acker a letter assuring that any disparagement or denigration of any partner, supplier, or competitor is not endorsed or tolerated by Select Comfort.  The letter also advised Mr. Acker that Select Comfort took immediate action to address the reported behavior and put the Select Comfort teams on notice that Select Comfort would not tolerate this behavior.  (Michael Bookbinder, Trial Tr. 299:4–300:11; Px 145.)

234.    Sleepy's continued to send out secret shoppers in January 2007 and throughout the year for use in this lawsuit, with various instructions and scenarios drafted by Sleepy's with instructions to bring Sleepy's into conversations and to prompt Select Comfort sales associates to say negative things.  (D-34 at 2; *see also* Jesus Arroyo, Trial Tr. 629:13–16, 658:3–659:18; Gerald Petrillo, Trial Tr. 814:15–815:4, 839:2–21; Joseph Seth, Trial Tr. 929:6–930:11, 955:10–16; Robert Gorman, Trial Tr. 1240:19–25; Tyler Paiva, Trial Tr. 1430:1–8; Paul Mahoney, Trial Tr. 1913:3–1914:18, 1938:2–8.)

235.    As with the earlier secret shops, no original documents, notes or reports were preserved by Sleepy's.  None of the secret shoppers were asked to retain or provide such documents.  (*See supra* ¶ 231.)

## VIII.   THE WIND-UP AGREEMENT.

236.    The parties negotiated and signed a Wind-Up Agreement on April 18, 2007. (Michael Bookbinder, Trial Tr. 306:2–13; Adam Blank, Trial Tr. 3170:9–22, 3172:6–18; Px 123.)

237.    The Wind-Up Agreement included a mutual non-disparagement provision, similar to the unilateral non-disparagement provision located in Section 3(j) of the Dealer Agreement titled "Mutual Commitment on Non-Disparagement and Release of Claims" that provided:

> Each of the parties will agree to not disparage or denigrate the other party or any of its products, retail stores or other channels of distribution, provided however that either party may make legitimate and factually substantiated product claims and product comparisons consistent with FTC guidelines.

(Px 123 § (3)(a).)

238.    Even at this time, Sleepy's did not complain about the quality of the Personal Preference™ line or reject any shipment of beds.  (Michael Bookbinder, Trial Tr. 369:3–369:6.)

239.    During the course of Sleepy's business relationship with Select Comfort, Sleepy's overall sales improved.   (Adam Blank, Trial Tr. 3178:23–3179:7.)   Sleepy's "sales increased…just over 30 percent" between 2006 and 2007, and "sales again increased over 30 percent" between 2007 and 2008.  (Adam Blank, Trial Tr. 3178:23–3179:7.)

240.    Conversely, sales in Select Comfort's retail stores in the New York area *decreased* during the period of the parties' relationship.  (Dolores Franco, Trial Tr. 1856:25–1858:5.)

241.    After Sleepy's and Select Comfort executed the Wind-Up Agreement, Mr. Acker instructed Sleepy's sales force to lie to customers about why Sleepy's no longer carried Sleep Number® beds.  Specifically, he instructed them to state that Sleepy's "decided to replace [Select Comfort] with special merchandise with latex and some other various materials that we

44

think are comfortable and will give you great night's sleep" if someone asked why Sleepy's didn't carry Select Comfort anymore.  (Michael Bookbinder, Trial Tr. 508:11–509:5; D-125.)

242.    In December 2006, while planning for this lawsuit, Sleepy's was interviewing former Select Comfort employees to look for "evidence" against Select Comfort, including looking for whether the former Select Comfort employees would say that Select Comfort corporate instructed them to say negative things about either Sleepy's or the Personal Preference™ beds.  (Michael Bookbinder, Trial Tr. 511:4–512:12; 514:3–9; D-145.)

243.    The former Select Comfort employees that were interviewed stated that no one from corporate ever instructed them to say anything disparaging about the Retail Partners. (Michael Bookbinder, Trial Tr. 512:13–513:21; D-145.)

244.    In contrast to Sleepy's representation of Select Comfort's sales personnel during trial, in September 2007, Harry Acker and Sleepy's employee, Dan Thigpen, discussed hiring Select Comfort sales people to work at Sleepy's noting their "incredible" "professionalism and talent."  (Michael Bookbinder, Trial Tr. 509:7–511:2; D-97 at 3.)

245.    Sleepy's did target and hire salespeople away from Select Comfort.  (*See, e.g.*, Amy Desrosiers, Trial Tr. 2851:4–5; D-97 at 3.)

246.    Sleepy's claims that it did not perform as well as other Retail Partners because Select Comfort made disparaging comments.  However, Sleepy's expert, Dr. Benjamin Wilner, claims that a consumer was many times more likely to purchase from Sleepy's after visiting a Select Comfort store compared to a consumer who visited a Select Comfort store in another Retail Partner's region would be to then purchase from that other Retail Partner.    (Trial Tr. 60:17–62:4; July 21, 2015).

45

247.    If Select Comfort were disparaging Sleepy's to customers, it would be expected that consumers would be less, not more, likely to buy from Sleepy's than other Retail Partners. (Trial Tr. 158:1 – 159:12, July 22, 2015.)  Select Comfort's expert, Dr. Steven Schwarz noted that "[i]f you had a situation where the disparagement was really affecting consumer behavior, and it was persistent, and it was systematic, and it occurred across stores and over time, if you had all of that, it would be very surprising to see that you have 40 percent approximately more customers who are going to the Sleep Number Store first and then buying the bed at Sleepy's. You would expect something exactly the opposite.  You would expect a much smaller percentage in that crossover rate."  (Trial Tr. 159:3–12, July 22, 2015.)

248.    The sales, cost and profit financial information relied upon by Dr. Wilner was not admitted into evidence, nor was it produced in fact discovery.  No witness authenticated this financial information for accuracy.  Dr. Wilner did not obtain the information from Sleepy's financial department but instead obtained it from Sleepy's IT personnel of unknown position. (Trial Tr. 113:11–17, 115:21–23, July 22, 2015.)

249.    Dr. Wilner also failed to account for how only a handful of Select Comfort stores could have cost Sleepy's tens of thousands of sales by making false statements to potential customers.  (Trial Tr. 159:13–160:11, July 22, 2015.)

250.    Dr. Schwartz further opined that Dr. Wilner did not have a basis to testify to any damages because Sleepy's had not established causation, had not satisfied the Critical Success Factors, had not established that any consumers considered any disparagement material or that there were any identifiable lost sales.  (See generally, Trial Tr. 134:5–163:18, July 22, 2015.)

## BACKGROUND

### I.    PROCEDURAL POSTURE.

Plaintiff Sleepy's commenced this litigation in early 2007 alleging a widespread pattern of disparagement by Defendant Select Comfort's employees of disparaging Select Comfort's own products.  Sleepy's claimed that this caused customers to refrain from purchasing Select Comfort products at Sleepy's stores and deprived Sleepy's of related profits.  Select Comfort denied these allegations and has consistently asserted that this entire case was manufactured by Sleepy's to gain a commercial advantage.

As the first phase of trial concluded, Select Comfort moved for judgment on June 13, 2012.  (Trial Tr. 3302:7–14.)  After formally briefing Select Comfort's prior motion for judgment, the Court granted the motion finding for Select Comfort as a matter of law on certain claims and as the finder of fact on others.  Sleepy's partially appealed the Court's ruling to the Second Circuit.  Sleepy's did not appeal dismissal of its Lanham Act and fraudulent inducement claims.  It also did not appeal certain factual findings and trial rulings made by Court.  Therefore, the judgment on these claims is final and the issues waived.  *U.S. v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (the mandate rule, which is a subsidiary rule of the law-of-the-case doctrine, "generally prohibits the district court from reopening an issue on remand" if the issue was "ripe for review at the time of an initial appeal but was nonetheless foregone").

### II.    THE SECOND CIRCUIT'S APPELLATE DECISION.

"The mandate rule compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Bryce*, 287 F.3d 249, 253 (2d Cir. 2002) (internal quotation marks, citations and emphasis omitted).  "[W]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the

47

issue on remand unless the mandate can reasonably be understood as permitting it to do so." *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001); *see United States v. Stanley*, 54 F.3d 103, 107 (2d Cir.1995) ("'[T]he [mandate] rule forecloses litigation of issues decided by the district court but foregone on appeal or otherwise waived.'" (citation omitted)).

On February 27, 2015, the Second Circuit issued its opinion on Sleepy's appeal. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191 (2d Cir. 2015). The Second Circuit affirmed the Court's dismissal of Sleepy's claim for breach of contract with respect to an alleged breach of Section 4(a) of the Dealer Agreement. It reversed the Court's dismissal on the following claims for specific narrow reasons:

(1) Dismissal of Sleepy's <u>Breach of Contract - Section 4(c)</u>, <u>Breach of Good Faith and Fair Dealing</u>, and <u>Unfair Competition</u> claims were vacated for the narrow reason that the Court erred in its interpretation of the Termination provision of the Dealer Agreement by concluding that it was not possible for the Dealer Agreement to be extended by conduct through operation of § 9 of the Dealer Agreement. *Id.* at 196.

(2) Dismissal of Sleepy's <u>Slander per se</u> claims was vacated based on an erroneous application of the New York law related to the complete defense of consent to a defamation claim. *Id.* at 199.

The Second Circuit also addressed two types of evidentiary rulings made by the district court. It found that certain evidence excluded as hearsay should have been admitted and considered, but for the narrow purpose as evidence of customer state of mind, and not for the truth of the matter. *Id.* at 204–06. It also addressed the admissibility of certain recordings Sleepy's sought to introduce. The Second Circuit found that the district court *may* have erred "to

the extent" it excluded recordings for Sleepy's failure to establish a chain of custody, but it specifically directed the district court to consider the pending issue of spoliation.  *Id.*

Claims, issues and prior findings of fact not specifically appealed by Sleepy's have been waived.  *Ben Zvi*, 242 F.3d at 95; *Norton v. Sam's Club,* 145 F.3d 114, 117–118 (1998).

## III.    OUTSTANDING ISSUES.

In addition to the issues appealed to the Second Circuit and the instructions to this Court on remand, there remain three critical issues on which Select Comfort has pending motions to be resolved by the Court, all of which bear on the outcome of this matter.

### A.    Spoliation.

During trial, Defendant moved to renew its Motion in Limine No. 1 as permitted by this Court's Order dated March 5, 2012, and moved to strike and preclude all evidence of secret shops on grounds of Sleepy's spoliation of evidence.  This issue has been fully briefed.  (Dkt. 686, 723, 770, 771, 785.)  The evidence shows Sleepy's engaged in an egregious pattern of spoliation of the key evidence that Sleepy's alleges support its claims.  Sleepy's destroyed all original instructions for its "blitz" of secret shops.  The instructions are undisputedly important evidence to determine whether the shops were conducted for purposes of "decoying" Select Comfort into this lawsuit.  The record also shows that Sleepy's made no effort to preserve evidence, including handwritten notes, e-mails, original reports and recordings of the secret shops upon which it bases its claims, even though the weight of other evidence introduced at trial proves that the shops were performed to elicit evidence for litigation.  The evidence Sleepy's offered, and repeatedly used to "refresh" its witnesses recollections, were "compilations," which some unidentified person created and altered, and which Sleepy's counsel has further altered to support its case.

49

As a sanction for Sleepy's spoliation of evidence, Select Comfort asks the Court to strike all testimony and exhibits regarding the secret shops Sleepy's admitted into evidence and exclude any pending evidentiary rulings related to secret shop evidence.  During the appeal, the Second Circuit noted that "[a]t the time the court entered judgment on partial findings for Select Comfort, the court had not yet issued a definitive ruling on Select Comfort's spoliation motion. We leave it to the district court to consider that issue, and the consequent admissibility of the relevant shop recordings, on remand."  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 206, n.14) (2d Cir. 2015).

**B.     The Admissibility Of The Thomas Weisel Report.**

In the Spring of 2006, an independent investment group called Thomas Weisel Partners LLC ("TWP") conducted an analysis of Select Comfort's Retail Partner program. (D-22.)  TWP was not hired by Select Comfort nor is it affiliated with Select Comfort.  Prior to trial, Plaintiff moved *in limine* to exclude the Weisel Report from evidence.  The Special Master denied that motion and that denial was adopted by the Court.  (Dkt. 660, 704.)  Sleepy's also objected to Select Comfort's several attempts to introduce this evidence at trial.  Defendant laid proper foundation for the admissibility of this report as (1) a business record of both TWP (now Stifel Nicolaus ) and Select Comfort; and (2) an adoptive admission.  (Bruce Bauman, Trial Tr. 2356:22–2372:1; John Colombo, Trial Tr. 2970:9–2985:11, 3507:2–3008:19; Dkt. 774)  The parties have previously briefed this issue for the Court.  (Dkt. 774, 775.)  Subsequent to that briefing, Plaintiff's expert, Dr. Benjamin Wilner, recently testified that he relied on the Weisel Report in forming his opinion.  (Benjamin Wilner, 82:4–25, July 21, 2015.) Defendant requests that the Court review the record and rule on the admissibility of this evidence so it can be considered part of the trial record.

### C.     The Reliability Of Sleepy's Expert's Opinion.

During the trial in 2012, Sleepy's first put Dr. Wilner on the stand to testify.  At that time, Select Comfort objected to his testimony being received because Sleepy's had failed to admit into evidence its sales, cost and profit information.  (Trial Tr. 3238–39.)  As noted in subsequent questioning of Dr. Wilner, it was clear that he based his entire damage theory on taking Sleepy's sales and profits at certain stores and adding a percentage of additional sales to such stores, which constituted his damages.  Therefore, Sleepy's sales, cost and profit information was critical to his analysis.  Sleepy's, however, never produced the underlying sales information in discovery, did not list it on its trial exhibit list, did not seek to admit it at trial, and did not have any witnesses authenticate it in any manner.  Indeed, part of that failure includes failing to introduce any evidence as to what Sleepy's actual sales were of Select Comfort products and what percentage they comprised of overall sales, a critical component of Dr. Wilner's analysis.  Dr. Wilner acknowledged in his testimony that he did nothing to establish if Sleepy's sales information is correct.  (Trial Tr. 113:11 – 116:19, July 21, 2015)  In fact, Dr. Wilner did not even get the data from Sleepy's financial department, but instead obtained it from persons in Sleepy's IT department (who did not testify).  (Trial Tr. 113:11–17, 115:17–24, July 21, 2015)

Obviously, accuracy is critical because if the data is inflated or inaccurate, it would make Dr. Wilner's simple mathematics theory inflated and inaccurate.  Despite this, and being apprised of this foundational problem three years ago, Sleepy's never sought to remedy this fatal deficiency.  Select Comfort has filed a brief more fully detailing the arguments on this issue and moves that Dr. Wilner's testimony not be considered.

