UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
SLEEPY'S LLC,

                    Plaintiff,

                                          MEMORANDUM, DECISION, &
          -against-                       ORDER AFTER BENCH TRIAL
                                          07-CV-4018(JS)(ARL)
SELECT COMFORT WHOLESALE CORPORATION,
SELECT COMFORT RETAIL CORPORATION,
and SELECT COMFORT CORPORATION,

                    Defendants.
-----------------------------------X
APPEARANCES
For Plaintiff:      Andrew W. Singer, Esq.
                    David J. Kanfer, Esq.
                    Lewis Donald Prutzman, Esq.
                    Paul D. Sarkozi, Esq.
                    Vincent J. Syracuse, Esq.
                    George Foulke Du Pont, Esq.
                    Stefanie Marie Ramirez, Esq.
                    Tannenbaum Halpern Syracuse & Hirschtritt LLP
                    900 Third Ave.
                    New York, NY 10022

For Defendants:     Heidi A.O. Fisher, Esq.
                    Joseph S. Miller, Esq.
                    Michael J. Bleck, Esq.
                    Michael K. Gravink, Esq.
                    Andrew S. Hansen, Esq.
                    Michelle R. Schjodt, Esq.
                    Oppenheimer Wolff & Donnelly LLP
                    45 South Seventh St., Ste 3300
                    Minneapolis, MN 55402

                    Joseph S. Androphy, Esq.
                    Michael Faillace & Associates, P.C.
                    60 East 42nd St., Ste 2540
                    New York, NY 10165

SEYBERT, District Judge:

          Plaintiff  Sleepy's  LLC  ("Plaintiff"  or  "Sleepy's")

commenced this action against defendants Select Comfort Wholesale

Corporation, Select Comfort Retail Corporation, and Select Comfort Corporation (collectively "Defendant" or "Select Comfort") seeking, _inter alia_, damages resulting from Select Comfort's alleged breach of a 2005 sales agreement. A bench trial was held before Judge Thomas C. Platt between March and June of 2012. Following the first phase of that trial, Judge Platt granted Select Comfort's motion for judgment as a matter of law. (Sept. 26, 2012 Memorandum and Order, Docket Entry 825.) On February 27, 2015, the Second Circuit vacated Judge Platt's order as to a number of Plaintiff's causes of action and remanded those causes for resolution. Sleepy's LLC v. Select Comfort Wholesale Corp., 779 F.3d 191, 193 (2d Cir. 2015). On July 21 and 22, 2015, this Court heard testimony to complete the trial record. (See Docket Entries 852-53.) The Court, pursuant to Federal Rule of Civil Procedure 52(a), now issues its findings of fact and conclusions of law.[1]

---

[1] After it heard testimony, the Court indicated that it would receive proposed findings of fact and conclusions of law from both sides. The Court expressed that it would not receive reply submissions or other memoranda. Both Sleepy's and Select Comfort submitted proposed findings of fact and conclusions of law. (See Pl.'s Proposed FoF, Docket Entry 854; Defs.' Proposed FoF, Docket Entry 855.) Concurrently, Select Comfort also submitted a "Trial Brief." (Docket Entry 856.) In light of the Court's instructions, Sleepy's has requested that Select Comfort's trial brief be stricken. (See Sept. 1, 2015 Letter, Docket Entry 857.) The Court agrees with Sleepy's position. Accordingly, it has not considered Select Comfort's Trial Brief in reaching these Findings of Fact and Conclusions of Law. Even if it were to consider it, however, the Court's conclusion would not change.

After considering the evidence offered at trial, the arguments of counsel, and the controlling law on the issues presented, the Court finds in favor of Defendant.

## FINDINGS OF FACT

Based on the evidence presented, the Court makes the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a).[2]  These findings of fact are drawn from witness testimony at trial ("Tr."), the parties' trial exhibits (labeled "PX" for Plaintiff's exhibits and "DX" for Defendant's), and undisputed facts submitted by the parties in the Amended Joint Pre-Trial Order ("PTO").

## I.    The Parties & Products

Sleepy's is a New York based company that owns a chain of retail stores that sell mattresses and other sleep products. (Tr. 74:19-79:8.[3])  Between 2005 and 2007, Sleepy's owned between

---

[2] To the extent that any of the findings of fact may be deemed conclusions of law, they shall also be considered conclusions.  Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings.  See Miller v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451, 88 L. Ed. 2d 405 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

[3] Though the Court has been provided with courtesy copies of the entire trial transcript, only portions of the transcript are docketed.  (See Docket Entries 779-83, 808-11, 813-16, 835-40.) To ensure completeness of the electronic record, Defendant is ORDERED to file the remaining portions of the transcript on the docket.

300 and 400 retail stores, which were located mostly throughout the northeastern United States.[4]  (Tr. 74:23-77:1.)  Sleepy's carries products made by a broad range of suppliers, and consistently advertises that they "have them all."  (PX 152; DX 17.[5])

Three Sleepy's executives were heavily involved in the circumstances that led to this lawsuit: Harry Acker ("Acker"), Michael Bookbinder ("Bookbinder") and Ira Fishman ("Fishman"). Acker is Sleepy's founder, owner, and CEO.  (Tr. 87:4-6, 385:15-22.)  Bookbinder was, during the relevant time, Sleepy's Executive Vice President of Sales.  (Tr. 74:13-18.)  Bookbinder oversaw both the sales force and the advertising and marketing department, and he was responsible for dealing with Sleepy's suppliers.  (Tr. 77:18-78:7.)  Fishman was Sleepy's Vice President of Merchandising, and he was responsible for working with vendors to put together product lineups.  (Tr. 92:14-20.)

Select Comfort is the manufacturer and retail seller of the Sleep Number bed.  (Tr. 2250:22-2252:9, 2780:10-24.)  In lieu

---

[4] In 2009, Sleepy's Inc. assigned all its rights, contracts, and titles to Sleepy's LLC.  (Tr. 2962:24-2963:5.)  For purposes of these Findings of Fact and Conclusions of Law, the Court uses the term "Sleepy's" to refer to both entities, depending on the relevant timeframe.

[5] Throughout these Findings of Fact and Conclusions of Law, the Court uses "PX" to cite to Plaintiff's trial exhibits and "DX" to cite to Defendant's.

of metal coils, the Sleep Number bed contains a series of air chambers that can be inflated or deflated to adjust the firmness. (Tr. 2780:25-2782:15.)  The air chambers sit atop a solid, rigid foundation, and they are covered by various layers of foam and padding, similar to a traditional mattress. (Tr. 2626:10-2627:5.)

