UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
SLEEPY'S LLC,

                        Plaintiff,

                                            <u>MEMORANDUM & ORDER</u>
            -against-                       07-CV-4018(JS)(ARL)

SELECT COMFORT WHOLESALE CORPORATION,
SELECT COMFORT RETAIL CORPORATION,
and SELECT COMFORT CORPORATION,

                        Defendants.
------------------------------------X
APPEARANCES
For Plaintiff:      Andrew W. Singer, Esq.
                    David J. Kanfer, Esq.
                    Lewis Donald Prutzman, Esq.
                    Paul D. Sarkozi, Esq.
                    Vincent J. Syracuse, Esq.
                    George Foulke Du Pont, Esq.
                    Stephanie Marie Ramirez, Esq.
                    Tannenbaum Halpern Syracuse & Hirschtritt LLP
                    900 Third Avenue
                    New York, New York 10022

For Defendants:     Heidi A.O. Fisher, Esq.
                    Andrew S. Hansen, Esq., <u>pro</u> <u>hac</u> <u>vice</u>
                    Fox Rothschild LLP
                    Campbell Mithun Tower, Suite 2000
                    222 South Ninth Street
                    Minneapolis, Minnesota 55402

                    Joseph S. Miller, Esq., <u>pro</u> <u>hac</u> <u>vice</u>
                    Michael J. Bleck, Esq.
                    Michael K. Gravink, Esq., <u>pro</u> <u>hac</u> <u>vice</u>
                    Michelle R. Schjodt, Esq.
                    Oppenheimer Wolff & Donnelly LLP
                    45 South Seventh Street, Suite 3300
                    Minneapolis, Minnesota 55402

                    Joshua S. Androphy, Esq.
                    Michael Faillace & Associates, P.C.
                    60 East 42nd Street, Suite 2540
                    New York, New York 10165

SEYBERT, District Judge:

This matter comes before the Court on remand from the Second Circuit Court of Appeals following its decision in Sleepy's LLC v. Select Comfort Wholesale Corp. ("Sleepy's 2018"), 909 F.3d 519, 521 (2d Cir. 2018) that affirmed in part, vacated in part, and remanded portions of this Court's decisions arising out of Sleepy's LLC v. Select Comfort Wholesale Corp. ("Sleepy's 2015"), 133 F. Supp. 3d 483 (E.D.N.Y. 2015), Sleepy's LLC v. Select Comfort Wholesale Corp. ("Sleepy's Jan. 2016"), No. 07-CV-4018, 2016 WL 126377 (E.D.N.Y. Jan. 11, 2016), and Sleepy's LLC v. Select Comfort Wholesale Corp. ("Sleepy's Sept. 2016"), 222 F. Supp. 3d 169 (E.D.N.Y. 2016). Plaintiff Sleepy's LLC ("Sleepy's") commenced this action in state court on August 24, 2007 against defendants Select Comfort Wholesale Corporation, Select Comfort Retail Corporation, and Select Comfort Corporation (collectively "Select Comfort" or "Defendants") seeking, inter alia, damages resulting from Select Comfort's alleged breach of a 2005 sales agreement. On September 25, 2007 Defendants removed the action to this Court.

Currently before the Court are the parties' omnibus briefs addressing (1) whether the Court properly dismissed Sleepy's claims of slander per se on the basis that Sleepy's consented to the alleged defamatory statements and (2) whether this case is an "exceptional" case under Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 134 S. Ct. 1749, 188 L.

2

Ed. 2d 816 (2014), and if so, the appropriate amount of attorney's fees to be awarded. (Def. Br., D.E. 898; Pl. Opp., D.E. 899; Def. Reply, D.E. 900.)

The Court finds (1) that Sleepy's claims for slander per se were properly dismissed because it consented to the alleged defamatory statements raised in the Amended Complaint and (2) this case is not exceptional under Octane Fitness and Select Comfort is not entitled to attorney's fees under the Lanham Act.

BACKGROUND[1]

The Court assumes familiarity with the facts chronicled in earlier orders. See, e.g., Sleepy's LLC v. v. Select Comfort Wholesale Corp. ("Sleepy's 2012"), No. 07-CV-4018, 2012 WL 13106064, at *1-2 (E.D.N.Y. Sept. 26, 2012) (Platt, J.); Sleepy's 2015, 133 F. Supp. 3d at 487-95. The details pertinent to this Memorandum and Order are further discussed below.

Sleepy's, a New York-based retailer, sells mattresses and other bedding products. (Tr. 74:19-79:8.) Select Comfort manufactures and sells the Sleep Number bed. (Tr. 2250:10-2252:9, 2780:10-2782:15.) Select Comfort sold its "Core Line" of products in its own retail stores and offered the "Personal Preference Line" of products through its retail partners. (Tr. 107:8-16; 2551:17-

---

[1] The Court references the trial transcript ("Tr.") and the parties' trial exhibits, labeled "PX" for Plaintiff's Exhibit and "DX" for Defense Exhibit.

2553:3; 2624:9-16.)  In 2005, Sleepy's approached Select Comfort to become a retail partner.  (Tr. 326:14-18; 388:3-16.)  On June 17, 2005, the parties executed the "Select Comfort Corporation Dealer Agreement" (the "Dealer Agreement") that provided Sleepy's would become an authorized dealer and would sell the Personal Preference Line of Select Comfort products.  (PX 133.) The Dealer Agreement set September 30, 2006[2] as the agreement's expiration date.  (PX 133, ¶ 9(a).)

Sleepy's sales figures for the Personal Preference Line were disappointing (Tr. 144:25-145:10) and the program never grew to the level the parties anticipated (Tr. 183:16-19).  By the second quarter of 2006, Sleepy's upper management team convened to determine the cause of the disappointing figures.  (Tr. 184:13-188:6.)  Three Sleepy's executives were involved: Harry Acker ("Acker"), Sleepy's founder, owner, and CEO, Michael Bookbinder ("Bookbinder"), Sleepy's Executive Vice President of Sales, and Ira Fishman ("Fishman"), Sleepy's Vice President of Merchandising.

Sleepy's had heard from potential customers and through "secret shops"[3] conducted by Sleepy's management team at Select

---

[2] Although the parties never executed a written agreement to extend the terms of the Dealer Agreement, the parties continued to operate under its terms beyond September 30, 2006.  The parties dispute whether the Dealer Agreement terminated on that date.  See Sleepy's 2015, 133 F. Supp. 3d at 489 n.6.

[3] A "secret shop" occurs when a Sleepy's employee enters a Select Comfort retail store, poses as a potential customer, and records

Comfort stores that Select Comfort salespeople had been "talk[ing] negatively about the products that Sleepy's carried, specifically" the Personal Preference Line. (Tr. 191:24-192:6.) By early September 2006, specifically Labor Day weekend, Sleepy's started to seriously consider whether the results of its sales were caused by Select Comfort employees disparaging the Personal Preference Line sold at Sleepy's. (Tr. 191:13-192:6; 192:17-193:2.) At that time, Sleepy's ordered its managers to conduct "serious" secret shops, as opposed to "random shops," of Select Comfort retail stores to "corroborate" their "concern[s]" of disparagement. (Tr. 191:13-193:15; 213:12-214:2 (Bookbinder testifying that Sleepy's management "organized a seri[es] of secret shops" to evaluate the hypothesis that disparagement was a reason for Sleepy's poor sales).) Sleepy's ordered these secret shops "so [Select Comfort] would know what was going on in their training area and stop the disparagement." (Tr. 215:3-7.)

On November 4, 2006,[4] Anthony Colon ("Colon"), then a Sleepy's Regional Manager, conducted a secret shop of a Select

---

the experience. (Tr. 213:20-283:5.) "Secret shops" are common in the industry. (Tr. 281:18-25; 2173:1-9.) Select Comfort has also conducted its own secret shops. (Tr. 2144:4-6.)

[4] Colon originally testified that this secret shop occurred on September 4, 2006. (Tr. 863:13-14.) Colon acknowledged that the shop may have occurred on November 4, 2006. (Tr. 886:22-887:3 ("The shop was definitely done on a Saturday.").) The parties do not contest that November 4, 2006 is the operative

Comfort store in Manhattan at the direction of Bookbinder, who did not give him any "direct details" except that he needed a secret shop of a Select Comfort store "as soon" as possible. (Tr. 863:22-864:5; 874:21-875:8.) On November 5, 2006, Deborah Zaffron ("Zaffron"), then a Sleepy's District Manager, conducted a secret shop of a Select Comfort retail store in Bay Shore, New York. (Tr. 667:13; 668:16-19; 692:8-14.) Zaffron testified that she never conducted a secret shop without instructions to do so (Tr. 1013:20-22) and was told to conduct this specific shop (Tr. 692:11-18). After the shop, Zaffron spoke with Bookbinder and Fishman to let them know the "negative information" she obtained. (Tr. 702:22-6.)