## PROPOSED CONCLUSIONS OF LAW

**I.     SLEEPY'S HAS SUBMITTED NO EVIDENCE OF INJURY OR CAUSATION.**

Sleepy's failed to carry its burden of proof that Select Comfort caused it any damages, or for that matter, that it was damaged at all.  The Second Circuit specifically noted that "these issues remain open on remand."  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 206, n.15) (2d Cir. 2015).  Therefore, the Court begins its analysis by considering this broad, dispositive issue.

### A.     Legal Standard.

Sleepy's alleges damages for lost profit damages, which requires it to prove damages to a "reasonable certainty."  *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000); *Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 235 (N.Y. 1986) ("In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of intervening causes."); *see also Healy v. Carlson Travel Network Assoc.*, 227 F. Supp. 2d 1080, 1088 (D. Minn. 2002).  Such damages must be "capable of measurement based upon known reliable factors *without undue speculation*."  *Schonfeld*, 218 F.3d at 172 (citing *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007 (N.Y. 1993)).  Damages must flow from an actual injury; in other words, damages must be proven, not assumed.  *Fingerlakes Aquaculture, LLC v. Progras Welding Supply, Inc.*, 825 N.Y.S.2d 559, 560 (N.Y. App. Div. 2006) (dismissing action because plaintiff failed to prove any actual damages occurred); *Ortho Pharms. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994) (Plaintiff must show more than its own "subjective belief" that it has been harmed, and that "injury and causation will not be presumed.").

Where, as here, lost profits are based on a new business venture, "a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon

which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford Co.*, 493 N.E.2d at 235.  Minnesota law goes even further—and all of the contract claims are governed by Minnesota law.  "[O]rdinarily proof of lost profits in a new business venture is too speculative to be the basis for recovery." *Healy*, 227 F. Supp. 2d at 1088 (quoting *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977)).

The damages, if proven, must be causally linked to Select Comfort's alleged conduct. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769–70 (2d Cir. 1994).  Therefore, for each of its claims, Sleepy's bears the burden to show not only that it was actually injured, but that Select Comfort's alleged actions "proximately caused" the injury by proving a "direct relationship" between the two.  *Id.*  It was Sleepy's burden to prove causation and damages on each of its claims by a preponderance of the evidence at trial.[2]

### B.    There Is No Direct Evidence Of Causation Or Damages In The Record.

A dramatic omission of evidence in Sleepy's case is its complete lack of direct evidence. Sleepy's lost profits theory of damages rests on the premise that Select Comfort's sales employees made certain allegedly derogatory statements to customers that caused Sleepy's to lose thousands to tens of thousands of customer sales.  But Sleepy's failed to identify, locate, or call even one of these customers to testify at trial, nor were any ever documented in discovery. Likewise, Sleepy's failed to introduce any evidence that any customers heard any disparaging or slanderous statement made by Select Comfort, or that statements made by Select Comfort

---

[2]    *See MapInfo Corp. v. Spatial Re–Eng'g Consultants*, No. 02–CV–1008, 2006 WL 2811816, at *21 (N.D.N.Y. Sept. 28, 2006) (summary judgment for failure to show causation); *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 676 (S.D.N.Y. 2005) (dismissing unfair competition claim for failure to show "causal link" between defendant's actions and alleged losses); *Ammirato v. Duraclean Int'l, Inc.*, No. CV 07–5204, 2011 WL 2730918, at *11 (E.D.N.Y. July 13, 2011) (breach of contract); *Weight Watchers of Quebec Ltd. v. Weight Watchers Int'l, Inc.*, 523 F. Supp. 774, 776 (E.D.N.Y. 1981) (implied covenant of good faith and fair dealing); *Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 533 (S.D.N.Y. 2002) (unfair competition); *Machleder v. Diaz*, 801 F.2d 46, 56 (2d Cir. 1986) (defamation).

influenced even one purchasing decision.  In 2006 and 2007, Plaintiff had 300–400 stores throughout the northeast United States, including the New York metro area, and in over 140 of those stores it sold the Sleep Number® bed, reflecting millions of potential customers.  (Michael Bookbinder, Trial Tr. 74:23–77:1.)  Out of this customer base, Sleepy's failed to introduce evidence of even one potential customer.

Likewise, Sleepy's cannot rely on its secret shop evidence, because it is undisputed that the secrets shops, if credited at all, show only elicited statements made to Sleepy's own employees, not actual customers.  Such evidence is insufficient to support Sleepy's claims or damages.  *See Fashion Boutique of Short Hills v. Fendi USA, Inc.*, No. 91 Civ. 4544, 1998 WL 259942, at *5 (S.D.N.Y. May 21, 1998) ("*Fashion Boutique II*") (statements made to Plaintiff's agents cannot support slander and disparagement claims); *Fashion Boutique of Short Hills v. Fendi USA, Inc.*, 314 F.3d 48, 59–61 (2d Cir. 2002) ("*Fashion Boutique IV*") (affirming exclusion of expert testimony and finding that general damages must be based on loss of actual customers).

In lieu of testimony of actual customers, Sleepy's instead offers evidence from its own current and former employees relaying unsubstantiated stories of a few alleged customers who, they testified, canceled sales.  But this evidence is inadmissible for the purpose of proving either that the Select Comfort employee made the statement or the sale was actually cancelled. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d at 204 (admissible "for the limited purpose of the customer's belief").  While it is probative of unnamed customers' beliefs, its value is rendered useless because Sleepy's failed to introduce other, admissible evidence of the alleged statements or lost sales themselves.  If any of this evidence was trustworthy, it should not have been a monumental task to identify and subpoena the actual customers to testify.

## C.      Sleepy's Cannot Prove Its Case Through Circumstantial Evidence.

Sleepy's has admitted that it has no direct evidence of injury, causation, or damages, and that it has attempted to prove its case "circumstantially."  (Trial Tr. 3297:9–15, 3303:18–20.) But circumstantial evidence of causation and damages in this type of case is almost exclusively used in Lanham Act claims, which has been dismissed in this case.  As will be discussed in greater detail herein, Sleepy's remaining claims cannot be supported by circumstantial evidence of causation and damages.

Plaintiff urges the Court to make several generous inferences that it has failed to prove through direct evidence: (1) an inference that the alleged disparaging statements made to secret shoppers were also made to actual consumers; (2) an inference that such statements adversely influenced customer's purchasing decisions;[3] (3) an inference that such statements had been occurring during the entire business relationship; and (4) an inference that thousands of sales were lost as a result.  But reliance on such a speculative chain of inferences is not consistent with Sleepy's burden to prove lost profit damages to a "reasonable certainty."  *Schonfeld*, 218 F.3d at 172.  Moreover, the Court has already determined as the fact-finder that "Plaintiff failed to prove that these alleged misrepresentations [in the secret shops] were 'disseminated sufficiently to the relevant purchasing public.'"  (Dkt. 825 at 34 (dismissing Lanham Act Claim).)   Where widespread dissemination has not been proven, damages will not be presumed.  *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.* ("*Fashion Boutique III*"), 75 F. Supp. 2d 235,

---

[3]    Plaintiff also asked the Court to assume that certain truthful advertisements by Defendant—which do not mention Plaintiff or the Personal Preference™ line of products in any way—could be confusing and improperly influence consumers.  The Court found that the advertisements were not false or misleading in any way and that Plaintiff failed to introduce evidence of a "consumer response" to its advertisements.  It therefore dismissed Plaintiff's Lanham Act Claim.  These findings were not appealed and are the law of the case for all purposes.

240–41 (S.D.N.Y. 1999), *aff'd*, 314 F.3d 48 (2d Cir. 2002) (refusing to presume special damages in product disparagement action).[4]

### 1.    Sleepy's Failed To Introduce Consumer Evidence.

Even if the Court entertained Sleepy's attempt to prove its causation and damages case circumstantially, Sleepy's would still fail because it failed to introduce sufficient consumer evidence to support its required inferences. *See Ortho Pharms. Corp.*, 32 F.3d at 694–96 (affirming dismissal because plaintiff failed to show that it suffered any injury); *ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 161–63 (2d Cir. 2008) (affirming summary judgment on Lanham Act and common law unfair competition claims because plaintiff failed to offer consumer study evidence, research reports, or evidence "even from a single one of defendants' customers" and presented nothing "aside from [its] own inadmissible speculation"). Probative consumer evidence means actual consumer testimony, or at the very least consumer surveys and/or market studies, and usually includes a combination of these. *Ortho Pharms. Corp.*, 32 F.3d at 695. For example, even if Select Comfort employees made disparaging statements, did consumers find such statements material and did they affect the purchasing decision? Sleepy's did not present any market studies, consumer surveys, expert witnesses, or customer testimony to supply a basis for such generous assumptions. To rule any other way would allow competitors to maintain and prevail in lawsuits for damages against competitors involving nothing more than the secret shop testimony of their own employees.

---

[4]    As will be discussed in further detail on pp. 69–71, 102–103, Sleepy's remaining slander *per se* and unfair competition claims are really unpled product disparagement claims requiring that lost customers be named. *Id.*

2.   **The Evidence Shows That The Extraordinary Inferences Requested By Plaintiff Are Not Justified.**

Not only has Sleepy's failed to introduce the evidence necessary to support its circumstantial case for causation and damages, but the evidence in the record renders Sleepy's inferential leap implausible.  Sleepy's failed to offer any customer testimony and this failure is even more significant in light of evidence demonstrating that before it filed this case, Sleepy's attempted to find actual customers who heard the types of negative statements that form basis of Sleepy's lawsuit.  On January 4, 2007, Harry Acker, Sleepy's CEO, sent a voicemail to the entire Sleepy's sales force in which he specifically instructed:

> I would like everyone who carries Select Comfort in their store to send an e-mail to Mike Bookbinder if they have had contact with consumers who have said that the Select Comfort store salespeople have been saying negative things about Sleepy's or about the products we carry from Select Comfort.

(Michael Bookbinder, Trial Tr. 498:25–501:6, D-36.)  Mr. Bookbinder received no responses.

Further, the undisputed and consistent testimony, including testimony from former Select Comfort employees who worked for Sleepy's at the time of their testimony, confirmed Select Comfort's corporate policy and training to avoid disparaging or speaking negatively about any competitor or Retail Partner at any time—including Sleepy's.   (Dolores Franco, Trial Tr. 1861:13–1865:10; Tim Werner, Trial Tr. 2651:10–2654:4; Amy Desrosiers, Trial Tr. 2864:15–22; Frank Del Vicario, Trial Tr. 2024:5–2025:22.)  Sleepy's has offered no contrary evidence.

Finally, Sleepy's requested damages inference is implausible because Sleepy's claims that its sales as a whole actually improved during the time it carried Select Comfort's products. (Adam Blank, Trial Tr. 3178:23–3179:7.)  In fact, Sleepy's claimed that its sales thrived during the period of its relationship with Select Comfort.  Sleepy's "sales increased . . . just over 30 percent" between 2006 and 2007, and "sales again increased over 30 percent" between 2007 and 2008.  (Adam Blank, Trial Tr. 3178:23–3179:7.)  Accordingly, merely having Sleep Number®

beds on its showroom floors helped boost Sleepy's sales during 2005–2007, which is the exact result Sleepy's had hoped to obtain.[5]  Conversely, Select Comfort's sales declined during the same period of time, negating Sleepy's entire circumstantial theory of sales lost to Select Comfort.  (Dolores Franco, Trial Tr. 1856:25–1858:5.)  Therefore, the only "evidence" in the record that Sleepy's lost any sales or that those lost sales were caused by Select Comfort's actions are the unsubstantiated theories of its corporate executives.  But "when the fact of injury is in issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a [factfinder] can rely."  *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986).

**D.**  **Sleepy's Failed To Sell Sleep Number® Beds Because Of Its Own Actions.**

Sleepy's bore the burden of proof on every one of its claims, yet the evidence supports a finding that the fault for Sleepy's disappointing sales of Sleep Number® beds falls squarely on Sleepy's own shoulders.  This cuts across every one of Sleepy's claims and further undercuts any inference of injury and causation.

**1.**  **Sleepy's Failed To Adequately Advertise The Personal Preference™ Line.**

Unrebutted evidence established that advertising for Select Comfort products is critical to successful sales.  (Tim Werner, Trial Tr. 2634:10–24.)  Select Comfort spends nearly $100 million per year on advertising, and its other Retail Partners did significantly more advertising than Sleepy's.  (Tim Werner, Trial Tr. 2634:21–2636:1, 2641:8–2642:4.)  Sleepy's did not seriously rebut this point, submitting only a small number of ads (nine) that it claimed it ran at some point.  There was no evidence of any television or internet advertising.  During the parties'

---

[5]  The evidence suggests that Sleepy's motive in pursuing a Dealer Agreement with Select Comfort was so that could advertise that "we have them all" (Michael Bookbinder, Trial Tr. 381:8–11; Px 152); in other words, Sleepy's sought to position itself as a one–stop–shop carrying all brands so customers would not shop around.

relationship, Select Comfort identified that a major contributing cause of Sleepy's disappointing sales was Sleepy's lack of advertising of the Personal Preference™ line, as compared to Select Comfort's other successful Retail Partners.   (Tim Werner, Trial Tr. 2641:8–2642:5; Keith Spurgeon, Trial Tr. 2810:3–11.)  This was a material issue from the very beginning.

Sleepy's enticed Select Comfort to enter a relationship by promising to conduct significant advertising.   (Tim Werner, Trial Tr. 2589:1–3; Tim Werner, Trial Tr. 2620:23–2621:9, 2632:18–2634:24, 2636:2–11, 2638:4–2640:15; Keith Spurgeon, Trial Tr. 2794:11–2795:10, 2797:14–2800:16, 2802:10–2803:2; Bruce Bauman, Trial Tr. 2299:20–2300:2; Trial Ex. D-102.)  Sleepy's, however, did not advertise as it had promised.   (Tim Werner, Trial Tr. 2640:16–2641:14; Bruce Bauman, Trial Tr. 2338:20–2340:13; Keith Spurgeon, Trial Tr. 2808:25–2810:2.)  Sleepy's blamed this failure on its territory being limited to Long Island, arguing its advertising would be inefficient.   (Tim Werner, Trial Tr. 2674:2–2676:3; Bruce Bauman, Trial Tr. 2346:16–2347:8; Keith Spurgeon, Trial Tr. 2812:4–2813:20.)  Therefore, in exchange for another promise from Sleepy's to advertise, Select Comfort agreed to expand Sleepy's territory.   (*Id.*; Michael Bookbinder, Trial Tr. 476:15–21.)   Indeed, Harry Acker admitted in an internal recording:

> I thought that if we got New York we would be able to talk our salespeople into selling it.  I guess I talked you into New York and I did promise you that we would promote the product and go crazy.