In 2000, Select Comfort began partnering with other mattress retailers to offer a version of the Sleep Number products in those retail stores. (Tr. 2616:9-13.)  While Select Comfort sold its "Core Line" of products in its own retail stores, it offered the "Personal Preference Line" of products via its retail partners.  (Tr. 2551:17–2553:3, 2624:9–16.)  The Personal Preference Line was designed to complement the Core Line by offering models that fall between the Core Line models.  (Tr. 105:8-106:11.)  The technology and basic components of the Personal Preference Line products were exactly the same as those of the Core Line, and they were both covered by the same warranty.  (Tr. 2272:22-2273:24; 2281:4-11.)  Nonetheless, there were a number of differences.  For example, while the Personal Preference Line products utilized a one-piece, wooden foundation, the Core Line products utilized a multi-piece, polymer foundation.  (Tr. 2273:17-22; 2275:14-2276:6.)  This difference was apparently motivated by shipping concerns; Select Comfort shipped its products via United Parcel Service, which limited its package sizes so that a single-piece foundation could not be shipped.  (Tr.

2276:7-18.)  Select Comfort's retail partners, on the other hand, could utilize a single-piece foundation because they used their own delivery services.  (Tr. 2275:1-2277:25.)

## II.  The Retail Partner Agreement

On January 17, 2005, Sleepy's approached Select Comfort about becoming one of Select Comfort's retail partners.  (Tr. 91:11-92:12.)  After some initial diligence on the part of both Sleepy's and Select Comfort, the parties agreed that Sleepy's would become a Select Comfort retail partner.

In the Spring of 2005, the parties negotiated a contract entitled "Select Comfort Corporation Dealer Agreement" (the "Retail Partner Agreement" or the "Agreement").  (PX 133.)  The Retail Partner Agreement, in essence, provided that Sleepy's would become an authorized dealer of the Personal Preference Line of Select Comfort products.  (PX 133; Tr. 367:20-22.)  The Agreement has two relevant provisions.  Paragraph 4(c) reads as follows:

> [Select Comfort will: . . .] Provide warranty
> service in accordance with Select Comfort's
> published warranty for all products and
> components sold to [Sleepy's] by Select
> Comfort; Each party represents that it shall
> not impair, infringe upon or adversely affect
> the character, reputation and good will
> (collectively the 'Brand Image') of the other
> party.

(PX 133 ¶ 4(c).)  Paragraph 3(j) reads as follows:

> [Sleepy's will: . . .] Not disparage Select
> Comfort or any products distributed through
> Select Comfort's retail stores or any of

> Select Comfort's other retail partners and not
> interfere with any of Select Comfort retail
> store's relationships with customers or
> potential customers.

(PX 133 ¶ 3(j).)

The Retail Partner Agreement became effective on June 17, 2005, and was scheduled to expire on September 30, 2006. (PX 133 at 1 & ¶ 9(a).) Although the Agreement stated that its term could not be extended except by written agreement of the parties--which never occurred--the parties continued to operate under the terms of the Agreement beyond September 30, 2006.[6] (Tr. 296:20-297:5.)

III. <u>The Disappointing Results of the Retail Partner Agreement</u>

Almost immediately after the effective date of the Retail Partner Agreement, Sleepy's sales figures for the Personal Preference Line were disappointing. (Tr. 144:25-145:10.) The program never grew to the level that Select Comfort and Sleepy's had anticipated. (Tr. 183:16-19.) By the second quarter of 2006, the poor results lead to a series of meetings among members of

---

[6] Select Comfort contends that notwithstanding the parties' conduct after September 30, 2006, the Retail Partner Agreement terminated on that date. (<u>See</u> Def.'s Proposed FoF at 84-85.) Sleepy's, on the other hand, insists that the parties' conduct extended the Agreement until at least January of 2007. (<u>See</u> Pl.'s Proposed FoF ¶ 52.) Because it has no effect on the Court's analysis, the Court declines to rule on this issue and instead assumes, <u>arguendo</u>, that the Retail Partner Agreement was extended until the April 18, 2007 Wind-Up Agreement.

Sleepy's upper management to determine the cause of the disappointing figures. (Tr. 185:13-188:11.)

By September 2006, Sleepy's began considering whether the disappointing results of their relationship with Select Comfort were caused by Select Comfort's disparaging the Personal Preference Line available at Sleepy's.[7] (Tr. 191:13-192:6.) To test that hypothesis, Sleepy's ordered its managers to perform "secret shops" of Select Comfort retail stores. In these instances, the Sleepy's employees were instructed to enter a Select Comfort retail store, pose as a potential customer, and record the experience. In many instances, the secret shopper would tape-record the interaction, while in other cases she would prepare a written report of the experience.

On either September 4 or November 4, 2006,[8] Anthony Colon ("Colon"), then a Sleepy's Regional Manager (Tr. 860:8-9), visited a Select Comfort store in upper Manhattan (Tr. 863:9-18). Colon

---

[7] The Court notes that a more genuine search for the cause of Sleepy's disappointing sales figures might have started with more introspection. For example, the poor sales figures were quite likely the result of Sleepy's failure to advertise the Personal Preference Line as promised, (Tr. 2640:16-2641:14, 2338:20-2340:13, 2808:25-2810:8), or of Sleepy's salespeople denigrating the Personal Preference Line, (Tr. 411:13-415:11; DX 209).

[8] Colon originally testified that this secret shop occurred on Saturday, September 4, 2006. (Tr. 863:13-14.) Upon learning that September 4, 2006 was actually a Monday, Colon acknowledged that the shop may have occurred on Saturday November 4, 2006. (Tr. 886:22-887:3.)

alleges that he met with Select Comfort sales representative Don Ehrman ("Ehrman"), and requested that Ehrman explain to him the differences between a certain mattress from the Personal Preference Line and a mattress from Select Comfort's Core Line. (PX 1.22; Tr. 865:17-866:2.) Colon stated that in response, Erhman expressed five reasons why Select Comfort's Core Line was better than the Personal Preference Line: (1) Select Comfort's mattresses would be made to order, while those at Sleepy's were made and warehoused prior to purchase (Tr. 866:4-9; PX 1.22); (2) the Personal Preference Line mattress included a wired remote control, while Select Comfort's could be wireless (Tr. 866:10-14; PX 1.22); (3) any problems with the mattress would be easier to resolve at Select Comfort than at Sleepy's (Tr. 866:24-867:8); (4) the mattress could be returned or exchanged at Select Comfort, but not at Sleepy's (Tr. 867:9-11; PX 1.22); and (5) the Personal Preference Line had a wood foundation, which meant that the mattress would not be as comfortable for as long as a Core Line product (Tr. 867:25-868:4; PX 1.22).[9]

---

[9] Overall, the Court found Colon's testimony to be unreliable. Among other things, Colon could not recall the date of the secret shop at issue, (Tr. 886:22-887:3), and waivered on whether PX 1.22 was an email or some other document (Tr. 890:4-11). More troublingly, however, Colon repeatedly insisted that PX 1.22--which is so plainly a summary of his secret shop that no reasonable person could argue otherwise--was instead a verbatim recitation of his shopping experience. (Tr. 884:12-17.) As a result, Colon insists that throughout the entirety of the roughly

IV.  Building a Case

        On a November 6, 2006 conference call, Bookbinder, Acker, and Fishman discussed how the results of Colon's secret shop well-positioned them for a potential slander lawsuit against Select Comfort.  (DX 95.)  Acker opined, "[t]his may be an enormous, fabulous lawsuit for Sleepy's to collect damages."  (DX 95 at 4.)  He went on:

> This may be very good because if we start getting involved in a lawsuit especially in a class action and it gets publicity it will not be good for them.  This cannot help them at all in the industry, it won't mean a thing to the consumer, but it will for people who want to do business with him.
>
>        Get all of this information to Adam[10] and another law firm, one that specializes in this.  Find out who does this.