On November 6, 2006, Bookbinder, Acker, and Fishman participated in a conference call and discussed Sleepy's relationship with Select Comfort. (DX 95.) They discussed Colon's secret shop and recognized that the results positioned them for a potential slander lawsuit against Select Comfort. (DX 95 at 4-6.) Acker opined that "[t]his may be an enormous, fabulous lawsuit for Sleepy's to collect damages." (DX 95 at 4.) He went on:

> This may be very good because if we start getting involved in a lawsuit especially in a class action and it gets publicity it will not be good for them. This cannot help them at all in the industry, it won't mean a thing to the consumer, but it will for people who want

date for the Colon secret shop. (Def Br. at 6-7; Pl. Opp. at 6.)

> to do business with them.  Get all of this
> information to Adam[5] and another law firm, one
> that specializes in this.  Find out who does
> this.

(DX 95 at 4.)  Later, Acker demanded more secret shops to obtain

the same potential evidence that Colon uncovered:

> [Acker]: I want three more shops by area
> managers looking for the same thing that [ ]
> Colon was looking for.  They are telling the
> consumer that they are going to have problems
> with the products that they sell us.  So they
> are telling consumers that a Select Comfort
> product that we carry is not only inferior,
> but also problematic.  Think about that
> fellas.
>
> [Fishman]: Harry it gets better or worse
> depending on how you want to look at it.
>
> [Acker]: Stop the preambles just keep going.
> This is a good chance that we can sue this man
> personally for defamation and slander.  Make
> a note that we can sue him.
>
> [Fishman]: Select Comfort said, that we caulk
> down the wood foundation, both salespeople
> said that buying from Select Comfort is like
> buying the original; it would be like buying
> a Coach bag from Coach.  But, buying from
> somewhere else it would be like buying a copy.
>
> [Acker]: Great Slander, I love it.

(DX 95 at 6.)

Sleepy's did not initiate a suit against Select Comfort

at that time.  However, shortly after the November 6, 2006 call,

---

[5] Adam Blank was Sleepy's executive vice president and general
counsel.  (Tr. 2896:16-16; 2897:7-10.)

Bookbinder sent an email[6] to Sleepy's Regional Vice Presidents, Regional Managers, and Area Managers ordering a "blitz" of secret shops to obtain "more [ ] reports from [ ] around November 6, 7, 8 [2006.]" (Tr. 244:6-12; 520:23-523:4; DX 295.) Bookbinder requested that Sleepy's employees submit their "blitz" shop reports by November 8, 2006. (Tr. 244:6-12; DX 295.) Bookbinder instructed that Sleepy's was looking for disparaging remarks from Select Comfort. (DX 295.) Two of the instructions read: "we want to know specifically what Select Comfort Says about Sleepy's," and "do they denigrate Sleepy's or the products we sell?" (DX 295.) Bookbinder testified that these instructions were provided "as a result of Harry Acker saying 'I want more shops'" on the November 6, 2006 call.[7] (Tr. 532:2-10.)

Between November 6, 2006 and December 5, 2006, Fishman interviewed former Select Comfort salespeople to determine whether Select Comfort's corporate management team instructed its sales force to "say negative things about either Sleepy's or the Personal

---

[6] Sleepy's did not produce the original "blitz" email in discovery or at trial. However, Bookbinder testified that this email was likely sent on November 6, 2006 or "maybe" November 7, 2006. (Tr. 531:3-8; 532:2-6.)

[7] Bookbinder further testified that he "always" indicated whether a directive came from Acker to stress the importance of the task. (Tr. 523:15-21.) Sleepy's employees "knew that when something came from [Acker] and [Acker] wanted it, [ ] forget about what you were doing, [Acker's request] is what you are going to do." (Tr. 527:4-6.)

Preference bed." (DX 145; Tr. 512:8-12.) In a December 5, 2006 email chain, Fishman wrote to Bookbinder that there were "no disparaging comments from [Select Comfort] corporate about partners" (DX 145 at 2) and that "[t]here was no smoking gun" (DX 145 at 3). Fishman prepared a summary of these interviews for Acker and wrote that "[t]here is nothing worth transcribing as far as any evidence against [Select Comfort] trying to sell against us." (DX 145.)

On January 3, 2007, Sleepy's and Select Comfort met for a business review meeting (the "January 3 Meeting").[8] (Tr. 241:2-4; 244:16-20.) Going into this meeting, Select Comfort was prepared to "end the relationship knowing the contract had expired" on September 30, 2006. (PX 33; Tr. 2154:19-2155:6.) Instead, Sleepy's confronted Select Comfort with approximately ten shop reports. (Tr. 247:1-11; 2422:25-2423:23.) Acker requested a letter from Bill McLaughlin ("McLaughlin"), Select Comfort's CEO,

---

[8] Select Comfort initially requested this business review meeting in August 2006 to discuss the retail program's performance. (Tr. 239:23-240:3; DX 3 at 6.) The meeting was scheduled for September 7, 2006 and was re-scheduled to November 9, 2006 and December 7, 2006. (Tr. 239:23-240:21; Tr. 2407:14-25; PX 35; PX 36; DX 3; DX 177; DX 192; DX 193.) Sleepy's delayed this meeting after it reviewed their secret shop reports. (Tr. 244:13-20.) On the November 6, 2006 call, after hearing examples of "denigration," Acker asked Bookbinder to "call Select Comfort and tell them we must cancel the November 9th meeting" and stated that he "would like to see if [Sleepy's] could drag this out because [Acker] need[ed] more time" to conduct secret shops of Select Comfort. (DX 95 at 7; Tr. 492:8-22; 496:24-497:4.)

"assuring Sleepy's that [Select Comfort's] actions or the denigration that the shops showed would stop." (Tr. 245:19-23.) Bruce Bauman ("Bauman"), Select Comfort's Vice President of Retail Partners, testified that Acker gave Select Comfort 72 hours to provide that letter or Sleepy's would send its sales people "out to Select Comfort stores to secret shop [Select Comfort] with the intent to gather more information as a basis for suing us." (Tr. 2074:23-25; 2077:1-9; 2423:14-23; 2956:6-13; PX 32.)

Select Comfort did not send a non-disparagement letter within 72 hours. On January 8, 2007, Bookbinder directly emailed McLaughlin asking for the letter. (PX 82.) In response, Bookbinder received a call from Bauman who made it clear that Sleepy's "should not expect" Select Comfort's CEO to send Acker a non-disparagement letter. (Tr. 287:16-288:4; PX 32.)

The next day, on January 9, 2007, Bookbinder sent an email to Sleepy's employees with the subject line "Shopping Select Comfort Stores" and stating that he wanted to "make sure that we cover every [S]elect [C]omfort showroom in our trading area." (DX 34.) The email included a document that provided specific instructions and questions for Sleepy's employees to ask during secret shops of Select Comfort stores. (DX 34; Tr. 304:4-14.) Bookbinder's instructions detailed a "scenario" that Sleepy's secret shoppers should posit to solicit, among other things, (1) whether Select Comfort employees "make any statements" that

10

polymer or wood box springs are better because "this is the type of information [Sleepy's] needs"; (2) whether Select Comfort gave "reasons why not to buy from their retail partner[,] example: do they say anything regarding the 'freshness' of the product;" (3) whether "Select Comfort claim their services or products are better than their partners"; and (4) whether Select Comfort "denigrate[s] their partner in any way[,] meaning, does the Select Comfort agent make any statements about Sleepy's that are untrue or defamatory?" (DX 34.)

Bookbinder testified that the purpose of the January 9, 2007 email and the request for secret shops was to confirm whether "denigration was still going on in the Select Comfort stores" and whether, after the January 3 Meeting "anything had changed regarding defamation . . . from the sales . . . teams at Select Comfort." (Tr. 304:9-18.) After a review of the post-January 3, 2007 secret shops, Sleepy's concluded that there was no "change in the patterns of denigration and defamation in the Select Comfort Stores." (Tr. 304:19-305:2.)

Sleepy's employees started to conduct additional secret shops almost immediately following the January 9, 2007 email. The Court addressed the substance of each secret shop alleged in the Amended Complaint in prior Orders.[9] <u>Sleepy's 2015</u>, 133 F. Supp.

_____

[9] Although not pled in the Amended Complaint, the Court addressed one additional secret shop conducted by Zaffron sometime in the

3d at 491-94; Sleepy's 2012, 2012 WL 13106064, at *9-15.  Those secret shops are discussed in additional detail infra.

On January 11, 2007, Keith Spurgeon ("Spurgeon"), Select Comfort's Senior Vice President and General Manager of Consumer Channels, sent a letter to Acker to wind up the parties' business relationship and reiterated Select Comfort's position that the Dealer Agreement terminated on September 30, 2006.  (PX 31.)  On the same day, Bookbinder emailed Select Comfort's CEO on Acker's behalf and stated that Sleepy's had no intention of terminating its relationship with Select Comfort until the "issue of defamation resulting in damage" to Sleepy's was addressed.  (PX 81; Tr. 298:13-22.)