(Michael Bookbinder, Trial Tr. 482:13–16; D-69.)   Sleepy's again failed to run promised advertising.   (Tim Werner, Trial Tr. 2676:24–2677:12; Bruce Bauman, Trial Tr. 2345:5–12, 2348:4–11; Keith Spurgeon, Trial Tr. 2814:24–25.)

Sleepy's lack of advertising was discussed by the parties on several occasions.   (Bruce Bauman, Trial Tr. 2340:14–19, 2343:23–2344:13.)   Indeed, when pressed about the lack of advertising, Sleepy's acknowledged the failure in writing, stating:

> The major problem that we have with Harry's discussion with you about advertising in New York is really going to sound odd, but we believe it is true. We have created what Harry calls a "monster" at Sleepy's.  There are so many customers coming into our stores, our sales people do not, and so far, will not, take the time that is required to present and sell the Personal Preference collection of beds. . . .  So, Harry ask [sic], what good will it do to spend MORE money (we certainly have NOT ceased, or cut back on print advertising) on TV when we can't handle the customers now?  Good question, right?

(Michael Bookbinder, Trial Tr. 478:4–478:15; D-3.)

Sleepy's internal recordings also establish its failure to run the promised advertising.  At a November 2006 conference among Sleepy's leaders, it was noted that Select Comfort "WILL ALMOST [sic] REQUIRE US TO DO MORE ADVERTISING AS WE PROMISED."  (D-95 at SP009056.)   In another recording, Harry Acker admitted that Sleepy's was not doing the promised electronic advertising: "I CAN TELL YOU RIGHT NOW THAT WE WILL NOT PROMOTE THE PRODUCT ON TV OR RADIO . . . ."  (D-69 at SP008875.)  Sleepy's failure to carry through with its promised advertising, which Select Comfort's other Retail Partners had done, was a major contributor to Sleepy's failure to sell Select Comfort's products.

### 2.    Sleepy's Salespeople's Behavior Undercut Sleepy's Sales Of The Personal Preference™ Line.

#### a.    Sleepy's Salespeople Did Not Show The Product.

Sleepy's internal documents repeatedly reflect that its salespeople were not showing the Personal Preference™ beds to consumers which would, of course, substantially hinder sales of Select Comfort's products.  These documents include statements that:

- Sleepy's salespeople were "afraid" to sell Select Comfort's products.  (Michael Bookbinder, Trial Tr. 426:4–428:3; D-72 at 1.)

- Sleepy's sales force has not taken to the Personal Preference product.  (Michael Bookbinder, Trial Tr. 483:10–13; D-69 at 2.)

- Sleepy's did not have enough salespeople to cover all of the customers that were coming into its stores.  (Michael Bookbinder, Trial Tr. 482:12–483:9; D-69 at 1.)

- Sleepy's salespeople are not showing the Select Comfort products. (Michael Bookbinder, Trial Tr. 453:12–455:7, 483:10–24; D-67; D-69 at 2.)

- Sleepy's salespeople did not take the time necessary to sell the Personal Preference™ beds. (Michael Bookbinder, Trial Tr. 481:19–482:11; D-69 at 1.)[6]

This was not a guess. Sleepy's knew of this significant failure to show the product because it conducted 100-200 secret shops of its own stores *each month* to determine whether Sleepy's employees were performing up to Sleepy's expectations and showing the products. (Michael Bookbinder, Trial Tr. 88:11–22; Michael Bookbinder, Trial Tr. 271:5–10; Adam Blank, Trial Tr. 3173:2–20.) As evidenced by Sleepy's internal documents, it is clear they were not, and that Sleepy's knew that.

### b. Sleepy's Salespeople Were Disparaging The Personal Preference™ Beds.

Sleepy's salespersons were also disparaging Select Comfort and the Personal Preference™ line of beds Sleepy's carried. Unlike Sleepy's, Select Comfort did not need to resort to secret shops to introduce evidence that Sleepy's own salespeople were denigrating the Personal Preference™ beds. For example, shortly before September 8, 2005, Select Comfort sent Sleepy's a list of complaints about comments made by Sleepy's sales force. (Michael Bookbinder, Trial Tr. 411:13–415:11, 416:3–20; D-209.) Sleepy's own internal documents also discuss how its salespeople were "knocking," "denigrating" and "disparaging" Select Comfort and the Personal Preference™ line. (*Id.*; Michael Bookbinder, Trial Tr. 429:1–434:23, 505:20–506:12; D-116; D-117.) Sleepy's conducted a survey of its salespeople, and those salespeople admitted on several occasions to disparaging the Sleep Number bed. (D-26 at SP002029,

---

[6]   Undisputed evidence at trial revealed that selling this type of non–traditional bed takes more time with the customer to walk through the technology and features of the bed. (Dolores Franco, Trial Tr. 1858:15–1861:12.) Select Comfort attempted to train Sleepy's sales people, but it was out of their comfort zone and they resisted it. (Michael Bookbinder, Trial Tr. 478:4–478:15, 185:6–19, 186:21–25; D-3.)

SP002032, SP002059, SP002070.)   In other words, this conduct was apparently accepted by Sleepy's to the point that its salespeople felt comfortable reporting such activity to Sleepy's management.   There is no evidence that these employees were disciplined or that the comments were ever discussed with them.   Significantly, this evidence is straight from Sleepy's internal documents, not the result of secret shops, and it clearly establishes that Sleepy's was regularly disparaging Select Comfort to actual customers.

### 3.    Sleepy's Acknowledged And Identified The Causes Of Its Poor Sales Of Personal Preference™ Products.

As noted above, the evidence shows that during the course of the parties' business relationship, Sleepy's CEO blamed its failure to sell Select Comfort beds on a variety of factors—none of which included disparagement or unfair business practices by Select Comfort. It was only later, when manufacturing this lawsuit to try to leverage a business deal, that Sleepy's zeroed in on its theory in this lawsuit.   Sleepy's has attempted to dismiss the evidence of its own conduct by suggesting that Mr. Acker was just hypothesizing.   However, Mr. Acker chose not to testify at trial, so such explanations are unavailing.   Moreover, these candid internal recordings of Sleepy's management show no signs of being mere hypothesizing.

The case of *Argus Incorporated v. Eastman Kodak Company* is instructive.   801 F.2d 38 (2d Cir. 1986).   In *Argus*, a licensor and distributor of photographic equipment brought an antitrust action against a competing manufacturer claiming that its actions caused the plaintiff's declining sales.   *Id*. at 39.   The district court dismissed the claim because "the damage claims were too speculative to support a recovery."   *Id*. at 40.   The record contained evidence that, during the relevant time period of declining sales, the plaintiff attributed the cause of the decline to various other factors—but not to defendant's actions.   *Id*. at 42–43.   The Second Circuit reviewed the record and found particularly persuasive this evidence of:

62

> contemporaneous explanations proffered by [plaintiff's] management for the severe financial difficulties the company experienced.  The failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim.

*Id*. at 42, 45 (finding plaintiff's causation claims "thoroughly implausible").

Sleepy's internal documents also reveal that it had investigated the reasons why Sleepy's was failing to sell the Personal Preference™ line of beds:

> We have investigated carefully and have spoken to a lot of our salespeople and we are willing to share with you a lot of feedback from them.
>
> ***
>
> Our sales people feel like you are an adversary, not a partner, and personally we agree with them.  We don't think they have been trained to sell the product properly.  A lot of our sales people feel that the Select Comfort product is inferior to other merchandise that we carry . . . .

(Michael Bookbinder, Trial Tr. 484:9–487:17; D-123.)  Importantly, the results of that investigation did not include Select Comfort sales personnel making disparaging statements about Sleepy's or the Personal Preference™ line of products Sleepy's carried.  (Michael Bookbinder, Trial Tr. 480:1–481:17, 484:9–488:4; D-3; D-123.)

Like in *Argus*, there is substantial evidence of causes attributable to Sleepy's own acts and omissions to explain why Sleepy's sales of Select Comfort products were disappointing that were apparent during the course of the parties' business relationship, rendering Sleepy's belated and unproven theory of causation baseless.

### 4.        An Independent Analysis Confirmed Sleepy's Internal Comments.[7]

Thomas Weisel Partners LLC ("TWP") is an independent investment group that analyzes publicly traded companies and makes investment recommendations based on its analysis through reports to investors.  During the spring of 2006, TWP conducted a comprehensive independent analysis of Select Comfort's Retail Partner strategy—that is, the type of business relationship

---

[7]       See discussion regarding the admissibility of the Weisel Report p. 50, *supra*.

Select Comfort had with Sleepy's—and investigated both Sleepy's stores and those of other Retail Partners.  The Weisel Report stated that "with the exception of Sleepy's, we generally had positive experiences", and included a subheading stating "Extremely negative experience at Sleepy's."  (D-22 at 2, 4.)  The report also included the following observations:

- "consistently unimpressed with the customer care, product knowledge and the overall store environment," of Sleepy's;

- "the store personnel were extremely aggressive;"

- "[i]n a few instances, the sales person was negative about the Sleep Number® brand and tried to steer us toward other products;"

- Sleepy's had a "'car salesmen-like' mentality;"

- "salesmen created an uncomfortable environment;"

- "Aside from Sleepy's, we believe that all other retail partners accurately portrayed [Defendant's] luxury sleep brand in their stores."

(D-22 at 2, 4–5, 8.)  In ranking the Retail Partners evaluated for the report in several different categories such as store environment, knowledge of Select Comfort's product, honesty, not pushing promotions, and products offered, the analysts noted that "Sleepy's was consistently at the bottom of the rankings" and received a 2 out of 5 for "honesty" while all other Retail Partners scored a 4 or 4.5.  (D-22 at 4.)

Not only did an independent, unbiased third party make these findings, but Sleepy's was apparently not surprised by them.  Michael Bookbinder testified that he believed them to be true.  (Michael Bookbinder, Trial Tr. 431:16–432:4, 6–11; 432:22–433:9.)

### E.  The Damages Experts.

When the parties returned to conclude the trial, both sides offered expert testimony on damages.  Dr. Benjamin Wilner testified for Sleepy's.  While Dr. Wilner spent great effort in explaining to the Court how he constructed his damages model, he freely admitted that he was

asked to assume causation, while at the same time admitting that his damage model necessarily required that Sleepy's prove it through some sort of consumer evidence.  (Benjamin Wilner, Trial Tr. 51:19–2; 52:5–53:23, July 21, 2015.)  As stated, Sleepy's has failed to prove causation, and therefore, Dr. Wilner's expert testimony is unfounded and irrelevant.

Even if Sleepy's had offered evidence of causation, the result would be the same.  As discussed, the business relationship between the two parties was a new business venture— Sleepy's had no track record of success in selling an airbed product, had no experience selling a product in only a subset of its stores, and the parties had never done business together before.  It is difficult for plaintiffs to meet the strict standard of proof for lost profits in a new business venture because "there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty." *Kenford Co.*, 493 N.E.2d at 235; *Healy*, 227 F. Supp. 2d at 1088 ("[O]rdinarily proof of lost profits in a new business venture is too speculative to be the basis for recovery.")  Dr. Wilner's analysis fails to meet this standard in two ways:  first, it is based on unreliable data; and second, the "benchmark" he uses to substitute for the "reasonable basis of experience" is faulty.  Furthermore, Dr. Wilner's opinion is generally too speculative to offer a sound basis for his damages calculation.

Speculation runs throughout Dr. Wilner's damage theory.  It is based upon a foundation of purported Sleepy's sales information that was not admitted into evidence, was not authenticated, and was not allowed to be tested by Select Comfort through any cross examination.  Sleepy's is not a publicly traded company, and its financial accounting is not transparent.  (Benjamin Wilner, Trial Tr. 113:18–21, July 21, 2015.)  Dr. Wilner did not obtain Sleepy's purported information from anyone in Sleepy's financial department, instead obtained it from Sleepy's IT Department.  (Benjamin Wilner, Trial Tr. 113:11–17, 115:17–23, July 21,

2015)   Dr. Wilner could not even testify that the sales information that he relied on is accurate. Select Comfort's expert, Dr. Steven Schwartz, testified that Dr. Wilner should not have relied on such unverified data or, if he was going to rely on it, that he need to do an analysis to establish its accuracy.   (Steven Schwartz, Trial Tr. 160:23–162:20, July 22, 2015.)   Because neither Dr. Wilner nor Sleepy's did anything to ensure accuracy (or if Sleepy's frequently has to correct financials), as an economist, Dr. Wilner should not have relied on the data.   (*Id.*)

Dr. Wilner also rested his entire damage model on what Sleepy's "reasonably expected" in relation to profits, relying on a single document entitled "Sleepy's Business Review" prepared as a PowerPoint presentation by Select Comfort for the final meeting between the parties.   (Px 124.)   Therefore, it was not a forecast, but a summary.   But the flaw in his approach, as pointed out by Select Comfort's expert, Dr. Steven Schwartz, is that Dr. Wilner did no critical analysis of the benchmark he was using as a starting point from which to calculate Sleepy's purported lost profits, rendering his entire calculation speculative and unreliable. *Fashion Boutique IV*, 314 F.3d 48, 59–61 (2d Cir. 2002) (affirming exclusion of expert testimony in part because he assumed causation and finding that general damages must be based on loss of actual customers).

The speculative nature of Dr. Wilner's opinion is further heightened by there being undisputed evidence that the Critical Success Factors upon which he relied were not satisfied by Sleepy's.   For example, Sleepy's did not advertise like it promised or as well as well as the other Retail Partners.   (Tim Werner, Trial Tr. 2640:16–2641:14; Bruce Bauman, Trial Tr. 2338:20– 2340:13; Keith Spurgeon, Trial Tr. 2808:25–2810:2; (Tim Werner, Trial Tr. 2676:24–2677:12; Bruce Bauman, Trial Tr. 2345:5–12, 2348:4–11; Keith Spurgeon, Trial Tr. 2814:24–25.) Sleepy's did not provide Select Comfort the training access to its sales employees that other Retail Partners allowed, which compromised Sleepy's ability to sell Select Comfort beds.