(DX 95 at 4.)  Later, Acker demanded a search for more of the same potential evidence that Colon uncovered:

---

fifteen to twenty minute interaction, he only uttered the one or two sentences discussed above.  (Tr. 884:18-885:9.)  Notwithstanding that the substance of Colon's secret shop was only marginally controverted, the Court finds that the testimony of Colon is insufficient, as a matter of law, to carry Plaintiff's burden with respect to these allegations, for it is black-letter law that "the trier of facts is not obliged to believe uncontradicted testimony, especially if it offends common sense."  Leather's Best, Inc. v. Tidewater Terminal, Inc., 346 F. Supp. 962, 965 (E.D.N.Y. 1972).  In any event and as discussed more fully below, Plaintiff's slander per se claims arising from this incident fail as a matter of law.

[10] During this time, Adam Blank was Sleepy's general counsel.  (Tr. 2896:24-2897:10.)

[Acker]: I want three more shops by area managers looking for the same thing that Tony Colon was looking for.

They are telling the consumer that they are going to have problems with the products that they sell us. So they are telling consumers that a Select Comfort product that we carry is not only inferior, but also problematic. Think about that fellas.

[Fishman]: Harry it gets better or worse depending on how you want to look at it.

[Acker]: Stop the preambles just keep going. This is a good chance that we can sue this man personally for defamation and slander. Make a note that we can sue him.

[Fishman]: Select Comfort said, that we caulk down the wood foundation, both salespeople said that buying from Select Comfort is like buying the original; it would be like buying a Coach bag from Coach. But, buying from somewhere else it would be like buying a copy.

[Acker]: Great Slander, I love it.

(DX 95 at 6.)

Shortly after this conversation, Bookbinder sent an e-mail to Sleepy's Regional Vice Presidents, Regional Managers, and Area Managers ordering a "blitz" of secret shops in each Sleepy's market area where Select Comfort had stores. (Tr. 244:6-12, 520:23-523:13; DX 295.) The instructions for these secret shops made clear that Sleepy's was looking for disparaging remarks on the part of Select Comfort; "we want to know specifically what Select Comfort Says about Sleepy's," and "do they denigrate

11

Sleepy's or the products we sell?" were two of the instructions. (DX 295.)

Over time, Sleepy's instructions regarding what information to solicit during the secret shops of Select Comfort stores grew more specific. For example, by January 2007, the secret shop instruction template included questions such as: "[d]oes select comfort give reasons why not to buy from their retail partner, example: do they say anything regarding the 'freshness' of the product;" "[d]o they denigrate their partner in any way;" and "[d]oes Select Comfort claim their services or products are better than their partners." (PX 1.61.)

V.   The Secret Shops

In addition to the secret shop conducted by Colon discussed above, the Amended Complaint offers fifteen other secret shops that each form the basis of a claim for slander per se. (Am. Compl., Docket Entry 326, ¶¶ 66-78, Ex. E.) With the exception of four instances,[11] the Court discusses each individually.

A.   November 5, 2006 - Bay Shore, NY

On November 5, 2006 Deborah Zaffron ("Zaffron"), then a Sleepy's District Manager (Tr. 668:17), conducted a secret shop of

---

[11] Plaintiff abandoned four of those original claims. (Sept. 26, 2012 Memorandum & Order at 20 n.5.)

a Select Comfort retail store in Bay Shore, NY (Tr. 692:8-14).[12]
Zaffron explained that when she inquired as to the difference
between the Personal Preference Line and the Core Line, the Select
Comfort representative offered five distinguishing
characteristics: (1) "[Sleepy's] box springs were given to
Sleepy's for free [and] Select Comfort would never honor the

---

[12] Throughout the testimony of Sleepy's secret shoppers, a
pattern emerged: beyond oral testimony, Sleepy's offered
almost no primary evidence from those shops. It became
apparent that Sleepy's could not produce (a) the
instructions for the secret shops, (b) any original notes
from employees that performed the secret shops, (c) any
original recordings of the secret shops, or (d) any
original reports of the secret shops. Instead, Sleepy's
offered compilations of the secret shop reports that were
not prepared by a testifying witness and--at least on some
occasions--had been altered. (See Tr. 1042:4-23; 1047:9-
1054:1.) Sleepy's made no attempt to preserve any of this
original evidence; a formal litigation hold was apparently
never instituted, (3122:3-3126:19), and none of the
testifying secret shoppers were told to retain their
original reports or recordings, (Tr. 614:22-615:3, 890:12-
891:7, 922:24-25, 932:3-8, 947:17-948:10, 951:13-17,
1135:15-19, 1224:18-1225:23, 1270:8-13, 1316:24-1317:1).
In light of the fact that Sleepy's made no attempt to
retain this primary evidence even though it had clearly
contemplated litigation, Select Comfort moved to exclude
all evidence of the secret shops as a sanction for
Sleepy's spoliation of relevant evidence. (See Sanctions
Mot., Docket Entry 770.) The Court agrees that Sleepy's
engaged in egregious, grossly negligent spoliation of
evidence in the face of contemplated litigation justifying
the imposition of sanctions. See West v. Goodyear Tire &
Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). The Court
declines to impose any sanctions, however, because it
finds that Plaintiff's claims all fail even when
considering the evidence of which Select Comfort urges
exclusion.

warranty of the merchandise" (Tr. 696:22-24); (2) Sleepy's
mattresses were stored in a warehouse (Tr. 697:14-17); (3) "the
box springs that Sleepy's sold were warped and would break" (Tr.
699:11-13); (4) the foam in the Personal Preference Line mattress
was different (Tr. 701:22); and (5) the wood foundation in the
Personal Preference Line was inferior to Select Comfort's Core
Line (Tr. 702:13-15).