On January 23, 2007, McLaughlin sent Acker a letter stating that "any disparagement or denigration of any partner, supplier, competitor, or their products, services or reputation is neither endorsed nor tolerated at Select Comfort" and that Select Comfort was "disappointed" by Sleepy's shopping reports and took "immediate action to address the reported behavior."  (PX 145.)  On April 18, 2007, the parties signed a "Wind-Up Agreement" and terminated their relationship in accordance with that agreement.[10]

_____

spring of 2007 or 2008 (the "Zaffron Incident").  Sleepy's 2015, 133 F. Supp. 3d at 494.

[10] The Wind-Up Agreement provides that the parties "agreed to forego litigation subject to the terms of the stipulation between the parties for a period of at least ninety (90) days to

(PX 123.)  On August 24, 2007, Sleepy's initiated this action in New York State Supreme Court.  (See Notice of Removal, D.E. 1.)

<u>PROCEDURAL HISTORY</u>

This case has a long and tortured history.[11]  Three years after removal to this Court on September 25, 2007, Sleepy's filed an Amended Complaint asserting claims for:  (1) breach of contract (first and second causes of action); (2) fraudulent inducement (third cause of action); (3) slander per se (fourth, fifth, sixth, and seventh causes of action); (4) breach of the implied covenant of good faith and fair dealing (eighth cause of action); (5) unfair competition (ninth cause of action); and (6) violations of the Lanham Act (tenth cause of action).  (See Am. Compl., D.E. 326, ¶¶ 52-94.)

Between March 21 and June 13, 2012 Judge Thomas C. Platt held a bench trial.  Following the first phase of that trial, Judge Platt granted Select Comfort's motion for judgment as a matter of law.  <u>Sleepy's 2012</u>, 2012 WL 13106064.  Sleepy's appealed parts of

---

enable discussions concerning a possible future relationship." (PX 123 at SP000201 at ¶ 5(a).)

[11] Throughout this litigation, Judge Platt urged the parties to discuss settlement.  (Nov. 5, 2010 Order, D.E. 380.)  On the eve of trial, Judge Platt held a settlement conference.  (Mar. 20, 2012 Minute Order.)  Even at trial, Judge Platt urged counsel to talk to their clients because "both sides have problems" and that if "either side thinks that it's an open and shut affair, it's not."  (Tr. 1492:20-24.)  Nine years later, this Court shares Judge Platt's "fatherly wisdom."  (Tr. 1493:10.)

Judge Platt's decision but not the dismissal of its claims for fraudulent inducement and Lanham Act violations. On February 27, 2015, the Second Circuit vacated Judge Platt's Order (see D.E. 843) as to a number of Sleepy's causes of action and remanded those causes for resolution. Sleepy's LLC v. Select Comfort Wholesale Corp. ("Sleepy's I"), 779 F.3d 191, 193 (2d Cir. 2015). On remand, on July 21 and 22, 2015, this Court received testimony to complete the trial record. (See Minute Entries, D.E. 852, 853.) On September 22, 2015, the Court issued findings of fact and conclusions of law and entered judgment in favor of Select Comfort. Sleepy's 2015, 133 F. Supp. 3d 483.

As relevant here, the Court dismissed all of Sleepy's claims for slander per se because "the allegedly defamatory statement[s] [were] made only to Sleepy's representatives, and the Court saw no evidence suggesting that any other individual overheard any of the twelve instances of disparagement." Id. at 499 (citation omitted) (emphasis in original). Therefore, the Court concluded that Sleepy's failed to establish the necessary element of publication. Id. The Court found that the April 2007 or 2008 Zaffron Incident, although not pled in the Amended Complaint, was the "only [ ] instance of publication." Id. However, "a claim of slander per se arising from the [Zaffron] [I]ncident" failed because "Sleepy's consented to the publication of those allegedly defamatory remarks." Id.

14

On January 11, 2016, the Court, noting that Select Comfort was a "prevailing party" under the Lanham Act, found that this matter was "exceptional" pursuant to 15 U.S.C. § 1117(a) warranting an award of attorney's fees. Sleepy's Jan. 2016, 2016 WL 126377 at *3-4. On April 12, 2016, the Court referred Select Comfort's motion to Magistrate Judge Arlene R. Lindsay for a report and recommendation ("R&R") to determine the appropriate amount of damages, costs, and/or fees to be awarded. (Apr. 12, 2016 Referral Order, D.E. 879.)

On August 8, 2016, Judge Lindsay issued a R&R recommending that the Court grant Select Comfort's fees motion but reduced the requested fees and costs. Sleepy's LLC v. Select Comfort Wholesale Corp., No. 07-CV-4018, 2016 WL 11266558 (E.D.N.Y. Aug. 8, 2016) (Lindsay, M.J.). On September 30, 2016, the Court adopted Judge Lindsay's R&R in part and awarded Select Comfort seventy-five percent of Judge Lindsay's recommended fee award. Sleepy's Sept. 2016, 222 F. Supp. 3d 169.

Sleepy's appealed from the September 22, 2015 Order, the January 11, 2016 Order, and the September 30, 2016 Order. On November 27, 2018, the Second Circuit affirmed the Court's September 22, 2015 Order to the extent it dismissed Sleepy's claims for breach of contract, unfair competition, and the implied covenant of good faith and fair dealing. Sleepy's 2018, 909 F.3d at 528. The Second Circuit vacated the September 22, 2015 Order

"insofar as it dismisses Sleepy's slander claims because the communication in question had not been 'published'" finding that under New York law, the publication requirement is satisfied even where "a defamatory statement was made to the defamed company's representatives." Id. at 528. The Second Circuit did, however, "agree with the [Court's] conclusion that Sleepy's consented to the disparaging statements with regards to the Zaffron [I]ncident and, to that extent, affirm[ed] the [ ] judgment." Id. at 529. The Second Circuit remanded the matter for a determination of "whether Sleepy's consented to the [remaining] slander claims." Id. at 528-29.

The Second Circuit also vacated the Court's January 2016 finding that this matter is "exceptional" under the Lanham Act and remanded the matter for de novo review under the "exceptional" framework outlined by the Supreme Court in Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 134 S. Ct. 1749, 188 L. Ed. 2d 816 (2014). Sleepy's 2018, 909 F.3d at 530-31. The Second Circuit further vacated the fee award and instructed that on remand, the Court must "explain what amount of attorney's fees would reflect the proportion of Select Comfort's legal efforts spent defending against the Lanham Act claim." Id. at 533-34.

## I.  Slander Per Se

In addition to the two November 2006 secret shops conducted by Colon and Zaffron discussed above, the Amended Complaint offers ten[12] additional secret shops that form the basis of Sleepy's claims for slander per se.  (Am. Compl., ¶¶ 66-78; Am. Compl., Ex. E, at ECF pp. 45-48.)

### A.  Legal Standard

The elements of a cause of action for slander under New York law[13] are "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001).

However, an action for defamation does not lie where the publication occurs with the consent of the defamed party.  See, e.g, Sleepy's I, 779 F.3d at 199.  The consent given need not be unequivocal or affirmative, rather, "in some circumstances, a person's intentional eliciting of a statement she expects will be

---

[12] Sleepy's previously abandoned four of its slander per se claims.  Sleepy's 2012, 2012 WL 13106064, at *10 n.5.

[13] The Court applies New York law.  See Sleepy's 2015, 133 F. Supp. 3d at 498 n.17.

defamatory can constitute her consent to the making of the statement." <u>Id.</u>; <u>see also</u> <u>Schaefer v. Brookdale Univ. Hosp. & Med. Ctr.</u>, 859 N.Y.S.2d 899, 18 Misc. 3d 1142 (Sup. Ct. 2008), <u>aff'd</u>, 888 N.Y.S.2d 122, 66 A.D.3d 985 (2d Dep't 2009); <u>Hirschfeld v. Institutional Inv'r, Inc.</u>, 688 N.Y.S.2d 31, 260 A.D.2d 171 (1st Dep't 1999); <u>LeBreton v. Weiss</u>, 256 A.D.2d 47, 680 N.Y.S.2d 532 (1st Dep't 1998). Thus, a "plaintiff who had authorized an agent to make an inquiry on his behalf is not to be charged with consent to a defamatory statement made in reply to the inquiry, <u>unless he had reason to anticipate that the response might be a defamatory one</u>." <u>Sleepy's 2018</u>, 909 F.3d at 529 (quoting <u>Teichner v. Bellan</u>, 7 A.D.2d 247, 251, 181 N.Y.S.2d 842, 846 (4th Dep't 1959)) (emphasis in original).