(Bruce Bauman, Trial Tr. 2337:8–2338:13; Tim Werner, Trial Tr. 2669:12–2670:9.)  Sleepy's did not offer its employees the Employee Purchase Program that Select Comfort had requested and in which other Retail Partners had participated.   (Michael Bookbinder, Trial Tr. 168:6–17, 168:20–170:15, 171:9–173:15; Bruce Bauman, trial Tr. 2242:2–10; D-180.)   And the Weisel Report, prepared by an independent third party, specifically identified Sleepy's as being unlike the other Retail Partner on several critical points. (D-22 at 2, 4–5, 8.)   Select Comfort had compiled the Business Review to point out all the Critical Success Factors that Sleepy's had failed.   Dr. Wilner even acknowledged that his analysis uses numbers contingent upon the Critical Success Factors being satisfied, but that he did to analysis to determine if they were, in fact, satisfied by Sleepy's.   (Benjamin Wilner, Trial Tr. 48:16–49:5, 99:11–113:6; July 21, 2015.)

Dr. Wilner's benchmark is a profit summary of what other, successful Retail Partners were able to achieve under the Retail Partner program, indicated by a percentage of sales increase they enjoyed.   But Dr. Wilner assumed that same increase for Sleepy's while at the same time failing to consider that his calculation is necessarily tied to a critical analysis of the similarity of Sleepy's to other successful Retail Partners and their implementation of a number of best practices that Select Comfort dubbed the "Critical Success Factors."   (Steven Schwartz, 52:5–53:23, July 22, 2015.)   Those factors largely coincide with Sleepy's failings already discussed.

Further adding to the speculative nature of the damages is that Dr. Wilner does not apportion the damages between claims. (Steven Schwartz, Trial Tr. 154:4–156:5.) This is particularly significant because Sleepy's originally asserted and proceeded to trial with a breach a contract claim of Section 4(a) of the Dealer Agreement, which related not to any disparagement

but was a claim that Select Comfort provided inferior product.  This was the same product provided to all other Retail Partners, but Dr. Wilner nevertheless opined that Sleepy's did not do as well as other Retail Partners because Sleepy's received inferior product.  However, all Retail Partners, including Sleepy's, received identical product.  Despite this, Dr. Wilner's damage opinion was the exact same for that claim as it was for the breach of contract disparagement claim, the slander per se claims, and even the now dismissed Lanham Act and fraudulent inducement claims.

Dr. Wilner also lacked knowledge of the parties' relationship.  He did not know the name of the beds being sold by Sleepy's.  (Benjamin Wilner, Trial Tr. 59:20–24, July 21, 2015.)  He did not know how many Select Comfort stores existed in Sleepy's authorized region (Benjamin Wilner, Trial Tr. 60:5–9, July 21, 2015) which is important because Select Comfort had to operate have significant numbers of stores and influence huge volumes of customers to affect the sales of Sleepy's in the manner suggested by Dr. Wilner.

Finally, Dr. Wilner's analysis is also based on Sleepy's sales of Select Comfort being as high of a percentage of overall sales as other Retail Partners.  However, Dr. Wilner did no analysis as to how Sleepy's compared to the other Retail Partners including an analysis of geography, affluence of customers, how many competitive beds were on display, salesperson training, sale prices, or advertising.  To the contrary, Dr. Wilner testified that a greater percentage of persons who shopped at Select Comfort purchased from Sleepy's than other retail partners.  (Benjamin Wilner, Trial Tr. 60:18–62:4, July 21, 2015.)  Of course, this cuts against Sleepy's theory that its sales were impacted by disparaging statements from Select Comfort since consumers were more likely to buy from Sleepy's after having shopped at Select Comfort than from any other Retail Partner.  If Select Comfort was actually engaged in the conduct claimed,

68

the percentage of consumers buying at Sleepy's after shopping at Select Comfort should be less, not greater than other Retail Partners.   Accordingly, Dr. Wilner's speculative opinion, which rests upon the untenable foundation of unadmitted, unauthenticated and unreliable sales and profit data, combined with unsatisfied Critical Success Factors, does not establish any basis for recovery.

Sleepy's has not met its burden of proving lost profits to a reasonable certainty.  *Kenford Co.*, 493 N.E.2d at 235 (in a new business venture, "a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.");  *Healy*, 227 F. Supp. 2d at 1088 ("[O]rdinarily proof of lost profits in a new business venture is too speculative to be the basis for recovery.").   Therefore, Sleepy's claims must be dismissed.

## II.     SLEEPY'S HAS FAILED TO PROVE ITS CLAIM FOR SLANDER *PER SE*.

### A.     Legal Standard.

"Under New York law, the essential elements of a claim of slander are an oral defamatory statement of fact regarding the plaintiff which is published to a third party and which causes the plaintiff injury."  *Fashion Boutique II*, No. 91 Civ. 4544, 1998 WL 259942, at *1 (S.D.N.Y. May 21, 1998); *Snyder v. Sony Music Entm't, Inc.*, 684 N.Y.S.2d 235, 238 (N.Y. App. Div. 1999) ("A cause of action for slander requires publication of the defamatory matter, which occurs when it is heard by some third party.").   As a threshold matter, Sleepy's slander per se claims fail if they do not constitute "defamatory matter."

**B.    Sleepy's Claims Fail Because The Alleged Statements Do Not Constitute Slander Per Se—Rather, They Are Unpled Product Disparagement.**

**1.    The Alleged Statements Do Not Attack Sleepy's Integrity Or Credit.**

The vast majority of Sleepy's claims fail because the statements might only support a claim for product disparagement, not slander per se.  "[S]lander and disparagement of goods constitute distinct causes of action." *Fashion Boutique IV*, 314 F.3d at 59.  "[F]alse statements attacking the <u>integrity or credit</u> of a business constitute slander per se." *Id.*; *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670–71 (1981).   In contrast, an action must be brought as disparagement of goods if the alleged false statement is directed at the <u>quality</u> of the business' goods or services. *Ruder & Finn Inc.*, 52 N.Y.2d at 670–71.  Not only did Sleepy's fail to plead product disparagement claims, but an action for product disparagement can only lie if Plaintiff proves malice and special damages. *Id.*

Almost all of Sleepy's alleged slander per se claims are not based on statements involving its "integrity or credit," but rather are allegations related to the quality of product itself or the quality of Sleepy's services in selling the product.  These alleged statements cannot form the basis of a slander per se claim under New York Law and must be dismissed.  For example, none of the following statements alleged in the Amended Complaint can support a claim for slander per se:

- <u>Fourth Cause of Action</u>: statements relating to the foundation, storage of the product (Am. Compl. ¶ 67);

- <u>Fifth Cause of Action</u>: statements related to quality of the product by comparing it to John Deere tractor at Home Depot (Am. Compl. ¶ 70);

- <u>Sixth Cause of Action</u>: statements related to potential "degradation" of the product because it is stored in a warehouse (Am. Compl. ¶ 73);

- <u>Seventh Cause of Action</u>:  commenting on *Select Comfort's* own handling of products when purchased from a Select Comfort store with no comment on how Sleepy's handles the products it sells (Am. Compl. ¶ 76)

70

- Exhibit E:[8]

  o  11/4/2006 (Shopper Anthony Colon): truthful statements about the differences between Sleepy's and Select Comfort's return, refund, and exchange policies

  o  11/8/2006 (Shopper Michael Grinnan): statements about the product being a "knock-off"

  o  1/17/2006 (Shopper Michael Grinnan):  statements about the model of bed and quality of the foundation

  o  1/10/2007 (Shopper Robert Gorman): statements about the product being a "knock-off"

  o  1/15/2007 (Shopper Joseph Seth): statements about foundation

  o  1/16/2007 (Shopper Paul Mahoney): statement about the differences in the foundation

All of these categories of alleged statements relate to the quality of the product or services—not to Sleepy's integrity or credit.  Therefore, they cannot support a claim for slander per se as a matter of law.  *See Cambridge Assocs. v. Inland Vale Farm Co.*, 497 N.Y.S.2d 751, 753 (N.Y. App. Div. 1986) (finding that allegations of high nitrate levels in water could lead to cancer-causing materials were directed at plaintiff's product, and therefore plaintiff could not maintain an action for slander per se).  Sleepy's did not bring disparagement of goods claims against Select Comfort.  Therefore, each of these claims fail.

But even if Sleepy's had asserted product disparagement claims, those claims would have to be dismissed because Sleepy's failed to prove special damages.  *Ruder & Finn Inc.*, 52 N.Y.2d at 670–71.  Where the loss of customers constitutes the alleged special damages, the individuals who ceased to be customers and who refused to purchase must be named and the exact damages itemized.  *Fashion Boutique IV*, 314 F.3d at 48.  There is no dispute that Sleepy's has not

---

[8]   Plaintiff abandoned four of its original slander *per se* claims.  (Dkt. 825 at 20 n.5, 14.)

identified any lost customers.  Similarly, Sleepy's has not offered any evidence of malice.  Accordingly, Select Comfort is entitled to judgment on each of these claims.

### 2.    Sleepy's Failed To Establish Falsity.

Even if some of Sleepy's purported slander per se claims survived, they must be dismissed because Sleepy's has not met its burden to prove falsity.  "Under well-established principles of law, a plaintiff in a defamation action 'has the burden of showing the falsity of factual assertions.'"  *Prozeralik v. Capital Cities Commc'ns, Inc.*, 626 N.E.2d 34, 37–38 (N.Y. 1993).  Sleepy's has not even attempted to meet this burden.  Rather, it simply points to statements and asks the Court to assume they are false.  Without affirmative proof of falsity, the claims fail.

The Court has already identified a secret shop statement occurring on January 16, 2007, as truthful, and it dismissed that claim.  (Dkt. 825 at 26–27.)  The only remaining potential slander per se claims related to alleged statements related to Sleepy's handling of product warranties, but they, too, must be dismissed.

The first potential claim relates to the secret shop conducted by Deborah Zaffron on November 5, 2007, which includes a statement that "Sleepy's does not honor warranties.  If you buy from Select Comfort, you will always have the real company behind you."  And "Call [Sleepy's] up and you'll find that Sleepy's will not honor [the warranty]."  (Px 3.17).  First, as already explained by the Court, the statement appearing in the Amended Complaint was paraphrased and did not appear in either the secret shoppers "report" or the purported recording of the shop.  (Dkt. 825 at 21.)  This underscores the unreliability of Sleepy's allegations and evidence.  Moreover, it is a true statement that Sleepy's did not handle the warranty on the Select Comfort Personal Preference beds; Select Comfort itself did that.  (Bruce Bauman, Trial Tr. 2311:9–2312:5.)

72

The second potential claim relates to a secret shop conducted by Jacqueline Gruman on February 6, 2007.  Ms. Gruman allegedly visited a Select Comfort store in Pennsylvania where Sleepy's was contractually prohibited from selling or offering the Personal Preference bed at any time.  And she visited the store after both the termination of the Dealer Agreement and after Select Comfort notified Sleepy's, in writing, that the Dealer Agreement would not be renewed. The thrust of Ms. Gruman's testimony is that she told the Select Comfort employee that she had been at the nearby Sleepy's store and that Sleepy's informed her that they could get her a Sleep Number® bed, which was not possible.  Ms. Gruman testified that the Select Comfort employee made derogatory statements that the Sleepy's employee will lie to make a sale, and that Sleepy's does not back up the warranty.  (Jacqueline Gruman, Trial Tr. 1464:5–7, 1466:20–23, 1482:25–1485:21.) With respect to the warranty, as discussed, it is true that Sleepy's does not handle the warranty on Select Comfort products.   Further, Ms. Gruman clearly concocted a poorly-constructed scenario in order to solicit some derogatory response from the Select Comfort employee.   And she testified that the hypothetical she used prompted the Select Comfort employee to respond that Sleepy's will "lie"—which, if the hypothetical had been true (if a Pennsylvania Sleepy's employee had indeed told a customer it could sell a Select Comfort® bed), would be a completely accurate statement by the Select Comfort employee.

Finally, with respect to alleged statements regarding Sleepy's honoring of warranties in general, Sleepy's did not present any evidence to prove the falsity of any statements.  Indeed, Sleepy's General Counsel, Adam Blank, admitted during his testimony that in 2004, the New Jersey Attorney General filed suit against Sleepy's for violations of the State's Consumer Fraud Act alleging the company, among other things, sold defective or damaged products to consumers, failed to deliver merchandise as promised, and misled consumers regarding the

companies' exchange policy and their right to receive refunds.  (Adam Blank, Trial Tr. 3033:20–22, 3038:2–3039:14; D-247.)  He also admitted that during that timeframe, Sleepy's had been the subject of an investigation by the New York City Department of Consumer Affairs for, among other things, failing to honor warranties.  (Adam Blank, Trial Tr. 3013:17–3015:10, 3020:15–21, 3022:8–20, 3023:18–3024:6, D-259; D-263.)  And those investigations were reported in the press, which disseminated that information to the general public for consumption.  (Blank, Trial. Tr. 3027:18–3028:2, 3022:8–20, 3033:20–3041:7.)  While not itself evidence of the truth—that Sleepy's did, indeed, fail to honor warranties—it certainly indicates that Sleepy's had a reputation in the marketplace for such business practices.  Because Sleepy's has not met its burden of proving the falsity of these statements, Sleepy's slander per se claims fail.

### C.   Sleepy's Schemed To "Decoy" Select Comfort Into A Lawsuit, And Therefore Consented To All Allegedly Slanderous Statements.

Even if the statements constituted slander per se, Sleepy's claims fail because it consented to them.

### 1.   Legal Standard.

An essential element for a slander *per se* claim is publication.  Under New York law when a party or a party's agent procures the alleged statement, the requesting party consents to any resulting slander, and the statements are not actionable.  *Wells v. Belstrat Hotel Corp*., 208 N.Y.S. 625, 627–28 (N.Y. App. Div. 1925) ("the plaintiff should not recover damages by reason of an alleged libel which she procured, either herself or by her agent"); *Fashion Boutique II*, 1998 WL 259942, at *5 (S.D.N.Y. May 21, 1998) ("When a plaintiff engages an agent whose mission is to induce defamatory statements, the plaintiff consents to any such resulting defamation.").  In other words, consent confers a complete defense to Plaintiff's slander claims. *Park v. Lewis*, 528 N.Y.S.2d 250, 251 (N.Y. App. Div. 1988) (dismissing claim because plaintiff

"consented to the alleged defamatory statements" by sending its agents into Defendant's business to collect statements about Plaintiff); *see also* Restatement (Second) of Torts § 577 cmt. e (1977); William Lloyd Prosser, et al., *Prosser & Keeton on Torts*, § 114 at 823 (5th ed. 1984).