B.  November 8, 2006 - Deptford Township, NJ

On November 8, 2006, Michael Grinnan ("Grinnan"), then
a Sleepy's Regional Manager, performed a secret shop of a Select
Comfort store in Deptford Township, New Jersey. (Tr. 1294:23-25;
PX 1.38.) When Grinnan asked about the differences between the
Personal Preference Line and Select Comfort's own line, the Select
Comfort representative explained that "[T]hey're not the same.
[Select Comfort's mattresses] don't have the same materials as the
ones Sleepy's has. This is better." (Tr. 1307:18-21.) The Select
Comfort representative compared the Personal Preference Line to
other "knockoffs," such as those offered on the QVC home-shopping
channel. (Tr. 1307:22-1308:1.)

C.  January 10, 2007 - Bay Shore, NY

On January 10, 2007, Bob Gorman ("Gorman"), then a
Sleepy's Regional Manager, performed a secret shop of a Select
Comfort store in Bay Shore, New York. (Tr. 1234:22-1235:3; 1238:3-
9). When Gorman mentioned that Sleepy's carries a line of

14

mattresses similar to Select Comfort, the Select Comfort representative told him that "buying from Sleepy's is like buying a knockoff of a Coach bag."  (Tr. 1243:19-21.)

      D.   <u>January 12, 2007 - Manchester, CT</u>

On January 12, 2007, Joseph Kilty ("Kilty"), then a Sleepy's District Manager, performed a secret shop of a Select Comfort store in Manchester, Connecticut. (Tr. 1497:1-2; PX 1.61.) Sometime during the secret shop, the Select Comfort representative analogized buying a mattress from the Personal Preference Line to another shopping experience:

> If you go to Home Depot and look at a John Deere tractor and then go to John Deere and look at the same tractor, what is the difference?  The difference is the tractor sold by Home Depot is cheaper, not exactly the same product or quality as the one sold by John Deere itself.  This is the same situation we have with these beds.

(Tr. 1509:8-19.)

Kilty's report specifically addressed the questions asked in one version of Sleepy's secret shop instruction template. (PX 1.61.)  Those questions included: "[d]oes select comfort give reasons why not to buy from their retail partner, example: do they say anything regarding the 'freshness' of the product;" "[d]o they denigrate their partner in any way;" and "[d]oes Select Comfort claim their services or products are better than their partners." (PX 1.61.)

E.  <u>January 12, 2007 - Queens, NY</u>

On January 12, 2007, Jim Constantinides ("Constantinides"), then a Sleepy's Regional Sales Manager, performed a secret shop of a Select Comfort retail store in Queens, New York.  (Tr. 559:8-9; 576:2-6.)  Constantinides explained to the Select Comfort representative that he had seen a Sleep Number bed at Sleepy's, and he wanted to know the difference between that bed and one sold at Select Comfort.  (Tr. 580:22-581:1.)  The representative explained that "Sleepy's carried a wood box spring that could warp and also hold allergens and that their polymer box was better.  Also, that the Select Comfort mattresses were made to order and that Sleepy's would hold the product in the warehouse for a long period of time."  (Tr. 581:19-25.)

Constantinides recalls that Bookbinder instructed him to perform this secret shop.  (Tr. 578:18-24.)  Specifically, Bookbinder told him to "go into the Select Comfort stores and see how they were explaining the differences between our product and their product and see if there were any disparaging remarks."  (Tr. 578:18-24.)  In light of those instructions, Constantinides explained that he went into the Select Comfort store looking specifically for disparagement.  (Tr. 610:14-16.)

F.  <u>January 14, 2007 - Yorktown Heights, NY</u>

On January 14, 2007, Tyler Asa Pavia ("Pavia"), then a Sleepy's District Manager, performed a secret shop of a Select

Comfort retail store in Yorktown Heights, New York. (Tr. 1153:1-3; 1156:24-1157:3.) At some point during the shop, Pavia mentioned that he was considering going to Sleepy's. (Tr. 1163:12-23.) The Select Comfort representative then explained that Sleepy's "keep[s] . . . the Select Comfort mattress in the warehouse for extended periods where they can become stale and have pest infestation. . . . [I]f a bed sits too long in a warehouse it can become . . . full of bugs and degraded." (Tr. 1175:15-1176:4.) Additionally, the Select Comfort representative expressed that the polymer foundation used in the Core Line was superior to the wooden foundation used in the Personal Preference Line. (Tr. 1164:2-9.)

Like Kilty, Pavia did not prepare an independent report of this secret shop. (PX 1.73.) Instead, his secret shop report answers a series of questions put to him by management, including: "specifically, what did the sales person in the Select Comfort store above say about the Select Comfort products that Sleepy's carries;" "does the Select Comfort salesperson denigrate Sleepy's in any way;" and "does the select comfort salesperson make any statements about Sleepy's that are untrue or defamatory". (PX 1.73.)

G.   January 15, 2007 - Staten Island, NY

On January 15, 2007, Joseph Seth ("Seth"), then a Sleepy's District Manager, performed a secret shop of a Select Comfort retail store in Staten Island, New York. (Tr. 903:7-8;

17

904:25-905:16.)  When Seth asked what the differences were between a certain model in the Personal Preference Line and a similarly-priced model from the Core Line, the Select Comfort representative explained that the polymer foundation was unique to mattresses sold at Select Comfort, and it was stronger than the foundation used by Sleepy's.  (Tr. 913:9-10.)

Prior to conducting the secret shop, Seth received a list of questions that he was expected to answer.  (DX 34.)  These questions were similar to those received by Pavia and Kilty, and included: "does select comfort give reasons why not to buy from their retail partner, example: do they say anything regarding the 'freshness' of the products that you buy from Select versus the 'freshness' of the products sold by Sleepy's (how long the products may have been 'on the shelf'") and "do they denigrate their partner in any way?".[13]  (PX 1.80.)  In light of these questions, Seth explained that he asked the Select Comfort representative specific questions in order to obtain the answers.  (Tr. 930:6-11.)

H.  January 16, 2007 - Freehold, NJ

On January 16, 2007, Paul Mahoney ("Mahoney"), then a Sleepy's District Manager, performed a secret shop of a Select Comfort retail store in Freehold, New Jersey.  (Tr. 1895:11-13; 1912:19-1915:17.)  The Select Comfort representative explained

---

[13] Ironically, Seth answered both of these questions in the negative.  (PX 1.80.)

that while the Personal Preference Line uses a wood foundation, Select Comfort's own line used a polymer base, which was sturdier. (Tr. 1915:18-17.)

I.   January 16, 2007 - Langhorne, PA

On January 16, 2007, Gerald Petrillo ("Petrillo"), then a Sleepy's District Manager, performed a secret shop of a Select Comfort retail store in Langhorne, Pennsylvania. (Tr. 807:14-15; 810:17-21; 818:17-819:5.) When he asked the Select Comfort representative why he should by from Select Comfort rather than Sleepy's, the representative responded that Select Comfort's plastic foundation was stronger than the one available at Sleepy's, and that a Select Comfort mattress would be "fresher" than one purchased from Sleepy's. (Tr. 819:23-820:13; 821:1-22.)