The rule that consent to publication bars a defamation claim seems at least in part motivated by a desire to preclude a plaintiff from intentionally eliciting a defamatory response for the purpose of decoying the defendant into a lawsuit. Restatement (Second) of Torts § 583 (1977), cited with approval in <u>LeBreton</u>, 680 N.Y.S.2d at 532, 256 A.D.2d at 47. As such, the Second Circuit has observed:

> [I]t appears . . . that New York's standard [for when a plaintiff consents to a publication] would be along the following lines: When a plaintiff sues for defamation based on a statement . . . the more the evidence supports the proposition that the plaintiff elicited the statement with a high

> degree of certainty that it would be
> defamatory, for the purpose of enabling a
> lawsuit, the stronger the defendant's case for
> deeming the statement consented to, thus
> barring the claim.

Sleepy's I, 779 F.3d at 201; Teichner, 7 A.D.2d at 251, 181
N.Y.S.2d at 846 (noting that in these circumstances, a plaintiff
has "impliedly agreed to assume the risk of a defamatory
communication to his agent.").

Restatement (Second) of Torts Section 584 outlines an
exception to the rule of consent and provides that "'[a]n honest
inquiry or investigation by the person defamed to ascertain the
existence, source, content or meaning of a defamatory publication
is not a defense to an action for its republication by the
defamer.'" Sleepy's I, 779 F.3d at 199 (quoting Restatement
(Second) of Torts § 584). "Comment d to [Section 584 further]
explains that this exception to the rule of Section 583 'has no
application when the inquiry is not an honest inquiry or
investigation to ascertain the facts, and the republication is
invited only for the purpose of decoying the defendant into a
lawsuit.'" Id. Thus, "[w]hether a republication of an earlier
defamation is itself actionable when elicited by the defamed party
appears to turn in part on a combination of the defamed party's
motivation for eliciting the republication and the degree of
certainty of the defamed party's expectation that the statement
elicited will be defamatory." Id. at 200.

B.   Analysis

On remand, the Court is tasked with determining whether Sleepy's consented to the remaining alleged defamatory statements. Sleepy's 2018, 909 F.3d at 522.  The Court addresses the parties' arguments and the alleged instances of slander in turn.

1.   The November 2006 Secret Shops

The first three instances of alleged slander occurred on November 4, 2006 (the Colon secret shop, discussed supra), November 5, 2006 (the Zaffron secret shop,[14] discussed supra), and November 8, 2006 (the Michael Grinnan secret shop, discussed infra) (collectively, the "November 2006 Secret Shops"). (See Am. Compl., Ex. E. at 1-2.)

Select Comfort primarily argues that the Court's September 22, 2015 decision applies "universally to all statements elicited during Sleepy's secret shop campaign and establish[es] consent to all alleged statements" because "virtually all of the [remaining] secret shops" occurred after the November 6, 2006 "Blitz" email. (Def. Br. at 5.)  Sleepy's argues that it did not consent to statements arising out of the November 2006 Secret Shops because it (1) understood that the Dealer Agreement forbade disparagement and (2) by late October or early November 2006,

---

[14] Zaffron's November 5, 2006 secret shop is not to be confused with the now-dismissed Zaffron Incident that occurred in April 2007 or 2008.  See Sleepy's 2015, 133 F. Supp. 3d at 494.

Sleepy's first decided to investigate its hypothesis that its sales of Select Comfort beds were disappointing as a result of systematic disparagement by Select Comfort's salespeople. (Pl. Opp at 6-7.)

As a preliminary matter, Sleepy's claim for slander per se arising out of the November 4, 2006 secret shop was properly dismissed because, as stated, Colon's testimony was unreliable and "insufficient, as a matter of law, to carry Plaintiff's burden with respect to these allegations, for it is black-letter law that 'the trier of facts is not obliged to believe uncontradicted testimony, especially if it offends common sense.'" Sleepy's 2015, 133 F. Supp. 3d at 490 n.9 (quoting Leather's Best, Inc. v. Tidewater Terminal, Inc., 346 F. Supp. 962, 965 (E.D.N.Y. 1972)).

Nonetheless, all of Sleepy's slander per se claims arising out of the November 2006 Secret Shops fail as a matter of law. Sleepy's arguments ignore the facts and timeline established at trial: around early September 2006, specifically Labor Day weekend, Sleepy's sought to "corroborate" their "concern[s]" that the disappointing sales of Select Comfort beds were caused by Select Comfort's alleged disparagement of the Personal Preference Line. (Tr. 191:13-193:2.) By early September 2006, and not early November 2006 as Sleepy's contends, Sleepy's ordered its managers to perform "serious" "secret shops," as opposed to "random shops," of Select Comfort retail stores. (Tr. 191:23-193:15; 213:12-214:2; DX 95 at 3 (Acker stating on November 6, 2006 "[l]et's hear

the rest of the shopper reports." (emphasis added).)  Further,
Acker sought, and succeeded, to postpone the January 3 Meeting for
the purpose of ordering additional secret shops to look for "the
same thing that [ ] Colon was looking for."[15]  (DX 95; Tr. 496:19-
497:17; see also PX 34 (noting that by November 27, 2006, Sleepy's
conducted secret shops of Select Comfort because Select Comfort
"was 'trash talking' Sleepy's;" that "everything was documented;"
and that "they were all told to shop [Select Comfort] by the upper
management".)  This evidence supports a finding that Sleepy's had
reason to anticipate the November 2006 Secret Shops would provoke
a defamatory response.  Sleepy's I, 779 F.3d at 200 ("Whether a
republication of an earlier defamation is itself actionable when
elicited by the defamed party appears to turn in part on a
combination of the defamed party's motivation for eliciting the

---

[15] The Court disagrees with Sleepy's post-hoc arguments that
Acker had limited involvement in the circumstances underlying
this litigation and rejects Sleepy's argument that "Select
Comfort's hyperbolic portrayal of Acker and his rant in the heat
of anger . . . exaggerates Acker's role at the company."  (Pl.
Opp. at 4-5.)  The record makes clear that Sleepy's employees
"knew that when something came from [Acker] and [Acker] wanted
it, [ ] forget about what you were doing, [Acker's request] is
what you are going to do."  Tr. 527:4-6; 385:15-22 ("Harry
[Acker] is the boss"); 87:4-6; see also DX 3 (email from
Bookbinder to Bauman requesting to postpone the business review
meeting and that he would "feel more comfortable" if Harry were
at the meeting because he owns the company and "should be
present at an important meeting like this.")

republication and the degree of certainty of the defamed party's expectation that the statement elicited will be defamatory.").

Sleepy's further argues it "had substantial reason to believe that defamation would be unlikely" in these three instances because in March 2006 Select comfort "told Sleepy's that disparagement by its salesforce should not happen and had apologized for it." (Pl. Opp. at 6-7.) This argument also fails because Sleepy's does not connect how a March 2006 "reassurance" from Select Comfort that disparagement "should not happen" (Pl. Opp. at 7) supports the conclusion that in November 2006, eight months later, Sleepy's engaged in an "honest inquiry" to investigate alleged defamation. (Pl. Opp. at 25.) This argument squarely conflicts with trial testimony that in early September 2006, Sleepy's "seriously" questioned whether the Select Comfort's salesforce engaged in disparagement and thereafter sought to "corroborate" that hypothesis. See Discussion supra, at 5.

The Court does not find that the two secret shops conducted by Colon and Zaffron were an "honest inquiry" on the sole basis that they pre-date the November 6, 2006 call wherein Acker addressed a potential law suit against Select Comfort. Sleepy's I, 779 F.3d at 200. The Court agrees that the evidence cited by Select Comfort (Def. Br. at 5-8), in addition to the evidence cited above, leaves no doubt that by early November 2006,

Sleepy's had a high degree of "confidence or certainty . . . that such a pattern of slander existed." Sleepy's I, 779 F.3d at 201.

Indeed, Colon's and Zaffron's trial testimony bolster the Court's conclusion that Sleepy's consented to the publication of the alleged defamatory statements arising out of their November 2006 secret shops. Colon testified that he conducted the November 4, 2006 secret shop at Bookbinder's direction, who did not give him any "direct details" except that he needed a secret shop done of a Select store "as soon" as possible. (Tr. 863:22-864:5; 874:21-875:8.) Zaffron testified that she never conducted a secret shop without instructions to do so (Tr. 1013:20-22) and was told to specifically conduct the November 5, 2006 secret shop and spoke with Bookbinder and Fishman to advise them of the "negative information" obtained (Tr. 692:11-18; 702:22-703:6).