The Second Circuit vacated the opinion of the Court on this issue, not because the outcome was wrong, but because the Second Circuit found that the Court applied an improper test to analyze consent. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015). The Second Circuit found that "[w]hether republication of an earlier defamation is itself actionable when elicited by the defamed party appears to turn in part on a combination of the defamed party's motivation for eliciting the republication and the degree of certainty of the defamed party's expectation that the statement elicited will be defamatory." *Id.* at 200.

> There is, of course, a close relationship between the degree of assurance the plaintiff possesses that the statement elicited from the defendant will be defamatory and the plaintiff's likely motive in eliciting them. The higher the degree of the plaintiff's certainty that the defendant's statement will be defamatory, the less likely it is that the plaintiff is eliciting them in an "honest inquiry or investigation to ascertain the facts," as expressly condoned by Section 584, and the more likely it is that "the republication is invited only for the purpose of decoying the defendant into a lawsuit," which precludes suit on the elicited republication.

*Id.* Therefore, the Second Circuit expressed the standard as follows:

> When a plaintiff sues for defamation based on a statement of the defendant elicited by the plaintiff with some reason to expect that the defendant's statement might be defamatory, the more the evidence supports the proposition that the plaintiff elicited the statement with a high degree of certain that it would be defamatory, for the purpose of enabling a lawsuit, the stronger the defendant's case for deeming the statement consented to, thus barring the claim.

*Id.* at 201.

## 2. Sleepy's Internal Recording Shows That The Secret Shops Were Conducted To Trap Select Comfort Into A Choice Between Being Sued And Extending The Dealer Agreement.

The record on this issue is very clear through documentary evidence and testimony presented at trial.   On November 6, 2006, Sleepy's executives, Mr. Bookbinder and Mr. Fishman, participated in a telephone conference with Harry Acker, Sleepy's CEO, which was recorded.   (Michael Bookbinder, Trial Tr. 488:12–489:11; D-95.)   During that telephone conference, Mr. Bookbinder, Mr. Acker and Mr. Fishman reviewed the results of a secret shop of a Select Comfort store conducted by Anthony Colon on November 4, 2006.  (D-95.)[9]  During this telephone conference, and in response to reviewing the secret shop, Mr. Acker stated:

> This may be an enormous fabulous lawsuit for Sleepy's to collect damages . . .

> This may be very good because if we start getting involved in a lawsuit especially in a class action and it gets publicity it will not be good for them.  This cannot help them at all in the industry, it won't mean a thing to the consumer, but it will for people who want to do business with them.

> Get all of this information to Adam [Blank] and another law firm, one that specializes in this. . . .

> I want three more shops by area managers looking for the same thing that Tony Colon was looking for. . . .

> This is a good chance that we can sue this man personally for defamation and slander.  Make a note that we can sue him.

> Great slander. I love it.  Next. . . .

(Michael Bookbinder, Trial Tr. 493:23–495:9, D-95.)

---

[9]   The Court explained the discrepancy related to the date in its previous Opinion.  (Dkt. 825 at 13–14 n.3.)   The only other shop predating this meeting was a shop conducted by Deb Zaffron on November 5, 2006.

During this same telephone conference, Mr. Acker further instructed his employees to delay a meeting between the parties scheduled to take place on November 9, 2006,[10] and to conduct a "blitz" of secret shops of Select Comfort stores, stating "I would like to see if we could drag this out because I need more time." (Michael Bookbinder, Trial Tr. 244:13–20, 492:8–11, 496:19–497:14; D-95 at SP009059.)   Harry Acker's admissions are critical to the analysis because "Harry is the boss." (Michael Bookbinder, Trial Tr. 385:15–22; *see also* Bookbinder, Trial Tr. 87:4–6 ("the executive team . . . report[ed] up to Harry Acker, who was the CEO and owner of the company").

Here, the statements Sleepy's relies upon for its slander *per se* claims were solicited by Sleepy's employees under instructions from Sleepy's executives, and, as is clear from the transcript of the internal meeting and Sleepy's CEO's comments, the blitz was for the specific purpose of "decoying the defendant into a lawsuit." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 200 (2d Cir. 2015).  To do so, the shoppers were specifically instructed to find out if Select Comfort's employees "denigrate Sleepy's or the products we sell"? (D-295; *see also* Anthony Perez, Trial Tr. 939:12–940:8, 982:12–16; Robert Gorman, Trial Tr. 1268:25–1269:17; Michael Grinnan, Trial Tr. 1302:13–1303:22; Paul Mahoney, Trial Tr. 1900:13–21.) They were instructed that this was the "information we need." (D-34 at p. 2.)

Sleepy's cannot rely on such solicited comments, designed to support a lawsuit, as a basis of a slander claim. *See Solas v. Jones*, No. 04 Civ. 2980, 2005 WL 525444, at *4 (S.D.N.Y. March 7, 2005) (defamation claims dismissed because except for the solicitation of the

---

[10]   The November 9, 2006 meeting Mr. Acker referenced was the Business Review meeting that Select Comfort had been attempting to schedule to discuss the end of the Dealer Agreement. As will be discussed in more detail, *infra*, Sleepy's used the secret shops in an attempt to solicit actionable statements to leverage an extension or renewal of the Dealer Agreement from Select Comfort.

comments, the defendant would not have made the allegedly defamatory statements); *Wells*, 208 N.Y.S. at 627–28 (same).   Therefore, there has been no publication, an essential element of Sleepy's claims.

### 3. Mr. Colon's "Shop" Cannot Support A Claim For Slander *Per Se*.

Although Mr. Colon's shop appears to be the first shop[11] that Sleepy's relies upon, Mr. Acker's statement that additional people should look for the "same thing Tony Colon was looking for" clearly indicates that Mr. Colon's job was to solicit slander for a lawsuit.   He testified that Mr. Bookbinder personally called him up and requested the shop be conducted—he didn't do it of his own volition.   (Anthony Colon, Trial Tr. 863:22–864:5; 874:16–875:3.)   And his testimony that there were no specific details or instructions is not credible in light of the internal recording confirming that he was "looking for" something specific.   (Compare *id*. and D-95.)   Finally, as noted earlier, nothing in Mr. Colon's shop is actionable as slander per se: it contains truthful statements and general statements about the quality of the products and services at Sleepy's.   (Anthony Colon, Trial Tr. 865:14–868:4.)

### D. The Evidence Cannot Be Admitted To Show A "Pattern And Practice."

On appeal, the Second Circuit noted:

> According to Sleepy's argument, the elicited statements had two purposes.   One was as actionable slanders.   Their second, and perhaps more important, purpose was as evidence demonstrating that Select Comfort's sales force had adopted a pattern and practice of telling customer who inquired about the relative merits of purchasing Select Comfort's merchandise from Sleepy's that the wooden foundations of the beds sold by Sleepy's were defective and that Sleepy's did not honor its warranties.

---

[11]   As discussed, Sleepy's claims to have conducted over 100 Secret Shops on Select Comfort stores, so it is unlikely this was the first one.   It is more likely that prior shops were innocuous, and Mr. Colon's shop was one of the first that Sleepy's conducted with a specific goal—litigation—in mind.   *Sleepy's LLC*, 779 F.3d 191, 201 n.11.

*Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 201–02 (2d Cir. 2015) (citing Fed. R. Evid. 406).   The Second Circuit instructed the Court to consider first (a) whether Sleepy's evidence of statements elicited from Select Comfort showed a pattern and practice on the part of Select Comfort to make such defamatory statement to its customers, and, if so, (b) whether New York law would sustain liability for the incidents of unsolicited slanders so demonstrated.   *Id.*   Both answers are no.   The Court has already found Sleepy's failed to prove "a well-enforced policy to disparage Plaintiff and held, as fact-finder, that alleged misrepresentations [during the secret shops] were not disseminated sufficiently to the relevant purchasing public."   (Dkt. 825 at 33–34.)   This finding of fact is the law of the case and precludes an inference of a pattern and practice as a matter of law.   But even without that finding of fact, there is no "pattern and practice" theory availability to Sleepy's under the circumstance of this case.

### 1.      Pattern And Practice Evidence Is Not Probative Of A Slander *Per Se* Claim.

Select Comfort could find no case law supporting a theory that New York would sustain liability for slander per se claims for assumed slanders proven circumstantially through a "pattern and practice" based on solicited statements.   Nor could it find such support in any other state.   That is not surprising.   The nature of the slander per se claim does not lend itself to proof by "pattern and practice."   To pursue a slander claim, it is critical to know—and prove—exactly what words were spoken to determine whether they had defamatory meaning.   *Evans v. Waldo*, No. 04-CV-566, 2006 WL 2689819, at *2 (E.D.N.Y. Sept. 18, 2006).   Indeed, under New York law, "In an action for libel or slander, the particular words complained of shall be set forth in the complaint".   N.Y. C.P.L.R. 3016 (McKinney 2015).   Proving exactly what words were spoken is inconsistent in general with the inferences that must be made in considering pattern and practice

evidence.  Indeed, such an inference might show, at best, the gist of general statements and could not replicate the necessary context, intent, or meaning of those statements.  The Second Circuit cited *Fashion Boutique IV*, 314 F.3d 48, 62 (2d Cir. 2002), as support for the potential of the pattern-and-practice theory urged by Sleepy's.  But in *Fashion Boutique IV*, the Second Circuit refused to infer widespread disparagement based on evidence of limited isolated instances.  *Id.* The evidence in the present matter compels the same result.

### 2.     Sleepy's Introduced Insufficient Evidence To Show A Pattern And Practice.

"Before a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature." *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 542 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).  The examples offered to establish a pattern of conduct or habit must: (1) demonstrate that the conduct is "a reflexive response to a repeated, specific situation," *U.S. v. Quattrone*, 441 F.3d 153, 192 n.40 (2d Cir. 2006); and (2) be "sufficiently numerous and regular to permit the inference of systematic conduct," *Loussier v. Universal Music Grp., Inc.*, No. 02-2247, 2005 WL 5644420, at *2 (S.D.N.Y. Aug. 30, 2005).

To determine whether the examples offered are sufficiently numerous and regular to permit the inference of systemic conduct, the "adequacy of sampling and the uniformity of response" are controlling considerations.  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1373 (2d Cir. 1988) (affirming exclusion of testimony that defendant disregarded antitrust advice on a handful of occasions where testimony was offered to prove that defendant habitually disregarded antitrust advice); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985) (error to admit collateral evidence of routine practice that falls short of

"adequacy of sampling and uniformity of response" required by Rule 406) (cited with approval by *U.S. Football League*, 842 F.2d at 1373); *Zubulake*, 382 F. Supp. 2d at 542.  In this regard, "[t]he regularity of a party's conduct is tested by the 'ratio of reaction to situations,' which requires 'some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place." *Loussier*, 2005 WL 564420, at *3 (evidence of eight specific instances where defendant purportedly infringed copyrights was inadmissible to demonstrate the defendant engages in a regular and uniform practice of infringing copyright in a manner that constitutes the kind of systemic or semi-automatic conduct necessary to permit the inference of habit where plaintiff had composed "hundreds (or more) songs" during the same period).

Here, assuming *arguendo* that the shop reports had reflected actionable statements, Sleepy's secret shop evidence is not admissible to prove that Select Comfort committed non-solicited instances of slander per se.

First, the alleged conduct at issue is not "reflexive," or "semi-automatic."  *See generally* Fed. R. Evid. 406 advisory committee's notes.  Rather, a discussion in a store with a salesperson could take any number of various paths depending on what factors are present.  Sleepy's has not attempted to introduce any evidence that its secret shopper questions and statements made to Select Comfort employees were standardized in any way and that the standard script was typical of questions and statements of real, actual customers such that the Court could infer that a real customer would ask the same questions and receive the same responses time after time.  For example, the Seventh Circuit Court of Appeals held that evidence of a defendant's breach of contracts through late deliveries and defective performance was not habit or routine-practice evidence that could be used to show that the defendant similarly breached its contract with the

plaintiff because of the necessary differences in the defendant's dealings with different parties. *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1294 (7th Cir. 1988); *see also G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1532–33 (11th Cir. 1985) (excluding evidence of other contract breaches "when considered in the light of Home's contractual dealings with thousands of small subcontractors and the significant differences between the types of contracts involved and the course of dealing required of them").  Moreover, it is undisputed that Select Comfort had a corporate policy against disparagement and that all store personnel were trained on that policy.  (Dolores Franco, Trial Tr. 1861:13–1865:10; Tim Werner, Trial Tr. 2651:10–2654:4.)

Even if the secret shops were the type that could be probative of pattern and practice evidence, there is insufficient regularity or numerosity of examples of the alleged conduct in this case to make that inferential leap.  As discussed earlier, there are millions of potential customers in the geographical area in which Sleepy's was allowed to sell the Personal Preference™ beds. And although that number will significantly decrease when restricted how many of those potential customer visited both a Select Comfort store and a Sleepy's store, Sleepy's did not offer any evidence of that number.  Sleepy's claims to have conducted over one hundred secret shops of Select Comfort stores.  (Adam Blank, Trial Tr. 3136:13–21.)  But it presented testimony about only thirty-four of them—already discarding about two-thirds of the relevant sample.  Of those thirty-four secret shops, Sleepy's identified only twelve potential slanderous events, whittling the ratio of alleged incident to the sample to roughly 1 in 10.  And as discussed previously, most—if not all—of those alleged slanderous incidents are not even actionable as slander per se.  With respect to the remaining shops, not all were negative, and not all were even about Sleepy's.

Finally, there is no evidence regarding how many unique store employees were "shopped."  Indeed, the evidence shows that certain Select Comfort employees were shopped multiple times in an effort to increase the appearance of a "pattern."  For example, after noting allegedly actionable statements from one particular employee, Bill O'Grady (who happened to be a disgruntled former Sleepy's employee), Plaintiff targeted him at least two more times. (Zaffron, Trial Tr. 696:9–697:4; Px 1.11, Gorman, Trial Tr. 1243:3–17, 1245:17–1246:15.) Similarly, Exhibit E to the Amended Complaint indicates that the same employee, identified only as "Bruce," was shopped on two separate occasions, but made different statements each time. Even if the Court considered every one of these secret shops, it would still constitute a woefully insufficient showing of the regularity or numerosity of the examples of the conduct required to establish a pattern and practice.  *See also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 942 F. Supp. 209, 217 (S.D.N.Y. 1996) (holding that "the fact that a handful of employees made disparaging comments to a small fraction of the relevant purchasing public [is not] evidence of a policy to disparage the quality or authenticity of the merchandise sold by [plaintiff]").