J.   January 17, 2007 - Morristown, NJ

On January 17, 2007, Grinnan performed a secret shop of a Select Comfort retail store in Morristown, New Jersey. (Tr. 1333:19-1334:19.) When Grinnan mentioned having seen a Select Comfort mattress available at Sleepy's, the Select Comfort representative explained that "[t]he beds that Sleepy's carried had an inferior wood foundation." (1337:25-1338:1.)

K.   February 6, 2007 - Pottstown, PA

On February 6, 2007, Jacqueline Grumman ("Grumman"), then a Sleepy's District Sales Manager, performed a secret shop of a Select Comfort retail store in Pottstown, Pennsylvania. (Tr.

1458:17-19; 1462:6-1463:7.) When Grumman mentioned that she had seen a similar mattress at Sleepy's, the Select Comfort representative explained that "[Select Comfort] was taking the contract away [from Sleepy's] because Sleepy's has screwed us . . . the salespeople will lie to you, and they'll tell you anything to make a sale." (Tr. 1466:24-1467:2.) "Sleepy's finds every loophole . . . the salespeople at Sleepy's will lie to you about almost everything." (Tr. 1470:25-1471:2.)

VI.  The Zaffron Incident

Although it was not separately pleaded in the Amended Complaint, the Court received evidence from Zaffron regarding another secret shopping incident.  This incident merits some independent discussion.

Zaffron testified that sometime in the spring of 2007 or 2008, a customer visited the Sleepy's store located in Garden City, N.Y., to cancel a purchase that he had made earlier that day.  (Tr. 672:5-674:6; 681:22-682:1.)  The customer explained that he had just visited the Select Comfort retail store nearby, and he learned that the mattress that he had purchased from Sleepy's was inferior to those available at the Select Comfort store.  (Tr. 681:22-682:1.)  In an effort to save the sale, Zaffron called the Select Comfort store, and--on speaker phone with the customer present-- inquired as to the differences between line of mattresses available at Sleepy's and those available at Select Comfort.  (Tr. 682:16-

683:14.)  During that conversation, the Select Comfort employee repeated the derogatory statements, and told Zaffron and the customer "many negative things about the Select Comfort [bed] that Sleepy's sells," including that the Select Comfort beds at Sleepy's were inferior to the beds at the Select Comfort store.  (Tr. 682:16-683:14.)  The customer ultimately cancelled his purchase from Sleepy's.  (Tr. 683:15-16.)

## VII. The Wind-Up Agreement

On April 18, 2007, the parties negotiated and signed a Wind-Up Agreement.  (PX 123.)  The parties terminated their relationship in accordance with that agreement.

## CONCLUSIONS OF LAW

Following remand from the Second Circuit, four of Plaintiff's causes of action remain: breach of contract, breach of the implied covenant of good faith and fair dealing, slander per se, and unfair competition.  The Court considers each in turn.

## I.  Breach of Contract

Plaintiff first alleges that by systematically disparaging the Personal Preference Line, Select Comfort breached the Retail Partner Agreement.  Specifically, Plaintiff contends that Select Comfort breached paragraph 4(c), which, in part, reads:

> Each party represents that it shall not impair, infringe upon, or adversely affect the character, reputation and good will (collectively the "Brand Image") of the other party.

21

(PX 133 ¶ 4(c).)  At first glance, it seems that the conduct of which Select Comfort is accused falls squarely within the conduct prohibited by this broad clause.  Such a conclusion, however, would divorce this phrase from its context, and it is hornbook law that phrases and clauses of a contract may not be interpreted out of context.  See, e.g., Grachek v. Grachek, 750 N.W.2d 328, 333 (Minn. Ct. App. 2008) ("[L]anguage in a contract 'should never be interpreted in isolation, but rather in the context of the entire agreement.'") (quoting Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 916 (Minn. 1990)); George v. Evenson, No. A06-2133, 2007 WL 4303518, at *5 (Minn. Ct. App. Dec. 11, 2007) ("Phrases and sentences cannot be dissected and read separately and out of context with the entire agreement."), aff'd, 754 N.W.2d 335 (2008).[14]  In its entirety, paragraph 4(c) reads as follows:

> [Select Comfort will: . . .] Provide warranty service in accordance with Select Comfort's published warranty for all products and components sold to Retail Partner by Select Comfort; Each party represents that it shall not impair, infringe upon or adversely affect the character, reputation and good will (collectively the "Brand Images"), of the other party.

(PX 133 ¶ 4(c).)

---

[14] The Retail Partner Agreement is governed by Minnesota Law.  (PX 133 ¶ 11(d).)

Plaintiff would have the Court read Paragraph 4(c) as imposing on Select Comfort two completely separate obligations: (1) to provide standard warranty service and (2) to not impair, infringe upon, etc., Sleepy's brand image. This reading is illogical, however, because it requires the assumption that these two clauses are in no way related. A more reasonable reading of Paragraph 4(c) suggests that the broad language of the second clause is somehow limited by the first; that is, that the obligation of the second clause relates only to the duties that Select Comfort undertook in the first. See First State Bank v. City & Cnty. Bank, 872 F.2d 707, 713 (6th Cir. 1989) ("[I]t is reasonable to assume that the second clause of the sentence in question is related solely to the duties enunciated in the first clause of the sentence, and is not related to some unmentioned or undisclosed duty or obligation."); Slay Warehousing Co. v. Reliance Ins. Co., 471 F.2d 1364, 1368 (8th Cir. 1973) ("The clause relating to expense here is more reasonably related to the investigation and disposition of claims and suits mentioned in the preceding sentence." (internal quotation marks omitted)). By this reading, the mutual obligation on the parties to not impair the respective brand image of their counterparts relates solely to the warranty service provided by Select Comfort in connection with the Personal Preference Line.

Other clauses in the Retail Partner Agreement support a narrower reading of paragraph 4(c) than Plaintiff urges.  Paragraph 3(j) reads as follows:

> [Sleepy's will . . .] Not disparage Select Comfort or any products distributed through Select Comfort's retail stores or any of Select Comfort's other retail partners and not interfere with any of Select Comfort retail store's relationships with customers or potential customers.

(PX 133 ¶ 3(j).)  This narrower, one-way disparagement clause in paragraph 3(j) would be superfluous if one were to read paragraph 4(c) as a broad, mutual non-disparagement clause.  Because a "contract must be interpreted in a way that gives all of its provisions meaning," Current Tech. Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995), the existence of Paragraph 3(j) suggests that Paragraph 4(c) is not as broad as Plaintiff suggests, but is instead limited to Select Comfort's obligation to provide warranty service.