As for the November 8, 2006 secret shop conducted by Michael Grinnan's ("Grinnan"), his trial testimony also supports a finding that Sleepy's consented to statements stemming from that shop. (Tr. 1293:20-1315:1.) Grinnan testified that prior to the November 8, 2006 secret shop, he received instructions to find out "what the Select Comfort sales people were saying about Sleepy's." (Tr. 1301:20-23.) Specifically, Grinnan testified that he received Bookbinder's email to "blitz the Select Comfort stores" and was provided with a bullet point list of instructions that directed him to find out whether Select Comfort "denigrate Sleepy's

24

or the products [Sleepy's] sell[s]." (DX 295; Tr. 1302:18-1303:1.)
As Bookbinder testified, the "blitz" email was sent in response to
"Harry Acker saying 'I want more shops'" to obtain additional
statements. (Tr. 532:2-10.) Accordingly, Sleepy's consented to
the statements arising out of the November 8, 2006 secret shop
because at that time "Sleepy's was both virtually certain that its
inquiry would elicit allegedly slanderous statements and [was]
substantially motivated by the desire to bolster a contemplated
lawsuit." Sleepy's 2015, 133 F. Supp. 3d at 500.

Therefore, Sleepy's had a high degree of certainty that
"such a pattern of slander existed" during the November 2006 Secret
Shops and Sleepy's claims arising out of these three secret shops
were properly dismissed. Sleepy's I, 799 F.3d 201.

2. The January-February 2007 Secret Shops[16]

The remaining nine instances of alleged slander occurred
between January 10, 2007 and February 6, 2007 (the "2007 Secret
Shops"). (Am. Compl., ¶¶ 67, 70, 73, 76, Ex. E.) For the same
reasons that the Second Circuit affirmed the Court's finding that
Sleepy's consented to the Zaffron Incident, the Court finds that

---

[16] Sleepy's does not address its slander per se claims arising
out of a January 16, 2007 secret shop conducted by Paul Mahoney
(Am. Compl., Ex. E at 2) and a January 17, 2007 secret shop
conducted by Grinnan (Am. Compl., Ex. E at 2) despite surviving
the Second Circuit's remand Order. (See Pl. Opp. at 6-9
(addressing ten Secret Shops.) The Court assumes Sleepy's does
not intend to pursue these claims. For the avoidance of doubt,
the Court addresses these claims.

Sleepy's consented to alleged defamatory statements arising out of the 2007 Secret Shops and they were therefore properly dismissed. See Sleepy's 2018, 909 F.3d at 529 ("We therefore agree with the district court's conclusion that Sleepy's consented to the disparaging statements with regards to the Zaffron [I]ncident and, to that extent, affirm the district court's judgment.")

Indeed, the Court's reasoning in its September 22, 2015 Order is equally applicable here when considering that the remaining nine instances of alleged slander occurred prior to the Zaffron Incident. See Sleepy's 2015, 133 F. Supp. 3d at 500 (finding Sleepy's consented to claim for slander per se based on the Zaffron Incident where, by that time, Sleepy's "had undertaken a mission to gather ammunition for a future lawsuit against Select Comfort."). Thus, where there was sufficient evidence to support a finding that Sleepy's consented to statements arising out of an April 2007 (or 2008) secret shop, there is no doubt that the same evidence supports a finding that Sleepy's consented to statements arising out of the earlier 2007 Secret Shops. See id.

The trial evidence, as discussed in detail supra, supports this finding. The 2007 Secret Shops began almost immediately after the January 9, 2007 email that indicated Sleepy's "needs" secret shops to confirm, among other things, whether "Select Comfort [ ] make[s] any statements about Sleepy's that are untrue or defamatory." (DX 34.) Further, after

confronting Select Comfort with secret shops reports at the January 3 Meeting, Acker demanded a non-disparagement letter and threatened additional secret shops "with the intent to sue [ ] if they found examples of [Select Comfort's] sales team denigrating Sleepy's." (See supra; PX 32.) The Court cannot overlook that the January 9, 2007 email was sent only one day after Select Comfort indicated that it would not provide a non-disparagement letter. (PX 32, dated January 8, 2007.) With this in mind, the Court is persuaded that statements arising out of the 2007 Secret Shops were a direct response to the January 9, 2007 email and were not "honest inquir[ies] or investigation[s]." See Comment d to Restatement (Second) of Torts § 584 (1977) (stating that the "honest inquiry" exception to the consent rule does not apply where the publication is invited for the purposes of decoying the defendant into a lawsuit). Put differently, the evidence shows that between January 2007 and February 2007, "Sleepy's was both virtually certain that its inquiry would elicit allegedly slanderous statements and substantially motivated by the desire to bolster a contemplated lawsuit," and thus "Sleepy's consented to the publication of these allegedly defamatory statements." Sleepy's 2015, 133 F. Supp. 3d. at 500; accord Sleepy's 2018, 909 F.3d at 529. Accordingly, Sleepy's claims for slander per se arising out of the 2007 Secret Shops were properly dismissed.

Without citation to case law, Sleepy's argues that they did not consent to these statements because they received "renewed" or "reset" "expectation[s] [from Select Comfort] that the defamation would stop" throughout January 2007. (Pl. Opp. at 7-9.) This argument is without merit and belies the Second Circuit's Order affirming dismissal alleged slander arising out of the Zaffron Incident. See discussion supra. However, even considering this argument, Sleepy's slander per se claims still fail.

    i.    The January 2007 Secret Shops

Sleepy's cites to Plaintiff's Exhibits 32 and 157 to support its theory that on January 8, 2007, Select Comfort provided "renewed" assurances of non-disparagement. (Pl. Opp. at 7.) Although not clear, the Court construes this argument as asserting that Sleepy's did not consent to statements arising out of the eight secret shops that occurred between January 8, 2007 and January 23, 2007[17] (the "January 2007 Secret Shops") because the "renewed" assurances of non-disparagement rendered the secret shops "honest inquiries." This argument is not founded in fact.

---

[17] The January 2007 Secret Shops occurred on:
(1) January 10, 2007 by Robert Gorman; (2) January 12, 2007 by Jim Constantinides, (3) January 12, 2007 by Joseph Kilty, (4) January 14, 2007 by Tyler Paiva, (5) January 15, 2007 by Joseph Seth, and (6) January 16, 2007 by Gerald Petrillo. (Pl.'s Br. at 7-8.) The two remaining secret shops, not addressed by Sleepy's, occurred on: (7) January 16, 2007 by Mahoney and (8) January 17, 2007 by Grinnan.

A review of those exhibits makes clear that Select Comfort did not, and could not, "renew" or "reset" Sleepy's expectations because Select Comfort explicitly stated that it did not intend to provide Sleepy's with a letter that the alleged disparagement would cease. (See PX 32, dated January 8, 2007 (internal Select Comfort email indicating that Bauman informed Bookbinder that Select Comfort was "not intending to provide" a letter of non-disparagement); PX 157 (January 13, 2007 voicemail transcript from Bauman to Bookbinder "clarify[ing]" that Select Comfort was "not intending to send a letter to [Acker] outlining what [Acker] had asked for" at the January 3 Meeting).). Sleepy's further cites to its proposed findings of fact to support its "reset" theory. (Pl. Opp. at 7 (citing Pl. Findings of Fact, D.E. 803, ¶ 123).) However, there, Sleepy's concedes no such "reset" occurred. (See Pl. Findings of Fact ¶ 123 (noting that Select Comfort did not provide a non-disparagement letter and on January 8, 2007 Bauman stated "there would be no letter" by providing the "same reasoning [Bauman] and Mr. Spurgeon had articulated at the January 3 [M]eeting.").  Accordingly, Sleepy's did not receive "renewed" or "reset" expectations to negate its consent to statements arising out of the January 2007 Secret Shops.

The trial testimony from each secret shopper who conducted a January 2007 Secret Shop underscores that Sleepy's did not have a "renewed" expectation of non-disparagement in

January 2007. The testimony overwhelmingly shows that each shop was conducted in response to the January 9, 2007 email or with instructions to specifically look for defamation or denigration. (See Tr. 1240:13-1241:10 (Robert Gorman testifying that prior to his January 10, 2007 secret shop he received the January 9, 2007 email that provided specific questions to ask); Tr. 1503:19-24, 1505:14-22, 1589:8-12 (Joseph Kilty testifying that prior to his January 12, 2007 secret shop, Sleepy's "probably requested that [the secret shoppers] look specifically for denigration;" part of his "mission" during the secret shop was "[t]o find out whether or not [Defendant's salesperson] would denigrate Sleepy's;" that he "tried to lead the salesperson into" denigration); Tr. 577:18-578:8, 584:2-8, 610:14-16 (Jim Constantinides testifying that Bookbinder instructed him to perform the January 12, 2007 secret shop and to "go into the Select Comfort stores and see how they were explaining the differences between our product and their product" and to look specifically for disparagement); Tr. 1159:4-1160:24 (Tyler Paiva testifying that prior to the January 14, 2007 secret shop, he received instructions--the January 9, 2007 email--on how to conduct this secret shop); Tr. 929:6-930:11 (Joseph Seth testifying that prior to his January 15, 2007 secret shop, he received the January 9, 2007 email and list of questions and that he asked those questions); Tr. 1913:3-9, 1914:6-18, (Paul Mahoney testifying that prior to his January 16, 2007 secret shop, he was

30

"instructed by another email," the January 9, 2007 email, "to go out and shop Select Comfort stores again" and that he brought a "copy of the email that" contained the "information [Sleepy's was] looking to get," and that his goal was to try "to get that information."); Tr. 813:3-25, 814:6-815:4, 816:10-16, 817:8-22 (Gerald Petrillo testifying that he was asked to conduct the January 16, 2007 secret shop by his regional manager because Sleepy's "needed one done that day;" that he received written instructions, the January 9, 2007 email; and that these instructions were different than instructions he received for other secret shops); Tr. 1336:2-4 (Grinnan testifying that prior to his January 17, 2007 secret shop, he was instructed to "shop Select Comfort <u>again</u> and see if they were <u>still</u> saying things, <u>if anything had changed</u>.") (emphasis added).[18]

Therefore, Sleepy's consented to statements arising out of the eight January 2007 Secret Shops and claims for slander per se based on those statements were properly dismissed.