## III.   SELECT COMFORT DID NOT BREACH SECTION 4(c) OF THE DEALER AGREEMENT.

Sleepy's brings a breach-of-contract claim based on the allegedly disparaging statements solicited by its secret shoppers.  Section 4(c) states that Select Comfort will:

> Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to Retail Partner by Select Comfort; Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party;

(Px 133 § 4(c).)  Select Comfort's alleged statements do not violate section 4(c) on its face— Sleepy's failed to establish that Section 4(c) applied to anything other than warranty service, the

83

clause in which it is contained.  Sleepy's also failed to present any admissible evidence of an adverse effect on its "Brand Image."  Finally, Sleepy's first breached the contract in the same way alleged by Sleepy's, excusing Select Comfort's performance.

### A.    The Dealer Agreement Terminated On September 30, 2006 And Was Not Extended By Conduct Of The Parties.

All of the alleged "disparaging" statements Sleepy's bases this claim on occurred *after* the Dealer Agreement expired, and therefore there can be no cause of action for breach of contract arising from the alleged statements.  *See Viking Supply v. Nat.'l Cart Co.*, 310 F.3d 1092, 1097–99 (8th Cir. 2002)[12] (no breach when contract expired by its terms before alleged actions constituting breach).

Sleepy's argues that the Dealer Agreement nonetheless continued because the parties maintained a business relationship past the termination date.  The Second Circuit vacated the Court's finding that the plain language of § 9(e) the Dealer Agreement "did not prevent the Dealer Agreement from being extended by the parties' conduct after the Agreement's Initial Term expired on September 30, 2006."  However, because "[t]he court did not confront" Plaintiff's argument that the Dealer Agreement was extended by conduct of the parties" and, if it was, whether Select Comfort breached § 4(c) while the Agreement was in force, the Second Circuit instructed the Court to "rule on those issues on remand."  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 198 (2d Cir. 2015).  The record does not support an extension of the Dealer Agreement by waiver nor does it support a finding that a new contract was implied-in-fact, and therefore, the original holding of the Court that there was no extension and the Dealer Agreement expired should stand.

---

[12]   Minnesota law applies to Sleepy's breach-of-contract claim pursuant to the Dealer Agreement's choice of law provision.  (Px 133 § 11(d).)

The Dealer Agreement, by its terms, terminated on September 30, 2006. The Termination Section of the Dealer Agreement states:

9.     <u>Termination</u>

(a)     <u>Initial Term</u>.   Subject to earlier termination in accordance with any provision of this Agreement, the term of this Agreement shall commence as of the Effective Date and will expire September 30, 2006 (the "Initial Term").

(b)     <u>Renewal Periods</u>.   At least sixty (60) days prior to the expiration of the Initial Term, Select Comfort will, at its sole discretion, provide Retail Partner our proposed Retail Partner Agreement.

* * *

(e)     <u>Waiver of Termination</u>.   The conduct by either of the parties after termination of this Agreement, including without limitation any sale of the Products, will not be construed as a waiver of the termination of this Agreement or as an extension or continuation of the term of this Agreement beyond the period specified in the notice of termination; any such termination of this Agreement may only be waived by an express written waiver of termination signed by the terminating party.

(Px 133 § 9.)

The Dealer Agreement also states:

11.     <u>Miscellaneous</u>.

(e)     <u>Waiver</u>.   Any waiver of any provision of this Agreement must be in a written instrument signed by the waiving party to be enforceable.  Any one-time waiver of any term of this Agreement or failure to strictly enforce the terms of this Agreement will not preclude a party from asserting a subsequent or continuing breach or from otherwise requiring strict conformance with the terms of this Agreement.

(Px 133 § 11(e).)

## B.     Select Comfort's Actions Were Not Consistent With An Intent To Waive Termination.

Contractual relationships are not formed by "gotcha" tactics.  It is undisputed that the term of the written Dealer Agreement expired on September 30, 2006.  Sleepy's seeks to impose a further implied contractual relationship on Select Comfort through waiver of that expiration

85

provision.  The existence and terms of an implied contract are issues of fact that Sleepy's had the burden to prove by a preponderance of the evidence at trial.  *Dynamic Air Inc. v. Reichhold, Inc.*, No. 05-cv-0955, 2007 U.S. Dist. LEXIS 57651, at *22 (D. Minn. Aug. 7, 2007) (internal citation omitted); *Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005).

Under Minnesota law, waiver is "the 'intentional relinquishment of known right'." *Valspar Refinish, Inc. v. Gaylord's Inc*., 764 N.W.2d 359, 367 (Minn. 2009).  "Knowledge and intent are essential elements of waiver."  *Id*.  To waive a contractual term through conduct, a party must intentionally act in a way that is inconsistent with its rights under the contract.  *Id*.; *see Webb Candy, Inc. v. Walmart Stores, Inc*., No. 09-cv-2056, 2010 WL 2301461, at *8 (D. Minn. June 7, 2010) (noting waiver is a "narrow exception" and finding no waiver of the expiration term of the contract).  Sleepy's failed to meet its burden.  Instead, the evidence establishes that Select Comfort did not extend the term of the Dealer Agreement.

### 1.      Sleepy's Orchestrated A Delay To The End Of The Relationship.

251.    On August 1, 2006, two months before the Dealer Agreement terminated, Select Comfort sought and pursued a business review meeting with Sleepy's to discuss the foundering business relationship.  (Bruce Bauman, Trial Tr. 2375:4–6; Michael Bookbinder, Trial Tr. 239:23–240:13, 474:24–475:24; Px 28; D-3; D-177.)   The business review meeting was originally scheduled for September 7, 2006—well before the Dealer Agreement would terminate. (Michael Bookbinder, Trial Tr. 240:14–21; Bruce Bauman, Trial Tr. 2394:9–2395:7; Px 28; D-177.)   Select Comfort specifically advised Sleepy's that the meeting was about Sleepy's poor performance and was "much more than a general business update meeting."  (D-3 at SP000070; D-177 at SLCO0006828.)

However, Sleepy's cancelled that meeting, and throughout the fall and winter of 2006, scheduled, cancelled and rescheduled the meeting multiple times.  (Michael Bookbinder, Trial

Tr. 239:23–241:4, 244:13–20; Michael Bookbinder, Trial Tr. 477:3–24; Bruce Bauman, Trial Tr. 2394:9–2395:7, 2407:14–25; Px 28; D-177; D-3; D-193.)  The evidence establishes that Sleepy's intentionally delayed that meeting so it could pursue its own objective—to buy time to conduct the secret shops to use to try to leverage Select Comfort into entering a new Dealer Agreement. (Michael Bookbinder, Trial Tr. 244:9–20, 491:20–492:17; D-95 at SP009056, SP009059 (Harry Acker ordering another meeting cancellation on November 6, 2006 after discussing potential litigation stating: "I would like to see if we could drag this out because I need more time.").) Without knowing the true reasons for the delay, Select Comfort in good faith continued to fulfill bed orders from Sleepy's until the meeting could take place.  (Bruce Bauman, Trial Tr. 2333:11–15, 2412:22–2413:19; Keith Spurgeon, Trial Tr. 2826:3–25.)  Sleepy's contends that this action, that Sleepy's itself orchestrated, waived the expiration term and extended the contractual period, foisting continued contractual obligations on Select Comfort.

### 2.    Select Comfort Did Not Intend To Waive Expiration Of The Dealer Agreement.

Select Comfort's actions in continuing to sell products to Sleepy's do not demonstrate an intent to waive termination of the Dealer Agreement.  Indeed, they were consistent with what it believed to be its rights under § 9(e) of the Dealer Agreement.  Notwithstanding that the Second Circuit held that § 9(e) did not prevent the contract from being extended by conduct as a matter of law, § 9(e) is still relevant as evidence of Select Comfort's understanding of and reliance upon that provision for its good faith belief that by continuing to supply merchandise to Sleepy's past the expiration date it was not waiving termination of the Dealer Agreement.

The Dealer Agreement contemplates that renewals would be deliberate and negotiated, and it shows a clear intent by the parties not to be bound by the terms of the Dealer Agreement unless they took certain affirmative steps.  It also provides that it was within Select Comfort's

"sole discretion" to determine whether to renew the contract by providing Sleepy's with a new proposed contract.  (Px 133 § 9(b).)  There is no dispute that Select Comfort did not request a contract renewal, did not send Sleepy's a new proposed contract, nor did it provide Sleepy's with an express written amendment or waiver of the end of the contract term as required by the Dealer Agreement.  (Px 133, §§ 9(e), 11(c) or 11(e); Keith Spurgeon, Trial Tr. 2826:12–25; Bruce Bauman, Trial Tr. 2332:20–2333:10, 2413:9–2414:6.)  *Webb Candy, Inc*., 2010 WL 2301461, at *8 (finding significant that the agreement "repeatedly assured [the party] that nothing about the agreement could be changed—including the expiration date—except in 'a writing' that was 'executed by 'both parties'"); *Dynamic Air, Inc.*, 2007 U.S. Dist. LEXIS 57651, at *21–*22 (after the contract expired, the plaintiff sent additional contracts to the defendant including the same terms as the prior contract the parties had entered, and the defendant continued to provide services consistent with those new contracts).

PowerPoint presentations that Select Comfort created for both the original business review meeting (scheduled for September 7, 2006) and for the final meeting (which occurred on January 3, 2007) both reiterate that the Dealer Agreement expired on September 30, 2006, evincing that Select Comfort had no intention to extend the agreement past the September 30, 2006 termination date.  (Bruce Bauman, Trial Tr. 2377:7–17, 2380:16–2381:4; D-166; Px 124.) Moreover, on January 11, 2007, Select Comfort sent a letter to Sleepy's after the business review meeting confirming that, notwithstanding that Select Comfort continued to supply products to Sleepy's, the Dealer Agreement had expired and Select Comfort saw "no reason to extend the term of [the Dealer] Agreement."  (Px 31.)  Likewise, there is no testimony supporting an intention to extend the Agreement.  In fact, just the opposite is true.  (Bruce Bauman, Trial Tr. 2413:20–2414:6; 2509:2–2510:25; 2377:7–2393:1.2.)

Sleepy's sole evidence offered in support of its theory is Select Comfort's continued shipments of product to Sleepy's until the official Wind-Up Agreement had been signed. Sleepy's suggests that the Dealer Agreement must have controlled the parties' relationship during that interim period.  But that is not the case.  First, as discussed, Select Comfort's executives testified that they relied on § 9 of the Dealer Agreement and believed that by continuing to ship products to Sleepy's, Select Comfort would not be waiving expiration. Further, the Wind-Up Agreement simply controlled the orderly disposal of inventory and point-of-purchase materials, such as signage.  (Px 123.)  A dealer agreement is not required to conduct business transactions in a sales environment.  Once the parties' Dealer Agreement expired, the parties' sales transactions were governed by the Uniform Commercial Code.  Sleepy's failed to present any evidence showing that Select Comfort intended to waive expiration.  *Valspar Refinish, Inc.*, 764 N.W.2d at 368; *Webb Candy, Inc*., 2010 WL 2301461, at *8.

### C.     Select Comfort's Actions Were Not Consistent With An Intent To Create An Implied-In-Fact Contract.

Absent a finding that the parties intended to waive the termination, Sleepy's argument that the Dealer Agreement was extended by conduct requires this Court find that the parties' conduct created a new, implied-in-fact contract.  *See Bolander*, 703 N.W.2d at 542.  An implied-in-fact contract is created only when the conduct of the parties satisfies two conditions: (1) the performance that allegedly gives rise to the new contract flows continuously from the performance that took place under the original contract; and (2) the performance is substantially unchanged following the contract's expiration.  *Webb Candy, Inc.*, 2010 WL 2301461, at *9 (D. Minn. June 7, 2010).  These elements are intended to ferret out a situation in which the parties have impliedly agreed to continue business-as-usual.  But "the fact that parties to an expired contract continue to deal with one another does not mean that they *necessarily* create a new

89

contract." *Webb Candy, Inc.*, 2010 WL 2301461, at *8 (emphasis in original). When such parties continue to deal, the existence of an implied-in-fact contract is rebutted by evidence that the parties did not intend to create a new contractual relationship. *Id.* at *9. Such rebuttal evidence includes evidence of failed negotiations to renew the contract, provisions stating that the contract would not be extended unless by a signed writing, failures to adhere to the terms of the expired contract, and correspondence indicating that the business relationship has changed notwithstanding continued performance. *Id.* at *10 (collecting cases). The overwhelming weight of the evidence in the record conclusively shows that the parties had no intention of creating a new contractual relationship.

Sleepy's points solely to Select Comfort's continued shipping of beds as proof of an implied contract. But as discussed, that fact is not probative of an implied contract when the Dealer Agreement specifically discusses the possibility that the parties may continue to ship product without intending to be bound by a new, implied contract. Moreover, the facts are clear that the parties' relationship was not "substantially unchanged." On the contrary, Select Comfort attempted to schedule a meeting with Sleepy's, prior to the expiration of the contract, to discuss Sleepy's poor performance. It alerted Sleepy's to the fact the meeting was much more than a typical business review meeting. It is clear from Sleepy's reaction, in dodging the meeting for several months, that it saw the writing on the wall. That, taken together with the fact that Select Comfort had not renewed the Dealer Agreement in writing nor had it made any attempts to negotiate a new contract, and the Dealer Agreement contained provisions outlining how the contract could be renewed and disclaiming waiver except in writing, clearly show that Select Comfort did not intend to enter into a new contract with Sleepy's, and Sleepy's was well-aware of Select Comfort's intentions. Finally, the record is clear that any continued shipping of

merchandise past the expiration date was orchestrated by Sleepy's, and it would be unjust to reward its unscrupulous behavior by finding that Select Comfort had unwittingly waived contractual terms.

### D.    Section 4(c) Applies To Select Comfort's Provision Of Warranty Service.

Even if the Dealer Agreement had been extended by conduct, Sleepy's breach-of-contract claim would fail because Section 4(c) is not a "non-disparagement" provision as Sleepy's argues and simply does not apply to the conduct (alleged statements made during secret shops) that Sleepy's alleges supports a breach.  Section 4 (c) does not even contain the word "disparage."  It states that Select Comfort will:

> Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to Retail Partner by Select Comfort; Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the "Brand Image") of the other party;

"Where the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning."  *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999).  On its face, Section 4(c) describes Select Comfort's obligations regarding providing warranty service.  (Px 133 § 4(c).)  The second phrase of Section 4(c) is separated only by a semicolon, indicating that the phrase "Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively, the 'Brand Image') of the other party" applies to the parties' provision of warranty service.  *See Metro Office Parks Co. v. Control Data Corp.*, 205 N.W.2d 121, 124 (Minn. 1973) (recognizing that phrases "cannot be dissected and read in [] isolation"); *Kladek, Inc. v. Am. Bank of St. Paul*, A09-948, 2010 WL 935378, at *3 (Minn. Ct. App. Mar. 16, 2010) (providing that the court should examine the meaning of a contract in accordance with the rules of grammar).