At the very least, the language of paragraph 4(c), in the context of the entire agreement, is ambiguous.  See ICC Leasing Corp. v. Midwestern Mach. Co., 257 N.W.2d 551, 554 (Minn. 1977) ("A writing is ambiguous if, judged by its language alone and without resort to parol evidence, it is reasonably susceptible of more than one meaning." (citation omitted)).  When a term is ambiguous, parol evidence may be allowed to determine the intent

of the parties.  Caldas v. Affordable Granite & Stone, Inc., 820

N.W.2d 826, 832 (Minn. 2012).

An earlier draft of the Retail Partnership Agreement did

not have the disputed clause in paragraph 4(c).  Sleepy's,

therefore, expressed its concern that Select Comfort was servicing

any warranty issues on the Personal Preference Line, but was under

no obligation to service these warranties to the customers'

satisfaction.  Specifically, in responding to the first clause of

paragraph 4(c), Sleepy's noted:

> Does this representation mean that Select
> Comfort will be handling all warranty claims
> directly with the customer?  If so, can
> Sleepy's get a representation regarding Select
> Comfort's best efforts to service Sleepy's
> customers insofar as nothing is more important
> to Sleepy's than its reputation.

(DX 10 ¶ 4(c).)  Bookbinder acknowledges that the "Brand Image"

clause in Paragraph 4(c) was added in response to this concern.

(Tr. 336:7-337:17.)

In short, Plaintiff contends that the disparaging

conduct alleged breached a clause in the Retail Partner Agreement

that (1) appears next to and logically limited by a clause

regarding Select Comfort's obligation to provide warranty service,

(2) renders superfluous a (presumably) bargained-for one-way non-

disparagement clause in favor of Select Comfort, and (3) was added

in response to concern that Select Comfort would not properly

service warranties associated with the Personal Preference Line.

The Court cannot countenance such a tortured reading of the Retail Partner Agreement; "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." James Baird Co. v. Gimbel Bros., 64 F.2d 344, 346 (2d Cir. 1933) (Hand, J.). Accordingly, Plaintiff's breach of contract claim fails.

## II. Breach of the Implied Covenant of Good Faith & Fair Dealing

Alternatively, Plaintiff claims that Defendant's conduct breached the implied covenant of good faith and fair dealing that inheres in contracts under Minnesota law. The Court disagrees.

The Retail Partner Agreement is subject to the Uniform Commercial Code,[15] which "imposes an obligation of good faith in [every contract's] performance and enforcement." Minn. Stat. Ann. § 336.1-304. This general obligation, however, does not beget a separate cause of action. As the provision's comments make clear: "[Section 336.1-304] does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract . . . ." Minn. Stat. Ann.

---

[15] See, e.g., Old Country Toyota Corp. v. Toyota Motor Dists., Inc., 966 F. Supp. 167 (E.D.N.Y. 1997) (holding that a similar dealership agreement falls under the UCC); Bonebrake v. Cox, 499 F.2d 951, 959 (8th Cir. 1974) (same).

§ 336.1-304 cmt. 1. Accordingly, Plaintiff's claim for a violation of the implied covenant of good faith and fair dealing fails. See, e.g., The Grandoe Corp. v. Gander Mountain Co., No. 11-CV-0947, 2012 WL 3430735, at *2 n.2 (D. Minn. Aug. 14, 2012); Minnwest Bank Cent. v. Flagship Props. LLC, 689 N.W.2d 295, 303 n.5 (Minn. Ct. App. 2004) ("The implied covenant of good faith and fair dealing does not apply to sales contracts." (citation omitted)).

        Plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing would fare no better if the Agreement was subject to Minnesota common law. "Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing." In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995). But this covenant is narrowly tailored; "[t]he law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties." Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996) (citation omitted). In this vein, the implied covenant of good faith and fair dealing may not be construed to impose obligations "beyond the scope of the underlying contract." Hennepin, 540 N.W.2d at 503. Instead, the implied covenant of good faith and fair dealing operates as a gap filler to address circumstances not contemplated by the parties at the time of contracting. RBC Dan Rouscher, Inc. v. Fed. Ins. Co., No. 03-CV-2609, 2003 WL 25836278, at *7-9 (D. Minn. Dec. 2, 2005).

In light of the fact that the implied covenant of good faith and fair dealing operates to prohibit certain conduct <u>not contemplated</u> by the parties, it should not apply to a circumstance that the parties did contemplate at the time of contracting. <u>See, e.g.</u>, <u>United States v. Outer Harbor Dock & Wharf Co.</u>, 124 F. Supp. 337, 344 (S.D. Cal. 1954) ("[T]here can be no implied covenant where the subject is completely covered by the contract."); <u>United States v. Basin Elec. Power Co-op.</u>, 248 F.3d 781, 796 (8th Cir. 2001) ("Since good faith is merely a way of effectuating the parties intent in unforseen circumstances, the implied covenant has 'nothing to do with the enforcement of terms actually negotiated' and cannot 'block [the] use of terms that actually appear in the contract.'" (quoting <u>Cont'l Bank, N.A. v. Everett</u>, 964 F.2d 701, 705 (7th Cir. 1992) (alteration in original)). Here, the parties contemplated the possibility of product disparagement, and agreed on a one-way non-disparagement clause in favor of Select Comfort. Using the implied covenant of good faith and fair dealing to rewrite this one-way non-disparagement clause to a mutual one would work a significant hardship upon Select Comfort, who presumably bargained for that clause's asymmetry.[16]

---

[16] In this case, the Court finds consideration of the hardship that finding an implied covenant of good faith and fair dealing would have on Select Comfort is particularly appropriate. Unlike most agreements where the parties can be expected to work cooperatively, this Agreement contemplated competition between Sleepy's and

Additionally, Minnesota courts require a showing of bad faith in order to find a breach of the implied covenant of good faith and fair dealing. See BP Products N. Am., Inc. v. Twin Cities Stores, Inc., 534 F. Supp. 2d 959, 966 (D. Minn. 2007) (collecting cases); Minnwest Bank, 689 N.W.2d at 303 ("To establish a violation of this covenant, a party must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty." (citation omitted)). Here, the record is devoid of evidence suggesting that Select Comfort, as a whole, acted in bad faith. Indeed, by all accounts, Select Comfort made significant effort to discipline those salespeople that were accused of disparaging the Personal Preference Line. (PX 145.) Thus, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails for the independent reason that Plaintiff has failed to demonstrate bad faith on the part of Select Comfort.

---

Select Comfort. Implying on Select Comfort a non-disparagement duty would have handcuffed its sales team in the competition that the Retail Partner Agreement envisioned. Moreover, a non-disparagement clause in favor of Sleepy's may have imposed upon Select Comfort the additional burden of closely monitoring its commission-based sales team. The implied covenant of good faith and fair dealing does not impose obligations such as these, which are far beyond the scope of the contract. See Teng Moua v. Jani-King, Inc., 810 F. Supp. 2d 882, 900 (D. Minn. 2011).