---

[18] Further, many of the secret shop reports directly responded to questions asked in a version of Sleepy's secret shop instruction template. <u>See, e.g.</u>, <u>Sleepy's 2015</u>, 133 F. Supp. 3d at 492-94 (noting that Kilty's, Paiva's, and Seth's secret shop reports responded to the instruction template); (<u>see also</u> Tr. 1916:10-23 (Mahoney testifying that his secret shop report directly responded to the questions in DX 34)).

ii.     The February 2007 Secret Shops

Sleepy's final claim for slander per se arises out of a February 6, 2007 secret shop by Jacqueline Gruman ("Gruman").[19] (Tr. 1458:17–19; 1462:6–1463:7.)  With respect to this secret shop, Sleepy's argues that after January 23, 2007, it had "renewed expectation that slander would _not_ be encountered" and that it had "every reason to expect that the slander would stop."  (See Pl. Opp at 9) (emphasis in original).  On January 23, 2007, McLuaghlin sent Acker a letter stating that Select Comfort "took immediate action to address the reported behavior" and put Select Comfort "on notice that this would not be tolerated and reassuring them that you were working with your teams to be equally respectful." (PX 145.)  The Court again construes this argument as asserting the  January 23, 2007  letter  "reset"  Sleepy's  expectations rendering the February 6, 2006 secret shop an "honest inquiry." (Pl. Opp. at 8-9.)

---

[19] Gruman testified that no one specifically instructed her to conduct this secret shop.  (Tr. 1462:8-21.)  However, in consideration of the evidence and Sleepy's "egregious and grossly negligent" spoliation (see discussion infra), the Court draws an adverse inference that Gruman did receive the January 9, 2007 email and that this secret shop was part of Sleepy's campaign to gather evidence of alleged denigration. See Pyskaty v. Wide World of Cars, LLC, No. 15-CV-1600, 2019 WL 917153, at *7 (S.D.N.Y. Feb. 25, 2019) (the Court may, as the trier of fact, "draw an adverse inference based on the missing evidence.").

As stated above, the Court is not persuaded by Sleepy's "reset" theory. Further, the January 23, 2007 letter cannot be viewed in isolation. The evidence overwhelmingly supports a finding that in January and February 2007, Sleepy's threatened litigation and was actively collecting evidence of alleged denigration for use in a potential lawsuit. (Tr. 3165:21-3166:7 (Sleepy's in-house counsel testifying that "around February" 2007, they informed Select Comfort that if the parties were unable to reach a solution then Sleepy's "would have no choice but litigation.") Indeed, Gruman's February 6, 2007 secret shop was included in a portfolio of secret shop summaries to be placed in Bookbinder's "denigration book." (PX 182 at SP000863.) Moreover, on February 6, 2007, Bookbinder sent Select Comfort an email that included a draft letter from Sleepy's outside counsel stating, among other things, after January 23, 2007 "recent shopping reports indicate[d] that the disparagement has continued unabated." (DX 173 at 3.[20]) It follows that by February 6, 2007, Sleepy's could

---

[20] On May 4, 2012, Select Comfort sought to admit Defense Exhibit 173. (Tr. 3152:2; 3156:7-13.) Sleepy's objected arguing it was a settlement communication prohibited under Federal Rule of Evidence 408. (Tr. 3154:18-3155:13.) Judge Platt reserved judgment and the parties submitted briefs. (Def. Admissibility Br., D.E. 776; Pl. Admissibility Br., D.E. 788.) Judge Platt did not rule on the issue. Federal Rule of Evidence 408 bars settlement evidence only "if it is used to prove liability, invalidity of a claim, or the amount of damages; it does not exclude evidence that is offered for another purpose." Separzadeh v. Iconix Brand Grp., Inc., No. 15-CV-8643, 2016 WL 6126386, at *4 (S.D.N.Y. Oct. 19, 2016) (citation omitted).

not have "reset" expectations of non-disparagement and this secret shop was not an "honest inquiry."

Therefore, between January and February 2007, Sleepy's was collecting evidence for a potential lawsuit and was nearly certain that "such a pattern of slander existed." Sleepy's I, 779 F.3d at 201. Accordingly, all of Sleepy's claims for slander per se arising out of the eight January 2007 Secret Shops and the February 6, 2007 secret shop were properly dismissed.

## II.  Fee Award Determination

At trial, Sleepy's argued that Select Comfort violated Section 43(a) of the Lanham Act by disseminating misrepresentations regarding Sleepy's products, services, and

---

Without deciding whether Defense Exhibit 173 is an offer to compromise, it is permissible for "another purpose" and not to impeach or contradict a witness, prove liability, invalidity of a claim, or the amount of damages. FED. R. EVID. 408; Int'l Bus. Machines Corp. v. BGC Partners, Inc., No. 10-CV-0128, 2013 WL 1775367, at *6 n.6 (S.D.N.Y. Apr. 25, 2013). Here, Defense Exhibit 173 is evidence of Sleepy's knowledge that after January 23, 2007, it continued to secret shop Select Comfort and had knowledge that "recent shopping reports indicate that disparagement has continued unabated." United States v. Wahl, 563 F. App'x 45, 50–51 (2d Cir. 2014) (affirming district court's decision to admit evidence for "another purpose" where it was use to prove a party's knowledge of certain facts); In re OSG Sec. Litig., 12 F. Supp. 3d 619, 621 (S.D.N.Y. 2014) ("While settlements are inadmissible as evidence of liability, they are admissible for other purposes, including proof of knowledge."); Sage Realty Corp. v. Ins. Co. of N. Am., 34 F.3d 124, 128 (2d Cir. 1994) ("A trial court has broad discretion in deciding whether to admit evidence, and its determinations will not be reversed in the absence of an abuse of discretion amounting to manifest error.").

commercial activities in commercial advertising or promotion. (Pl. 2012 Trial Br., D.E. 802, at 37.) Sleepy's based this claim on (1) Select Comfort's advertising and promotional materials in Select Comfort's "Brand Standards Manual;" (2) Select Comfort's promotional brochure; and (3) the derogatory or disparaging statements made by Select Comfort employees as part "of a widespread corporate training policy." (Pl. 2012 Trial Br., at 37-38.) Judge Platt, acting as fact finder, found for Select Comfort and dismissed Sleepy's Lanham Act claim. Sleepy's 2012, 2012 WL 13106064, at *15-17. Sleepy's never appealed the dismissal of its Lanham Act claim.

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In its January 11, 2016 Order, the Court determined that this case is exceptional. See Sleepy's Jan. 2016, 2016 WL 126377, at *4-6. The Second Circuit vacated that finding and instructed the Court to determine whether Sleepy's brought an exceptional case under the Lanham Act by applying the standard outlined in Octane Fitness. Sleepy's 2018, 909 F.3d at 529-31 (citing Octane Fitness, 572 U.S. at 554, 134 S. Ct at 1756). Further, to the extent this case is "exceptional" under the Lanham Act, the Court "must revisit its approach to determining the amount of the award." Id. at 531. The Court addresses each in turn.

A. "Exceptional Case" Under the Lanham Act

Select Comfort argues that this is an exceptional case under Octane Fitness because (1) Sleepy's claims are frivolous, objectively unreasonable, and motivated by bad faith (Def. Br. at 13-15); (2) Sleepy's failed to present evidence to establish its Lanham Act claim (Def. Br. at 15-17); and (3) the "totality of the circumstances," including spoliation, supports a finding that this case is exceptional (Def. Br. at 17-18). Sleepy's responds that (1) this action was not motivated by an improper purpose or in bad faith (Pl. Opp. at 15-16); (2) although the Lanham Act claim did not prevail, it was not meritless because it survived multiple rounds of dispositive motion practice and a trial (Pl. Opp. at 16-18); and (3) it would be unfair and inappropriate for the Court to impose spoliation sanctions indirectly in the form of a Lanham Act fee award (Pl. Opp. at 19-20).