The court must review the entire contract as a whole to interpret the meaning of Section 4(c). *Cherogsky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525-26 (Minn. 1990) (court must "construe a contract as a whole and attempt to harmonize all clauses of the contract" and "avoid an interpretation . . . that would render a provision meaningless"); *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 707 (Minn. 2013) ("Based on the language of the additional insured endorsement, interpreted as a whole in light of its place within a liability insurance policy, we conclude that the language . . . provides coverage to ECI as an additional insured only in instances of ECI's vicarious liability for Bolduc's negligent acts or omissions." (emphasis added)).  Therefore, to interpret Section 4(c), the Court must consider it in light of Section 3(j) of the Dealer Agreement.

In contrast to Section 4(c), Section 3(j) is a classic non-disparagement provision.  (Px 133 § 3(j).)  Section 3(j) provides that Sleepy's will:

> Not disparage Select Comfort or any products distributed through Select Comfort's retail stores or any of Select Comfort's other retail partners and not interfere with any of Select Comfort's retail store's relationships with customers or potential customers.

(*Id.*)  But importantly, Section 3(j) is <u>unilateral</u> and only protected Select Comfort.  Sleepy's, who was represented by its General Counsel during negotiations of the Dealer Agreement, did not ask to make Section 3(j) mutual.  (Adam Blank, Trial Tr. 3103:23–3104:5, 3105:13–3106:19.)[13]  This demonstrates that the parties knew how to draft a mutual non-disparagement provision when that was their intent.

---

[13]   The parties' later Wind-Up Agreement, not at issue here, further illustrates the limited scope of Section 4(c) of the Dealer Agreement.  In the Wind-Up Agreement, the parties included a mutual non–disparagement provision.  (Px 123 § (3)(a).)  Section 3(a) of the Wind-Up Agreement is entitled "Mutual Commitment on Non–Disparagement and Release of Claims" and provides:

### E.     The Drafting History Supports Select Comfort's Interpretation Of Section 4(c).

To the extent Section 4(c) is ambiguous, the drafting history of Section 4(c) confirms that it is not a non-disparagement clause and was intended to address conduct solely in the context of provision of warranty services.

Whether a contract is ambiguous is a question of law. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010).  When the Court finds that a contract is ambiguous, however, it may use parol evidence to aid it in interpreting the contract. *Bari v. Control Data Corp.*, 439 N.W.2d 44, 47 (Minn. Ct. App. 1989).  The determination of whether a contract is ambiguous "depends on the meaning assigned to the words and phrases in accordance with the apparent purpose of the contract as a whole." *Halla Nursery, Inc. v. City of Chanhassen*, 781 N.W.2d 880, 884 (Minn. 2010).  A contract is ambiguous if its language is subject to two or more reasonable interpretations. *Dykes*, 781 N.W.2d at 582; *see also Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Eng'g Sales, Inc.*, 436 N.W.2d 121, 123 (Minn. Ct. App. 1989) (even when an agreement purports to be the final and integrated expression of the terms, an ambiguous term may require parol evidence to determine the intent of the parties).

The drafting history of the Dealer Agreement, and particularly Section 4(c), reveal the intent of the parties in including the second clause in Section 4(c).  Select Comfort handled warranty service on all of the Personal Preference™ beds sold at Sleepy's.  During the drafting

---

Each of the parties will agree to not disparage or denigrate the other party or any of its products, retail stores or other channels of distribution, provided however that either party may make legitimate and factually substantiated product claims and product comparisons consistent with FTC guidelines.

(Px 123 § (3)(a).)  This language is similar to Section 3(j)—but not 4(c)—and, as with Section 3(j), is contained in its own, separate paragraph.

of the contract, Sleepy's General Counsel inserted the following comment in Section 4(c), which

outlined Select Comfort's responsibility related to that provision of warranty services:

> Does this representation mean that Select Comfort will be handling warranty
> claims directly with the customer?  If so, can Sleepy's get a representation
> regarding Select Comfort's best efforts to service Sleepy's customers insofar as
> nothing is more important to Sleepy's than its reputation.

(D-10.)  Both Sleepy's and Select Comfort testified that this was because Sleepy's was not

accustomed to having another party handle warranty claims for its customers.  (Michael

Bookbinder, Trial Tr. 337:10–17; Bruce Bauman, Trial Tr. 2315:7–21; Tim Werner, Trial Tr.

2602:23–2604:1.)  Sleepy's General Counsel drafted the language of the "representation"

requested by Sleepy's and approved the placement of that language in Section 4(c) before the

Dealer Agreement was signed.  (Adam Blank, Trial Tr. 3109:19–24, 3111:1–5.)  Therefore, the

meaning of the second clause of Section 4(c) clearly was intended to, and does, relate to the

language of the first clause.

## F.    Sleepy's Has Shown No Loss Of Brand Image.

Sleepy's has also failed to present any evidence of an "impair[ment]" "infring[ment]" or

"adverse effect" on its "brand image," which it would have had to do to prove its breach claim

under section 4(c).  (Px 133 § 4(c).)  Such loss of good will "may not be merely speculative,

possible or imaginary."  *Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 781 (2d Cir. 1994)

(vacating jury verdict because plaintiff had insufficient evidence of loss of good will); *Mapinfo

Corp. v. Spatial Re-Eng'g Consultants*, No. 02-1008, 2006 WL 2811816, at *4-*5, *10

(N.D.N.Y. Sept. 28, 2006) (granting summary judgment on similar breach-of-contract claim

where claimant failed to come forward with evidence of any lost customer who both heard the

alleged disparaging statements and changed its view of the plaintiff as a result); *Hiram Hicks,

Inc. v. Synagro WWT, LLC*, 867 F. Supp. 2d 676, 692–93 (E.D. Pa. 2012) (rejecting similar claim

under brand-image clause because there was no evidence that the alleged statements damaged party's goodwill or business reputation, let alone that third party's decision to negotiate reduced contract price was the result of damage to goodwill or reputation caused by the statements); *Romper Room Inc. v. Winmark Corp.*, 60 F. Supp. 3d 993, at Part II.B. (E.D. Wis. 2014) (holding that franchisor failed to overcome franchisee's showing of likelihood of success on the merits supporting preliminary injunction where defendant failed to produce customer surveys or other evidence showing that franchisor's brand image had been adversely affected and record showed that sales at plaintiff's stores had actually increased since purported breach); *Jay N Jen, Inc. v. Polge Seafood Dist., Inc.*, 894 N.Y.S.2d 296, 298 (N.Y. App. Div. 2010) (affirming district court's refusal to award damages for similar claim concerning covenant not to impair goodwill where plaintiff failed to demonstrate "either reduced sales to a solicited customer to whom defendant[s] sold [ . . . products] or that the opportunity to profit on additional sales to such customer was lost by consequence of defendant[s'] solicitation." (brackets in original) (internal quotation marks omitted)).

Sleepy's relies entirely on secret shop evidence to prove this claim. But, as a threshold matter, statements made to Sleepy's own employees during secret shops cannot possibly injure Sleepy's "good will" in the marketplace. Sleepy's can point to no actual customers who heard the allegedly disparaging statements. Moreover, Select Comfort presented evidence of several negative press articles about Sleepy's during the relevant timeframe that Sleepy's admitted its customers would have seen (Adam Blank, Trial Tr. 3013:17–3015:10, 3020:15–21, 3022:8–20, 3023:18–3024:6, D-259; D-263), negating even an inference that any alleged statements made by Select Comfort negatively affected Sleepy's good will. In short, Sleepy's has presented no testimony, surveys, or other evidence to suggest (1) what its brand image is; (2) whether it was

95

damaged; and (3) the cause of that damage.  Nor did Dr. Wilner opine that any of his claimed

damages were due to damage to Sleepy's good will.  Accordingly, this claim fails.

### G.      Sleepy's Prior Breach Excused Select Comfort's Performance.

Under Minnesota law, a material breach by one party excuses the performance of

another.  *MTS Co. v. Taiga Corp.*, 365 N.W.2d 321, 327 (Minn. Ct. App. 1985) ("A rule in the

law of contracts is that a party cannot raise to its advantage a breach of contract against another

party when it has first breached the contract itself."); *Distronics Corp. v. Roberts-Hamilton Co.*,

575 F. Supp. 275, 277 (D. Minn. 1983) (holding that a plaintiff's material breach of contract

justifies a defendant's non-performance).

Sleepy's should not be allowed to recover for breach of Section 4(c) where there is

substantial evidence that its sales force made "disparaging" or "denigrating" comments about

Select Comfort and the Personal Preference™ line of beds throughout the parties' relationship,

thereby breaching Section 3(j) of the Dealer Agreement—the actual, unilateral, non-

disparagement clause.  This evidence relates to information Select Comfort brought to Sleepy's

attention and which Sleepy's admitted occurred (Michael Bookbinder, Trial Tr. 411:13–415:11,

416:3–20; D-209); instances of disparagement admitted by Sleepy's salespeople in response to

Sleepy's internal salesperson survey (D-26 at SP002029, SP002032, SP002059, SP002070); and

information uncovered and reported by TWP through its independent investigation (D-22).

Indeed, these instances account for more actual customer complaints about Sleepy's than

Sleepy's brought forward about Select Comfort in over two months of trial.

Because Sleepy's was in breach of Section 3(j) (and under its own interpretation, Section

4(c)), Sleepy's may not recover on its mirror-image breach-of-contract claim.  *Home Ins. Co. v.*

*Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 534 (Minn. 2003) (as a matter of law,

policyholder's purported breach in failing to provide notice under special endorsement that

defense costs were approaching $750,000 was excused by insurer's prior breach in failing to defend policyholder); *AgInformationData, LLC v. Integrated Solutions Grp., Inc.*, No. 11-3673, 2014 WL 4348209, at * (D. Minn. Sept. 8, 2014) (holding that subsequent alleged breach of non-disclosure agreement was excused by opposing party's prior breach); *Farmers Ins. Exch. v. West*, No. 11-2297, 2013 WL 1687704, at *4 (D. Minn. Apr. 18, 2013) (as a matter of law, claimant's prior breach of restrictive covenant excused subsequent alleged breach by other party); *Sierra Petroleum Co. v. Beaudry Oil & Serv., Inc.*, No. 08-6466, 2011 WL 2036974, at *16 (D. Minn. May 24, 2011) (same).

### H.    The Parties' Course Of Performance Established That Negative Salesperson Statements Did Not Constitute A Material Breach.

Where parties to a contract have given it a practical construction by their conduct, as by acts in performance thereof, such construction may be considered by the court in determining its meaning and in ascertaining the mutual intent of the parties.  *Leslie v. Minneapolis Teachers Ret. Fund Ass'n*, 16 N.W.2d 313, 374 (Minn. 1944).  Sleepy's cannot recover for breach of the Dealer Agreement because the parties' course of performance established that neither party considered statements made by sales people to be a material breach of the Dealer Agreement.

Sleepy's executives acknowledge that in any sales industry, like the bedding industry, salespeople sometimes say things they should not.  (Michael Bookbinder, Trial Tr. 416:24–417:15.)  When this does occur, Sleepy's believes the appropriate way to deal with the instances is by talking to and correcting those employees.  (*Id*. at 416:24–417:15.)  Sleepy's and Select Comfort had an established course of performance when these situations arose on either side, which allowed the parties to work through the issue and maintain their contractual relationship.  (Tim Werner, Trial Tr. 2652:9–2656:21; Bruce Bauman, Trial Tr. 2354:20–2357:15; Keith Spurgeon, Trial Tr. 2778:14–19.)  This course of performance had the effect of establishing that

such statements were not a material breach of the Dealer Agreement.  *J.J. Brooksbank Co. v. Budget Rent-A-Car Corp.*, 337 N.W.2d 372, 376 (Minn. 1983) ("The process of interpretation . . . can be supplemented by a practical construction of a contract, which has been defined as: '[The parties'] conduct during the course of performance . . . .'" (citation omitted)); *Investors Syndicate v. Baskerville Bros. Holding Co.*, 274 N.W. 627, 631 (Minn. 1937) (adopting parties' practical construction of contract as evidenced by their course of performance, which demonstrated that they construed the contract as calling for only 6% interest, where record reflected that defendant only first suggested its competing 8% interpretation after it was in default and seeking to stave off foreclosure by asserting "pretend claims" of illegality for usury). Therefore, it was disingenuous for Sleepy's to solicit negative statements from Select Comfort's sales people and then bring a breach-of-contract claim based on those statements.

## IV.   SLEEPY'S HAS NOT ESTABLISHED A BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Sleepy's claim for breach of the implied covenant of good faith and fair dealing is not recognized as a separate cause of action in Minnesota in sales contracts controlled by the Uniform Commercial Code.  For that reason, this claim should be dismissed.  However, even under a common law duty—not applicable here—Sleepy's claim still fails because the actions it argues breach the duty occurred after the Dealer Agreement had terminated and because the it failed to prove bad faith actions designed to impede Sleepy's ability to perform.

### A.   Minnesota Does Not Recognize A Separate Cause Of Action.

The Dealer Agreement is a sales contract that is controlled by the UCC.  *Bonebrake v. Cox*, 499 F.2d 951, 959–60 (8th Cir. 1974); *accord Old Country Toyota Corp. v. Toyota Motor Distribs., Inc.*, 966 F. Supp. 167, 168–70 (E.D.N.Y. 1997) (concluding that dealer agreement was sales agreement governed by UCC under New York law).  The common law covenant of good

faith and fair dealing does not apply to sales contracts under Minnesota law.  *See*, *e.g.*, *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 303 n.5 (Minn. Ct. App. 2004).  Rather Minnesota Statutes Section 336.1–304 imposes an "obligation of good faith in its performance and enforcement."  *Id*.  But Minnesota's UCC does not give rise to a separate cause of action.  "[T]he doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached."  Minn. Stat. § 336.1–304, U.C.C. cmt. 1.  Therefore, this claim fails as a matter of law and must be dismissed.  *The Grandoe Corp. v. Gander Mountain Co*., No. 11-cv-0947, 2012 WL 3430735, at *2 n.2 (D. Minn. Aug. 14, 2012) (dismissing claim on summary judgment).