III. <u>Slander Per Se</u>

Plaintiff asserts twelve causes of action for slander per se, each arising from a secret shopping instance discussed in the Findings of Fact. (Am. Compl. ¶¶ 66-78, Ex. E.) But beyond these individual instances, Sleepy's contends that the aggregate of these secret shops says something more; Sleepy's submits that it has demonstrated a pattern and practice of slander per se, and the existence of that pattern and practice begets a broader, more general cause of action. As discussed below, Sleepy's position is flawed for a host of reasons.

A. <u>Legal Standard</u>

The elements of a cause of action for slander under New York law[17] are "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." <u>Albert v. Loksen</u>, 239 F.3d 256, 265-66 (2d Cir. 2001) (footnotes and citations omitted). Additionally, there are four categories

_____

[17] Where the parties are domiciled in different states, "[n]ormally, the applicable rule of decision will be that of the state where the [tort] occurred." <u>Neumeier v. Kuehner</u>, 31 N.Y.2d 121, 128, 286 N.E.2d 454, 458, 335 N.Y.S.2d 64 (1972). Here, most of the secret shops took place in New York, and neither party has claimed applicability of an alternative. Accordingly, the Court applies New York law to Plaintiff's tort claims.

of defamatory statements where special damages need not be shown (collectively "slander per se"): statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." Liberman v. Gelstein, 80 N.Y.2d 429, 435, 605 N.E.2d 344, 347, 590 N.Y.S.2d 857 (1992).

    B.   Individually Actionable Slanders

Under New York defamation law, "publication is a term of art. . . . A defamatory writing is not published if it is read by no one but the one defamed. Published it is, however, as soon as read by any one else." Ostrowe v. Lee, 256 N.Y. 36, 38, 175 N.E. 505 (1931) (Cardozo, C.J.). On this basis alone, all of Plaintiff's claims for slander per se fail. In all of the instances pleaded in the Amended Complaint, the allegedly defamatory statement was made only to Sleepy's representatives, and the Court saw no evidence suggesting that any other individual overheard any of the twelve instances of disparagement. See Fashion Boutique of Short Hills v. Fendi USA, Inc., No. 91-CV-4544, 1998 WL 259942, at *5 (S.D.N.Y. May 21, 1998) (statements made to plaintiff's agents cannot support slander and disparagement claims).

Indeed, the Court heard direct evidence[18] of only one instance of publication: when Zaffron called a Select Comfort employee in the presence of a potential customer. (See supra Part VI. at 20.) Nonetheless, a claim of slander per se arising from this incident would still fail because Sleepy's consented to the publication of those allegedly defamatory remarks.

Where the publication occurs with the consent of the defamed party, an action for defamation does not lie. See, e.g, Sleepy's LLC, 779 F.3d at 199. The consent given need not be unequivocal or affirmative; "in some circumstances, a person's intentional eliciting of a statement she expects will be defamatory can constitute her consent to the making of the statement." Id.; see also Schaefer v. Brookdale Univ. Hosp. & Med. Ctr., 18 Misc. 3d 1142, 859 N.Y.S.2d 899 (Sup. Ct. 2008) (finding that plaintiff

---

[18] Sleepy's offered the hearsay testimony of other Sleepy's individuals who explained that a customer had told them that a Select Comfort representative had disparaged the Personal Preference Line to them, but this evidence is insufficient to establish publication. First, it is admissible only as evidence of the customers' states of mind, not as to whether a Select Comfort employee actually defamed the Personal Preference Line to them. See Sleepy's, 779 F.3d at 204. Second, as discussed more fully at infra Part III.C, the comments made to these customers--as told secondhand by the Sleepy's witnesses-- were not slander per se; the comments all criticized a mattress from the Personal Preference Line, not Sleepy's itself. Third, there is no evidence connecting any of these allegedly published instances of defamation to those instances alleged in the Complaint and discussed in these Findings of Fact and Conclusions of Law.

had consented to the defamatory statement by demanding the publication of information that he "had reason to anticipate . . . would not be positive), aff'd, 888 N.Y.S.2d 122, 66 A.D.3d 985 (2d Dep't 2009); Hirschfeld v. Inst. Inv'r, Inc., 260 A.D.2d 171, 688 N.Y.S.2d 31 (1st Dep't 1999) (plaintiff's sending a letter requesting a written statement of the reason for her termination was consenting to the publication); LeBreton v. Weiss, 256 A.D.2d 47, 680 N.Y.S.2d 532 (1st Dep't 1998) (plaintiff had two individuals contact defendant under the pretense of being landlords and had them make certain inquiries to which defendant responded by making the defamatory statements upon which the action was premised).

Although New York's highest court has offered little guidance on the rationale for the rule that consent to publication bars a defamation claim, the rule seems at least in part motivated by a desire to preclude a plaintiff from intentionally eliciting a defamatory response for the purpose of decoying the defendant into a lawsuit. Restatement (Second) of Torts § 583 (1977), cited with approval in LeBreton, 256 A.D.2d at 47, 680 N.Y.S.2d at 532. As such, the Second Circuit has observed:

> [I]t appears . . . that New York's standard [for when a plaintiff consents to a publication] would be along the following lines: When a plaintiff sues for defamation based on a statement . . . the more evidence [that] supports the proposition that the plaintiff elicited the statement with a high

degree of certainty that it would be
defamatory, for the purpose of enabling a
lawsuit, the stronger the defendant's case for
deeming the statement consented to, thus
barring the claim.

Sleepy's LLC, 779 F.3d at 199.

Here, Sleepy's had every reason to suspect that the
comments that Zaffron solicited from the Select Comfort
salesperson would be disparaging. The customer with whom Zaffron
spoke immediately prior to the call told her as much. Moreover,
Sleepy's had undertaken a mission to gather ammunition for a future
lawsuit against Select Comfort. Acker even stated that he
"love[d]" hearing the extent of Select Comfort's alleged
disparagement. In light of this aim, Sleepy's inquiry cannot be
considered an "honest inquiry or investigation." Restatement
(Second) of Torts § 584 (1977) (stating that the honest inquiry
exception to the consent rule does not apply where the publication
is invited for the purposes of decoying the defendant into a
lawsuit). In short, because the evidence shows that Sleepy's was
both virtually certain that its inquiry would elicit allegedly
slanderous statements and substantially motivated by the desire to
bolster a contemplated lawsuit, Sleepy's consented to the
publication of these allegedly defamatory statements. See
Sleepy's LLC, 779 F.3d at 199.[19]

---

[19] Though it need not visit the issue, the Court suspects
that even if Plaintiff's other claimed instances of

34

C.    <u>Pattern and Practice of Defamation</u>

Sleepy's submits that aside from the individually actionable slanders, it has established that Select Comfort has engaged in a pattern and practice of slander per se, and, in light of that pattern and practice, Sleepy's is entitled to general damages. (<u>See</u> Pl.'s Proposed FoF ¶ 53 ("Here, because the evidence shows a pervasive pattern and practice of disparagement and defamation going well beyond the specific defamatory statements proven, damages are not limited to the damage to Sleepy's reputation solely in the eyes of those to whom specific defamatory statements were made.").)  Sleepy's argument fails both on the facts and as a matter of law.