1. Legal Standard

An "'exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'" Sleepy's 2018, 909 F.3d at 530 (quoting Octane Fitness, 572 U.S. at 554)). When evaluating whether a case is "exceptional," district courts have "wide latitude" to "engage in a 'case-by-case exercise of their discretion, considering the

totality of the circumstances.'" 4 Pillar Dynasty LLC v. N.Y. & Co., Inc., 933 F.3d 202, 215 (2d Cir. 2019) (quoting Octane Fitness, 572 U.S. at 554). Those considerations include a "wide variety of factors," such as "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Sleepy's 2018, 909 F.3d at 530 (quoting Octane Fitness, 572 U.S. at 554 n.6 (citing Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19, 127 L. Ed. 2d 455 (1994)); see also Louis Vuitton Malletier, S.A. v. My Other Bag, Inc., 764 F. App'x 39, 41 (2d Cir. 2019) (affirming that case was not exceptional where "[t]he court's opinion enumerated the Fogerty factors and applied each in turn.").

     "Courts in the Second Circuit generally determine cases to be exceptional under the Octane Fitness standard when litigants have acted unreasonably or in bad faith." Travel Leaders Grp., LLC v. Corley, No. 19-CV-1595, 2019 WL 6647319, at *14 n.7 (S.D.N.Y. Dec. 5, 2019) (citing John Wiley & Sons, Inc. v. Book Dog Books, LLC, 327 F. Supp. 3d 606, 642 (S.D.N.Y. 2018) (exceptional case where defendants "took unreasonable positions throughout th[e] litigation" and violated court's discovery orders); (quoting River Light V, L.P. v. Lin & J Int'l, Inc., No. 13-CV-3669, 2015 WL 3916271, at *10 (S.D.N.Y. June 25, 2015) (attorney's fees where "defendants engaged in intentional

infringement, perpetrated fraud and spoliation, pursued counterclaims grounded in that fraud, and have continued to sell their infringing merchandise throughout this litigation, all with the intent to deceive and profit at the expense of the administration of justice")); Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc., No. 11-CV-3633, 2015 WL 1573325, at *2 (S.D.N.Y. Apr. 9, 2015) (exceptional case where there was "no genuine dispute of material fact as to inequitable conduct" during litigation); Cognex Corp. v. Microscan Sys., Inc., No. 13-CV-2027, 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (exceptional patent case due to, among other things, defendants' "unreasonable litigation tactics that have wasted the [c]ourt's time and have required plaintiffs to expend significant resources")).

## 2. Application

A review of cases post-Octane Fitness supports the conclusion that this case is not exceptional. Sleepy's claims were not frivolous or objectively unreasonable. "'An action is 'frivolous' when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory.'" Universal Church Inc. v. Universal Life Church/ULC Monastery, No. 14-CV-5213, 2019 WL 4601741, at *3 (S.D.N.Y. Sept. 19, 2019) (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)). "'A claim is based on an

indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.'" Id. (quoting Livingston, 141 F.3d at 437).

Here, the allegations on which Sleepy's based its claim arose out of (1) Select Comfort's "Brand Standards Manual;" (2) Select Comfort's promotional brochure; and (3) the derogatory or disparaging statements made by Select Comfort employees as part "of a widespread corporate training policy." See supra. According to Select Comfort, this case was frivolous and objectively unreasonable because Sleepy's pre-suit investigation did not uncover any basis for its Lanham Act claim. (Def. Br. at 14-15.) In support, Select Comfort points to Fishman's email that his interviews with Select Comfort employees did not uncover a "smoking gun" and that "no one from [Select Comfort] corporate ever said anything disparaging against the partners." (Def. Br. at 14.)

In arguing that this case is exceptional, Select Comfort focuses primarily on Sleepy's allegations regarding Select Comfort's "widespread" corporate policy of disparagement. Nonetheless, the results of two interviews does not provide the Court with a basis to find that Sleepy's pursued a case it knew to be meritless. Sleepy's did, in fact, present other evidence of what it believed to be a widespread policy of defamation. See, e.g., Sleepy's 2012, 2012 WL 13106064, at *15-16. Moreover, that

Sleepy's was ultimately unsuccessful in proving its Lanham Act claim on this basis "does not mean that [Sleepy's arguments] were unusually weak or that it was objectively unreasonable to take the case to trial." SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd., 396 F. Supp. 3d 323, 352–53 (S.D.N.Y. 2019) (citing Stryker Corp. v. Zimmer, Inc., 837 F.3d 1268, 1279 (Fed. Cir. 2016)); Sleepy's 2018, 909 F.3d at 531 n.7 (questioning whether this case was "frivolous or improperly motivated" where "Sleepy's claims survived summary judgment and were only dismissed after a bench trial on a motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c)"); Universal Church, 2019 WL 4601741, at *3 (while "plaintiff's claims were ultimately unsuccessful, the legal theories on which they were rooted had clear bases in law" such that they survived a motion to dismiss and summary judgment). Therefore, it was not frivolous or objectively unreasonable for Sleepy's to maintain this action.

Whether Sleepy's was motivated by an improper purpose in bringing this action presents a closer call. Select Comfort argues that "Sleepy's planned, prepared, and initiated this lawsuit for the improper purpose of gaining leverage to force Select Comfort to maintain a business relationship with Sleepy's," "to renegotiate the Dealer Agreement on terms more favorable to Sleepy's," and to "hurt Select Comfort's reputation and business in general." (Def. Br. at 13.) "The 'paradigmatic case' of

improper motive justifying an 'exceptional' case finding is where 'plaintiff with no intention of testing the substance of its theories brings meritless claims to extract a nuisance value settlement based on the fact that defendants will be required to expend tens or hundreds of thousands of dollars in discovery." Universal Church, 2019 WL 4601741, at *4 (quoting Joao Control & Monitoring Sys., LLC v. Digital Playground, Inc., No. 12-CV-6781, 2018 WL 1596068, at *6 (S.D.N.Y. Mar. 28, 2018)).

Select Comfort has not shown, however, that Sleepy's sued merely to "gain leverage" to maintain a future business relationship or to renegotiate the Dealer Agreement. The parties did not renegotiate the Dealer Agreement and their business relationship ended in April 2007. Moreover, Sleepy's "tested its claims, presumably at considerable cost, and lost." Id.; Joao Control, 2018 WL 1596068, at *6 (declining to find case exceptional where plaintiff unsuccessfully "pressed the merits" of its case "over a period of years, presumably at substantial expense to itself"); see also SFA Sys., LLC v. Newegg Inc., 793 F.3d 1344, 1351 (Fed. Cir. 2015). The parties' briefs do not indicate, nor can the Court find evidence, that throughout this litigation, Sleepy's continued to pressure Select Comfort to renegotiate the Dealer Agreement or to maintain future business dealings. Instead, Sleepy's pursued its claims, including the Lanham Act claim, through multiple dispositive motions and trial. This supports the

41

conclusion that Sleepy's did not initiate this action for an improper purpose.

Select Comfort points to the Court's previous observation that this case is exceptional and reliance on Acker's comments to conclude that "there are substantial overtone[s] to suggest that this case was filed as a 'competitive ploy.'" (Def. Br. at 13; Sleepy's Jan. 2016, 2016 WL 126377, at *4.) However, on remand and in consideration of the above, the Court finds that Acker's comments alone do not support a finding that Sleepy's sued in bad faith or for an improper purpose. Cf. Benihana of Tokyo, LLC v. Benihana, Inc., No. 14-CV-0224, 2018 WL 3574864, at *9-10 (S.D.N.Y. July 25, 2018), aff'd, 771 F. App'x 71 (2d Cir. 2019) (finding case exceptional where plaintiff's "ulterior motive" was "to force [defendant] to expend large counsel fees . . . so that [it] might . . . have [plaintiff] purchase [its] assets"). Indeed, while Acker's "business behavior [was] unsavory, [ ] improper behavior does not entitle [Select Comfort] to an award of attorney's fees due to the filing and prosecution of this lawsuit." See, e.g., MZ Wallace Inc. v. Fuller, No. 18-CV-2265, 2018 WL 6715489, at *15 (S.D.N.Y. Dec. 20, 2018). The Court agrees with the Second Circuit that Sleepy's decision to pursue its Lanham Act, months after Acker's comments and after wind-up negotiations, was not an unreasonable "response to [alleged] defamation." Sleepy's 2018, 909 F.3d at 531 n.7 ("It is not altogether clear to

us that the case at bar was 'frivolous[ ]' or improperly 'motivate[ed]' . . . although Acker's comments strike us as objectionable and inappropriate, it is not self-evident that they alone could convert an otherwise-reasonable response to possible defamation (investigation and litigation) into a bad-faith competitive ploy.").