### B.        The Claim Also Fails Under Common Law.

Minnesota law does not favor claims based on the breach of an implied covenant of good faith and fair dealing.  *Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.*, 811 F. Supp. 1372, 1383 (D. Minn. 1993).  "Moreover, where a party's actions do not prevent another party from performing the contract, there is no breach of the implied covenant of good faith and fair dealing."  *Id*. (granting motion for summary judgment).  The implied covenant does not expand the scope of the contract and does not survive the expiration or termination of the contract.  *Kivel v. Wealthspring Mortg. Corp*., 398 F. Supp. 2d 1049, 1057 (D. Minn. 2005) (implied covenant "does not exist independent of or beyond the scope of the underlying contract" and requires that one party not "unjustifiably hinder" the other party's performance).  "[T]he burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc*., 487 F.3d 89, 98 (2d Cir. 2007).

### 1. This Claim Fails If The Dealer Agreement Expired On September 30, 2006.

The Court has already found that there is no evidence of a breach prior to September 30, 2006, the expiration of the Dealer Agreement.  Because the Dealer Agreement was not extended by conduct, no implied covenant existed at the time the alleged breaching actions occurred, and therefore there is no breach.  *Kivel*, 398 F. Supp. 2d at 1057.

### 2. Sleepy's Has Presented No Evidence Of A Breach.

Even if the Dealer Agreement was extended through January 11, 2007, the date of the letter confirming the Dealer Agreement had expired and would not be renewed, this claim still fails because Sleepy's has failed to present any evidence of a breach at any time.  (Px 31.)  As a threshold matter, Sleepy's has failed to identify what contractual obligation Select Comfort prevented it from performing.  *Pliam v. Cendant Mortg. Corp.*, 513 Fed. App'x 634, 635 (8th Cir. 2013) (affirming dismissal of good-faith-and-fair-dealing claim because complaint contained no allegations that the alleged breach hindered plaintiffs' ability to perform).

Moreover, a finding of bad faith on Select Comfort's part is required to sustain a claim for breach of the covenant of good faith and fair dealing.  *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998).  "Actions are done in good faith when done honestly, whether it be negligently or not." *Id.*  Conversely, actions are in bad faith when "a party's refusal to fulfill some duty or contractual obligation [is] based on an ulterior motive, not an honest mistake regarding one's rights or duties." *Id.*  Sleepy's stated theory is that Select Comfort intentionally designed and shipped inferior products to its Retail Partners and also misrepresented to customers that the beds sold at Retail Partner stores (which are Select Comfort's own product) were inferior.  (Am. Compl. ¶ 81.)  Sleepy's contends that these misrepresentations were not isolated events but were rather part of a larger well-enforced

100

corporate policy of disparagement such that Select Comfort breached its duty of good faith and fair dealing.  Not only does such a theory defy logic, but the Court, as fact-finder, had already found that Select Comfort did not ship inferior product to Sleepy's.  (Dkt. 825 at 28–29.)  It also found that there is no evidence in the record that Select Comfort made any misrepresentations to actual customers, nor did Sleepy's prove a well-enforced policy of disparagement.  (*Id.* at 13, 33–34.)  There is no evidence from which the Court can make a finding that Select Comfort breached a duty owed to Sleepy's.

### 3.    Sleepy's Secret Shop Evidence Does Not Support This Claim.

To the extent Sleepy's relies on its "secret shop" evidence to support this claim on the theory that the Court can infer that statements allegedly made to secret shoppers were similarly made to customers and thus breaching Select Comfort's duty of good faith and fair dealing, the claim similarly fails.  A claim for breach of the duty of good faith and fair dealing requires the plaintiff to prove "a causal link between the alleged breach and the party's claimed damages." *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 671–72 (8th Cir. 2012) ("Because the homeowners pled no connection between the lender's failure to respond to their status requests or refusal to release the loan file and the homeowners' failure to perform under the mortgage agreement, thereby causing their damages, they did not adequately plead a cause of action for breach of the duty of good faith and fair dealing based on these actions.").

As discussed earlier, Sleepy's claimed to have conducted over one hundred secret shops of Select Comfort stores.  (Adam Blank, Trial Tr. 3136:13–21.)  It presented testimony of only thirty-four of them, and even fewer occurred before January 11, 2007.  This sample simply does not support an inference that similar statements were made to actual customers in sufficient quantities to prevent Sleepy's from selling the Personal Preference bed.  *Sports & Travel Mktg., Inc.*, 811 F. Supp. at 1383 (granting motion for summary judgment); *LaSociete Generale*

101

*Immobiliere v. Minneapolis Community Dev. Agency*, 44 F.3d 629, 638 (8th Cir. 1994) (evidence supporting good-faith-and-fair-dealing claim held to be insufficient as a matter of law where plaintiff provided no evidence that defendant's statements adversely influenced the decision-making process of a prospective anchor tenant, and instead asked the court to infer causation from the mere fact that plaintiff failed to obtain a second anchor tenant).

## V.   SLEEPY'S HAS NOT PROVEN ITS CLAIM OF UNFAIR COMPETITION.

Sleepy's has argued that Select Comfort engaged in unfair competition by causing it to "expend significant effort and money or marketing and popularizing [Defendants'] products." (Am. Compl. ¶ 87.)  Its claim fails for several reasons.

### A.   Legal Standard.

As an initial matter, Sleepy's had the burden of establishing some property right or benefit to which it was entitled in order to further pursue its unfair competition claim.  *LoPresti v. Mass. Mut. Life Ins. Co.*, 820 N.Y.S.2d 275, 277 (N.Y. App. Div. 2006); *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 675 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006).

To state a claim for the misappropriation theory of unfair competition, a plaintiff must allege "that the defendant: (1) 'misappropriated the plaintiff[]'s labors, skills, expenditures, or good will'; and (2) 'displayed some element of bad faith in doing so.'"  *Abe's Rooms, Inc. v. Space Hunters, Inc*., 833 N.Y.S.2d 138, 140 (N.Y. App. Div. 2007).   A claim of unfair competition will fail where a plaintiff cannot demonstrate "the bad faith misappropriation of a commercial advantage which belonged exclusively to him."   *LoPresti*, 820 N.Y.S.2d at 277. Where the alleged property right or benefit existed in a contract, the property right or benefit expires with the expiration or termination of the contract.  *See, e.g.*, *Minevitch v. Puleo*, 193 N.Y.S.2d 833, 835 (N.Y. App. Div. 1959) (rejecting unfair competition claim based upon rights obtained through contract when actions giving rise to claim post-dated the contract).

Like slander *per se*, unfair competition is distinguished from product disparagement under New York law. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 275 (S.D.N.Y. 2003).  While unfair competition is "limited to 'misappropriation of the skill, expenditures, and labor of another,'" product disparagement, as discussed earlier, is the "proper cause of action" where a statement is confined to "denigrating the quality of the business' goods or services." *Id.* at 275–76.  Even if the Court construes this as an unfair competition claim, "[a] claim of unfair competition by disparagement is a distinct variation requiring that the claimant 'generally must allege and prove malice and special damages' to properly state a claim for relief." *Id.* at 277.

**B.   Sleepy's Claim Fails Because Sleepy's Has Failed To Prove Malice And Special Damages.**

The evidence identified by Sleepy's in support of its unfair competition claim confirms that it must be dismissed outright because it failed to bring a product disparagement claim.  The instances of alleged slander per se were discussed in detail, *supra*, at pp. 70–73.  In addition, Sleepy's itself purported to categorize the statements in the secret shops as a whole, not limited to slander per se claims, and those categorizations made clear that the vast majority of alleged statements related to the product itself.  (Sleepy's App. Br. 17–19.)

But even if the Court considers this claim, Sleepy's must still be held to the heightened burden of proof necessary to prevail on a product disparagement claim.  That means that Sleepy's was required to show malice and special damages, consisting of the specific identities of customers who ceased to be customers because of Select Comfort's alleged disparagement. Sleepy's has failed to identify any such customer.  And it has likewise failed to introduce evidence of malice.  Therefore, this claim fails.

103

### C.    There Is No Evidence Of A Property Right Belonging Exclusively To Sleepy's.

Sleepy's also fails to establish a basic claim for unfair competition.  Sleepy's was required to identify a property right or benefit to which it was entitled and on which its claim was based.  *LoPresti*, 820 N.Y.S.2d at 277.  In stating its claim, Sleepy's relied upon the Dealer Agreement to supply the property right to which it claims it was entitled.  (Am. Compl. ¶ 87.)  In other words, the Dealer Agreement granted Sleepy's the legal right to sell the Personal Preference™ line of the Sleep Number® bed in an exclusive geographic location.  (PX 133 §§ 1, 4(f)); without it, Sleepy's simply had no commercial "right" in relation to the Sleep Number® bed for Select Comfort to allegedly misappropriate.  The Court previously found that there was no evidence of unfair competition within the contract period.  (Dkt. 825 at pp.15–16.)  It is the law of the case.  The Second Circuit did not disturb that finding on appeal, but it vacated the Court's judgment finding the Court's decision was based on an erroneous interpretation of the termination clause of the Dealer Agreement.  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 196 (2d Cir. 2015).  Therefore, because the Dealer Agreement did terminate on September 30, 2006, Sleepy's unfair competition claims fails.

### D.    There Is No Evidence That Defendant Misappropriated Sleepy's Labors, Skill, Expenditures, Or Good Will.

Further, consistent with the prior findings of the Court, Sleepy's own theory of the case undercuts its ability to prove this claim, or any of its claims.  Sleepy's has continually asserted that Select Comfort's Retail Partner Program contained built-in, but misrepresented, competitive advantages for Select Comfort and that Select Comfort exploited its undisclosed competitive advantage to misappropriate the benefits of Sleepy's efforts for itself.  But the evidence is clear that the Retail Partner Program was the same for all Retail Partners and they all sold the same beds.  (Bruce Bauman, Trial Tr. 2323:12–17.)  Other Retail Partners had great success with the

program, and none ever complained about the alleged issues that now form the basis of Sleepy's lawsuit.  (Keith Spurgeon, Trial Tr. 2804:14–2805:2.)  The fact that Sleepy's is the lone outlier indicates that the fault lies with Sleepy's itself—not with the program and not with Select Comfort.

> Notably, Sleepy's also argued to the Second Circuit that:

> The district court erroneously dismissed Sleepy's claims for unfair competition based on a misunderstanding of the wrongs suffered by Sleepy's . . . . Consequently, the district court completely overlooked the evidence showing that Select Comfort had structured its retail partner program, and behaved, in a way that enabled it to misappropriate Sleepy's commercial advantage.

(Sleepy's Appellate Br. 23.)  However, the Court did not overlook Sleepy's argument.  Rather, the Court specifically considered and rejected the evidence Sleepy's cited in support of this theory.  (Dkt. 825 at 16–17.)  And the Second Circuit did not disturb this finding on appeal.

### E.    Sleepy's Has Offered No Evidence Of Bad Faith.

Even if not held to the standard for a product disparagement claim, requiring Sleepy's to show malice, Sleepy's still bore the burden of proving Select Comfort acted in bad faith.  *Abe's Rooms, Inc.*, 38 A.D.3d at 692.  There is simply no evidence to support such a conclusion. Indeed, in weighing the evidence, the Court has already concluded that there were no quality differences between the products and that Select Comfort had no ill-intent in creating the Retail Partner program.  (*Id.* at 17, 28.)

## VI.    SLEEPY'S IS NOT ENTITLED TO PREJUDGMENT INTEREST ON ANY POTENTIAL AWARD OF DAMAGES.

Dr. Wilner asserted and testified that Sleepy's is entitled to prejudgment interest pursuant to Minnesota Statutes Section 549.09.  (Trial Tr. 45:21-46:18.)  Minn. Stat. § 549.09 (2014). However, prejudgment interest in not available under § 549.09 where a plaintiff's damages are not reasonably ascertainable by reference to generally recognized standards of measurement.

The Minnesota Supreme Court has explained that an award of prejudgment interest is particularly inappropriate in cases like this one, where the plaintiff's claims are premised upon alleged injury to reputation:

> [W]e have distinguished between liquidated and unliquidated claims, allowing interest in the case of unliquidated claims only where the damages were readily ascertainable by computation or reference to generally recognized standards such as market value and not where the amount of damages depended upon contingencies or upon jury discretion (as in actions for personal injury or <u>injury to reputation</u>).

*Potter v. Hartzell Propeller, Inc.*, 189 N.W.2d 499, 504 (Minn. 1971) (affirming refusal to award prejudgment interest where "the amount of the loss could not be ascertained until the jury had determined it") (emphasis added).  The rationale for this rule is that "one who cannot ascertain the amount of damages for which he might be held liable cannot be expected to tender payment and thereby stop the running of interest."  *Id.*  The unascertainable nature of Sleepy's alleged damages is perhaps best illustrated by the vastly different methodologies and opinions offered by the parties' experts in this case.  *See id.* (noting that $50,000 range of fair-market-value estimates offered by the parties at trial "rather dramatically indicate the absence of an objective standard of measurement").  Thus, even if the Court awards Sleepy's some damages, Sleepy's would not be entitled to an award of prejudgment interest because, prior to the Court's determination of Sleepy's damages (if any), Select Comfort could not ascertain the amount of damages for which it might be held liable and, thus, could not have been expected to tender payment and thereby stop the running of interest.

## <u>CONCLUSION</u>

After months of trial and patience by the Court, Sleepy's failed to identify a single lost sale, returned product, cancelled order, or customer that was impacted in any way by the conduct Sleepy's attributes to Select Comfort.  Because Sleepy's has failed to prove any of its claims,

injury, or any causation, this case should be dismissed.  Sleepy's has failed to carry its burden of proof in establishing multiple elements of each of its claims, and Select Comfort requests that the Court dismiss this litigation and enter judgment in Select Comfort's favor.


Date:  August 21, 2015

**OPPENHEIMER WOLFF & DONNELLY LLP**


By:  s/ Andrew S. Hansen
     Andrew S. Hansen  (AH 6788)
     Heidi A.O. Fisher (HF 6782)
Oppenheimer Wolff & Donnelly LLP
Campbell Mithun Tower - Suite 2000
222 South Ninth Street
Minneapolis, Minnesota  55402
Telephone:  (612) 607-7000
Facsimile:  (612) 607-7100
E-Mail:  *ahansen@oppenheimer.com*
     *hfisher@oppeneheimer.com*

**ATTORNEYS FOR DEFENDANTS SELECT COMFORT WHOLESALE CORPORATION, SELECT COMFORT RETAIL CORPORATION, AND SELECT COMFORT CORPORATION**