Sleepy's correctly asserts that general damages are available for instances of slander per se, then, from that proposition, asks the Court to conclude that the alleged denigration was so pervasive and widespread that Sleepy's need not show any specific instance of slander.  But that is a non sequittur.  The availability of general damages does not absolve Sleepy's from having to prove a specific slander claim.  <u>Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.</u>, 314 F.3d 48, 62 n.3 (2d Cir. 2002).  The Court disagrees with Sleepy's suggestion

---

slander per se had been published, those claims would nonetheless be barred for the same reasons that any claim arising out of the Zaffron incident is.

that New York law supports a claim of "general slander per se" where a pattern of denigration is shown.  As an initial matter, the Court notes that it has not been presented with, nor has it independently uncovered <u>any</u> case from <u>any</u> jurisdiction that supports Plaintiff's proposed understanding of defamation jurisprudence.  Moreover, it is black letter law that a claim of slander requires proof of the slanderous statement, <u>see</u> <u>Evans v.</u> <u>Waldo</u>, No. 04-CV-0566, 2006 WL 2689819, at *2 (E.D.N.Y. Sept. 18, 2006) (requiring "the exact slanderous words allegedly spoken" (citation omitted)), and finding liability based on a general pattern of slander, without reference to a specific statement, would vitiate that requirement.

Plaintiff's suggestion that New York slander law would support a finding of liability based on a pattern and practice of disparagement may be based on Federal Rule of Evidence 406.  Rule 406 states:

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

FED. R. EVID. 406.  But Rule 406 does not purport to alter the substantive elements of a cause of action.  <u>Shady Grove Orthopedic</u> <u>Assocs., P.A. v. Allstate Ins. Co.</u>, 559 U.S. 393, 407, 130 S. Ct.

1431, 1442, 176 L. Ed. 2d 311 (2010). Thus, proof of a specific slanderous statement is still required. In any event, Rule 406 contemplates the routine practice evidence as tending to show a course of action "on a particular occasion." FED. R. EVID. 406. Here, Plaintiff offers no particular occasion, instead insisting that the Court find liability based on the practice alone. The Court declines to do so.

But even if New York law would espouse the new "general slander per se" suggested by Plaintiff, the Court concludes that Plaintiff has not produced sufficient evidence to show a pattern or practice of slander per se. Instead, the evidence shown demonstrated that in the majority of the secret shops performed, Select Comfort's comments were limited to how the Personal Preference Line was inferior to the Core Line, and it is well settled that disparaging statements about an organization's product do not constitute slander per se. See, e.g., Drug Research Corp. v. Curtis Pub. Co., 7 N.Y.2d 435, 440, 166 N.E.2d 319, 322, 199 N.Y.S.2d 33 (1960) ("The rule is that, if a product has been attacked, the manufacturer may recover in a cause of action for libel, providing he proves malice and special damages as well as the falsity of the criticism."); Angio-Med. Corp. v. Eli Lilly & Co., 720 F. Supp. 269, 274 (S.D.N.Y. 1989) ("Language which merely disparages a product is not actionable unless special damages are pleaded and it appears that such damage is a natural and immediate

consequence of the disparaging statements."); Alternative Electrodes, LLC v. Empi, Inc., 597 F. Supp. 2d 322, 338 (E.D.N.Y. 2009) ("In any event, plaintiff only has alleged disparaging statements about its product, and the amended complaint does not contain allegations regarding business methods or the integrity of the Company itself. Therefore, special damages must be alleged to sufficiently plead a claim for business disparagement."). Only in one or two instances did Select Comfort's comments arguably rise to an actionable slander per se, (see Tr. 1265:8-9 ("Sleepy's doesn't have the greatest reputation"), 1467:1-2 (Sleepy's "salespeople will lie to you, and they'll tell you anything to make a sale")), and that is insufficient to establish a routine pattern or practice.

Accordingly, for all these reasons, Plaintiff's slander per se claims fail.

IV. Unfair Competition

Plaintiff also brings a claim for unfair competition under New York law. For the following reasons, Plaintiff's unfair competition claim fails.

Although a claim of unfair competition under New York law encompasses a broad range of unfair practices, Am. Footwear Corp. v. Gen. Footwear Co., 609 F.2d 655, 662 (2d Cir. 1979), the doctrine's reach is not without limits, Carson Optical, Inc. v. Prym Consumer USA, Inc., 11 F. Supp. 3d 317, 328 (E.D.N.Y. 2014).

Though it is "broad" and "flexible," id., the New York Court of appeals has refused to broaden the tort of unfair competition to include every instance of "commercial unfairness." Ruder & Finn Inc. v. Seaboard Sur. Co., 52 N.Y.2d 663, 671, 422 N.E.2d 518, 522, 439 N.Y.S.2d 858 (1981). Instead, it is limited to cases where one has misappropriated the skill, expenditures, and labor of another. See id.; Cue Pub. Co. v. Kirshenberg, 22 Misc. 2d 188, 189, 198 N.Y.S.2d 993, 996 (1960) (noting that while there are many definitions of unfair competition, "[t]his is nothing but a convenient name for the doctrine that no one should be allowed to sell his goods as those of another" (internal quotation marks and citations omitted)). As a consequence, a claim for unfair competition will not lie absent the defendant's bad faith misappropriation of a commercial advantage belonging exclusively to the plaintiff. Ruder, 52 N.Y.2d at 671, 422 N.E.2d at 522; LoPresti v. Mass. Mut. Life Ins. Co., 30 A.D.3d 474, 476, 820 N.Y.S.2d 275, 277 (2006); Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) (collecting cases).

Here, the Court finds that Select Comfort did not misappropriate the skill, expenditures, or labor of Sleepy's. By all accounts, Select Comfort's sales representatives sought to distance their own products from those of the Personal Preference Line; they endeavored to maximize their own competitive advantage, not usurp Sleepy's. Plaintiff's claim that Select Comfort

improperly denigrated the Personal Preference Line to the advantage of Select Comfort may constitute a product disparagement claim, but it is not a claim for unfair competition. See Gucci Am., Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 2d 269, 275 (S.D.N.Y. 2003) (similarly distinguishing an unfair competition claim from a product disparagement claim).

Accordingly, Plaintiff's unfair competition claim fails.

CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendant on all of the remaining claims. As discussed in footnote three, Defendant is instructed to complete the electronic record by filing the remaining trial transcripts on the docket. Thereupon, the Clerk of the Court is directed to enter judgment consistent with these Findings of Fact and Conclusions of Law, and to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September   22  , 2015
           Central Islip, New York