Select Comfort also argues that Sleepy's had improper motives because it "pursued this lawsuit armed with nothing more than the secret shop evidence that Sleepy's [ ] manufactured for this litigation." (Def. Br. at 15.) The Court rejects this assertion. While there are serious spoliation concerns, as discussed in prior Orders and _infra_, Select Comfort did not establish that Sleepy's falsely manufactured the secret shops for purposes of this lawsuit. There is no doubt that performing secret shops is a tactic widely used in the industry and that secret shopper testimony corroborated that the secret shops at issue occurred. The Court similarly rejects Select Comfort's attempt to diminish secret shopper testimony as tainted because they reviewed the compiled secret shop reports. Judge Crane ruled, and Judge Platt agreed, that Sleepy's "should be permitted to try to refresh the witness' recollection with the shop reports even though they be excluded from evidence. It should also be permitted to establish that the witness' past recollection recorded as long as the witness subscribes to the document as his or her own

recollection rather than that of the administrative person who wrote it up." (Feb. 27, 2012 Order, D.E. 687, at 5-6; Mar. 12, 2012 Adoption Order, D.E. 756.)

Select Comfort has also not demonstrated a need for compensation. "To be sure, [it] prevailed convincingly" at trial. Universal Church, 2019 WL 4601741, at *5. However, "exceptionality requires more in a system in which the American Rule deprives thoroughly successful litigants of attorneys' fees every day, and that more is wanting here." Id. (noting that defendants did not show that plaintiff used "'unreasonable litigation tactics' or that [defendant] was otherwise 'guilty of any litigation misconduct,' that needlessly swelled their expenses." (internal quotation marks and citation omitted)).

Select Comfort further argues that this case is exceptional when considering the "totality of the circumstances," including Sleepy's spoliation, as well as Sleepy's inability to "present sufficient evidence to carry its burden at trial . . . demonstrate[ing] the unequal substantive strength of the parties' litigation position." (Def. Br. at 15-16.) As stated above, that Sleepy's was unsuccessful in proving its Lanham Act claim "does not mean that [Sleepy's arguments] were unusually weak or that it was objectively unreasonable to take the case to

trial."[21]  SIMO, 396 F. Supp. at 352-53 (citing Stryker, 837 F.3d
at 1279).

Select Comfort cites Romag Fastners, Inc. v. Fossil,
Inc., 866 F.3d 1330, 1341 (Fed. Cir. 2017) to argue that "the
district court's refusal to grant a Rule 50(a) motion [does not]
preclude[ ] awarding attorneys' fees." (Def. Br. at 17.)  While
true, Romag is nonetheless consistent with this Court's holding.
In Romag, the defendant appealed an award of fees under the Patent
Act.  Romag, 866 F.3d at 1336 (applying the Octane Fitness standard
for exceptionality).  Plaintiff there cross-appealed and argued,
among other things, that the district court erred in concluding
that denial of a Rule 50(a) motion precludes awarding attorney's
fees.  Id. at 1340-41.  The Federal Circuit agreed that the denial
of a Rule 50(a) motion alone "does not preclude a finding" that a
legal position was frivolous.  Id. at 1341.  The Federal Circuit
ultimately found "no error" where, in addition to considering the
denial of the Rule 50(a) motion, the district court held that the
defendant's arguments were "not entirely groundless" and that it

---

[21] Select Comfort argues that Sleepy's Lanham Act claim was
objectively unreasonable or frivolous by emphasizing that it
survived summary judgment only "by promising the Court evidence
at trial that it never had--that there were actual customers who
were subjected to false statements."  (Def Br. Br. at 16.)
However, Sleepy's briefed this issue before trial (Pl.
Mar. 19, 2012 Trial Br., D.E. 775) and Judge Platt permitted the
case to proceed to trial (see Mar. 20, 2012 Minute Entry; Mar.
21 2012 Minute Order).

"is not relevant that" a claim "may have been weak if it did not rise to the level of being objectively unreasonable." Id. Here, too, the Court finds that Sleepy's Lanham Act claim was not "objectively unreasonable" while recognizing that it survived multiple rounds of dispositive motions and was only dismissed after trial.

Nor do Sleepy's acts of spoliation render this case exceptional. Although Sleepy's argues otherwise, the Court previously determined that Sleepy's "engaged in egregious, grossly negligent spoliation of evidence in the face of contemplated litigation justifying the imposition of sanctions" with respect to original evidence of the secret shops. Sleepy's 2015, 133 F. Supp 3d at 491 n.12. However, egregious and grossly negligent spoliation does not provide the Court with a proper basis to conclude that this case is exceptional under the Lanham Act. As an initial observation, to label this case exceptional under the Lanham Act as a sanction for spoliation is inconsistent with the goals underlying spoliation sanctions. See, e.g., Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 391 (S.D.N.Y. 2015) (a court "should impose the least harsh sanction that can provide an adequate remedy" for spoliation).

Further, after a review of all transcripts and filings, including the parties' spoliation briefs, the Court cannot locate evidence that Sleepy's spoliation was intentional. Select Comfort

argues that this is not "simple negligent spoliation" but rather "spoliation of the evidence that was created explicitly to serve as the foundation for Sleepy's claims -- in other words, it was manufactured solely and specifically for the purpose of pursuing this lawsuit." (Def. Br. at 18.) Select Comfort has previously argued that because Sleepy's "never provided an explanation of what happened" to the missing evidence, the "only reasonable explanation at this juncture is that Plaintiff intentionally destroyed the evidence."[22] See, e.g., Def. 2012 Renewal Br., D.E. 770, at 13. According to Select Comfort therefore, Sleepy's either (1) never had any evidence and drafted false documents to pursue this lawsuit or (2) Sleepy's had evidence relevant to this lawsuit and intentionally destroyed it to bolster its claims. The Court

---

[22] Before trial, Select Comfort made two requests for sanctions as a result of Sleepy's spoliation. (Def. 2009 Sanctions Mot., D.E. 40; Def. 2012 Recons. Mot., D.E. 718.) Judge Platt denied those motions. (June 22, 2009 Order, D.E. 85; Mar. 12, 2012 Order, D.E. 758.) On January 10, 2012, after the parties filed many motions in limine, Judge Platt appointed the Honorable Stephen G. Crane to serve as special master. (Special Master Order, D.E. 684.) On February 8, 2012, Judge Crane declined to "revisit the issue" of sanctions. (Feb. 8, 2012 Order, D.E. 655; Feb. 21, 2012 Order, D.E. 686.) On February 27, 2012, Judge Crane granted Select Comfort's motion in limine to exclude evidence regarding Plaintiff's secret shop reports as business records, under the residual rule, and as past recollection recorded, without prejudice to Sleepy's laying a proper foundation at trial for their use, and otherwise denied Select Comfort's motion. (Feb. 27, 2012 Order, D.E. 687.) On April 10, 2012, Select comfort renewed its request for sanctions. (Def. 2012 Renewal., D.E. 770; Def. 2012 Renewal Supp., D.E. 771.) Judge Platt reserved decision. (Apr. 11, 2012 Minute Entry.)

declines to draw either inference.  While the parties' submissions reveal the contentious nature of this action, there is no evidence that Sleepy's sought to <u>intentionally</u> deprive Select Comfort of the evidence at issue.  Cf. <u>Congretation Rabbinical</u>, 138 F. Supp. 3d at 389 (noting that "this is the rare case where bad faith, and a clear intent to deprive Plaintiffs of the evidence at issue, is sufficiently clear from the face of the record" where defendant destroyed evidence to evade production to plaintiff and the Court); cf. <u>In re Rembrandt Techs. LP Patent Litig.</u>, 899 F.3d 1254, 1270 (Fed. Cir. 2018) (citing to "two facts in the record" to suggest a litigant's bad faith in spoliating evidence where there was knowledge that "document destruction was a significant risk."). Thus, while Sleepy's grossly negligent spoliation is deeply troubling, without more it is insufficient to find that this case is exceptional under the Lanham Act.

B. <u>Fee Award</u>

Because the Court finds that this case is not exceptional under <u>Octane Fitness</u>, Select Comfort is not entitled to attorney's fees.

CONCLUSION

For the foregoing reasons, the Court finds that (1) Sleepy's consented to the alleged defamatory statements arising out of the remaining twelve actionable secret shops in the Amended Complaint and those claims were properly dismissed and

48

(2) this case is not exceptional under Octane Fitness and Select Comfort is not entitled to fees under the Lanham Act. There are no remaining claims.

The Clerk of the Court is directed to enter judgment consistent with Memorandum and Order and to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     March __16__, 2020
           Central Islip, New York